**No. 26-5235**

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

KALSHIEX LLC,

*Plaintiff-Appellee,*

v.

WILLIAM ORGEL; MARY BETH THOMAS; JONATHAN SKRMETTI,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Middle District of Tennessee
No. 3:26-cv-34

## APPELLANTS' OPENING BRIEF

Jonathan Skrmetti
  *Attorney General & Reporter*

Aaron L. Bernard
  *Assistant Solicitor General*

Michael Wennerlund
  *Assistant Attorney General*

Walker Anderson
  *Honors Fellow*

OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 532-3234
Aaron.Bernard@ag.tn.gov

# TABLE OF CONTENTS

ORAL ARGUMENT REQUEST ................................................................ 1

STATEMENT OF JURISDICTION.......................................................... 2

STATEMENT OF THE ISSUES................................................................ 3

INTRODUCTION .................................................................................. 4

STATEMENT OF THE CASE ................................................................ 7

I.     Legal Background............................................................................. 7

       A.  Sports Wagering in Tennessee.................................................. 7

       B.  Federal Regulation of Gambling.............................................. 10

       C.  Federal Regulation of Derivatives............................................ 11

II.    Factual Background. ..................................................................... 16

III.   Procedural Background................................................................. 19

SUMMARY OF THE ARGUMENT ...................................................... 20

STANDARD OF REVIEW.................................................................... 23

ARGUMENT........................................................................................ 23

I.     Kalshi is not likely to succeed on the merits. ............................... 23

       A.    Kalshi's sports-event contracts are not lawful
            "swaps" under the CEA...................................................... 24

           1. The CEA's plain text does not cover Kalshi's sports-
              event contracts............................................................... 25

           2. Kalshi's reading defies statutory context......................... 31

           3. The CEA would have to speak more clearly to
              cover sports gambling...................................................... 33

           4. The district court ignored text, context, and
              clear statement rules....................................................... 40

       B.    The CEA does not preempt Tennessee law.......................... 43

           1. The CEA does not expressly preempt Tennessee law...... 45

           2. The CEA does not field preempt Tennessee law. ............. 49

           3. There is no conflict preemption. ..................................... 51

C.     Kalshi is unlikely to demonstrate a cause of action or overcome Tennessee's sovereign immunity. ..................... 61

     1.   Kalshi has no express cause of action. ............................ 61

     2.   Kalshi has no cause of action in equity. .......................... 62

     3.   Sovereign immunity bars Kalshi's claim. ....................... 67

II.    The remaining preliminary injunction factors favor Tennessee ... 67

III.   At minimum, the district court erred by granting broader relief than necessary. ....................................................... 69

CONCLUSION ................................................................................. 70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
  585 U.S. 579 (2018) ...............................................................68

*Ah Sin v. Wittman,*
  198 U.S. 500 (1905) .............................................................7, 37

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ...............................................................61

*Arbaugh v. Y&H Corp.,*
  546 U.S. 500 (2006) ...............................................................45

*Arizona v. United States,*
  567 U.S. 387 (2012) ...........................................................49, 50

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) ........................................................*passim*

*Bittner v. United States,*
  598 U.S. 85 (2023) .................................................................48

*Bloomberg L.P. v. CFTC,*
  949 F. Supp. 2d 91 (D.D.C. 2013) .........................................12

*Boechler, P.C. v. CIR,*
  596 U.S. 199 (2022) ...............................................................41

*Bond v. United States,*
  572 U.S. 844 (2014) ...............................................................37

*Burrage v. United States,*
  571 U.S. 204 (2014) ...........................................................25, 27

*Chevron v. Plaquemines Par.*,
146 S. Ct. 1052 (2026) ................................................................30

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ....................................................................56

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
767 F. Supp. 3d 556 (W.D. Mich. 2025) ......................................64

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) ...............................................18, 51

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992) ...............................................................47, 48

*Cleveland Newspaper Guild, Loc. 1 v. Plain Dealer Pub. Co.*,
839 F.2d 1147 (6th Cir. 1988) ...............................................67, 68

*Coal. for Competitive Elec., Dynegy Inc. v. Zibelman*,
272 F. Supp. 3d 554 (S.D.N.Y. 2017) .....................................63, 64

*Dayton Power & Light Co. v. FERC*,
126 F.4th 1107 (6th Cir. 2025) ..........................................*passim*

*Diaz v. Mich. Dep't of Corr.*,
703 F.3d 956 (6th Cir. 2013) .......................................................64

*Enbridge Energy, LP v. Nessel*,
146 S. Ct. 1074 (2026) ................................................................66

*Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*,
958 F.3d 532 (6th Cir. 2020) ......................................................23

*EOG Res., Inc. v. Lucky Land Mgmt., LLC*,
134 F.4th 868 (6th Cir. 2025) ...........................................23, 43, 62

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ....................................................................38

iv

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ..................................................................36, 37

*Fednav, Ltd. v. Chester,*
   547 F.3d 607 (6th Cir. 2008) ...........................................................61

*Fenner v. Gen. Motors, LLC,*
   113 F.4th 585 (6th Cir. 2024) .............................................44, 47, 52, 60

*Fischer v. United States,*
   603 U.S. 480 (2024) .......................................................................33

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
   373 U.S. 132 (1963) ..................................................................51, 54

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
   841 F.3d 133 (2d Cir. 2016) ...........................................................65

*FTC v. Ken Roberts Co.,*
   276 F.3d 583 (D.C. Cir. 2001) ......................................................46, 58

*Fulgenzi v. PLIVA, Inc.,*
   711 F.3d 578 (6th Cir. 2013)........................................................54, 56

*Greater New Orleans Broadcasting Ass'n, Inc. v. United States,*
   527 U.S. 173 (1999) ......................................................................38

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ......................................................................44

*Gulf Offshore Co. v. Mobil Oil Corp.,*
   453 U.S. 473 (1981) ......................................................................45

*Hencely v. Fluor Corp.,*
   146 S. Ct. 1086 (2026) ..............................................................56, 57

*Henson v. Santander Consumer USA Inc.,*
  582 U.S. 79 (2017) ....................................................................59

*Hines v. Davidowitz,*
  312 U.S. 52 (1941) ....................................................................51

*Home Depot U.S.A., Inc. v. Jackson,*
  587 U.S. 435 (2019) ..................................................................31

*In re Am. Int'l Grp., Inc. Derivative Litig.,*
  700 F. Supp. 2d 419 (S.D.N.Y. 2010)......................................13

*In re MCP No. 185,*
  124 F.4th 993 (6th Cir. 2025) ................................................57

*Inv. Co. Inst. v. CFTC,*
  720 F.3d 370 (D.C. Cir. 2013) ................................................11

*Inv. Co. Inst. v. CFTC,*
  891 F. Supp. 2d 162 (D.D.C. 2012) ................................11, 15

*James B. Oswald Co. v. Neate,*
  98 F.4th 666 (6th Cir. 2024) ............................................69, 70

*Johnson v. City of Shelby,*
  574 U.S. 10 (2014) ....................................................................62

*KalshiEX LLC v. Martin,*
  793 F. Supp. 3d 667 (D. Md. 2025)..........................................40

*KalshiEX, LLC v. Flaherty,*
  172 F.4th 220 (3d Cir. 2026)..............................................50, 54

*KalshiEX, LLC v. Hendrick,*
  817 F. Supp. 3d 1014 (D. Nev. 2025)...............................*passim*

*KalshiEX, LLC v. Schuler,*
  2026 WL 657004 (S.D. Ohio Mar. 9, 2026) ......................42, 60

vi

*KalshiEX, LLC v. Schuler,*
  2026 LX 220871 (6th Cir. April 24, 2026) ................................... *passim*

*Kansas v. Garcia,*
  589 U.S. 191 (2020) ................................................................... 49, 52

*Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York,*
  464 F.3d 255 (2d Cir. 2006) ............................................................ 62

*L. W. v. Skrmetti,*
  83 F.4th 460 (6th Cir. 2023) ...................................................... 23, 62

*Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utilities,*
  410 F. Supp. 3d 943 (S.D. Ind. 2019) .......................................... 63, 64

*Learning Res., Inc. v. Trump,*
  146 S. Ct. 628 (2026) ............................................................ 34, 36, 48

*Lindsey v. Whitmer,*
  124 F.4th 408 (6th Cir. 2024) .......................................................... 62

*Loper Bright Enterprises v. Raimondo,*
  603 U.S. 369 (2024) ........................................................................ 57

*Maryland v. Louisiana,*
  451 U.S. 725 (1981) ........................................................................ 44

*McKenna v. Dillon Transp., LLC,*
  97 F.4th 471 (6th Cir. 2024) .......................................................... 39

*Medtronic, Inc. v. Lohr,*
  518 U.S. 470 (1996) .................................................................. 44, 47

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
  456 U.S. 353 (1982) ........................................................................ 12

*Mich. Corr. Org. v. Mich. Dep't of Corr.,*
  774 F.3d 895 (6th Cir. 2014) ...................................................... 64, 65

vii

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
   453 U.S. 1 (1981) ................................................................................64

*Murphy v. NCAA*,
   584 U.S. 453 (2018) ........................................................................*passim*

*N. Am. Derivatives Exchange, Inc. d/b/a Crypto.com v.*
   *Nev. Gaming Control Bd.*,
   815 F. Supp. 3d 1169 (D. Nev. 2025) ............................................*passim*

*Oklahoma v. Castro-Huerta*,
   597 U.S. 629 (2022) .............................................................................45

*Oneok, Inc. v. Learjet, Inc.*,
   575 U.S. 373 (2015) ...........................................................47, 49, 50, 51

*Oquendo v. CIR*,
   148 F.4th 820 (6th Cir. 2025) ............................................................41

*Pac. Gas & Elec. Co. v. State Energy Res.*
   *Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983) .............................................................................49

*Pastoriza v. Pub. Serv. Co. of New Hampshire*,
   2025 WL 662935 (D.N.H. Feb. 28, 2025) .......................................63, 64

*Power & Tel. Supply Co. v. SunTrust Banks, Inc.*,
   447 F.3d 923 (6th Cir. 2006) ..............................................................12

*Riegel v. Medtronic, Inc.*,
   552 U.S. 312 (2008) .............................................................................54

*Sackett v. EPA*,
   598 U.S. 651 (2023) .................................................................37, 38, 48

*Salazar v. Paramount Glob.*,
   133 F.4th 642 (6th Cir. 2025) ..................................................31, 32, 43

*Seminole Tribe of Fla. v. Florida*,
   517 U.S. 44 (1996) ..................................................................67

*Tafflin v. Levitt*,
   493 U.S. 455 (1990) ................................................................46

*Tennessee v. FCC*,
   832 F.3d 597 (6th Cir. 2016) .......................................................38, 41

*Thompson v. DeWine*,
   976 F.3d 610 (6th Cir. 2020) ........................................................68

*Tiger Lily, LLC v. HUD*,
   5 F.4th 666 (6th Cir. 2021) ..........................................................37

*Torres v. Precision Indus., Inc.*,
   995 F.3d 485 (6th Cir. 2021) ....................................................*passim*

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) .................................................................65

*Union Home Mortgage Corp. v. Cromer*,
   31 F.4th 356 (6th Cir. 2022) .......................................................69, 70

*United States v. Bricker*,
   135 F.4th 427 (6th Cir. 2025) ......................................................38, 39

*United States v. Phillips*,
   155 F.4th 102 (2d Cir. 2025) .........................................................42

*United States v. Texas*,
   144 F.4th 632 (5th Cir. 2025) ........................................................50

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ......................................................... 34, 41, 48

*Whitman v. Am. Trucking Ass'n,*
531 U.S. 457 (2001) ....................................................................34

*Whole Woman's Health v. Jackson,*
595 U.S. 30 (2021) ......................................................................67

*Wyeth v. Levine,*
555 U.S. 555 (2009) .............................................................54, 55

*Yates v. United States,*
574 U.S. 528 (2015) ..................................................................31

## Federal Statutes

7 U.S.C. §1a(9) ............................................................................11

7 U.S.C. §1a(18) ..........................................................................15

7 U.S.C. §1a(47)(A) ............................................................*passim*

7 U.S.C. §2(a)(1)(A) ............................................................*passim*

7 U.S.C. §2(e) .................................................................13, 15, 35

7 U.S.C. §6(a) ..............................................................................35

7 U.S.C. §7a-2(c)(1) ..............................................................15, 44

7 U.S.C. §7a-2(c)(5)(C)(i) ...........................................15, 57, 58

7 U.S.C. §13a-1 ..........................................................................61

7 U.S.C. §13a-2 ..........................................................................61

7 U.S.C. §16(e)(2) ................................................................47, 48

7 U.S.C. §16(h) .....................................................................47, 48

x

7 U.S.C. §25(a)(2)................................................................61, 64

7 U.S.C. §25(b)(5)................................................................61, 64

18 U.S.C. §1084................................................................10

18 U.S.C. §1953(a) ................................................................10

18 U.S.C. §1955(b)(1)(i) ................................................................10

25 U.S.C. §2701................................................................10

28 U.S.C. §1292(a)(1)................................................................2

28 U.S.C. §1331................................................................2

28 U.S.C. §3701................................................................10

28 U.S.C. §3702................................................................10

28 U.S.C. §3704(a) ................................................................10

29 U.S.C. §1132................................................................66

30 U.S.C. §1254(a)(3)................................................................46

30 U.S.C. §1254(g) ................................................................46

## State Law

1799 Tenn. Pub. Acts, ch. 8................................................................7

1803 Tenn. Pub. Acts, ch. 12................................................................7

2019 Tenn. Pub. Acts, ch. 507................................................................8

Code of Tennessee §4870 (1858). ................................................................7

Code of Tennessee §11275 (1934) ...........................................................7

Tenn. Code Ann. §4-49-102(12)...............................................................9

Tenn. Code Ann. §4-49-102(14)...............................................................8

Tenn. Code Ann. §4-49-102(19)...............................................................9

Tenn. Code Ann. §4-49-102(39)........................................................8, 35

Tenn. Code Ann. §4-49-102(33)...............................................................8

Tenn. Code Ann. §4-49-104(b)..................................................................8

Tenn. Code Ann. §4-49-104(e) ................................................................10

Tenn. Code Ann. §4-49-106(a)..................................................................8

Tenn. Code Ann. §4-49-110 ......................................................................9

Tenn. Code Ann. §4-49-111 ........................................................9, 55, 60

Tenn. Code Ann. §4-49-113 .....................................................................35

Tenn. Code Ann. §4-49-114 ......................................................................8

Tenn. Code Ann. §4-49-118(a)..................................................................9

Tenn. Code Ann. § 4-49-119 .................................................................9, 10

Tenn. Code Ann. §4-49-125(f)...................................................................9

Tenn. Code Ann. §§39-17-501 to -509.......................................................7

**Rules**

Federal Rule of Civil Procedure 65..............................................3, 22, 69

## Regulations

17 C.F.R. §33.3(a) ..............................................................35

17 C.F.R. §38.150..............................................................55

17 C.F.R. §38.151(b) .........................................................55

17 C.F.R. §40.11(a) ......................................................*passim*

17 C.F.R. §40.11(c)............................................................16

17 C.F.R. §40.2(a)(3)(iv) ...................................................44

## Dictionaries

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ................26, 28

*Black's Law Dictionary* (9th ed. 2009).................................................26

*American Heritage Dictionary of the English Language*
  (4th ed. 2000) ...................................................................26, 28

## Other Authorities

*Core Principles and Other Requirements for*
  *Designated Contract Markets,*
  75 Fed. Reg. 80572 (Dec. 22, 2010) ......................................55

Gouker, *Kalshi Launches NBA Player Props,*
  Event Horizon (Nov. 18, 2025)..............................................17

Gouker, *Kalshi Was Promoting A 30-Leg Parlay To Users*
  *On Tuesday,* Event Horizon (April 1, 2026) ..........................17

Gouker, *Ten Times Kalshi Said People Could Bet on Things,*
  Event Horizon (Apr. 3, 2025) ...............................................18

Fallon, *Constitutional Remedies: In One Era & Out the Other*,
136 Harv. L. Rev. 1300 (2023) .................................................................65

*KalshiEX LLC, v. CFTC*, Brief of Appellee,
2024 WL 4802698 (D.C. Cir. 2024) ........................................6, 7, 22, 53

Oldham, Steene, and Tienken, *The* Ex parte Young *Cause of Action:*
*A Riddle, Wrapped in a Mystery, Inside an Enigma*,
120 Nw. U. L. Rev. 1697 (2026) .............................................................65

Pempus, *Mention Markets:*
*What These Bets Are And Why To Be Cautious Trading*
(Nov. 19, 2025) ........................................................................................17

Pfander & Wentzel, *The Common Law Origins of* Ex parte Young,
72 Stan. L. Rev. 1269 (2020) ..................................................................65

*Provisions Common to Registered Entities*,
76 Fed. Reg. 44776 (July 27, 2011) .......................................................16

## ORAL ARGUMENT REQUEST

Defendants-Appellants respectfully request oral argument. The district court preliminarily enjoined enforcement of the Tennessee Sports Gaming Act. That decision implicates important questions about federal jurisdiction, statutory interpretation, and preemption. Oral argument will aid the Court's consideration of those issues.

## STATEMENT OF JURISDICTION[1]

Plaintiffs invoked the district court's subject-matter jurisdiction under 28 U.S.C. §1331.  Compl., R.1, 6.  The district court issued its order granting Plaintiffs' preliminary injunction motion on February 19, 2026.  Order, R.49, 894.  Defendants timely filed their notice of appeal on March 20, 2026.  Notice of Appeal, R.54, 922.  This Court has jurisdiction to review the district court's preliminary injunction order under 28 U.S.C. §1292(a)(1).

---

[1] All record pincites refer to the "Page ID" numbers in the ECF file stamps for the district court's docket, No. 3:26-cv-34.

2

## STATEMENT OF THE ISSUES

This case involves a preemption challenge to Tennessee's sports wagering laws.  The issues presented are:

I.    Are Kalshi's sports-event contracts "swaps" within the definition of the Commodity Exchange Act?

II.   Assuming Kalshi's sports-event contracts are covered by the Commodity Exchange Act, are Defendants preempted from enforcing the Tennessee Sports Gaming Act against Kalshi?

III.  Does Kalshi have a cause of action that can overcome Tennessee's sovereign immunity?

IV.   If preliminary relief is warranted, does the preliminary injunction comply with Federal Rule of Civil Procedure 65 when it didn't specify what statutory sections Defendants are enjoined from enforcing?

## INTRODUCTION

In 2008, the American economy nearly collapsed under the weight of the sub-prime mortgage crisis. Unregulated markets in exotic derivatives like credit default swaps spiraled out of control. And billions of dollars would be spent bailing out financial institutions who dealt in those markets. In response, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act. Its purpose was clear: Dodd-Frank would bring transparency and order to the previously opaque world of swaps and derivatives.

What Dodd-Frank did not do was set nationwide sports wagering regulations.

Since the dawn of the Republic, States have had primary authority over whether, where, and how their citizens may wager on the outcome of a horse race or football game. Dodd-Frank left that longstanding distribution of power undisturbed.

Yet Plaintiff KalshiEX LLC believes Dodd-Frank legalized sports wagering across the country and made the Commodity Futures Trading Commission its sole regulator. Kalshi says its sports wagering products, so-called "sports-event contracts," are "swaps" under Dodd-Frank's

4

amendments to the Commodity Exchange Act. So it can offer wagers in the guise of swaps. According to Kalshi, it doesn't need to obtain a license, follow Tennessee consumer protection requirements, or pay taxes, like its competitors FanDuel, DraftKings, BetMGM, or bet365.

It's a clever theory. But word games can't absolve Kalshi of its obligation to follow Tennessee law. Kalshi can call its products whatever it wants, but "sports-event contracts" "are sports wagers and everyone who sees them knows it." *KalshiEX, LLC v. Hendrick*, 817 F.Supp.3d 1014, 1029 (D. Nev. 2025). And federal law doesn't grant Kalshi a pass to operate an unlicensed, untaxed sportsbook.

The district court disagreed and issued a preliminary injunction. That was an error.

Kalshi is not likely to succeed on the merits. Kalshi's sports-event contracts fall outside the statutory definition of "swaps" and look nothing like the other financial products regulated by Dodd-Frank.

At minimum, Dodd-Frank lacks a clear statement transferring regulation of the entire sports wagering industry to the CFTC. Sports wagering and its regulation carries vast social and economic importance; Congress would not have answered the major question of who governs

sports wagering so vaguely.  Nor would Congress have disrupted the historic State and federal power balance over the regulation of sports wagering without plainly saying so.  Such transfers of power require an unambiguous command—not a strained reading that would nullify a host of federal laws.

Even if Kalshi's sports-event contracts were swaps, Kalshi still cannot prevail because Dodd-Frank doesn't preempt Tennessee's sports wagering law.  Federal law gives the CFTC "exclusive jurisdiction" over "swaps."  7 U.S.C. §2(a)(1)(A).  But that jurisdictional provision gives the CFTC, as opposed to the SEC, the authority to enforce violations of the Commodity Exchange Act.  It says nothing about sports wagering.

Nor can Kalshi identify any conflict between State and federal law. To the contrary, CFTC regulations prohibit all of Kalshi's sports-event contracts, so there is *no conflict* between State and federal law.  Indeed, Kalshi used to agree.  In 2024, it told the D.C. Circuit that if a contract was "contingent on a game or a game-related event—like the Kentucky Derby, Super Bowl, or Masters golf tournament"—it would not be permissible under federal law.  *KalshiEX LLC, v. CFTC*, Brief of Appellee,

6

2024 WL 4802698, at \*17 (D.C. Cir. 2024); *see also id.* at \*44-45.  That remains true today.

In all events, the few isolated conflicts on which Kalshi relies are illusory.  And they aren't enough to excuse complete non-compliance with the whole of Tennessee's sports wagering law.  Reversal is warranted.

## STATEMENT OF THE CASE

### I.     Legal Background.

### A.  Sports Wagering in Tennessee.

For most of American history, gaming regulation resided exclusively "within the police powers of a state."  *Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905); *see Murphy v. NCAA*, 584 U.S. 453, 458-59 (2018).

Tennessee exemplifies that tradition.  It first regulated "gaming" in 1799.  *See* 1799 Tenn. Pub. Acts, ch. 8; 1803 Tenn. Pub. Acts, ch. 12 (criminalizing gaming).  Tennessee has maintained similar gaming regulations to the present day.  *See* Code of Tennessee §4870 (1858); Code of Tennessee §11275 (1934); Tenn. Code Ann. §§39-17-501 to -509.

Most gaming remains illegal in Tennessee.  But in 2019, the Tennessee General Assembly legalized "interactive sports wagering" and later created the Tennessee Sports Wagering Council (SWC) to police it.

*See* 2019 Tenn. Pub. Acts, ch. 507; Tenn. Code Ann. §4-49-106(a).  Tennessee law defines "interactive sports wagering" as "placing a wager on a sporting event via the internet, a mobile device, or other telecommunications platform."  *Id.* 4-49-102(14).  A "wager," also called a "bet," is "a sum of money that is risked by a bettor on the unknown outcome of one (1) or more sporting events, including … the form of fixed-odds betting, a future bet, live betting, a money line bet, pari-mutuel betting, parlay bet, pools, proposition bet, [or] spread bet[.]"  *Id.* §4-49-102(39).  And a "[s]porting event" is "any professional sporting or athletic event, including motorsports and e-sports, any collegiate sporting or athletic event[.]"  *Id.* §4-49-102(33).

Tennessee law also contains wagering-specific consumer-protection provisions that restrict the types of bets that may be offered and who may place them.  Thomas-Dec., R.35, 391-92.  It prohibits wagering on injuries, penalties, or the performance of individual college athletes, as well as in-game proposition bets on college teams.  Tenn. Code Ann. §4-49-114.  And it lists 14 categories of people ineligible to place wagers, ranging from SWC members to persons having the ability to directly affect a sport event's outcome.  *Id.* §4-49-112.  It also prohibits those under age

8

21 from wagering in Tennessee, *id.* §§4-49-118(a), 4-49-102(19), and requires that wagerers be "physically located in Tennessee," *id.* §4-49-111.

Tennessee law additionally imposes responsible-gaming requirements, including requirements that licensed operators allow users to restrict themselves from placing wagers, *id.* §4-49-119; anti-money-laundering controls, *id.* §4-49-110; and restrictions on credit cards or cryptocurrency to fund accounts, *id.* §4-49-125(f). These safeguards protect those who wager in Tennessee. Thomas-Dec., R.35, 392. Sports gaming is highly addictive, particularly among young men, so the State has a strong interest in regulating access to gaming. *Id.* And the State's regulations have been highly effective. To date, Tennessee has processed more than 7,500 self-exclusion requests. *Id.* at 392-93.

Aside from complying with those requirements, a legal sportsbook must pay a 1.85% tax on total wager amounts received. Tenn. Code Ann. §4-49-104(b), 102(12). Between the legalization of sports wagering in 2019 and November 2025, the State has collected $392,555,090 in wagering tax. Thomas-Dec., R.35, 393-94. In 2024 alone, Tennessee received $97,160,565. *Id.* In general, 80% of funds supports schools, 15% goes to

9

emergency services or infrastructure projects, and 5% supports gam-bling-related treatment services.  Tenn. Code Ann. §4-49-104(e), 119(c).

### B.     Federal Regulation of Gambling.

The federal government has long left the regulation of gambling to the States.  It wasn't until 1961 that Congress first supplemented State gaming laws with the Wire Act, which forbids using "a wire communica-tion facility" to transmit "bets or wagers on any sporting event or contest" across state lines, if gambling is illegal in both States.  18 U.S.C. §1084; *see id*. §§1953(a), 1955(b)(1)(i) (similar).  In 1988, Congress passed the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §2701 *et seq*., which allows federally recognized tribes to regulate most gaming on their lands, if it's legal in the surrounding State.  *Id*. §2710(b)(1)(A), (d)(1)(B).  And in 1992, Congress passed the Professional and Amateur Sports Protection Act ("PASPA").  28 U.S.C. §3701.  At the time, only four States allowed sports wagering in any capacity.  So PASPA limited sports wagering to the jurisdictions in which it was already legal and forbade additional State "authoriz[ation]" of sports wagering.  *Id*. §3702; *see id*. §3704(a).

In *Murphy* v. *NCAA*, the Supreme Court invalidated PASPA, hold-ing that the law violated the Tenth Amendment.  584 U.S. at 474.  The

10

Court reasoned that PASPA was "exactly the opposite of the general federal approach to gambling," which only criminalized conduct if it was already "illegal under state or local law." *Id.* at 484. Federalized sports gambling regulation did not "respect the policy choices of the people of each State on the controversial issue of gambling." *Id.*

### C.   Federal Regulation of Derivatives.

The CFTC regulates certain derivatives, which are "contracts deriving their value from underlying assets." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 372 (D.C. Cir. 2013). In general, derivatives include "futures contracts, options, and swap agreements" and "provide a way to transfer market risk or credit risk between two counterparties." *Inv. Co. Inst. v. CFTC*, 891 F.Supp.2d 162, 168, n.3 (D.D.C. 2012) (citations omitted).

**Historic Regulation of Derivatives.** The Commodity Exchange Act ("CEA") governs derivatives regulation. Enacted in 1936, the CEA historically provided for the federal regulation of commodity futures, an asset class that includes various agricultural products and "all other goods and articles ... and all services, rights, and interests ... in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. §1a(9). In 1974, Congress created the CFTC and gave it

11

"exclusive jurisdiction" to regulate commodity future contracts and other derivatives. *Id.* §2. Those amendments "separate[d] the functions of the [CFTC] from those of the [SEC]." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982).

In the years following the 1974 amendments, a new financial product known as a "swap" was invented. *Bloomberg L.P. v. CFTC*, 949 F.Supp.2d 91, 97 (D.D.C. 2013) (tracing the earliest swaps to 1981). Swaps are derivative contracts that allow traders to hedge against various financial risks. *See Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 926 & n.1 (6th Cir. 2006). For example, "an interest rate swap" occurs when two parties "agree to exchange or 'swap' [] interest payments" with "one party paying at a fixed interest rate and the other at a variable interest rate." *Id.*

At the time, swaps were "traded almost entirely in unregulated 'over the counter' ("OTC") markets, where large financial institutions acted as derivatives dealers." *Bloomberg,* 949 F.Supp.2d at 98. In these opaque markets, "transactions were not required to be cleared, dealers were not required to register with the government, and trading information was not required to be made public." *Id.* (cleaned up). With

12

essentially no regulatory oversight, OTC derivatives "spiraled out of control" and ultimately "contributed significantly to the global financial crisis in 2008." *Id.* (cleaned up).

"Credit default swaps" played a central role in the crisis. A credit default swap is a financial contract where one party pays another if a specified borrower defaults on their debt. During the 2008 financial crisis, AIG's "large[] volume of unhedged credit default swaps," particularly in the "subprime housing market," led to its collapse, and subsequent multi-billion dollar government bailout. *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F.Supp.2d 419, 426 (S.D.N.Y. 2010).

**Dodd-Frank**. In response, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act. *See* Dodd-Frank, Pub. L. No. 111-203, 124 Stat. 1376 (2010). Dodd-Frank brought "swaps" under the CFTC's jurisdiction. *See id.* §722, 124 Stat. 1376, 1672 (amending 7 U.S.C. §2(a)(1)(A)). And it essentially replaced the old OTC system with designated contract markets ("DCM"). *See* 7 U.S.C. §2(e). Targeting the housing crisis's causes, Congress directed the CFTC to consider in its swap rules (among other things) "price discovery" and "sound risk management practices." *Id.* §19(a)(2).

Under Dodd-Frank, "swap" has a lengthy six-part definition. *Id.* §1a(47)(A)(i)-(iv). It covers derivatives based on "interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind." *Id.* §1a(47)(A)(i). It includes transactions that transfer between the parties "the financial risk associated with a future change in" the value of the underlying interest. *Id.* §1a(47)(A)(iii). And it gives a 22-part list of transactions that meet this definition, ranging from "foreign exchange swap[s]" to "weather swap[s]." *Id.* §1a(47)(A)(iii)(VIII), (XVII).

Within that focus on financial engineering, the CEA also defines a "swap" as "any agreement, contract, or transaction ... that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* §1a(47)(A)(ii).

**CFTC's Role.** The CFTC regulates trading in swaps. *Id.* §2(a)(1)(A). If *any* consumer "agreement, contract, or transaction" meets the swap definition, *id.* §1a(47)(A), it *must* be traded on CFTC

14

regulated DCMs, *id*. §2(e).[2]  Placing these contracts onto regulated markets furthers Dodd-Frank's abolition of the OTC system and brings "previously dark markets in the complex derivative instruments at the heart of the [financial] crisis ... into the light." *Inv. Co. Inst.*, 891 F.Supp.2d at 174 (citations omitted).

Historically, "a DCM had to get the CFTC's preapproval to list contracts by convincing the CFTC that its contracts satisfied an economic purpose test and were not contrary to the public interest." *N. Am. Derivatives Exchange, Inc. d/b/a Crypto.com v. Nev. Gaming Control Bd.*, 815 F.Supp.3d 1169, 1176 (D. Nev. 2025) (hereinafter: *Crypto*).  But in 2000, Congress gave DCMs the ability to "self-certify" that their contracts were legal.  *Id*.; *see* 7 U.S.C. §7a-2(c)(1).

As part of Dodd-Frank, Congress passed a "Special Rule" authorizing the CFTC to classify certain contracts that "are based upon the occurrence" of an event as "contrary to the public interest" if they involve certain subject matters, including "gaming" or any other "activity that is unlawful under … State law." *See id*. §7a-2(c)(5)(C)(i).  This rule applies

---

[2] The only narrow exception is when both parties are "eligible contract participant[s]," 7 U.S.C. §2(e), a category limited to large "financial institution[s]" and similar sophisticated entities, *id*. §1a(18).

to *all* "agreements, contracts, [or] transactions" "based upon the occurrence" of an event, including swaps. *Id.*

In 2011, using this authority, the CFTC promulgated an across-the-board "[p]rohibition" on gaming-related contracts. 17 C.F.R. §40.11(a). Rule 40.11 commands that a DCM "shall not list for trading" any event contract that "involves, relates to, or references ... gaming." *Id.* In the agency's words, "its prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" *Provisions Common to Registered Entities*, 76 Fed. Reg. 44776, 44786 (July 27, 2011) (citations omitted).

As an exception to this blanket ban, the CFTC may separately review and approve contracts that would otherwise violate Rule 40.11. 17 C.F.R. §40.11(c). But absent that approval, a DCM must comply with the categorical "prohibition" on gaming contracts. *Id.* §40.11(a).

## II.    Factual Background.

Kalshi is registered with the CFTC as a DCM. Compl., R.1, 2. In January 2025, Kalshi began offering "sports-event contracts" that "allow users to place positions on, for example, which teams will advance in the

16

NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship." *Id.* at 16. Kalshi also offers bets on players' performances (such as how many assists, points, or rebounds an NBA player will have). Gouker, *Kalshi Launches NBA Player Props*, Event Horizon (Nov. 18, 2025), https://perma.cc/A7AY-CUMZ. And "parlay" wagers, which are combinations of multiple wagers. Gouker, *Kalshi Was Promoting A 30-Leg Parlay To Users On Tuesday*, Event Horizon (April 1, 2026), https://perma.cc/VNP7-K7G7.

Like a bet placed on a sportsbook, sports-event contracts can depend on the outcome of the sports event, or combination of events. Compl., R.1, 9-10. But often, these contracts are only tenuously tied to sporting event outcomes. For example, Kalshi has recently expanded into "mentions markets" which allow bets on if an announcer will *mention* a particular word during a broadcast. Pempus, *Mention Markets: What These Bets Are And Why To Be Cautious Trading* (Nov. 19, 2025), https://perma.cc/DPP2-JP5L. It also offers the ability to parlay (combine) bets on mentions—"For example, a three-leg parlay for a Monday Night Football mention market could involve announcers saying the words 'late hit,' 'pylon,' and 'turf.'" *Id.*

17

Kalshi presents itself as a platform for sports wagers, advertising that "You can now bet on sports in all 50 states with Kalshi"; that "Sports Betting [is] Legal in all 50 States on Kalshi"; and that Kalshi is "The First Nationwide Legal Sports Betting Platform." *See* Gouker, *Ten Times Kalshi Said People Could Bet on Things*, Event Horizon (Apr. 3, 2025), https://perma.cc/4F6N-3DDS. More recently, Kalshi has advertised that one can "Put real $$ on Football" and that it's "Legal in all 50 States." Bechtel-Dec., R.36-6, 417.

Kalshi operates the same way as "pari-mutuel" wagering used in horseracing. In pari-mutuel wagering, the "organizers aren't interested in the outcome of any particular bet" and charge a fee for hosting the wagering pool. *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 635 (6th Cir. 2025). The "[w]inning bettors" collect "from the rest of the pool," not the house. *Id.* Likewise on Kalshi, bettors are the counterparty to any given transaction. Compl., R.1, 8-9. And a sports-event contract's value is determined by market forces, and pricing is determined by available information. *Id.* at 9.

Kalshi's sports platform is nearly identical to other sportsbooks licensed in Tennessee, like FanDuel, DraftKings, BetMGM, and bet365.

18

Bechtel-Dec., R.36, 411-14. And Kalshi's offerings related to sport events are similar to bets offered by those sportsbooks. *Id.*

## III.   Procedural Background.

SWC issued a cease-and-desist letter to Kalshi demanding that it immediately stop offering sports-event contracts in Tennessee, void pending Tennessee contracts, and return deposits made by Tennesseans. Thomas-Dec., R.35-1, 396-98. SWC believed that Kalshi was illegally operating an unlicensed and untaxed sportsbook. *Id.* The letter threatened to pursue various civil remedies and to refer Kalshi for criminal prosecution. *Id.* at 398.

In response, Kalshi sued and sought a preliminary injunction. *See* Compl., R.1; PI-Mot., R.6; PI-Mem., R.7. That same day, the district court entered an *ex parte* temporary restraining order. TRO, R.22, 255-56. And then, after a hearing, "grant[ed] the plaintiff's Motion for Preliminary Injunction … as to the state official defendants and den[ied] it as to the state agency." Mem.Op., R.48, 893; *see* Order, R.49, 894 (same). Tennessee timely appealed. Notice of Appeal, R.54, 921-22.

On appeal, Tennessee moved for same day, same panel consideration with No. 26-3196, *KalshiEX LLC v. Schuler*, Kalshi's appeal from a

19

preliminary injunction denial in Ohio. CA6 Dkt. 21. After this Court denied Kalshi's motion for an injunction pending appeal in *Schuler*, *KalshiEX LLC v. Schuler*, 2026 LX 220871 (6th Cir. April 24, 2026) (per curiam) (hereinafter: *Schuler II*), it granted Tennessee's motion for same day, same panel consideration. CA6 Dkt. 22-2.

## SUMMARY OF THE ARGUMENT

**I.** Kalshi is unlikely to succeed on the merits.

**A.** Kalshi's sports-event contracts do not meet Dodd-Frank's definition of "swaps," which is tightly focused on financial hedging. Kalshi's "swap" definition is limitless and would render most of the statute superfluous. And Congress didn't put the elephant of sports gambling regulation in the mousehole of Dodd-Frank's generic swap definition. The major questions doctrine, federalism canon, and the presumption against implied repeals all require a clear statement to effect such a transformational change.

**B.** The CEA doesn't preempt State sports wagering law.

The CEA's exclusive jurisdiction clause is not an express preemption clause. Jurisdiction and preemption are not synonymous. All the

20

clause does is clarify that the CFTC, and not the SEC, enforces most CEA violations. It says nothing about State sports-wagering laws.

Nor does the statute create field preemption. The CEA is a Swiss cheese regulatory scheme that preserves State participation. It looks nothing like the comprehensive schemes—like immigration registration—that the Supreme Court has held effect field preemption.

Conflict preemption also fails. Even if some of Kalshi's contracts *could* satisfy the statute, they are flatly banned by CTFC regulations. 17 C.F.R. §40.11(a) commands that Kalshi's sports-event contracts "shall not" be listed for trading. *Id.* So regardless of the CEA's statutory definition, Kalshi's contracts are still illegal under federal law. That means State and federal law require the same thing and aren't in conflict *at all*.

Beyond that, the conflicts Kalshi points to are imagined and appear only in regulations. After *Loper Bright*, such speculative reliance on agency guidance and non-statutory requirements doesn't cut it. Kalshi's 'sports bets are swaps' position, combined with its broad theory of preemption, would make the CFTC the nation's sole sports wagering regulator. Congress wouldn't have required such a sea-change without saying so clearly.

21

**C.**  Kalshi also lacks a cause of action.  *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320 (2015), ruled that the Supremacy Clause "does not create a cause of action."  *Id.* at 324-25.  Yet Kalshi cites the Supremacy Clause as its only cause of action.  Compl., R.1, 21-22.  This is no mere pleading defect—Kalshi cannot be *clearly entitled* to extraordinary relief on a foreclosed theory.  Nor does Kalshi have any other valid cause of action that can overcome Tennessee's sovereign immunity.

**II.**  The remaining injunction factors favor Defendants.  Kalshi previously argued the opposite of its current position to the D.C. Circuit in 2024.  Back then, it recognized that "Congress sought to prevent exchanges from facilitating … sports gambling."  *KalshiEX LLC, v. CFTC,* Brief of Appellee, 2024 WL 4802698, at *45 (D.C. Cir. 2024).  Now it claims the opposite.  Equity should not reward such a flip-flop.  Beyond that, the public interest is served by Tennessee protecting its citizens from predatory operators and problem gaming.

**III.** Even if warranted, the district court's preliminary injunction fails to comply with Federal Rule of Civil Procedure 65.  It's overbroad, failing to specify what laws Defendants are enjoined from enforcing.  That's especially problematic because the district court's ruling rested on

22

conflict preemption grounds, and State law may *only* be preempted to the extent of an actual conflict.

## STANDARD OF REVIEW

A "preliminary injunction is an extraordinary and drastic remedy" permitted only when "the movant, *by a clear showing*, carries the burden of persuasion." *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (citation omitted). To carry that burden, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (citation omitted). Each factor is a "prerequisite" for obtaining preliminary relief. *Id.* at 885.

## ARGUMENT

### I.    Kalshi is not likely to succeed on the merits.

Kalshi failed to make "a clear showing" that it is likely to prevail on the merits. *L. W. v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023) *aff'd sub nom. United States v. Skrmetti*, 605 U.S. 495 (2025). Kalshi's sports-event contracts do not meet the statutory definition of "swaps," the CEA

does not preempt Tennessee sports wagering law, and Kalshi doesn't have a cause of action to bring this suit against a State. Each ground *independently* defeats Kalshi's suit, so it must make a clear showing of entitlement on all three. Kalshi doesn't win that triple crown.

## A.    Kalshi's sports-event contracts are not lawful "swaps" under the CEA.

Kalshi's preemption claim never leaves the starting gate because the CEA doesn't even apply to its sports-event contracts. The CFTC's "exclusive jurisdiction" extends "to accounts, agreements ... and transactions *involving swaps* or contracts of sale of a commodity for future delivery ... traded or executed on" a DCM. 7 U.S.C. §2(a)(1)(A) (emphasis added). The CEA's plain text shows that Kalshi's sports-event contracts aren't swaps within the CFTC's jurisdiction. Kalshi's contracts are instruments of sports gambling, not financial derivatives used for hedging or price discovery. This textual reading is confirmed by context. And were there any doubt, the major questions doctrine, federalism canon, and the presumption against implied repeals all foreclose Kalshi's reading. If Kalshi is correct, as a practical matter, *all* sports gambling *must* be exclusively regulated by the CFTC. Dodd-Frank changed a lot about financial markets, but it did not do that.

24

### 1. The CEA's plain text does not cover Kalshi's sports-event contracts.

To be a "swap" under the CEA, a contract must be "dependent on the occurrence, nonoccurrence, or extent of the occurrence of an event or contingency" that is "associated with a potential financial, economic, or commercial consequence."  7 U.S.C. §1a(47)(A)(ii).  Kalshi's sports-event contracts are neither.

***Events vs. outcomes***.  Kalshi allows users to purchase contracts based on the *outcomes* of sporting events.  Kalshi says as much in its complaint, stating that its "users can trade on the *outcome* of real-world events."  Compl., R.1, 15 (emphasis added).  But an "outcome" that results from an event is different from the "occurrence" of the event itself.  *See Burrage v. United States*, 571 U.S. 204, 211 (2014).  These are analytically distinct concepts.  *See Hendrick*, 817 F.Supp.3d at 1023; *Crypto*, 815 F.Supp.3d at 1181-85.  And to be a "swap" under the CEA, the contract *must* depend on the event's "occurrence" (or nonoccurrence or extent of occurrence), not its results.  7 U.S.C. §1a(47)(A)(ii).

"Occurrence," "outcome," and "event" in §1a(47)(A)(ii) have particular meanings.  At the time of Dodd-Frank's passage, "occurrence" generally meant "something that occurs" or the "action or instance of

25

occurring." Occurrence, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003); *see* Occurrence, *Black's Law Dictionary* (9th ed. 2009) ("Something that happens or takes place"). And the word "event" "usually implies an occurrence of *some importance* and frequently one having antecedent cause." *Merriam-Webster's, supra* (synonyms for occurrence) (emphasis added); *see* Event, *American Heritage Dictionary of the English Language* (4th ed. 2000) (an "event" is "a significant occurrence or happening"). By contrast, an "outcome" is "something that follows as a result or consequence." Outcome, *Merriam-Webster's, supra*; *see* Outcome, *American Heritage, supra* (similar).

Taking these definitions together, Kalshi's contracts do not depend on the sports event *taking place* (i.e., its "occurrence," 7 U.S.C. §1a(47)(A)(ii))—they depend on the *result* of a sports event (i.e., its outcome). Kalshi users can "trade" on which team will win a game, cover the spread, and the total score—not on whether the game itself occurred. Bechtel-Dec., R.36, 405-06. Like traditional sports bets, the trades Kalshi offers "are based on the outcomes of sporting events or on things that happen during a sporting event." *Hendrick,* 817 F.Supp.3d at 1026. "[W]ho wins the Kentucky Derby is an outcome of that event, not a

26

separate event in and of itself.*" Crypto*, 815 F.Supp.3d at 1183.  To say otherwise would collapse the difference between an event and the results that follow from its outcome.  *See id.*; c*f. Burrage*, 571 U.S. at 211-12.

Proving the point, no ordinary reader would say the number of points scored by a team is an "event."  In asking "Who won last night?" ordinary usage refers to the outcome—"the home-team won."  Only a lawyer for Kalshi would say "what was the occurrence of the event?" to ask for a player's rushing yard total.

Kalshi's sports-event contracts do not "depend[]" "on the occurrence, nonoccurrence, or extent of the occurrence of an event."  7 U.S.C. §1a(47)(A)(ii).  Final scores and individual player performances, like the total number of rebounds, are outcomes.  They do not "depend[]" on whether the game "occur[s]" but rather the *results of that game.  Id.*  As discussed above, results and outcomes are something else entirely—so Kalshi's sports-event contracts aren't covered by §1a(47)(A)(ii)'s text.

***Financial, economic, or commercial consequences.***  Even if Kalshi's sports-event contracts were based on event occurrence and not outcome, they still are not "associated with a potential financial, economic, or commercial consequence."  7 U.S.C. §1a(47)(A)(ii).

"[A]ssociate" means to "connect in the mind or imagination." Associate, *American Heritage, supra*. It describes something "closely connected [] with another" or "closely related esp. in the mind." Associate, *Merriam-Webster's, supra*. "Associate" is synonymous with "join." *Id*. And a "consequence" is "[s]omething that follows from an action or condition." *American Heritage, supra*. So, for sports-event contracts to qualify, the outcome must be closely connected with a financial, economic, or commercial result. This requires more than simply *having* some incidental or down-the-line financial implication resulting from an event. *See Hendrick*, 817 F.Supp.3d at 1026-27.

Kalshi failed to identify any sports-event contracts that fit the bill. Kalshi says its contracts have financial consequences for "team sponsors, advertisers, television networks, franchises, local communities, and more," including other sportsbooks. PI-Reply, R.41, 466. But regardless of which team covers the spread, (i.e., wins or loses by a certain point margin), the same economic activity will occur—fans will have bought concessions, and media rights will have been distributed. The same goes for bets on individual players' performances. Whether LeBron James has 6 or 7 assists does not change the value of tickets already sold.

28

Kalshi's proposed financial consequences are the kind of attenuated, incidental, down-the-line consequences that a plain-text reading prohibits. After all, there is a difference between *having* a potential financial, economic, or commercial consequence and being *associated with* (i.e., joined or connected to) one. That notion of connection or joining precludes Kalshi's limitless reading.

Kalshi previously agreed with that straightforward conclusion. In previous litigation, it conceded that sporting event outcomes "carry no economic risks," have "no inherent economic significance," and have no "economic consequences outside of the game itself." *See Hendrick*, 817 F.Supp.3d at 1028, n.3 (discussing previous litigation). Kalshi's original position is correct: Sports events do not have economic consequences outside the game itself occurring.

True, the statute requires only that the event occurrence be "associated with *potential*" consequences. 7 U.S.C. §1a(47)(A)(ii) (emphasis added). But "potential" modifies consequences, and not "associated with." *Id.* This allows for the possibility of financial consequences that may never occur. But it does not loosen the requirement that the event's occurrence be closely connected with those potential consequences.

29

Consider, for example, a shipper who hedges their risks with a swap that pays if no ship passes through the Suez Canal for a day. If that event occurs, it may not ultimately entail financial consequences, goods might be effectively diverted or losses elsewhere offset. But the potential for these consequences (diversion/increased costs) are closely *associated with a canal closure.*

Kalshi's sports offerings lack that close association. The combined single game rushing total of two players is not closely associated with any financial consequence. And it's *even more* attenuated for parlays across multiple sports. Although aggregate player performance may lead to sponsorships, no one would say a single three-pointer is closely connected with that outcome.

Beyond that, 'potential' cannot be "so broad that it is meaningless." *Chevron v. Plaquemines Par.*, 146 S. Ct. 1052, 1060 (2026). As the Supreme Court just explained, "it is the ordinary, not literalist, meaning that is the better one." *Id.* at 1061 (citation omitted). So, although one could argue "the fluttering of a butterfly's wings … 'relate to' the next week's weather," that broad reading of "relate to" cannot prevail where no "[o]rdinary reader" would understand the term that way. *Id.*; *see*

*Salazar v. Paramount Glob.*, 133 F.4th 642, 649-50 (6th Cir. 2025) (similar). So too here, "potential" cannot be read to expand the CEA's coverage to sports wagers—let alone parlays on mentions markets.

On the plain text, Kalshi's argument fails. Its contracts are not "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A)(ii). There is *no* consequence associated with hitting a 30-leg parlay. And even if some of Kalshi's sports-event contracts might have a conceivable consequence, they are far too attenuated to be "associated" with that consequence. *Id.* Kalshi's bets are just sports wagers, not swaps trading.

### 2.   Kalshi's reading defies statutory context.

Looking at the overall statutory scheme confirms that "swap" cannot cover Kalshi's bets.

Statutory language "must be read in [its] context and with a view to [its] place in the overall statutory scheme." *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) (citation omitted). That makes sense, since "a word is known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543 (2015). So Courts do not "scrutinize a statute

31

atomistically—chopping it up and giving each word the broadest possible meaning." *Salazar*, 133 F.4th at 650.

Here, the other swap definitions in §1a(47)(A) "refer almost exclusively to financial measures, indices, or instruments." *Hendrick*, 817 F.Supp.3d at 1027. They include options on "rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures," 7 U.S.C. §1a(47)(A)(i), or similar financial instruments for transferring risk, *id.* §1a(47)(A)(iii)(I)-(XXII) (listing 22 examples). That language shows Dodd-Frank was "aimed at systemic risks in the financial sector that undermined U.S. financial stability" and "should be interpreted through that lens." *Hendrick*, 817 F.Supp.3d at 1028-29.

Sports betting has no place in Dodd-Frank. As the surrounding statutory definitions make plain, swaps are used for hedging risk and price discovery on financial markets. *Cf.* 7. U.S.C. §19(a)(2). It's unrealistic to think that a 30-leg parlay, across multiple sports, provides any genuine hedging strategy. *See supra* 17.

Beyond that, if the "swap" definition in 7 U.S.C. §1a(47)(A)(ii) was as broad as Kalshi says, then there would be no need for the remaining five other statutory subparts. And it would have been unnecessary for

32

Congress to give a 22-part list of transactions that qualify as swaps. *Id.* §1a(47)(A)(iii). *See Crypto*, 815 F.Supp.3d at 1184. Under Kalshi's reading, all five other statutory subparts, and all 22 transactions in romanette iii would *also* constitute transactions dependent on event occurrence that are associated with potential consequences. *Compare* 7 U.S.C. §1a(47)(A)(ii), *with id.* §1a(47)(A)(iii). Courts usually reject such "unbounded interpretation[s]" that would "render superfluous" "a reticulated list." *Fischer v. United States*, 603 U.S. 480, 493 (2024). Even assuming §1a(47)(A) might have some belt-and-suspenders surplusage, "it is better" to adopt a reading that creates less surplusage. *Id.* at 496 (citation omitted). Kalshi's reading swallows the whole statute. The most generous tolerance of duplicative coverage cannot allow for that. *Id.*

### 3. The CEA would have to speak more clearly to cover sports gambling.

At minimum, the statutory text lacks the clear statement required to enact a significant change in nationwide sports gambling regulation. Absent unmistakably clear text, courts shouldn't read a statute to delegate authority to an agency on a major question or wade into an area of traditional State authority. Likewise, absent clear text, courts should not read statutes to impliedly repeal other laws.

33

Here, these three clear statement rules sing a common refrain: If Congress wanted to make a Federal Bureau of Bookmaking, it would not have hidden that power in 7 U.S.C. §1a(47)(A)'s general swap definition.

**Major Questions**.  As the Supreme Court has recently and repeatedly explained, Congress doesn't "hide elephants in mouse-holes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).  It "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Id.*  Under the major-questions doctrine, "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citation omitted); *see Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 638-39 (2026) (collecting cases).  Instead, Congress speaks clearly when it "wishes to assign to an agency decisions of vast economic and political significance." *West Virginia*, 597 U.S. at 716 (citations omitted).  A "colorable textual basis" isn't enough.  *Id.* at 722.

Sports wagering is undoubtedly an issue of both "vast economic and political significance."  Economically, it is estimated that in 2024 alone, legal-sports-betting revenue was $13.78 billion, as Americans *legally* wagered $149.9 *billion* on sports.  Thomas-Dec., R.35, 394.  And politically,

34

"Americans have never been of one mind about gambling, and attitudes have swung back and forth." *Murphy*, 584 U.S. at 458.

Kalshi's argument that Dodd-Frank encompasses sports gambling, then, implicates the major questions doctrine. And the doctrine makes short work of this case. Under Kalshi's rule, practically all sports wagers would be swaps. The typical sports wager is an enforceable contract where money is risked on a sporting event outcome. *E.g.*, Tenn. Code Ann. §§4-49-113 (wagers as contracts); 4-49-102(39) (defining "wager"). And under Kalshi's broad definition, any wager on the outcome of a sports event could theoretically have some downstream, tangential financial consequence. *Supra* 28-31. If that's correct, then, as a practical matter, *all* sports wagering would be swept "into the CFTC's exclusive jurisdiction." *See Crypto*, 815 F.Supp.3d at 1184-85. That's because the CEA makes it "unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a [DCM]." 7 U.S.C. §2(e); *see id.* §6(a); 17 C.F.R. §33.3(a). It follows that if all sports wagers are swaps and all consumer swaps must be traded on a DCM, then all sports wagers must be made on a DCM. *See supra* n.2 ("eligible contract participant[s]" are not involved in

35

normal sports wagers).  In almost every circumstance, there *could be no such thing* as a legal off-DCM sports wager.  *Id.*[3]

Had Congress intended to give the CFTC such vast regulatory authority over sports wagering—something already traditionally regulated by the States—then "it surely would have said so" explicitly.  *Crypto,* 815 F.Supp.3d at 1185.  But it didn't.  And that speaks volumes—particularly given that at the time of Dodd-Frank, federal law forbade most sports gambling.  *Supra* 10-11.  This Court "must be guided to a degree by common sense" in determining whether Congress intended such a groundbreaking decision.  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  The CEA doesn't use the unambiguous language necessary to support such an "extraordinary delegation[]" of "power[]."  *Learning Res.*, 146 S. Ct. at 638.

This case is on all fours with *Brown & Williamson.*  There, the FDA asserted "jurisdiction to regulate tobacco products" because "nicotine is a 'drug,'" and it had authority to regulate drugs.  *Brown & Williamson*, 529

---

[3] And if, as Kalshi argued below, States might retain authority over wagering "*outside of DCMs,*" PI-Mem., R.7, 159, creating a dual-track system with a massive new federal presence in sports wagering is *itself* a major question that would require unmistakable statutory clarity.

U.S. at 131.  The Court found that "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."  *Id.* at 160.  Just as "drug" did not delegate nationwide tobacco regulation to the FDA, Dodd-Frank's "swap" definition doesn't make the CFTC the sole sports gambling regulator.  *Id.*; *see Tiger Lily, LLC v. HUD*, 5 F.4th 666, 670-71 (6th Cir. 2021) (similar).

**Federalism**.  Courts use structural federalism as a "background principle[] of construction."  *Bond v. United States*, 572 U.S. 844, 857 (2014).  The Supreme Court has interpreted this principle to require "Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power."  *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (citation omitted).  So Courts don't interpret federal law to intrude upon "areas of traditional state responsibility" absent a "clear statement" doing so.  *Bond*, 572 U.S. at 858 (collecting cases).

Kalshi's position that all sports wagering must be regulated by the CFTC would "significantly alter the balance between federal and state power."  *Sackett*, 598 U.S. at 679 (citation omitted).  Gambling regulation lies at the core of "the police powers of a State," *Ah Sin*, 198 U.S. at 505-06, so federal law has historically "defer[red] to, and even promote[d],

37

differing gambling policies in different States." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999). That's a good thing. States have become experts in protecting their citizens from problem gambling. *Supra* 8-9 (discussing Tennessee's consumer protections).

Dodd-Frank's generic swap definition isn't the type of exceedingly clear language that would rip control over sports wagering away from the States. *See Sackett*, 598 U.S. at 679. In that way, this case is just like *Tennessee v. FCC*, 832 F.3d 597 (6th Cir. 2016). There, this Court refused to preempt Tennessee law based on the FCC's "general charge to promote competition in the telecommunications market." *Id.* at 613 (citation omitted). This Court, "in applying the clear statement rule," held "the federal statute should be treated with great skepticism and read in a way that preserves a State's" historic powers. *Id.* (citation omitted). So too here.

**Implied Repeals**. Kalshi's interpretation also violates the presumption against implied repeals. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). "Congress overrides an existing legislative directive only when it does so clearly and expressly." *United States v. Bricker*, 135 F.4th 427, 447 (6th Cir. 2025). And an implied repeal occurs *only* when "the

38

latter Act covers the whole subject of the earlier one and is clearly intended as a substitute." *McKenna v. Dillon Transp., LLC*, 97 F.4th 471, 476 (6th Cir. 2024) (quotation omitted).

Congress has expressly legislated on sports wagering several times—in the Wire Act, IGRA, and PASPA. *See supra* 10-11. Dodd-Frank did not "clearly and expressly" repeal these laws to legalize sports gambling nationwide. *Bricker*, 135 F.4th at 447. Nor did Dodd-Frank cover the "whole subject" of the earlier laws and provide a substitute. *McKenna*, 97 F.4th at 476. Rather, it regulated financial markets and brought light to previously opaque and exotic financial transactions. *Supra* 13-14. Dodd-Frank's financial regulations didn't substitute the entire federal gaming framework. *Id.* at 10-11.

*Murphy* proves the point. *Murphy* addressed the constitutionality of PASPA—the law that forbade most gambling nationwide. *Id.* But under Kalshi's view, *Murphy* is both wrong and unnecessary because Dodd-Frank superseded PASPA and placed sports gambling under the CFTC's control.

Had Congress wanted to completely re-work the multiple statutory frameworks on this topic of vast economic and political significance, it

would have been explicit.  *KalshiEX LLC v. Martin*, 793 F.Supp.3d 667, 679 (D. Md. 2025).  It was not.  And that dooms Kalshi's case.

*   *   *

Adding it all up, Kalshi's sports-event contracts are not "swaps" under the CEA, so the CFTC's jurisdiction is never triggered.  Saying otherwise would countenance a limitless definition that renders swaths of Dodd-Frank superfluous and would re-imagine multiple federal statutory frameworks.  Congress did not legislate such a major question—and strip the States of their traditional authority and impliedly repeal multiple statutes—through the vague auspices of the "swap" definition.

### 4. The district court ignored text, context, and clear statement rules.

The district court erred in finding that Kalshi's swaps met the statutory definition under the CEA.  Mem.Op., R.48, 882-85.

At the outset, the district court ignored clear statement rules.  Its opinion doesn't mention major questions, federalism, or the presumption against implied repeals.  *Compare* Mem.Op., R.48, 880-88, *with* PI-Resp., R.34, 306-09, 315-16 (discussing these principles).  In the face of these clear statement rules, the interpretive question changes.  *See supra* 34-40.  The district court shouldn't have asked whether there was a

40

"colorable textual basis" for Kalshi's position. *West Virginia*, 597 U.S. at 722. Nor even whether Kalshi had the "better" reading of the statute. *Boechler, P.C. v. CIR*, 596 U.S. 199, 206 (2022). Kalshi *does not* have the better reading, *see supra* 24-33, but assuming it did, in the "context" of clear statement rules, "*better is not enough,*" *see Boechler*, 596 U.S. at 206 (emphasis added). Rather, the court should've asked if the statute contained unmistakably clear language blessing such a sweeping change. *See supra* 34-40. Failure to do so was an error. *Tennessee*, 832 F.3d at 613; *see Oquendo v. CIR*, 148 F.4th 820, 832 (6th Cir. 2025).

Beyond those general failings, the district court's opinion was wrong on its own terms. *First*, in holding that Kalshi's sports-event contracts concern the occurrence of an event, it reasoned that "a three-hour-long game, and the Titans winning that game are both occurrences of events." Mem.Op., R.48, 883. But at that level of abstraction, any event can be reconceptualized into multiple "distinct" occurrences. Eating a cake is no longer dessert, but the event where 3 eggs, 2 cups of sugar, and stick of butter were consumed. The best reading of "event" isn't so broad as to be essentially meaningless. *Cf. supra* 25-27.

41

The district court erroneously relied on *United States v. Phillips*, 155 F.4th 102 (2d Cir. 2025). Mem.Op., R.48, 883-84. *Phillips*, a criminal case, dealt with manipulating the exchange rate between the U.S. dollar and the South African rand. 155 F.4th at 113. There was "no dispute" in *Phillips* that the swap met the CEA definition. *Id.* at 113 n.5. After all, "foreign exchange swap[s]" are expressly covered in romanette iii's 22-part list. 7 U.S.C. §1a(47)(A)(iii)(VIII). To be sure, *Phillips* cited romanette ii, but it offered no analysis of its language. 155 F.4th at 113 (citing 7 U.S.C. §1a(47)(A)(ii)). Regardless, the dollar/rand exchange rate is "a financial measure that directly affects commodity prices." *KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *6 n.4 (S.D. Ohio Mar. 9, 2026) (hereinafter: *Schuler I*). There is no such close connection between the subjects of Kalshi's sports-events contracts and any financial consequence. *See supra* 27-31.

*Second*, the district court's reading of the financial consequences prong was just as unbounded. It read the phrase "*potential* … consequences," to cover any event that could have a conceivable financial consequence. Mem.Op., R.48, 885 (emphasis in original). That statutory reading, based on the "broadest imaginable definitions of its component

42

words," is mistaken. *Salazar*, 133 F.4th at 650 (citation omitted). And it collapses the whole statute into just §1a(47)(A)(ii)'s definition.

The district court also relied on Plaintiff's counsel's oral representation that Kalshi "would not offer a contract" on "what is the color of the Gatorade shower going to be?" Mem.Op., R.48, 885 (citation omitted). But how different is that from a parlay of "announcers saying the words 'late hit,' 'pylon,' and 'turf[?]'" *Supra* 17 (citation omitted). That's not "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A)(ii).

Kalshi sought to enjoin the application of Tennessee's law to its entire DCM. Compl., R.1, 23. It maintains that *all* of its contracts comply with the CEA. *See id*. at 16-17. But some of its contracts plainly have no association with financial or economic consequences. *Contra* 7 U.S.C. §1a(47)(A)(ii). So Kalshi can't have made *a clear showing* entitling it to universal preliminary relief. *EOG*, 134 F.4th at 874.

### B. The CEA does not preempt Tennessee law.

Even if Kalshi's sports-event contracts are "swaps," Kalshi's suit still fails because the CEA doesn't preempt Tennessee law. When analyzing any preemption question, courts "start[] with the basic assumption

43

that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). This creates a "strong presumption" against preemption. *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021) (per curiam) (citation omitted). That presumption is "*particularly*" strong in cases involving "a field which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (cleaned up); *see Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594-95 (6th Cir. 2024) (similar). Congress must therefore "make its intention to [preempt] *unmistakably clear* in the language of [a] statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (cleaned up).

With those principles in mind, Kalshi's preemption theory never gets off the ground. According to Kalshi, after it "self-certifies" sports-event contracts, they are eligible swaps listings. *See* 7 U.S.C. §7a-2(c)(1); 17 C.F.R. §40.2(a)(3)(iv). And once the contracts are listed on a DCM, it maintains, all regulation falls under the CFTC's "exclusive jurisdiction," *see* 7 U.S.C. §2(a)(1)(A), and state law is preempted. Nothing in the

44

CFTC's jurisdiction clause—or the CEA as a whole—supports finding express preemption, field preemption, or conflict preemption.[4]

### 1. The CEA does not expressly preempt Tennessee law.

The CEA gives CFTC "exclusive jurisdiction" over "transactions involving swaps" "executed" on a DCM.  7 U.S.C. §2(a)(l)(A).  "This section, though, would represent an unusual express-preemption provision." *Schuler II*,  2026 LX 220871, at *11.  A typical provision "uses words like 'preempt' or 'supersede' when it comes to state law."  *Id*.  But §2(a)(1)(A) speaks in terms of "jurisdiction."  *Id.*

"Jurisdiction ... is a word of many, too many, meanings." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) (citation omitted).  But it's not usually understood to mean "preemption."  *See Schuler II*, 2026 LX 220871, at *11-12; *cf. Oklahoma v. Castro-Huerta,* 597 U.S. 629, 639-40, 643 (2022) (rejecting preemption when the statute included an "exclusive jurisdiction" clause); *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 479-82 (1981) (similar).  After all, there is a "deeply rooted presumption

---

[4] Although the district court only ruled on conflict preemption, Mem.Op., R.48, 886, no other theory constitutes an alternative for affirmance.  *See infra* 45-51.

in favor of concurrent state" authority. *Tafflin v. Levitt*, 493 U.S. 455, 459 (1990).

Here too, the "exclusive jurisdiction" clause doesn't preempt. On the contrary, the clause "identifies the governing *agency*." *Schuler II*, 2026 LX 220871, at \*11. The grant of exclusive jurisdiction "was to avoid unnecessary, overlapping and duplicative regulation, especially as between the [SEC] and the new CFTC." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001) (citation omitted). So all this jurisdictional clause does is specify that the CFTC, and not the SEC, shall enforce the CEA. Its plain terms don't have anything to do with preemption.

That makes sense because, "exclusive jurisdiction" usually refers to which court has authority over a claim, *not* the governing law. *Schuler II*, 2026 LX 220871, at \*11. When Congress wants to grant exclusive jurisdiction *and* specify the governing law it says so. *Compare, e.g.*, 30 U.S.C. §1254(a)(3) (providing for "exclusive jurisdiction" on certain matters), *with id.* §1254(g) (federal law "shall preempt[] and supersede[]" state regulation on those matters).

Confirming that jurisdiction in the CEA *doesn't* mean preemption, the statute also includes savings clauses and express-preemption

46

provisions.  7 U.S.C. §§2(a)(1)(A); 16(e)(2); 16(h).  As courts have repeatedly recognized, the inclusion of these provisions cuts against straining to read a "jurisdictional" provision as preemptive.  *Schuler II*, 2026 LX 220871, at *12-13; *see Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992).

*First*, the CEA expressly carves out room for State authority.  It provides that: "Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit ... regulatory authorities under the laws ... of any State, or (II) restrict ... such other authorities from carrying out their duties and responsibilities in accordance with such laws."  7 U.S.C. §2(a)(1)(A).  This shows Congress intended "continued exercise of state power, not to handicap or dilute it."  *See Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015) (citation omitted).  What is "hereinabove provided" is CFTC's ability to enforce the CEA.  The clause says nothing about States enforcing sports wagering laws.  If there might be a clash between the two, that is a conflict preemption question.  *See infra* 51-59.  But this language doesn't convert a jurisdictional grant into an express preemption clause.  *Schuler II*, 2026 LX 220871, at *11; *see Fenner*, 113 F.4th at 603; *Medtronic*, 518 U.S. at 485.

*Second*, the CEA contains two express-preemption clauses, 7 U.S.C. §§16(e)(2), 16(h), on which Kalshi doesn't rely. Those provisions also undermine Kalshi's claim that "exclusive jurisdiction" actually means 'express preemption.' "When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning." *Bittner v. United States*, 598 U.S. 85, 94 (2023); *see Cipollone*, 505 U.S. at 517 (applying a similar principle to preemption); *Torres*, 995 F.3d at 491 (same). So whatever "exclusive jurisdiction" means, it cannot be "supersede and preempt the application of any State or local law"—otherwise, Congress would have used the same language it used in the express preemption provisions. 7 U.S.C. §16(e)(2); *see id.* §16(h).

Confirming this plain-text reading, §2(a)(1)(A)'s "modest words," *West Virginia*, 597 U.S. at 723, aren't the type of unambiguous language necessary to support an "extraordinary delegation[]" of "power[]" to the CFTC, *Learning Res.*, 146 S. Ct. at 638; *supra* 34-37 (major questions doctrine). Nor is it the type of "exceedingly clear language" needed "to significantly alter the balance between federal and state power." *Sackett*, 598 U.S. at 679 (citation omitted); *see supra* 37-38. Nor is it enough to

48

imply a repeal of existing federal gaming statutes. *See supra* 38-40. The upshot: Nothing in 7 U.S.C. §2(a)(1)(A) expressly preempts State sports-wagering laws.

### 2.   The CEA does not field preempt Tennessee law.

Field preemption is "rare." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). It *only* occurs when Congress has "left no room for supplementary state legislation." *Id.* (quotation omitted); *see Oneok*, 575 U.S. at 384-85. And that only happens when the "federal interest" is "so dominant" that Congress sought to preclude all State participation—like in the context of immigration registration or nuclear safety. *See Arizona v. United States*, 567 U.S. 387, 399 (2012) (citation omitted); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983).

The CEA doesn't come close. To the contrary, it "teem[s] with references to state involvement." *Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1129 (6th Cir. 2025); *see Torres*, 995 F.3d at 491-92 (similar). The CEA contains numerous clauses affirmatively inviting State participation. *Schuler II*, 2026 LX 220871, at *15-16 (collecting examples). This strikes out field preemption. Courts usually reject field preemption where there has been analogous State participation. *See id.* at *15

49

(collecting cases); *United States v. Texas*, 144 F.4th 632, 723-24 (5th Cir. 2025) (Oldham, J., dissenting), *vacated en banc by* 173 F.4th 659.

Proving the point, consider what would happen if Kalshi or one of its bettors were sued for breach of contract. Kalshi has said such suits "will be governed by New York Law." *Schuler II*, 2026 LX 220871, at *16 (citation omitted). But state-law claims in state courts is the *opposite* of field preemption. *Oneok*, 575 U.S. at 385; *see Dayton Power*, 126 F.4th at 1129-30; *Torres*, 995 F.3d at 491-92. In contradistinction, an immigration registration violation goes to federal immigration court. *Arizona*, 567 U.S. at 401-02. The CEA's regime doesn't remotely resemble federal immigration law. *Id.*

The Third Circuit held otherwise. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026). But its decision is not persuasive. It has almost no discussion of whether Kalshi's contracts are swaps. *Id.* at 227-28. The court ignored the major questions doctrine, the federalism canon, and the presumption against implied repeals. *Id.* at 228-31. Beyond that, its holding rests on the odd notion that States have no traditional role in regulating *interstate* gambling. *Id.* at 230 n.4. But until *Murphy* in 2018, there was almost no interstate market for sports wagers since nearly all

50

States outlawed the activity. *Murphy*, 584 U.S. at 462. And the primary federal statute, the Wire Act, has always tied federal illegality to State law. *Id.* at 484.

In all events, Tennessee seeks to regulate traditional sports wagering within its borders—not nationwide. "[T]he *target* at which the state law *aims*" is the relevant focus for preemption. *Oneok*, 575 U.S. at 385. And here, the target is *intra*state sports wagering. Tennessee law "says nothing and regulates nothing with respect to" interstate gambling or swaps trading. *Torres*, 995 F.3d at 491. It has "no intention of targeting the [CFTC's] scheme" but rather is engaged in an "earnest effort to regulate its residents' primary conduct." *Churchill Downs*, 162 F.4th at 639. That "lies at the heart of the state's police power." *Schuler II*, 2026 LX 220871, at *16 (citation omitted).

### 3. There is no conflict preemption.

Conflict preemption comes in two varieties: when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*,

51

373 U.S. 132, 142-43 (1963).  These are narrow categories.  *See Fenner*, 113 F.4th at 593-94.  It's a textbook rule that "[t]he mere fact that state laws ... overlap to some degree with federal [laws] does not even begin to make a case for conflict preemption."  *Garcia*, 589 U.S. at 211.  That is why there is generally "a high bar" to succeeding on conflict preemption claims.  *See Dayton Power*, 126 F.4th at 1128 (citation omitted).

Kalshi fails to hurdle that high bar.  Assuming Kalshi's contracts are "swaps"—and they are not—17 C.F.R. §40.11(a) commands that Kalshi "shall not" list its gaming contracts.  So federal and State law presently demand the exact same thing.  Still, Kalshi says CFTC regulations make it impossible to implement geography restrictions required by Tennessee law.  And that Tennessee law stands as an obstacle to the CEA's purpose.  Neither avails.  It's not impossible to comply with both Tennessee and federal law, nor does Tennessee law stand as an obstacle to federal objectives.  And the district court's contrary holding overlooked basic elements of preemption law.

**a. Rule 40.11.**  Kalshi's sports-event contracts are barred under federal law.  So there is no conflict at all between State and federal law.  17 C.F.R. §40.11(a)(1) categorically bans all contracts that "involve[],

52

relate[] to, or reference[] ... gaming." *Id.* The text of this "blanket" ban is pellucid, *Crypto*, 815 F.Supp.3d at 1186—a DCM "shall not list for trading" a gaming contract. 17 C.F.R. §40.11(a). Kalshi's sports-event contracts are gaming contracts; they are contingent on sports game outcomes. Compl., R.1, 16. That makes them gaming contracts which violate Rule 40.11. *See* 17 C.F.R. §40.11(a).

Once again, Kalshi previously took this exact position. In litigation related to its elections contracts, Kalshi told the D.C. Circuit, an "event contract" "involves 'gaming' if it is contingent on a game or a game-related event—like the Kentucky Derby, Super Bowl, or Masters golf tournament." *KalshiEX LLC, v. CFTC*, Brief of Appellee, 2024 WL 4802698, at *17 (D.C. Cir. 2024); *see also id.* at *44-45. And specifically Kalshi said, "Congress sought to prevent exchanges from facilitating casino-style or *sports gambling*." *Id.* at *45 (emphasis added).

Although Kalshi has now switched positions, what it said to the D.C. Circuit remains correct. A contract about a sports game—"like the Kentucky Derby, Super Bowl, or Masters golf tournament" is "gaming." *Id.* at *17. That contradicts Rule 40.11. *See* 17 C.F.R. §40.11(a).

53

Under Rule 40.11 Kalshi's conflict preemption claim goes nowhere because *both* legal regimes require the same thing. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330 (2008); *cf. Dayton Power*, 126 F.4th at 1128. Under federal law, Kalshi isn't allowed to list its contracts, and under State law Kalshi may not offer wagers without a license and paying taxes. Under *both* regimes Kalshi presently may not offer sports wagers. No conflict, no preemption. *Id.*[5]

**b. Impossibility.** "Impossibility pre-emption is a demanding defense." *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). It requires that compliance with both State and federal law be impossible. *Paul*, 373 U.S. at 142-43. In this context, "the key question is whether the private party could independently comply with its state duty—without relying on the prior exercise of federal-agency discretion." *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 584 (6th Cir. 2013) (citation omitted). And "*there is no impossibility* as long as the approval comes after the independent action of the private party (especially where denial is speculative and unlikely)." *Id.* (cleaned up).

---

[5] The Third Circuit's decision also took no account of Rule 40.11. *See Flaherty*, 172 F.4th at 240-41 (Roth J., dissenting).

54

Kalshi says it cannot comply with Tenn. Code Ann. §4-49-111 which requires that "a person who is twenty-one (21) years of age or older" and "is physically located in" Tennessee, *id.*, because doing so would violate its "impartial access" obligations" under the CFTC's core principles for DCMs.  PI-Mem., R.7, 167 (citing 17 C.F.R. §§38.151(b), 38.150).  And it says State-law compliance might jeopardize its status as a DCM.  *Id.* That doesn't meet the "demanding defense" of impossibility preemption for three independent reasons.  *Wyeth*, 555 U.S. at 573.

*First*, Kalshi is wrong about what "impartial access" requires.  PI-Mem., R.7, 167.  Kalshi argues that "impartial access" doesn't allow it to "accept trades only within one state."  *Id.*  But impartial access is "an anti-discrimination command, not [] a limit on a facially neutral require-ment."  *Schuler II*, 2026 LX 220871, at *18 (citation omitted).  If anything, the notice of proposed rulemaking suggests that impartial refers to *economic* means, not geographic locations.  *See Core Principles and Other Requirements for Designated Contract Markets*, 75 Fed. Reg. 80572, 80579 & n.51 (Dec. 22, 2010).  And the rule is designed to prohibit "dis-criminatory access requirements."  *Id.*  So "Kalshi would not discriminate against nonresidents of [Tennessee] by complying with the State's

55

gambling laws any more than a company would discriminate against nonresidents by charging [Tennessee] sales tax for the nonresident's in-state purchases." *Schuler II*, 2026 LX 220871, at \*18 (citation omitted).

*Second*, even if Kalshi is right about the regulatory requirement, concerns about how an agency *might* respond to Kalshi's State law compliance is "precisely the possibility of impossibility that *Wyeth* found insufficient to warrant preemption." *Fulgenzi*, 711 F.3d at 584 (citation omitted). The CFTC sanctioning Kalshi for failure to comply with the "impartial access" (or any other) requirement is "speculative and unlikely." *Id*. The agency has allowed Kalshi to flout Rule 40.11 and shown "solicitude to the sports event contracts industry." Mem.Op., R.48, 890 n.19. There is "nothing more than a convenient litigating position," "announced" in a CFTC "amicus brief[]," *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155, 159 (2012) (citation omitted), to suggest the CFTC would pursue enforcement. That is not enough. *Id*.

*Third*, the "impartial access" regulation by itself is not sufficient for preemption. Preemption "must stem from either the Constitution itself or a valid statute enacted by Congress." *Hencely v. Fluor Corp.*, 146 S.

Ct. 1086, 1093 (2026) (citation omitted).  Kalshi points to neither.  PI-Mem., R.7, 167.

That's fatal after *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).  Perhaps under *Chevron*, a preemption plaintiff might've said the agency's interpretation controls.  But in *Loper Bright*'s world, courts cannot look to a regulation alone; they must "determine the best reading of the statute in the first instance."  *In re MCP No. 185*, 124 F.4th 993, 997 (6th Cir. 2025) (citation omitted).  Kalshi points to nothing *in the statute* that makes compliance with Tennessee law impossible.  PI-Mem., R.7, 167.

In fact, the opposite is true.  The CEA suggests a regime that might vary by State.  7 U.S.C. §7a-2(c)(5)(C)(i)(I) contemplates the prohibition of contracts involving "activity that is unlawful under any … State law." *Id*.  That statutory text "suggests that certain contracts may be listed in some state markets but not others."  *Schuler II*, 2026 LX 220871, at *19. So assuming that CFTC's regulations create geographic impartiality requirements, the statute itself doesn't.  Under *Loper Bright*, that dooms Kalshi's case.  *See Hencely*, 146 S. Ct. at 1093.

57

**c. Obstacle.** Tennessee law also doesn't represent an obstacle to the CEA. There is no obstacle preemption "when the state laws further Congress's overall goal." *Dayton Power*, 126 F.4th at 1128. So the "high bar" Kalshi must clear to successfully argue obstacle preemption requires it prove that Tennessee law "directly interfere[s] with the operation" of the CEA. *Id.* at 1127-28. It doesn't.

Tennessee law works in tandem with the CEA, which expressly provides for State sports-wagering laws in parallel with the CEA. 7 U.S.C. §7a-2(c)(5)(C)(i)(V); 17 C.F.R. §40.11(a)(1). There is no evidence that Dodd-Frank's purpose was to transform the CFTC into the exclusive regulator of sports wagering. *Supra* 13-14. On the contrary, "[b]oth the text and purpose of the [CEA] contemplate a regime in which other [governmental entities] may share power with the CFTC over activities that lie outside the scope of [the CFTC's exclusive jurisdiction]." *Ken Roberts*, 276 F.3d at 591. That commonsense conclusion should resolve this case. *Dayton Power*, 126 F.4th at 1127-28.

Kalshi nevertheless claims that Tennessee law stands in the way of the CEA's central purpose of *uniformity* in derivatives markets. R.7, 164-66. "But 'no statute yet known pursues its stated purpose at all costs,'

58

and the statutory limits on achieving the purpose often are just as critical to its passage as the purpose itself." *Schuler II*, 2026 LX 220871, at \*18 (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017)); *see id.* (collecting cases).  And the CEA's "preservation of state regulation through its many savings clauses shows that uniformity isn't to be accomplished at all costs here too."  *Id.* (citation omitted). So Kalshi's "generic uniformity concerns" are not enough to establish obstacle preemption.  *Id.*

Moreover, Kalshi's appeal to uniformity is just a field preemption argument repackaged.  Kalshi cannot get around Congress's choice *not* to enact a scheme comprehensive enough for field preemption by insisting Congress nevertheless intended uniform regulation.

**d.  The District Court's Errors.**  The district court again did not address any clear statement rules—not a word about the presumption against preemption, major questions, federalism, or implied repeals. Mem.Op., R.48, 886-88.  And it likewise didn't address Rule 40.11, *id.*, so it never explained how there could be a conflict when Kalshi's contracts

59

are illegal under both federal and Tennessee law. *Supra* 52-54. Both grounds call for reversal.

Still, the district court's decision is wrong. For one, it centrally relied on abstract notions of uniformity, Mem.Op., R.48, 887-88, which this Court has already suggested aren't sufficient for preemption, *Schuler II*, 2026 LX 220871, at *18. For two, it agreed with Kalshi's regulatory interpretation, Mem.Op., R.48, 887, faulting the State for not "point[ing] to "caselaw" on "the purpose of CFTC's impartiality requirement." *Id.* But there was "nothing but [Kalshi's] *ipse dixit* that the CFTC would view geographic restrictions predicated on compliance with state law as" a violation. *Schuler I*, 2026 WL 657004, at *9.

Finally, the district court's holding was too broad. It's blackletter law that a "state law is 'conflict' preempted only 'to the extent it *actually* conflicts with federal law.'" *Fenner*, 113 F.4th at 594 (cleaned up). Kalshi points to only one potential conflict—Tennessee's geographic restriction. PI-Mem., R.7, 167 (citing Tenn. Code Ann. §4-49-111). One conflict isn't a get-out-of-jail-free card. Kalshi has never offered a reason it can't otherwise get a Tennessee license, pay wagering tax, or implement Tennessee consumer protections that don't implicate geography. *Supra* 8-9

60

(listing requirements). "None of those things [are] impossible" or an obstacle. *Fednav, Ltd. v. Chester*, 547 F.3d 607, 623 (6th Cir. 2008). So even if Kalshi prevails on conflict preemption, it *still* must comply with Tennessee law that is not in conflict. *Id.*; *see Torres*, 995 F.3d at 495 (a successful preemption plaintiff's remedy must be limited to actual conflicts).

### C. Kalshi is unlikely to demonstrate a cause of action or overcome Tennessee's sovereign immunity.

Kalshi is also unlikely to succeed on the merits because it has no express, implied, or equitable "private cause[] of action" that can maintain this suit. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). And because Kalshi cannot use *Ex parte Young*'s equitable cause of action, it cannot overcome Tennessee's sovereign immunity.

### 1. Kalshi has no express cause of action.

The CEA envisions three classes of plaintiffs who may enforce its statutory provisions: the CFTC, States, and certain, specified private parties. *See* 7 U.S.C. §§13a-1, 13a-2, 25(a)(2), (b)(5). The CEA goes as far as saying §25(a)(2) and §25(b)(5) are the "exclusive remed[ies]" for private parties. *Id.* But that "exclusive remedy" tightly "limit[s] claims to those of a plaintiff who actually traded in the commodities market."

61

*Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 260 (2d Cir. 2006).  That's not Kalshi.

To get around these statutory pre-requisites, Kalshi invokes the Supremacy Clause as its only cause of action.  Compl., R.1, 21-22.  But Supreme Court precedent forecloses that path.  It has expressly held the Supremacy Clause "does not create a cause of action."  *Armstrong,* 575 U.S. at 324-25; *see Lindsey v. Whitmer*, 124 F.4th 408, 415 (6th Cir. 2024).

That is no mere pleading defect.  *Contra Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam).  Here, it's Kalshi's burden to make a "clear showing" of entitlement to preliminary relief.  *Skrmetti*, 83 F.4th at 471; *EOG*, 134 F.4th at 874.  Kalshi cannot be *clearly entitled* to a preliminary injunction on a theory directly foreclosed by the Supreme Court.

### 2.  Kalshi has no cause of action in equity.

Kalshi argued below that it may bring this suit in equity "in the form of 'an equitable anti-suit injunction.'"  PI-Reply., R. 41, 465 (citation omitted).  The district court held the same.  Mem.Op., R.48, 880-81.  That notion is mistaken.

62

To be sure, *Armstrong* recognized that an equitable cause of action might be available for certain preemption claims. *Armstrong*, 575 U.S. at 327. But the Court limited that remedy, emphasizing that when Congress vests enforcement authority elsewhere, it may "establish Congress's 'intent to *foreclose* equitable relief.'" *Id.* at 328 (cleaned up). The CEA does so.

As discussed above, the CEA has a reticulated set of enforcement procedures, which carefully divides enforcement authority among the CFTC, States, and certain private parties. "The limited private right of action provided by [the CEA] is by itself sufficient to establish that Congress intended to foreclose equitable relief." *Coal. for Competitive Elec., Dynegy Inc. v. Zibelman*, 272 F.Supp.3d 554, 566 (S.D.N.Y. 2017). When statutes have "a narrow private cause of action allowing private lawsuits in some but not most cases," that clearly indicates "that Congress chose to eliminate general equitable relief for private parties." *Id.*; *see Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utilities*, 410 F.Supp.3d 943, 956-57 (S.D. Ind. 2019) (same); *Pastoriza v. Pub. Serv. Co. of New Hampshire*, 2025 WL 662935, at *2 (D.N.H. Feb. 28, 2025) (same). On that score, in §1983 context, this Court has found "it difficult to believe

63

'that Congress intended to preserve'" a background right of action when there are "so many specific statutory remedies, including the two [express remedy] provisions." *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 962 (6th Cir. 2013) (quoting *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981)).

So too here. The CEA's comprehensive enforcement scheme shows Congress has "displac[ed]" Kalshi's claim for "equitable relief." *Armstrong*, 575 U.S. at 329; *see Zibelman*, 272 F.Supp.3d at 566; *Lawrenceburg Power*, 410 F.Supp.3d at 956-57; *Pastoriza*, 2025 WL 662935, at *2; *cf. Sandoval*, 532 U.S. at 286; *Diaz*, 703 F.3d at 962.

True, a district court recently found that a *different* gambling statute didn't displace equity. *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 767 F.Supp.3d 556, 569-70 (W.D. Mich. 2025). But central to that court's reasoning was the notion that the statute lacked an "exclusive remedy." *Id.* at 569. The CEA *does* have "exclusive remedy" provisions. *See* 7 U.S.C. §§25(a)(2), 25(b)(5).

Before *Armstrong*, this Court had suggested—in dicta—that litigants may have a cause of action when they "wield *Ex parte Young* as a cause-of-action-creating … shield" as opposed to a "*sword.*" *Mich. Corr.*

64

*Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) (neverthe-less holding plaintiffs had no cause of action).  But the Supreme Court clarified in *Armstrong* that "[t]he power of federal courts of equity to en-join unlawful executive action *is subject to express and implied statutory limitations.*"  575 U.S. at 327 (emphasis added).  That makes *all* equity subject to statutory limitation, regardless of whether a plaintiff wields *Ex parte Young* as a sword or a shield.  *Id.*; *see* Fallon, *Constitutional Remedies: In One Era & Out the Other*, 136 Harv. L. Rev. 1300, 1328 (2023) (same).  And *Armstrong* didn't make shield-based equity unabro-gatable by Congress.  575 U.S. at 327.[6]  That is why post-*Armstrong* cases recognize the "equity power to enjoin unlawful state or local action may, nevertheless, be limited by statute."  *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 145 (2d Cir. 2016).

---

[6] Recent scholarship has illuminated that there were no general anti-suit injunctions "accorded by courts of equity at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (citation omitted); *see* Pfander & Wentzel, *The Common Law Origins of* Ex parte Young, 72 Stan. L. Rev. 1269, 1272 n.8 (2020) (arguing that all-purpose anti-suit injunctions get "the history backwards"); Oldham, *et al.*, *The* Ex parte Young *Cause of Action: A Riddle, Wrapped in a Mystery, Inside an Enigma*, 120 Nw. U. L. Rev. 1697, 1710-13 (2026) (explaining that at the Founding an anti-suit injunction needed to be grounded in an equitable defense, unavailable at law, like mistake or fraud).

The question under *Armstrong* is: has the CEA provided a system that replaces background notions of equity? The answer is yes. *Supra* 61-62. Kalshi "cannot, by invoking [courts'] equitable powers, circumvent" the CEA's statutory limits. *Armstrong*, 575 U.S. at 328. Not including a cause of action for Kalshi isn't a Congressional oversight, but a deliberate choice. *See, e.g.*, 29 U.S.C. §1132 (ERISA's statutory cause of action "to enjoin any act or practice" which violates the Act); *cf. Schuler II*, 2026 LX 220871, at *11 (using ERISA as the classic example of preemption).

This Court has "no warrant to revise Congress's scheme simply because it did not 'affirmatively' preclude the availability of a judge-made action at equity." *Armstrong*, 575 U.S. at 329. To read an "unmentioned, open-ended, 'equitable' exception[] into the" CEA's enforcement scheme would be an end-run around statutory design. *Enbridge Energy, LP v. Nessel*, 146 S. Ct. 1074, 1082 (2026) (citation omitted). It would render the CEA's careful distribution of power between the CFTC, States, and private parties, a dead letter.

66

### 3. Sovereign immunity bars Kalshi's claim.

For the same reason that Kalshi lacks a cause of action in equity, the State has sovereign immunity to Kalshi's suit. Kalshi invokes *Ex parte Young* to avoid state sovereign immunity. Compl., R.1, 7. In certain circumstances, *Ex parte Young* allows "a narrow exception [to sovereign immunity] grounded in traditional equity practice." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). But *Ex parte Young* doesn't apply when "Congress has prescribed a detailed remedial scheme." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996). And regardless, as discussed above, this suit doesn't fit within traditional equity practice. *See supra* 62-65 & n.6.

## II. The remaining preliminary injunction factors favor Tennessee.

The district court found the equities and public interest favor Plaintiffs based on Kalshi's "expenses and reputational harm if it complies with Tennessee's demands." Mem.Op., R.48, 891. Meanwhile, it found the State would "likely face no harm." *Id.* Not so.

*First*, "he who comes into equity must come with clean hands." *Cleveland Newspaper Guild, Loc. 1 v. Plain Dealer Pub. Co.*, 839 F.2d 1147, 1155 (6th Cir. 1988). Kalshi has not. When Kalshi started self-

certifying sports-event contracts, it knew (and had argued to the D.C. Circuit) that such contracts would violate federal law. *Supra* 6, 53. Kalshi now backs a different horse. Equity doesn't reward such gamesmanship. *Plain Dealer Pub.*, 839 F.2d at 1155.

*Second*, a State is always injured when its laws are enjoined. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). So always it is "in the public interest" to enforce the State's democratically enacted laws. *See Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020).

Beyond that, the preliminary injunction prevents Tennessee from protecting its citizens from problem gambling. Sports wagering can be highly addictive, especially for young males. *Supra* 9. That is why Tennessee ensures any person who participates in sports wagering is: over the age of 21, not financing wagers with credit cards, and allowed to exclude themselves from a wagering platform. *Id.* at 8-9. So long as this injunction remains in place, these safety mechanisms remain sidelined. And each day Kalshi refuses to pay wagering tax, it deprives Tennessee of revenue to fund its schools and remediate the problem gambling that Kalshi exacerbates. *Id.* at 9-10. That is the opposite of public interest.

68

Assuming arguendo that Kalshi could demonstrate irreparable harm, the balance of harms favors Tennessee.  Kalshi is not clearly entitled to an injunction.

## III.  At minimum, the district court erred by granting broader relief than necessary.

Federal Rule of Civil Procedure Rule 65(d) requires an injunction to both "state its terms specifically" and do so without "referring to the complaint or other document."  *Union Home Mortgage Corp. v. Cromer*, 31 F.4th 356, 362 (6th Cir. 2022) (citation omitted).  These provisions "are no mere technical requirements."  *Id.*  (citation omitted).  A court must specify, "within the four corners of the injunction," which provisions a defendant is "refrain[ed] from" enforcing.  *James B. Oswald Co. v. Neate*, 98 F.4th 666, 678 (6th Cir. 2024) (cleaned up).

The district court did not do so, and that is a "fatal flaw[]."  *Id.* at 679.  It "grant[ed] the plaintiff's Motion for Preliminary Injunction … as to the state official defendants and den[ied] it as to the state agency."  Mem.Op., R.48, 893; *see* Order, R.49, 894 (same).  It didn't specify which statutory provisions Defendants cannot enforce, and relief was entirely in reference to Plaintiff's PI motion.  *Id.*  Especially since the court *only* could have enjoined Tennessee law "to the extent it actually conflicts with

69

federal law," *supra* 60 (quotation omitted), the order is impermissibly am-

biguous.  *See Cromer*, 31 F.4th at 362; *Neate*, 98 F.4th at 678.

## CONCLUSION

This Court should reverse the preliminary injunction.

Dated: May 18, 2026                    Respectfully submitted,

                                       Jonathan Skrmetti
                                         *Attorney General & Reporter*

                                       */s/ Aaron L. Bernard*
                                       *Assistant Solicitor General*
                                       *Counsel of Record*

                                       Michael Wennerlund
                                         *Assistant Attorney General*

                                       Walker Anderson
                                         *Honors Fellow*

                                       OFFICE OF THE TENNESSEE
                                       ATTORNEY GENERAL & REPORTER
                                       P.O. Box 20207
                                       Nashville, TN 37202
                                       (615) 532-3234
                                       Aaron.Bernard@ag.tn.gov

                                       *Counsel for Defendants-Appellants*

70

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's type-volume limitations because it contains 12,988 words, excluding portions omitted from the Court's required word count.

This brief complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Century Schoolbook font.

*/s/ Aaron L. Bernard*
AARON L. BERNARD

## CERTIFICATE OF SERVICE

On May 18, 2026, I filed an electronic copy of this brief with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under 6 Cir. R. 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

*/s/ Aaron L. Bernard*
AARON L. BERNARD

## ADDENDUM

**Page**

Designation of Court Documents ...............................................…...A-1

Statutory and Regulatory Provisions ................................................ A-2

# DESIGNATION OF COURT DOCUMENTS

*KalshiEX LLC v. Orgel*
No. 3:26-cv-00034 (M.D. Tenn.)

| Document | R. | PageID# |
|---|---|---|
| Complaint | 1 | 1-25 |
| Kalshi Motion for Preliminary Injunction | 6 | 136-37 |
| Kalshi Memorandum in Support of Motion for Preliminary Injunction | 7 | 141-175 |
| Defendants' Opposition to Kalshi's Motion for Preliminary Injunction | 34 | 283-326 |
| Declaration of Mary Beth Thomas | 35 | 390-95 |
| Exhibit A to Thomas Declaration | 35-1 | 396-98 |
| Exhibit B to Thomas Declaration | 35-2 | 399-403 |
| Declaration of Randall Bechtel | 36 | 404-07 |
| Exhibit A to Bechtel Declaration | 36-1 | 408-10 |
| Exhibit B to Bechtel Declaration | 36-2 | 411 |
| Exhibit C to Bechtel Declaration | 36-3 | 412 |
| Exhibit D to Bechtel Declaration | 36-4 | 413 |
| Exhibit E to Bechtel Declaration | 36-5 | 414 |
| Exhibit F to Bechtel Declaration | 36-6 | 415-17 |
| Exhibit G to Bechtel Declaration | 36-7 | 418-19 |
| Exhibit H to Bechtel Declaration | 36-8 | 420-21 |
| Kalshi's Reply in Support of Motion for Preliminary Injunction | 41 | 460-76 |
| Memorandum Opinion | 48 | 869-93 |
| Order Granting Preliminary Injunction | 49 | 894 |
| Notice of Appeal | 54 | 921-22 |

A-1

# STATUTORY AND REGULATORY PROVISIONS

7 U.S.C. §1a(19) ..................................................................................... A-3

7 U.S.C. §1a(47) ..................................................................................... A-4

7 U.S.C. §2(a)(1)(A) ............................................................................. A-11

7 U.S.C. §2(e) ....................................................................................... A-11

7 U.S.C. §7a-2(c)(C) ............................................................................ A-12

7 U.S.C. §13a-1 .................................................................................... A-13

7 U.S.C. §13a-2 .................................................................................... A-16

7 U.S.C. §16(e) ..................................................................................... A-18

7 U.S.C. §16(h) ..................................................................................... A-20

7 U.S.C. §25(a)(2) ................................................................................ A-20

7 U.S.C. §25(b)(5) ................................................................................ A-20

Tenn. Code Ann. §4-49-102 .................................................................. A-21

Tenn. Code Ann. §4-49-103 .................................................................. A-25

Tenn. Code Ann. §4-49-104 .................................................................. A-25

Tenn. Code Ann. §4-49-105(a) .............................................................. A-27

Tenn. Code Ann. §4-49-109 .................................................................. A-28

Tenn. Code Ann. §4-49-111 .................................................................. A-28

Tenn. Code Ann. §4-49-112 .................................................................. A-28

17 C.F.R. §38.150 ................................................................................. A-31

17 C.F.R. §38.151(b) ............................................................................ A-31

17 C.F.R. §40.2 ..................................................................................... A-32

17 C.F.R. §40.11 ................................................................................... A-35

A-2

**7 U.S.C. § 1a(19)**

**(19) Excluded commodity**

The term "excluded commodity" means—

**(i)** an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

**(ii)** any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

**(I)** not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

**(II)** based solely on 1 or more commodities that have no cash market;

**(iii)** any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

**(iv)** an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

**(I)** beyond the control of the parties to the relevant contract, agreement, or transaction; and

**(II)** associated with a financial, commercial, or economic consequence.

A-3

**7 U.S.C. § 1a(47)**

**(47) Swap**

**(A) In general**

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction—

**(i)** that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

**(ii)** that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

**(iii)** that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including

A-4

any agreement, contract, or transaction commonly known as—

**(I)** an interest rate swap;

**(II)** a rate floor;

**(III)** a rate cap;

**(IV)** a rate collar;

**(V)** a cross-currency rate swap;

**(VI)** a basis swap;

**(VII)** a currency swap;

**(VIII)** a foreign exchange swap;

**(IX)** a total return swap;

**(X)** an equity index swap;

**(XI)** an equity swap;

**(XII)** a debt index swap;

**(XIII)** a debt swap;

**(XIV)** a credit spread;

**(XV)** a credit default swap;

**(XVI)** a credit swap;

**(XVII)** a weather swap;

**(XVIII)** an energy swap;

**(XIX)** a metal swap;

**(XX)** an agricultural swap;

**(XXI)** an emissions swap; and

**(XXII)** a commodity swap;

A-5

**(iv)** that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

**(v)** including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

**(vi)** that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

**(B) Exclusions**

The term "swap" does not include—

**(i)** any contract of sale of a commodity for future delivery (or option on such a contract), leverage contract authorized under section 19 [7 USCS § 23], security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i) [7 USCS § 2(c)(2)(C)(i) or (D)(i)];

**(ii)** any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled;

**(iii)** any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof, that is subject to—

> **(I)** the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

**(II)** the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

**(iv)** any put, call, straddle, option, or privilege relating to a foreign currency entered into on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a));

**(v)** any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a fixed basis that is subject to—

**(I)** the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

**(II)** the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

**(vi)** any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a contingent basis that is subject to the Securities Act of 1933 (15 U.S.C. 77a et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), unless the agreement, contract, or transaction predicates the purchase or sale on the occurrence of a bona fide contingency that might reasonably be expected to affect or be affected by the creditworthiness of a party other than a party to the agreement, contract, or transaction;

**(vii)** any note, bond, or evidence of indebtedness that is a security, as defined in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1));

**(viii)** any agreement, contract, or transaction that is—

**(I)** based on a security; and

A-7

**(II)** entered into directly or through an underwriter (as defined in section 2(a)(11) of the Securities Act of 1933 (15 U.S.C. 77b(a)(11)) by the issuer of such security for the purposes of raising capital, unless the agreement, contract, or transaction is entered into to manage a risk associated with capital raising;

**(ix)** any agreement, contract, or transaction a counterparty of which is a Federal Reserve bank, the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States; and

**(x)** any security-based swap, other than a security-based swap as described in subparagraph (D).

**(C)  Rule of construction regarding master agreements**

**(i)** In general. Except as provided in clause (ii), the term "swap" includes a master agreement that provides for an agreement, contract, or transaction that is a swap under subparagraph (A), together with each supplement to any master agreement, without regard to whether the master agreement contains an agreement, contract, or transaction that is not a swap pursuant to subparagraph (A).

**(ii)** Exception. For purposes of clause (i), the master agreement shall be considered to be a swap only with respect to each agreement, contract, or transaction covered by the master agreement that is a swap pursuant to subparagraph (A).

**(D)  Mixed swap**

The term "security-based swap" includes any agreement, contract, or transaction that is as described in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)) and also is based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence (other than an event described in subparagraph (A)(iii)).

**(E)  Treatment of foreign exchange swaps and forwards**

> **(i)**  In general. Foreign exchange swaps and foreign exchange forwards shall be considered swaps under this paragraph unless the Secretary makes a written determination under section 1b of this title that either foreign exchange swaps or foreign exchange forwards or both—

>> **(I)**  should be not be regulated as swaps under this Act; and

>> **(II)**  are not structured to evade the Dodd-Frank Wall Street Reform and Consumer Protection Act in violation of any rule promulgated by the Commission pursuant to section 721(c) of that Act.

> **(ii)**  Congressional notice; effectiveness. The Secretary shall submit any written determination under clause (i) to the appropriate committees of Congress, including the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives. Any such written

determination by the Secretary shall not be effective until it is submitted to the appropriate committees of Congress.

**(iii)** Reporting. Notwithstanding a written determination by the Secretary under clause (i), all foreign exchange swaps and foreign exchange forwards shall be reported to either a swap data repository, or, if there is no swap data repository that would accept such swaps or forwards, to the Commission pursuant to section 4r of this title within such time period as the Commission may by rule or regulation prescribe.

**(iv)** Business standards. Notwithstanding a written determination by the Secretary pursuant to clause (i), any party to a foreign exchange swap or forward that is a swap dealer or major swap participant shall conform to the business conduct standards contained in section 6s(h) of this title.

**(v)** Secretary. For purposes of this subparagraph, the term "Secretary" means the Secretary of the Treasury.

**(F)** Exception for certain foreign exchange swaps and forwards.

**(i)** Registered entities. Any foreign exchange swap and any foreign exchange forward that is listed and traded on or subject to the rules of a designated contract market or a swap execution facility, or that is cleared by a derivatives clearing organization, shall not be exempt from any provision of this chapter or amendments made by the Wall Street Transparency and Accountability Act of 2010 prohibiting fraud or manipulation.

A-10

**7 U.S.C. § 2(a)(1)(A)**

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

**7 U.S.C. § 2(e)**

**(e) Limitation on participation.**   It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.

A-11

**7 U.S.C. § 7a-2(c)(C)**

**(C)  Special rule for review and approval of event contracts and swaps contracts**

**(i)**  Event contracts. In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

**(I)**  activity that is unlawful under any Federal or State law;

**(II)**  terrorism;

**(III)**  assassination;

**(IV)**  war;

**(V)**  gaming; or

**(VI)**  other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

**(ii)**  Prohibition. No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

**(iii)**  Swaps contracts.

**(I)**  In general. In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own

A-12

motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

**(II)** Requirements. Any such criteria, conditions, or rules shall consider—

**(aa)** the financial integrity of the derivatives clearing organization; and

**(bb)** any other factors which the Commission determines may be appropriate.

**(iv)** Deadline. The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation.

## 7 U.S.C. § 13a-1

**(a) Action to enjoin or restrain violations.** Whenever it shall appear to the Commission that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery or any swap, the Commission may bring an action in the proper district court of the United States or the proper United States court of any territory or other place subject to the jurisdiction of the United States, to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder, and said courts shall have jurisdiction to entertain such actions: *Provided,* That no restraining order (other than a restraining order which prohibits any person from destroying, altering or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records or other documents or which

A-13

prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property, and other than an order appointing a temporary receiver to administer such restraining order and to perform such other duties as the court may consider appropriate) or injunction for violation of the provisions of this chapter shall be issued ex parte by said court.

**(b) Injunction or restraining order.**   Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

**(c) Writs or other orders.**   Upon application of the Commission, the district courts of the United States and the United States courts of any territory or other place subject to the jurisdiction of the United States shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder, including the requirement that such person take such action as is necessary to remove the danger of violation of this chapter or any such rule, regulation, or order: *Provided,* That no such writ of mandamus, or order affording like relief, shall be issued ex parte.

**(d) Civil penalties.**

    **(1)** In general. In any action brought under this section, the Commission may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation—

        **(A)** a civil penalty in the amount of not more than the greater of $100,000 or triple the monetary gain to the person for each violation; or

        **(B)** in any case of manipulation or attempted manipulation in violation of section 9, 15, 13b, or 13(a)(2) of this title, a civil penalty in the amount of not more than the

A-14

greater of $1,000,000 or triple the monetary gain to the person for each violation.

**(2)**  If a person on whom such a penalty is imposed fails to pay the penalty within the time prescribed in the court's order, the Commission may refer the matter to the Attorney General who shall recover the penalty by action in the appropriate United States district court.

**(3)**  Equitable remedies. In any action brought under this section, the Commission may seek, and the court may impose, on a proper showing, on any person found in the action to have committed any violation, equitable remedies including—

**(A)**  restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses); and

**(B)**  disgorgement of gains received in connection with such violation.

**(e) Venue and process.**   Any action under this section may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or in the district where the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

**(f) Action by Attorney General.**   In lieu of bringing actions itself pursuant to this section, the Commission may request the Attorney General to bring the action.

**(g) Notice to Attorney General of action brought by Commission.**   Where the Commission elects to bring the action, it shall inform the Attorney General of such suit and advise him of subsequent developments.

**(h) Notice of investigations and enforcement actions.**   The Commission shall provide the Securities and Exchange

A-15

Commission with notice of the commencement of any proceeding and a copy of any order entered by the Commission against any futures commission merchant or introducing broker registered pursuant to section 6f(a)(2) of this title, any floor broker or floor trader exempt from registration pursuant to section 6f(a)(3) of this title, any associated person exempt from registration pursuant to section 6k(6) of this title, or any board of trade designated as a contract market pursuant to section 7b-1 of this title.

## 7 U.S.C. § 13a-2

**(1)** Whenever it shall appear to the attorney general of any State, the administrator of the securities laws of any State, or such other official as a State may designate, that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader) has engaged in, is engaging or is about to engage in, any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity or an action at law on behalf of its residents to enjoin such act or practice, to enforce compliance with this chapter, or any rule, regulation, or order of the Commission thereunder, to obtain damages on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

**(2)** The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia, shall have jurisdiction of all suits in equity and actions at law brought under this section to enforce any liability or duty created by this chapter or any rule, regulation, or order of the Commission thereunder, or to obtain damages or other relief with respect thereto. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders

A-16

affording like relief, commanding the defendant to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder, including the requirement that the defendant take such action as is necessary to remove the danger of violation of this chapter or of any such rule, regulation, or order. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

**(3)** Immediately upon instituting any such suit or action, the State shall serve written notice thereof upon the Commission and provide the Commission with a copy of its complaint, and the Commission shall have the right to (A) intervene in the suit or action and, upon doing so, shall be heard on all matters arising therein, and (B) file petitions for appeal.

**(4)** Any suit or action brought under this section in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

**(5)** For purposes of bringing any suit or action under this section, nothing in this chapter shall prevent the attorney general, the administrator of the State securities laws, or other duly authorized State officials from exercising the powers conferred on them by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

**(6)** For purposes of this section, "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

**(7)** Nothing contained in this section shall prohibit an authorized State official from proceeding in State court on the basis of an

A-17

alleged violation of any general civil or criminal antifraud statute of such State.

**(8)**

**(A)** Nothing in this chapter shall prohibit an authorized State official from proceeding in a State court against any person registered under this chapter (other than a floor broker, floor trader, or registered futures association) for an alleged violation of any antifraud provision of this chapter or any antifraud rule, regulation, or order issued pursuant to the chapter.

**(B)** The State shall give the Commission prior written notice of its intent to proceed before instituting a proceeding in State court as described in this subsection and shall furnish the Commission with a copy of its complaint immediately upon instituting any such proceeding. The Commission shall have the right to (i) intervene in the proceeding and, upon doing so, shall be heard on all matters arising therein, and (ii) file a petition for appeal. The Commission or the defendant may remove such proceeding to the district court of the United States for the proper district by following the procedure for removal otherwise provided by law, except that the petition for removal shall be filed within sixty days after service of the summons and complaint upon the defendant. The Commission shall have the right to appear as amicus curiae in any such proceeding.

## 7 U.S.C. § 16(e)

### (e) Relation to other law, departments, or agencies

**(1)** Nothing in this chapter shall supersede or preempt—

**(A)** criminal prosecution under any Federal criminal statute;

**(B)** the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or

A-18

regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest—

    **(i)** that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

    **(ii)** (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

    **(iii)** that is not subject to regulation by the Commission under section 6c or 23 of this title; or

**(C)** the application of any Federal or State statute, including any rule or regulation thereunder, to any person required to be registered or designated under this chapter who shall fail or refuse to obtain such registration or designation.

**(2)** This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of—

**(A)** an electronic trading facility excluded under section 2(e) of this title;

**(B)** an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter.

A-19

**7 U.S.C. § 16(h)**

> **(h) Regulation of swaps as insurance under State law.** A swap—
>
>> **(1)** shall not be considered to be insurance; and
>>
>> **(2)** may not be regulated as an insurance contract under the law of any State.

**7 U.S.C. 25(a)(2)**

> **(a)** Actual damages; actionable transactions; exclusive remedy.
>
> …
>
>> **(2)** Except as provided in subsection (b), the rights of action authorized by this subsection and by sections 7(d)(13), 7a-1(c)(2)(H), and 21(b)(10) of this title shall be the exclusive remedies under this chapter available to any person who sustains loss as a result of any alleged violation of this chapter. Nothing in this subsection shall limit or abridge the rights of the parties to agree in advance of a dispute upon any forum for resolving claims under this section, including arbitration.

**7 U.S.C. 25(b)(5)**

> **(b)** Liabilities of organizations and individuals; bad faith requirement; exclusive remedy.
>
> …
>
>> **(5)** The rights of action authorized by this subsection shall be the exclusive remedy under this chapter available to any person who sustains a loss as a result of (A) the alleged failure by a registered entity or registered futures association or by any officer, director, governor, committee member, or employee to enforce any bylaw, rule, regulation, or resolution referred to in paragraph (1) or (2) of this subsection, or (B) the taking of action in enforcing any bylaw, rule, regulation, or resolution referred to in this subsection that is alleged to have violated this chapter, or any Commission rule, regulation, or order.

A-20

**Tenn. Code Ann. § 4-49-102**

As used in this part, unless the context otherwise requires:

**(1)** [Deleted by 2023 amendment.]

**(2)** "Bettor" means a person who is:

**(A)** Twenty-one (21) years of age or older;

**(B)** Physically present in this state when placing a wager with a licensee; and

**(C)** Not prohibited from placing a wager under § 4-49-112;

**(3)** "Bond" means a bond held in escrow for the purpose of maintaining adequate reserves to account for losses suffered by a licensee and owed to bettors;

**(4)** "Cancelled wager" means a wager that was legal and appropriate when originally placed by the bettor, but some event, circumstance, or occurrence prevents the wager from being unequivocally determined in accordance with the licensee's approved house rules or internal controls;

**(5)** "Cheating" means improving the chances of winning or of altering the outcome by deception, interference, or manipulation of a sporting event or of any equipment, including software pertaining to or used in relation to the equipment, used for or in connection with the sporting event on which wagers are placed or are invited, including attempts and conspiracy to cheat;

**(6)** "Collegiate" means belonging to, or involving, a public or private institution of higher education;

**(7)** "Collegiate sporting event" means a sporting or athletics event involving a sports or athletics team of a public or private institution of higher education;

**(8)** "Council" means the sports wagering council;

A-21

**(9)** "E-sport" means any multiplayer video game played competitively for spectators, either in-person or via remote connection, in which success principally depends upon the superior knowledge, training, experience, and adroitness of the players;

**(10)** "Fixed-odds betting" means bets made at predetermined odds or on the spread where the return to the bettor is unaffected by any later change in odds or the spread;

**(11)** "Future bet" means a wager made on the occurrence of an event in the future relating to a sporting event;

**(12)** "Gross handle" means the total amount of gross wagers less cancelled or voided wagers received by the licensee over a specified period of time;

**(13)** "Gross wager":

    **(A)** Means all cash and promotional wagers received by licensees from bettors as wagers; and

    **(B)** Includes all wagers placed with cash, cash equivalents, promotional items, and all other media by which a bettor is allowed to place a wager;

**(14)** "Interactive sports wagering" means placing a wager on a sporting event via the internet, a mobile device, or other telecommunications platform;

**(15)** "Key personnel" means individuals who have the power to exercise significant influence over sports wagering in this state and who are associated with the applicant for licensure or registration as:

    **(i)** A principal owner of more than five percent (5%) of the applicant;

    **(ii)** A partner of the applicant, voting member on the board of directors of the applicant, or an officer of the

A-22

applicant, as those terms are defined in title 48 or 61, as applicable; or

**(iii)** An employee of the applicant who principally oversees wagering activity, risk management, platform management, or integrity monitoring;

**(16)** "License" means a license to accept wagers from bettors on sporting events issued under § 4-49-117;

**(17)** "Licensee" means a person who holds a license issued under § 4-49-117;

**(18)** "Live betting" means a type of wager that is placed after the sporting event being wagered on has commenced and whose odds on events occurring are adjusted in real time;

**(19)** "Minor" means a person who is less than twenty-one (21) years of age;

**(20)** "Money line wager" means a wager on the outcome of a sporting event outright, with fixed odds in relation to the dollar amount wagered;

**(21)** "Obvious error" means either a human or technical error that results in a licensee offering wagers at terms, prices, or odds that are materially different from the general market or clearly incorrect given the chance of the event happening at the time the wager was accepted;

**(22)** [Deleted by 2023 amendment.]

**(23)** "Online sports wagering platform" means the combination of hardware, software, and data networks used to manage, administer, or control sports wagering and any associated wagers accessible by any electronic means, including mobile applications and internet websites accessed via a mobile device or computer;

A-23

**(24)** "Pari-mutuel betting" means a type of bet in which all wagers on a particular occurrence are pooled and winnings are paid in accordance with the size of the pool and the number of winners;

**(25)** "Parlay bet" means a single wager that incorporates two (2) or more individual bets for purposes of earning a higher payout if each bet incorporated within the wager wins;

**(26)** "Person" means an individual, group of individuals, trust, or business entity;

**(27)** [Deleted by 2023 amendment.]

**(28)** "Promotional payout" means a payout by a licensee to a bettor in a form that cannot be immediately withdrawn by the bettor as cash;

**(29)** "Promotional wager" means a wager placed by a licensee using a bonus or other non-cash item;

**(30)** "Proposition bet" means a wager made regarding the occurrence or nonoccurrence during a sporting event of an event that does not directly affect the final outcome of the sporting event;

**(31)** "Registrant" means a person who holds a registration issued under § 4-49-133;

**(32)** "Resettled wager" means a wager that was settled incorrectly by a licensee due to a statistical correction, technical error, or human error;

**(33)** "Sporting event" means any professional sporting or athletic event, including motorsports and e-sports, any collegiate sporting or athletic event, or any Olympic sporting or athletic event sanctioned by a national or international organization or association. "Sporting event" does not include horse racing;

A-24

**(34)** "Sports governing body" means the organization, league, or association that oversees a sport and prescribes final rules and enforces codes of conduct with respect to such sport and participants therein;

**(35)** "Spread" means the predicted scoring differential between two (2) persons or teams engaged in a sporting event;

**(36)** "Supervisory employee" means a principal or employee having the authority to act on behalf of a licensee or whose judgment is being relied upon to manage and advance the business operations of a licensee; …

**(39)** "Wager" or "bet" means a sum of money that is risked by a bettor on the unknown outcome of one (1) or more sporting events, including, but not limited to, the form of fixed-odds betting, a future bet, live betting, a money line bet, pari-mutuel betting, parlay bet, pools, proposition bet, spread bet, or in any other form or manner as authorized by rule promulgated by the council.

## Tenn. Code Ann. § 4-49-103

A person issued a license to offer interactive sports wagering or a registration as a vendor under this part is subject to all provisions of this part relating to licensure, registration, regulation, and civil and criminal penalties.

## Tenn. Code Ann. § 4-49-104

**(a)** It is a taxable privilege to offer sports wagering in this state under a license issued in accordance with this part. Notwithstanding another state law to the contrary, a licensee shall only pay a privilege tax on  its gross handle in accordance with this section.

**(b)** There is imposed upon the gross handle of a licensee a privilege tax of one and eighty-five one hundredths percent (1.85%).

A-25

**(c)** The tax imposed under this section must be paid monthly by a licensee based on its gross handle for the immediately preceding calendar month, in accordance with rules promulgated by the council. A licensee may deduct from its gross handle the amount of federal excise tax paid each month, in accordance with rules promulgated by the council. A licensee shall not deduct from the gross handle winning payouts to bettors or promotional wagers or payouts. The council shall promulgate rules to specify the method by which a licensee must account for adjustments to the gross handle for wagers that are cancelled or voided and repeal all rules related to the privilege tax on adjusted gross income.

**(d)** For the purpose of enforcing this part and ascertaining the amount of tax due under this section, the council may competitively procure the services of an outside contractor to provide a central accounting and reporting system, to ascertain all bets wagered minus the total amount paid out to winning bettors daily, and such other information as the council may require. All licensees shall utilize such central accounting and reporting system.

**(e)**

>**(1)**

>>**(A)** Except as provided in subsection (f), eighty percent (80%) of the privilege tax collected under this section must be distributed by the council to the state treasurer for deposit into an account, to be known as the disbursement account, which is administered by the state treasurer for use by local education agencies (LEAs), as defined in § 49-1-103, for the construction and maintenance of public school buildings. …

>**(2)** Fifteen percent (15%) of the privilege tax collected under this section must be distributed by the council quarterly to the state treasurer for deposit into the general fund, to be remitted quarterly to each local government in this state on a per

A-26

capita basis, as determined by population based on the last federal census. For purposes of calculating the allocation, the population of counties excludes the population of each municipality within the boundaries of the county. Funds remitted to a local government under this subdivision (e)(2) must be allocated to the county or city general fund, as applicable, to be used for emergency services or local infrastructure projects, including, without limitation, transportation and road projects and public buildings. Notwithstanding another law to the contrary, the allocation and distribution of moneys to counties and municipalities under this subdivision (e)(2) must be made according to the revised populations certified by the department of economic and community development under § 4-3-710, except in instances where a jurisdiction's population is revised as a result of a special census or in a year in which populations are revised as a result of the regular decennial federal census.

**(3)** Five percent (5%) of the privilege tax collected under this section must be distributed by the council to the state treasurer and allocated to the department of mental health and substance abuse services to use in the manner prescribed by § 4-49-119. …

## Tenn. Code Ann. § 4-49-105(a)

**(a)**

**(1)** There is created the sports wagering council to enforce this part and supervise compliance with laws relating to the regulation and control of wagering on sporting events in this state.

**(2)** The council shall hire an executive director to direct and oversee the day-to-day operations and management of sports gaming under this part and other employees as deemed necessary by the council to assist the executive director and carry

A-27

out the duties of the council. The executive director will be vested with such powers and duties as specified by the council by rule.

**(3)** The council shall establish the salaries of the executive director and employees hired under this subsection (a) and such executive director and employees serve at the pleasure of the council.

**Tenn. Code Ann. § 4-49-109**

**(a)** The council shall prescribe by rule:

**(1)** The amount of a bond in escrow and the amount of cash that must be kept on hand to ensure that there exists adequate reserves to pay off bettors; and

**(2)** Any insurance requirements for a licensee.

**(b)** The licensee may maintain the bond at any bank lawfully operating in this state, and the licensee must be the beneficiary of any interest accrued thereon.

**Tenn. Code Ann. § 4-49-111**

**(a)** Except for those persons ineligible to place bets under § 4-49-112, a person who is twenty-one (21) years of age or older and who is physically located in this state may place a wager in the manner authorized by law.

**(b)** A licensee shall ensure that all wagers accepted in this state are from qualified bettors and in accordance with this part.

**Tenn. Code Ann. § 4-49-112**

**(a)** The following persons or categories of persons shall not, directly or indirectly, wager or bet on a sporting event in this state:

**(1)** A member, officer, or employee of the council, except that an employee of the council may place a nominal wager as part of an investigation or audit on behalf of the council. Winnings paid to an employee of the council based on a winning wager

A-28

as part of an investigation or audit must be separately accounted for by the council and returned to the operator on a quarterly basis;

**(2)** With respect to a licensee, any principal owner, partner, member of the board of directors, officer, or supervisory employee;

**(3)** With respect to a vendor of a licensee, any principal owner, partner, member of the board of directors, officer, or supervisory employee;

**(4)** Any contractor, subcontractor, or consultant, or officer or employee of a contractor, subcontractor, or consultant, of a licensee, if the person is directly involved in the licensee's operation of sports wagering or the processing of sports wagering claims or payments through the licensee's online sports wagering platform;

**(5)** Any person subject to a contract with the council if the contract contains a provision prohibiting the person from participating in sports wagering;

**(6)** Any person with access to information that is known exclusively to a person who is prohibited from placing a wager in this state under this section;

**(7)** Any amateur or Olympic athlete if the wager is based on the sport or athletic event in which the athlete participates and that is overseen by the athlete's sports governing body;

**(8)** Any professional athlete if the wager is based on any sport or athletic event overseen by the athlete's sports governing body;

**(9)** Any owner or employee of a team, player, umpire or sports union personnel, or employee, referee, coach, or official of a sports governing body, if the wager is based on a sporting event overseen by the person's sports governing body;

A-29

**(10)** Any trustee or regent of a governing board of a public or private institution of higher education;

**(11)** Any member of an advisory board established under title 49, chapter 9, part 5;

**(12)** Any person prohibited by the rules of a governing body of a collegiate sports team, league, or association from participating in sports wagering activities;

**(13)** With respect to a student or an employee of a public or private institution of higher education, any person who has access to material nonpublic information concerning a student athlete or team, and the information is relevant to the outcome of a sporting event; provided, that the person is only prohibited from using the information to place a wager on a collegiate sporting event; and

**(14)** Any person having the ability to directly affect the outcome of a sporting event.

**(b)** The council may prescribe by rule additional categories of persons who are prohibited from placing a wager in this state.

**(c)** The council shall post on its website the categories set forth in subsection (a) of persons who are ineligible to place a wager in this state.

**(d)** A violation of subsection (a) is:

**(1)** For a first offense, a Class C misdemeanor;

**(2)** For a second offense, a Class B misdemeanor; and

**(3)** For a third or subsequent offense, a Class A misdemeanor.

**(e)** As used in this section, "material nonpublic information" has the same meaning as defined in § 4-49-130(d).

A-30

**17 C.F.R. § 38.150**

**(a)** In general. The board of trade shall establish, monitor, and enforce compliance with the rules of the contract market, including:

**(1)** Access requirements;

**(2)** The terms and conditions of any contracts to be traded on the contract market; and

**(3)** Rules prohibiting abusive trade practices on the contract market.

**(b)** Capacity of contract market. The board of trade shall have the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the contract market.

**(c)** Requirement of rules. The rules of the contract market shall provide the board of trade with the ability and authority to obtain any necessary information to perform any function described in this section, including the capacity to carry out such international information-sharing agreements, as the Commission may require.

**17 C.F.R. § 38.151(b)**

**(b)** Impartial access by members, persons with trading privileges and independent software vendors. A designated contract market must provide its members, persons with trading privileges, and independent software vendors with impartial access to its markets and services, including:

**(1)** Access criteria that are impartial, transparent, and applied in a non-discriminatory manner; and

**(2)** Comparable fee structures for members, persons with trading privileges and independent software vendors receiving equal access to, or services from, the designated contract market.

A-31

**17 C.F.R. § 40.2**

**(a)** Submission requirements. A designated contract market or a swap execution facility must comply with the submission requirements of this section prior to listing a product for trading that has not been approved under § 40.3. A submission shall comply with the following conditions:

**(1)** The designated contract market or the swap execution facility has filed its submission electronically in a format and manner specified by the Commission;

**(2)** The Commission has received the submission by the open of business on the business day preceding the product's listing; and

**(3)** The submission includes:

**(i)** The information required by appendix D to this part;

**(ii)** A copy of the rules that set forth the contract's terms and conditions;

**(iii)** The intended listing date;

**(iv)** A certification by the designated contract market or the swap execution facility that the product to be listed complies with the Act and Commission regulations thereunder;

**(v)** A concise explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder. This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with applicable law, or

A-32

incorporate information contained in such documentation, with appropriate citations to data sources;

**(vi)** A certification that the registered entity posted a notice of a pending product certification with the Commission and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website. Information that the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(c)(4); and

**(vii)** A request for confidential treatment, if appropriate, as permitted under § 40.8.

**(b)** Additional information. If requested by Commission staff, a registered entity shall provide any additional evidence, information or data that demonstrates that the contract meets, initially or on a continuing basis, the requirements of the Act or the Commission's regulations or policies thereunder.

**(c)** Stay. The Commission may stay the listing of a contract pursuant to paragraph (a) of this section during the pendency of Commission proceedings for filing a false certification or during the pendency of a petition to alter or amend the contract terms and conditions pursuant to Section 8a(7) of the Act. The decision to stay the listing of a contract in such circumstances shall not be delegable to any employee of the Commission.

**(d)** Class certification of swaps.

**(1)** A designated contract market or swap execution facility may list or facilitate trading in any swap or number of swaps based upon an "excluded commodity," as defined in section 1a(19)(i) of the Act, not including any security, security index, and currency other than the United States Dollar and a

A-33

"major foreign currency," as defined in § 15.03(a) of this chapter, or an "excluded commodity," as defined in section 1a(19)(ii)-(iv) of the Act, provided the designated contract market or swap execution facility certifies, under paragraphs (a)(1) and (2) and (a)(3)(i), (iv), and (vi) of this section, the following:

(i) Each particular swap within the certified class of swaps is based upon an excluded commodity specified in paragraph (d)(1) of this section;

(ii) Each particular swap within the certified class of swaps is based upon an excluded commodity with an identical pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations;

(iii) The pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in each particular swap within the certified class of swaps is identical to a pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in a product previously submitted to the Commission and certified or approved pursuant to this section or § 40.3; and

(iv) Each particular swap within the certified class of swaps is based upon an excluded commodity involving an identical currency or identical currencies.

(2) The Commission may in its discretion require a registered entity to withdraw its certification under paragraph (d)(1) of this section and to submit each individual swap or certain individual swaps within the submission for Commission review pursuant to this section or § 40.3.

A-34

**17 C.F.R. § 40.11**

>(a) Prohibition. A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

>>(1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

>>(2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

>(b) [Reserved.]

>(c) 90-day review and approval of certain event contracts. The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90-day review. The 90-day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

>>(1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90-day review period.

A-35

The Commission shall post on the Web site a notification of the intent to carry out a 90-day review.

**(2)** Final determination. The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90-day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at the conclusion of such extended period agreed to or requested by the registered entity.