**No. 26-5235**

# In the United States Court of Appeals for the Sixth Circuit

KALSHIEX LLC,

*Plaintiff – Appellee,*

*v.*

WILLIAM ORGEL, in his official capacity as Chairman of the Tennessee Sports Wagering Council; MARY BETH THOMAS, in her official capacity as the Executive Director of the Tennessee Sports Wagering Council; JONATHAN THOMAS SKRMETTI, in his official capacity as Attorney General of Tennessee,

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NO. 3:26-CV-34

**BRIEF OF AMICUS CURIAE AMERICAN GAMING ASSOCIATION IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**

Bruce Bennett
Benjamin Sovocool
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001

Kevin F. King
  *Counsel of Record*
Matthew J. Glover
Scott Garfing
Sameer Aggarwal
Hassan Ahmad
Jacob A. Rinear
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for Amicus Curiae
American Gaming Association*

May 26, 2026

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 26-5235                    Case Name: KalshiEX LLC v. William Orgel, et al.

Name of counsel: Kevin F. King

Pursuant to 6th Cir. R. 26.1, American Gaming Association
*Name of Party*

makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.   Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

---

CERTIFICATE OF SERVICE

I certify that on _____ May 26, 2026 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Kevin F. King

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF AMICUS CURIAE ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 2

ARGUMENT .............................................................................................. 4

I.      Kalshi Offers Sports Bets. ................................................................ 4

II.      Kalshi's Arguments Defy Settled Legal Principles and Common Sense. ................................................................................ 13

         A.      Kalshi's Sports Bets Are Not "Swaps." ............................... 14

         B.      Kalshi's Preemption Arguments Fail. ................................... 22

III.      Licensed Gaming Operators and States Partner to Make Legal Sports Betting Effective. .......................................................... 27

IV.      Kalshi's Vision Would Upend the Longstanding Framework Governing Sports Betting. ............................................................... 31

CONCLUSION ......................................................................................... 35

CERTIFICATE OF COMPLIANCE ......................................................... 36

CERTIFICATE OF SERVICE .................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Churchill Downs Tech. Initiatives Co. v. Mich.*
*Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) ........................................................... 23

*City of Chicago v. Fulton*,
592 U.S. 154 (2021) .......................................................................... 19

*Commonwealth v. KalshiEX, LLC*,
2026 WL 188019 (Mass. Super. Ct. Jan. 20, 2026) ........................ 5, 10

*Dubin v. United States*,
599 U.S. 110 (2023) .......................................................................... 16

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......................................................................... 16

*Fenner v. Gen. Motors, LLC*,
113 F.4th 585 (6th Cir. 2024) ........................................................... 22

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......................................................................... 23

*Ho-Chunk Nation v. Kalshi, Inc.*,
2026 WL 1284077 (W.D. Wis. May 5, 2026) ...................................... 5

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) .............................................. 5, 10, 25, 26

*KalshiEX, LLC v. Hendrick*,
817 F.Supp.3d 1014 (D. Nev. 2025) .......................... 5, 9, 13, 15, 16, 19

*KalshiEX LLC v. Martin*,
793 F.Supp.3d 667 (D. Md. 2025) .................................................... 26

*KalshiEX LLC v. Schuler*,
2026 WL 1295806 (6th Cir. Apr. 24, 2026) .......................... 14, 24, 26

*Kansas v. Garcia,*
589 U.S. 191 (2020) .................................................................... 24

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .................................................................... 21

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) .................................................................... 23

*Meister v. U.S. Dep't of Agric.,*
623 F.3d 363 (6th Cir. 2010) ..................................................... 25

*Murphy v. NCAA,*
584 U.S. 453 (2018) .............................................................. 20, 22, 27

*NFIB v. OSHA,*
595 U.S. 109 (2022) .............................................................. 21, 22

*Northville Downs v. Granholm,*
622 F.3d 579 (6th Cir. 2010) ..................................................... 22

*Pulsifer v. United States,*
601 U.S. 124 (2024) .................................................................... 16

*QCX LLC v. Nessel,*
2026 WL 1166362 (W.D. Mich. Mar. 10, 2026) .................................. 18

*Quarles v. United States,*
587 U.S. 645 (2019) .................................................................... 16

*Salazar v. Paramount Glob.,*
133 F.4th 642 (6th Cir. 2025) ..................................................... 18

*State v. Lipkin,*
84 S.E. 340 (N.C. 1915) .............................................................. 13

*Utility Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) .............................................................. 3, 20

*Waite v. Press Pub. Ass'n,*
155 F. 58 (6th Cir. 1907) ............................................................ 13

iv

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ........................................................................ 3

*Yates v. United States,*
  574 U.S. 528 (2015) ...................................................................... 17

**Statutes**

7 U.S.C. § 1a ................................................... 4, 14, 15, 16, 17, 18, 19, 21

7 U.S.C. § 2 ................................................................................. 21, 23, 24

7 U.S.C. § 7a-2 ........................................................................... 19, 25, 26

7 U.S.C. § 13a-2 ...................................................................................... 24

7 U.S.C. § 16 ........................................................................................... 24

18 U.S.C. § 1084 .................................................................................... 27

18 U.S.C. § 1955 .................................................................................... 27

31 U.S.C. § 5362 .................................................................................... 27

31 U.S.C. § 5363 .................................................................................... 27

Ohio Rev. Code § 3772.031 ................................................................. 33

Ohio Rev. Code § 3775.04 .................................................................... 29

Ohio Rev. Code § 3775.99 .................................................................... 31

Ohio Rev. Code § 5753.021 .................................................................. 29

Tenn. Code Ann. § 4-49-104 ............................................................... 29

Tenn. Code Ann. § 4-49-114 ............................................................... 28

Tenn. Code Ann. § 4-49-117 ............................................................... 29

Tenn. Code Ann. § 4-49-119 ............................................................... 30

## Regulations

17 C.F.R. § 40.11 .................................................................... 19, 20, 25

Ohio Admin. Code 3775-9-03 ............................................................. 32

Ohio Admin. Code 3775-16-08 ........................................................... 32

Ohio Admin. Code 3775-17-01 ........................................................... 32

Tenn. Comp. R. & Regs. 1350-01-.02 ................................................. 31

Tenn. Comp. R. & Regs. 1350-01-.03 ................................................. 32

Tenn. Comp. R. & Regs. 1350-01-.06 ............................................ 32, 33

## Other Authorities

American Gaming Ass'n, *Gaming by the Numbers:*
*Ohio* (Dec. 31, 2024) .................................................................. 30

American Gaming Ass'n, *Gaming by the Numbers:*
*Tennessee* (Dec. 31, 2024) ........................................................ 30

American Gaming Ass'n, *Responsible Gaming Regulations*
*and Statutes Guide* (July 8, 2025) ............................................ 29

American Gaming Ass'n, *State of the States 2026: The AGA*
*Analysis of the Commercial Casino Industry* (May 2026) ............ 20, 29

Anthony Macuk, *No, You Can't Bet on College Sports Online*
*in Oregon* (Mar. 21, 2024) ........................................................ 28

Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State?*
*Not If You Call It a 'Prediction Market.'*, N.Y. Times
(Oct. 5, 2025) .............................................................................. 6

Dan Bernstein & Lev Akabas, *Kalshi Retail Bettors Have Lost*
*$100M+ on Parlays this Year*, Sportico (May 13, 2026) .............. 9

Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is*
*Legal in California, Texas*, Event Horizon (Sep. 17, 2025) ............ 9

Dustin Gouker, *Kalshi Posts Second-Biggest Day Ever: $700M In Volume*, Event Horizon (Apr. 27, 2026)...........................................12

Dustin Gouker, *Kalshi Says It's 'Kind of Addicting' in Instagram Post*, Event Horizon (Oct. 21, 2025)..................................32

Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, Event Horizon (Apr. 1, 2026)..................................8

Dustin Gouker, *Most of Kalshi's Recent Volume Growth Comes from Parlays*, Event Horizon (May 6, 2026) ..........................11

Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, Event Horizon (Aug. 27, 2025)...............................9

Emily Nicolle & Bernard Goyder, *Kalshi Complete First Block Trade, Backed by Jump Trading*, Bloomberg (Apr. 28, 2026) ......................................................................12

Event Contracts, 89 Fed. Reg. 48,968 (June 10, 2024) ..................................................34

Jacob Stern, *You've Never Seen Super Bowl Betting Like This Before*, The Atlantic (Feb. 5, 2026).......................................................11

Kalshi, *Responsible Trading Tools* .........................................................33

Kalshi, *Signing Up as an Individual* ......................................................31

Kalshi, *Trading Break*..............................................................................33

Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC (Jan. 16, 2026).........................................................................4

Michael J. de la Merced, *Kalshi, the Prediction Market, Is Now Valued at $22 Billion*, N.Y. Times (May 7, 2026) ......................11

Neil Mehta, Katherine Long & Caitlin Ostroff, *Why Almost Everyone Loses—Except a Few Sharks—on Prediction Markets*, Wall St. J. (May 3, 2026).............................................. 12, 34

vii

Ohio Casino Control Commission, *Event and Wager Catalogue* ...............................................................................28

Oral Argument, *N. Am. Derivatives Exch., Inc. v. Nevada,* No. 25-7187 (9th Cir. Apr. 16, 2026) ...................................11

Sam McQuillan, *Kalshi Parlay Volume Surges, But Sports Prediction Economics Still Lag Sportsbooks*, Legal Sports Report (Mar. 24, 2026).............................................................9

U.S. Trademark Application Serial No. 99488100 (filed Nov. 10, 2025) ..................................................................11

Virginia Gandolfo, *How to Display Sportsbook Odds at Kalshi: View American Odds*, RotoGrinders (2026).............................5

## INTEREST OF AMICUS CURIAE[1]

The American Gaming Association (AGA) is a non-profit trade association whose members represent the full spectrum of the legal, regulated gaming industry—including commercial and tribal casino operators, suppliers, and sports betting operators.  AGA's members participate in gaming markets throughout the United States; the industry generates $53 billion in annual tax revenue and supports 1.8 million jobs nationwide.  On behalf of its members, AGA works with law enforcement, elected officials, state agencies, and tribal leaders to combat illegal gambling and promote next-generation regulatory regimes.

AGA submits this brief to address the disruptive effects that Kalshi's unlicensed sports bets have had and will continue to have on the longstanding regulatory framework in Ohio, Tennessee, and other states.  As the premier trade group representing the commercial gaming industry, AGA has a strong interest in orderly application of federal law, which complements and facilitates state gaming regulations.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel certifies that no entity or person, aside from amicus curiae or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief, that undersigned counsel authored the brief in full, and that all parties have consented to the filing of this brief.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

For decades, Congress and the States have worked together to establish a regulatory framework for gaming that elevates local policy choices, protects consumers, and safeguards the integrity of sporting events. Licensed gaming operators, including AGA members, have built their businesses around this framework and partner with state regulators to make it effective. That cooperative model has delivered enormous benefits: capital investments, jobs, tax revenues, and a safe and transparent marketplace where every operator plays by the same rules.

Kalshi's theory would eviscerate that longstanding regulatory structure. Seeking to avoid the compliance burdens of state laws, Kalshi masks its wagers as derivatives contracts governed exclusively by the Commodity Exchange Act (CEA) and Commodity Futures Trading Commission (CFTC). But as is obvious to anyone who visits Kalshi's platform, "sports-event contracts" are hardly novel financial instruments—they are sports bets. Kalshi offers point spreads, over/under bets, proposition bets, and parlays, all of which are standard sportsbook fare, and it presents these bets through the same user

2

interface as prominent online sportsbooks. Kalshi's own advertisements reinforce the point by touting the company's "sports betting" options. Kalshi thus engages in precisely the type of conduct that Ohio's and Tennessee's laws expressly prohibit: unlicensed sports betting.

Embracing Kalshi's legal fiction would lead to practical problems as well. Consumers would have fewer and weaker protections than under state law. And States would lose the tax revenue, jobs, and other benefits provided by the long-standing cooperation between States and licensed gaming operators.

According to Kalshi and the CFTC, Congress accepted those risks—and tacitly authorized nationwide sports betting—when it enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank) in 2010. But there is no evidence—let alone the clear statement required by precedent—that Congress took that radical step. The Supreme Court has emphasized that Congress "does not ... hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), and courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance,'" *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)

3

(citation omitted).   Yet Kalshi and the CFTC insist that Congress overrode the laws of dozens of states and rearranged an entire market sector through obscure provisions regarding derivatives transactions.

Because Kalshi has not met the demanding test for a preliminary injunction, this Court should reverse.

## ARGUMENT

### I.   Kalshi Offers Sports Bets.

A bet on whether Team A and Team B will combine to score more than 230.5 points in a professional basketball game is not a derivatives contract.  And a bet on the speed of the fastest serve in a tennis match is not "associated with a potential financial, economic, or commercial consequence."[2]  7 U.S.C. § 1a(47)(A)(ii).  Yet Kalshi has twisted federal commodities law to obfuscate a simple truth: it is operating a sportsbook.

Courts and judges across the country have recognized as much.  As the *Orgel* district court observed, "a user would find Kalshi's offerings similar, if not identical, to a sportsbook."  *Orgel* Order, RE 48, PageID

---

[2] *See* Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to CFTC, *Notification Regarding the Initial Listing of the "Will the fastest serve in <tennis match> be <above/below/exactly/at least/between><count><speed>?" Contract* (Jan. 16, 2026), https://perma.cc/SGE5-NT5N.

#878-79.  Other courts have reached the same commonsense conclusion. *See, e.g.*, *KalshiEX, LLC v. Hendrick*, 817 F.Supp.3d 1014, 1029 (D. Nev. 2025) (Kalshi's contracts "are sports wagers and everyone who sees them knows it."); *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 232 (3d Cir. 2026) (Roth, J., dissenting) (Kalshi's "offerings are virtually indistinguishable from the betting products available on online sportsbooks.").

Kalshi knows it is offering sports bets.  In multiple courts, Kalshi has conceded the point.  *See Commonwealth v. KalshiEX, LLC*, 2026 WL 188019, at *3 (Mass. Super. Ct. Jan. 20, 2026) ("Kalshi does not argue that its sports-related event contracts do not meet the definition of sports wagering in the Commonwealth."); *Ho-Chunk Nation v. Kalshi, Inc.*, 2026 WL 1284077, at *4 (W.D. Wis. May 5, 2026) ("Kalshi does not appear to dispute that … its sports event contracts qualify as 'class III gaming.'").

Kalshi also allows users to view its offerings in "[s]ports fan mode,"[3] which displays markets in a manner that "mirrors" garden variety sports bets.  *Commonwealth*, 2026 WL 188019, at *2.  The graphic below—published in a *New York Times* article regarding Kalshi's sports betting

---

[3] Virginia Gandolfo, *How to Display Sportsbook Odds at Kalshi: View American Odds*, RotoGrinders (2026), https://perma.cc/Y99F-GTZG.

5

expansion—illustrates this approach.[4]  The first image shows betting options for an NFL game on a state-regulated online sportsbook; the second shows betting options on Kalshi for the same game.  Both use the same format, offer bets on the same point spread, and offer bets on the same over/under for the number of points scored.





Kalshi also offers bets that have long been standard sportsbook fare, such as proposition bets and parlays.  Proposition bets are wagers on statistics and other in-game outcomes.  For example, Kalshi offers bets

---

[4] Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025), https://perma.cc/JZ9K-7HX8.

on the total number of corner kicks in an English Premier League soccer match between Manchester City and Aston Villa:[5]



Kalshi also allows users to create custom parlays, which it dubs "Combo[s]," that combine several different wagers and pay off only if *all* the listed outcomes occur. And Kalshi does not restrict these parlay bets to a single game, or even to matchups within a single sport. For instance, Kalshi promotes parlays that rely on 30 different outcomes across

---

[5] Counsel for the AGA took a screenshot of this page on the Kalshi mobile application on May 20 at 10:58 PM ET.

multiple games within a single sport,[6] and 21-leg parlays that rely on outcomes in separate games across multiple sports: [7]



---

[6] Dustin Gouker, *Kalshi Was Promoting a 30-Leg Parlay to Users on Tuesday*, Event Horizon (Apr. 1, 2026), https://perma.cc/V34F-4WAU.

[7] Counsel for the AGA took a screenshot of this parlay on the Kalshi mobile application on May 12 at 10:15 AM ET.

Kalshi makes no effort to show that these parlays—which are "surging" on Kalshi[8] and "a growing share of its volume"[9]—are anything other than traditional sports bets.  Kalshi instead embraces the comparison: it advertised "legal sports betting in all 50 states," *Hendrick*, 817 F.Supp.3d at 1029 (citation omitted), including in states like Utah where sports betting is illegal:[10]

---

[8] Sam McQuillan, *Kalshi Parlay Volume Surges, But Sports Prediction Economics Still Lag Sportsbooks*, Legal Sports Report (Mar. 24, 2026), https://perma.cc/XF4N-RGRZ.

[9] Dan Bernstein & Lev Akabas, *Kalshi Retail Bettors Have Lost $100M+ on Parlays this Year*, Sportico (May 13, 2026), https://perma.cc/Y7HK-ZC5N (cleaned up).

[10] Dustin Gouker, *Kalshi Is Advertising That 'Sports Betting' Is Legal in California, Texas*, Event Horizon (Sep. 17, 2025), https://perma.cc/8NJ4-HFUR; Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, Event Horizon (Aug. 27, 2025), https://perma.cc/QEH6-YA3L.




*See also Flaherty*, 172 F.4th at 235 (Roth, J., dissenting) (additional marketing screenshots); *Commonwealth*, 2026 WL 188019, at *2 ("Kalshi referred to itself in advertisements as 'the first nationwide legal sports betting platform,' and its CEO has referred to its offerings as 'bets'").

Beyond its advertisements, Kalshi represented to the U.S. Patent & Trademark Office, in its application to trademark the term "prediction market," that its services are associated with "Bookmaking services, namely, providing of information related to sports betting; organizing, arranging, conducting sports betting and gambling tournaments,

competitions and contests."[11]   At bottom, Kalshi tells the world that it offers sports bets, but asks this Court to ignore that reality and conclude otherwise based on a novel reading of the CEA.  *See infra* at 14-22.  As one judge assessing Kalshi's arguments observed, this is "sophistry to the nth degree."   Oral Argument at 8:31, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Apr. 16, 2026).[12]

Unsurprisingly, the data confirms what the marketing makes clear: Kalshi  operates a sportsbook.  Sports betting accounts for "more than 90 percent" of Kalshi's volume.[13]   That volume is growing at a staggering pace, with annualized volume now $178 billion and more than $14.8 billion in April alone.[14]  On a single day last month, Kalshi "eclipsed $700 million in trading volume" of which "[m]ore than 92%" came from sports

---

[11] U.S. Trademark Application Serial No. 99488100 (filed Nov. 10, 2025), https://tsdr.uspto.gov/documentviewer?caseId=sn99488100&docId=APP 20251110143106#docIndex=3&page=1.

[12] https://youtu.be/JOCrxsSR-OU?si=tVEGQA5J7ZuJzP8e&t=511.

[13] Jacob Stern, *You've Never Seen Super Bowl Betting Like This Before*, The Atlantic (Feb. 5, 2026), https://perma.cc/T3GJ-QKYA.

[14] Michael J. de la Merced, *Kalshi, the Prediction Market, Is Now Valued at $22 Billion*, N.Y. Times (May 7, 2026), https://perma.cc/8B83-983L; Dustin Gouker, *Most of Kalshi's Recent Volume Growth Comes from Parlays*, Event Horizon (May 6, 2026), https://perma.cc/4D3W-3H26.

and parlays, and parlays alone were responsible for $189 million of volume.[15]

Kalshi claims that its sports bets differ from "run-of-the-mill sports bets" because the "price[s] [are] established by the market," while traditional sports books are themselves "party to the contract."  Kalshi *Schuler* Br. 3-4, 52.  That is a distinction without a difference.  Kalshi partners with a small cohort of "market makers"—professional trading firms that run algorithmic strategies to execute millions of dollars' worth of trades—to serve the same role as the house in a traditional sportsbook, including by "rebat[ing] some market makers' fees" and "pay[ing] them for providing liquidity."[16]  At least one market maker "owns a small stake in Kalshi in exchange for providing liquidity on its event contracts."[17]

The straightforward conclusion is that, although "Kalshi characterizes its sports-related event contracts" as futures, "at bottom,

---

[15] Dustin Gouker, *Kalshi Posts Second-Biggest Day Ever: $700M In Volume*, Event Horizon (Apr. 27, 2026), https://perma.cc/3GZU-CRJS.

[16] Neil Mehta, Katherine Long & Caitlin Ostroff, *Why Almost Everyone Loses—Except a Few Sharks—on Prediction Markets*, Wall St. J. (May 3, 2026), https://perma.cc/S676-47AL.

[17] Emily Nicolle & Bernard Goyder, *Kalshi Complete First Block Trade, Backed by Jump Trading*, Bloomberg (Apr. 28, 2026), https://perma.cc/M7CM-FQAB.

they are sports wagers." *Hendrick*, 817 F.Supp.3d at 1029. That finding accords with common sense and the century-old tradition of courts—including this Court—rejecting creative schemes to evade state gaming law. *Waite v. Press Pub. Ass'n*, 155 F. 58, 62 (6th Cir. 1907) ("guessing contest" offered by newspaper on presidential election results was "within the terms of the Michigan law" prohibiting lotteries "and the mischief at which it was aimed"); *see also, e.g.*, *State v. Lipkin*, 84 S.E. 340, 343 (N.C. 1915) (courts must "look to the substance and not to the form" of a gaming scheme). The same reasoning controls here. Approving Kalshi's nationwide sports betting ploy would elevate form over substance, to the detriment of Tennessee's historic police power to regulate gaming within its borders.

## II. Kalshi's Arguments Defy Settled Legal Principles and Common Sense.

Kalshi's core argument fails for two independent reasons grounded in settled law. *First,* Kalshi's sports bets are not "swaps" under the CEA and Dodd-Frank. Kalshi's contrary arguments lack any limiting principle and would give the CFTC exclusive jurisdiction over all sports betting nationwide. *Second,* Kalshi cannot overcome the presumption against preemption, which applies here given the States' traditional role

in regulating gaming. As a motions panel of this Court already demonstrated, Congress's decision to bring "swaps" under the CFTC's regulatory jurisdiction did not designate the CFTC as the nation's sole sportsbook regulator. *KalshiEX LLC v. Schuler*, 2026 WL 1295806, at *1 (6th Cir. Apr. 24, 2026).

### A.   Kalshi's Sports Bets Are Not "Swaps."

Kalshi seeks a preliminary injunction that would enjoin state law regarding *all* its sports bets—past, present, and future. It therefore must show that *all* of them qualify as "swaps" under the CEA. Kalshi does not come close to carrying that heavy burden.

Starting with the text, Kalshi's arguments falter because a "swap" must be based on the "occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). That does not describe Kalshi's sports bets. Take the parlays described above, for example: *No one* faces potential economic consequences from the outcome of a 21- or 30-leg parlay based on outcomes, point spreads, and player performances in a hodgepodge of different sporting events

14

played in different cities.[18]    These wagers make up a significant proportion of Kalshi's volume, yet neither Kalshi nor the CFTC has even *attempted* to show that they satisfy the statutory criteria.    To the contrary, Kalshi acknowledged in prior litigation that "a game has 'no inherent economic significance'" and lacks "'economic consequences outside of the game itself.'"    *Hendrick*, 817 F.Supp.3d at 1028 n.3 (citations omitted).    The *Orgel* district court never confronted this glaring flaw in Kalshi's argument, and the omission is fatal to its analysis.

Kalshi has suggested that a handful of its other wagers are "swaps" because they allow a sportsbook to hedge the risk presented by its open wagers.    *See* Kalshi *Schuler* Br. 47.    But that's just a lawyerly way of saying that Kalshi offers sports bets to those who have already placed them.    The underlying occurrence—e.g., the number of corner kicks in a soccer game—does not become associated with "potential" "economic consequences" merely because someone has bet on it.    Otherwise, every

---

[18] It is not sufficient for the parlays themselves to involve potential economic consequences, because the CEA requires the underlying events—not the swap—to be "associated with" such consequences.    7 U.S.C. § 1a(47)(A)(ii).    The word "potential" does not modify this requirement of association; instead, the statute requires an *actual* association with one or more such potential consequences.

15

occurrence in the universe (including coin flips) would qualify, rendering the requirements in section 1a(47)(A)(ii) meaningless. *See Hendrick*, 817 F.Supp.3d at 1028, 1030-31 & n.3. The Court "should not lightly conclude that Congress enacted a self-defeating statute." *Quarles v. United States*, 587 U.S. 645, 654 (2019).

The *Orgel* district court held that Kalshi's bets are "swaps"—without conducting any meaningful examination of particular wagers or classes of wagers—because the CEA uses "broad" language like "associated with" and "potential" financial consequences. *Orgel* Order, RE 48, PageID #884-85; *see also* CFTC *Schuler* Br. 10-11. That reading, however, flouts the well-established principle that courts should not interpret statutory phrases "in isolation" or based "on the broadest imaginable definitions of [their] component words." *Dubin v. United States*, 599 U.S. 110, 120 (2023) (citation omitted). The proper approach is to interpret the CEA "by reviewing [its] text in context," *Pulsifer v. United States*, 601 U.S. 124, 133 (2024), and in a way that "fit[s] all parts" of the statute "into an harmonious whole," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation omitted).

16

Here, every contextual indicator shows that Congress sought to regulate quintessential financial-market transactions when it enacted Dodd-Frank. For example, the CEA's definition of swaps refers to "option[s] … for the purchase or sale" of "currencies, commodities, securities" and the like, "interest rate swap[s]," instruments to hedge "financial risk," and "foreign exchange swap[s]." 7 U.S.C. § 1a(47)(A); *see* Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). Those traditional financial instruments bear no resemblance to a 30-leg parlay or a wager on the number of corner kicks in a soccer game.

Read in light of the context and structure of the CEA, an event contract has the requisite "financial, economic, or commercial consequence[s]" if it has the same kinds of effects as the other types of financial transactions described in section 1a(47)(A)—*i.e.*, if the underlying event itself has real-world economic effects and presents a bona fide need to hedge risk exposure, which the swap provides. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 543 (2015) (narrowing meaning of "tangible object" because courts must "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress" (citation

17

omitted)); *Salazar v. Paramount Glob.*, 133 F.4th 642, 650-51 (6th Cir. 2025) (declining to construe statute in an "atomisti[c]" manner based on "the pure definitional meaning of words in isolation," and instead relying on "context" and "common sense" to discern the statute's meaning (citation omitted)).

The *Schuler* district court correctly applied these principles. It concluded that the statute's purpose is "better achieved when a 'swap' is understood as a transaction involving financial instruments and measures that traditionally and directly *affect commodity prices*" like "[c]urrency exchange rates, the weather, and energy costs,"—not "the number of points scored in the Huskies-Bobcats game." *Schuler* Order, RE 69, PageID #904-05. Another court in this Circuit recognized that the interpretation advanced by Kalshi "extend[s] [the CEA's] reach to any and all things that happen," and the States' narrower reading "keeps … § 1a(47)(A)(ii) in line with its surrounding provisions, which refer almost exclusively to financial measures, indices, or instruments." *QCX LLC v. Nessel*, 2026 WL 1166362, at *2-3 (W.D. Mich. Mar. 10, 2026) (citation omitted). Indeed, Kalshi's reading of the meaning of "swap" in section 1a(47)(A)(ii) would swallow the separate (and differently worded)

18

"swap" definitions in section 1a(47)(A)(i) and (iii), rendering them superfluous. *City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

Those conclusions accord with history and experience. When Congress enacted Dodd-Frank to "brin[g] risky financial products out of the shadows," no one had *ever* offered a sports bet on a CFTC-registered exchange. *Hendrick*, 817 F.Supp.3d at 1031. To help ensure that no one would, Dodd-Frank included a "Special [R]ule" that allows the CFTC to prohibit contracts that involve "gaming" or any "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C).[19] The following year, the CFTC exercised that authority by adopting a regulation commanding that DCMs "shall not list for trading" any contract that "involves" the activities enumerated in the Special Rule—including "gaming" and "activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1). Despite the CFTC's newfound litigation position

---

[19] Because the Special Rule encompasses "agreements, contracts, transactions, *or* swaps," 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added), the reference to "gaming" does not prove that Congress envisioned gaming-based swaps.

(CFTC *Schuler* Br. 25-26), section 40.11(a) remains in effect and serves to *prohibit*—not authorize—gaming contracts on DCMs.

Kalshi's arguments also run headlong into the major-questions doctrine. Courts are "skeptic[al]" "[w]hen an agency claims to discover in a long-extant statute an unheralded power" over questions of vast economic and political significance. *Utility Air*, 573 U.S. at 324. That is precisely what Kalshi (and the CFTC) seek to do here by reinterpreting the CEA and Dodd-Frank to give the agency authority to regulate the $17 billion, 35-state commercial sports betting market.[20] As the Supreme Court recognized in *Murphy v. NCAA*, 584 U.S. 453, 486 (2018), the "legalization of sports gambling" has long been "a controversial subject" that involves "important policy choice[s]." Under Kalshi's view, however, *Murphy* was unnecessary because Congress silently empowered the CFTC to oversee sports betting in 2010. The "lack of historical precedent" for federally authorized nationwide sports betting, "coupled with the breadth of authority that the [CFTC] now claims, is a telling indication

---

[20] American Gaming Ass'n, *State of the States 2026: The AGA Analysis of the Commercial Casino Industry*, 10 (May 2026), https://perma.cc/E9RR-XPDN.

20

that the [newfound policy] extends beyond the agency's legitimate reach." *NFIB v. OSHA*, 595 U.S. 109, 119-20 (2022) (citation omitted).[21]

The implications of Kalshi's and the CFTC's position are extreme. If, in fact, sports wagers qualify as "swaps," the CEA would require *all* sports bets—including those placed on the Las Vegas Strip—to be traded on DCMs. This is so because the CEA makes it "unlawful for any person, other than an eligible contract participant,[22] to enter into a swap unless the swap is entered into on, or subject to the rules of" a DCM. 7 U.S.C. § 2(e). Kalshi insists that its arguments apply only to "on-DCM" trading and would leave the States with authority to regulate "off-DCM" sports betting. But there is no statutory basis for that gerrymandered approach: The CEA does not contain an exception for bets placed at retail sportsbooks, and its "swap" definition does not turn on whether a contract is listed on a DCM. *See* 7 U.S.C. § 1a(47)(A)(ii). There is, in short, no

---

[21] The absence of sports betting in CFTC-regulated markets from the agency's inception in 1974 through 2025 is in itself powerful evidence against Kalshi's position. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("The longstanding practice of the government … can inform a court's determination of what the law is." (cleaned up)).

[22] The CEA defines "eligible contract participant[s]" as "financial institution[s]," "insurance compan[ies]," and similar sophisticated entities and individuals. 7 U.S.C. § 1a(18).

21

plausible statutory basis to distinguish retail sports bets from identical wagers placed on Kalshi—if the latter are swaps, the former must be as well.  In other words, the unavoidable consequence of Kalshi's argument is that Congress made the CFTC the Nation's sole sports betting regulator when it enacted Dodd-Frank.  Precedent counsels against attributing such a sweeping interpretation to technical provisions regarding swaps transactions.  *See NFIB*, 595 U.S. at 117.

## B.    Kalshi's Preemption Arguments Fail.

Even if Kalshi's sports bets fit the CEA's definition of "swap," nothing in the statute precludes Tennessee from regulating them. Because "the States are independent sovereigns in our federal system," this Court applies a "presumption against preemption" of state law. *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024) (citation omitted).  And that presumption "operates with special force in cases in which Congress has legislated in a field which the States have traditionally occupied," such as gaming.  *Id.* (cleaned up); *see Murphy*, 584 U.S. at 484 (the "general federal approach" is to "respect the policy choices of the people of each State on the controversial issue of gambling"); *Northville Downs v. Granholm*, 622 F.3d 579, 587 (6th Cir.

22

2010) (recognizing gaming regulation as "a legitimate state interest" and a "proper exercise of the state's police power"). Kalshi therefore must show that it was Congress's "clear and manifest purpose" to displace Tennessee's power over sports betting.[23] *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citation omitted); *see also Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" (citation omitted)). Because the CEA says nothing about restricting states' authority to regulate sports wagering, Kalshi cannot clear that high bar.

Even beyond the presumption, Kalshi's arguments still fail given the CEA's text and structure. Starting with express preemption, the statutory language Kalshi invokes—the CEA's conferral of "exclusive jurisdiction," 7 U.S.C. § 2(a)(1)(A)—"would represent an unusual

---

[23] *Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board*, 162 F.4th 631 (6th Cir. 2025), does not change this conclusion. In *Churchill*, "the plain text" of the statute was held to preempt a state gambling regulation, so the Court's observation (in a footnote) that "*interstate* gambling" does not trigger the presumption against preemption was dicta. *Id.* at 641 n.5.

express-preemption provision." *Schuler*, 2026 WL 1295806, at *4. Indeed, even in the CEA itself, Congress elsewhere employed traditional express preemption language. *See* 7 U.S.C. § 16(e)(2) ("This chapter shall supersede and preempt the application of any State or local law"); *id.* § 16(h) ("A swap … may not be regulated as an insurance contract under the law of any State."). Those provisions, which are not applicable here, underscore that Congress did not expressly preempt state gaming law in section 2(a). *See Schuler*, 2026 WL 1295806, at *4.

Kalshi's implied preemption arguments fare no better. Field preemption, for instance, applies only in "rare cases" where Congress has "legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (cleaned up). But the CEA leaves considerable "room" for supplemental regulation, allowing states to subject DCMs to everything from common-law suits to statutory antifraud actions. *See* 7 U.S.C. § 2(a)(1)(A) (preserving the "regulatory authorities … of any State" with respect to swaps traded on DCMs); 7 U.S.C. § 13a-2(7) (permitting "State official[s]" to "proceed[] in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State."). In other

24

words, the "Swiss cheese-like field" that Congress created "cannot preempt state law because field preemption requires *complete* occupation on the part of the federal government." *Flaherty*, 172 F.4th at 238 (Roth, J., dissenting).

As for conflict preemption, Tennessee's sports wagering laws are aligned with federal objectives—after all, the Special Rule subjects contracts involving "gaming" and activity that violates state law to special scrutiny, 7 U.S.C. § 7a-2(c)(5)(C), and federal regulations expressly "[*p*]*rohibit*[]" DCMs from offering such contracts, 17 C.F.R. § 40.11(a) (emphasis added). The CFTC ignores these provisions. But "[i]t is an elemental principle of administrative law that agencies are bound to follow their own regulations," and no one disputes that section 40.11(a) is a legislative rule binding on the CFTC. *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010) (citation omitted).

The import of section 40.11(a) is not, as the CFTC suggests, that contracts involving "gaming" or unlawful activity are "somehow removed from the exclusive jurisdiction conferred by Congress." CFTC *Schuler* Br. 25. It is that such contracts have *never* been within the CFTC's sole domain. Even if Congress reserved some "field" or hinted at some

25

"objective" related to trading on DCMs (it did not), that protection would not reach contracts *unlawfully* listed on DCMs.  *See KalshiEX LLC v. Martin*, 793 F.Supp.3d 667, 676-79 (D. Md. 2025).

Despite all this textual evidence, a divided Third Circuit panel held that the CEA covers the "field" of on-DCM trading and establishes an "objectiv[e]" to "do away with [a] patchwork of state regulations." *Flaherty*, 172 F.4th at 229-30.  But the premise underlying that assessment—that the CEA demands uniformity regarding trading on DCMs—does not withstand scrutiny given the CEA's "several savings clauses" that "often permi[t] state regulation."  *Schuler*, 2026 WL 1295806, at \*5.  And even where the CEA does authorize federal regulatory action—such as in the statutory Special Rule—state law still shapes the exercise of the CFTC's authority.  *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).[24]

---

[24] The Special Rule also undermines the *Orgel* district court's "impartial access" theory of impossibility preemption.  *Orgel* Order, RE 48, PageID #887-88.  If the "impartial access" regulation requires DCMs to offer the same contracts in all fifty states—a novel reading the CFTC supports with only a dictionary definition, *see* CFTC *Schuler* Br. 24—the CFTC could not meaningfully police contracts involving "activity that is unlawful under any … State law."  7 U.S.C. § 7a-2(c)(5)(C).

Kalshi's preemption theories are especially strained given Congress's longstanding choice to embrace state gambling regulation. Congress has consistently eschewed comprehensive federal gaming regulation in favor of targeted statutes that incorporate, rather than supersede, state law. The Unlawful Internet Gambling Enforcement Act, for instance, prohibits knowingly accepting payments for "unlawful internet gambling" but defines that term with reference to *state* law. 31 U.S.C. §§ 5362(10)(A), 5363; *see also* 18 U.S.C. § 1955(b)(1) (defining "illegal gambling business" as one that "is a violation of the law of a *State* … in which it is conducted" (emphasis added)). Similarly, the Wire Act's prohibition on transmitting sports wagers creates exceptions for intrastate wagers and wagers between individuals in states where wagering is legal. *See* 18 U.S.C. § 1084(b). This consistent practice makes it exceedingly unlikely that Dodd-Frank preempted scores of state gambling laws without saying so clearly.

## III. Licensed Gaming Operators and States Partner to Make Legal Sports Betting Effective.

The final two preliminary injunction factors—harm to third parties and the public interest—further undercut Kalshi's arguments. *Schuler* Order, RE 69, PageID #913-14. Since *Murphy,* States have made

27

different choices about whether and how to offer sports betting. Some states prohibit sports betting altogether, but others, like Ohio and Tennessee, have adopted regulatory frameworks to permit licensed operators to offer sports betting. Operators have invested accordingly, building state-specific systems for licensing, geolocation, account controls, vendor relationships, and permissible bet offerings. And they work closely with state regulators to ensure that consumers can enjoy gaming as a safe, responsible form of entertainment.

The precise forms of sports betting that AGA's members offer vary by state. For example, in Ohio, sports betting is offered through a mix of physical locations and online platforms; by contrast, Tennessee chose an online-only model. Some states broadly permit betting on college sporting events and proposition bets, while others restrict such wagers altogether, or impose specific restrictions, such as prohibiting bets involving in-state schools.[25] AGA's members conform their offerings to these state-specific requirements.

---

[25] *See* Anthony Macuk, *No, You Can't Bet on College Sports Online in Oregon*, KGW8 (Mar. 21, 2024), https://perma.cc/T2RU-4WZT; *see also* Tenn. Code Ann. § 4-49-114(a)(1)(B); Ohio Casino Control Commission, *Event and Wager Catalogue*, https://perma.cc/EDN3-RBXV.

Ohio and Tennessee illustrate the breadth of state oversight and the ensuing reliance interests. They require prospective gaming operators to apply—and pay a substantial fee[26]—to state regulators for a license. After regulators' review and authorization—which often includes extensive investigations—licensed operators must pay taxes on their gross revenues or total handle; comply with state rules; and periodically renew their licenses. *See, e.g.*, Tenn. Code Ann. § 4-49-104; Ohio Rev. Code § 5753.021. Licensed operators have made substantial investments to satisfy these obligations, through advertising guidelines, gaming self-exclusion programs, and employee training standards.[27]

This state-based framework creates an economically significant, safe, and regulated marketplace that delivers real public benefits. Nationwide, commercial gaming revenue reached $78.62 billion in 2025, including $16.89 billion from commercial sports betting, and produced $17.86 billion in direct gaming tax revenue.[28] Licensed gaming operators

---

[26] *See* Ohio Rev. Code § 3775.04(E)(1) (fees up to $2.5 million); Tenn. Code Ann. § 4-49-117(b)(10) (up to $750,000).

[27] *See* American Gaming Ass'n, *Responsible Gaming Regulations and Statutes Guide* (July 8, 2025), https://perma.cc/M8W7-C5E7.

[28] *State of the States*, *supra* note 20, at 8-10.

support over 6,900 jobs and generate approximately $227 million in tax revenue in Tennessee.[29]   In Ohio, licensed gaming operators support nearly 34,000 local jobs and generate approximately $1.0 billion in gaming tax revenue.[30]  These revenues support public programs, such as public education.  *See, e.g.*, Tenn. Code Ann. § 4-49-119.

There is a bargain at the heart of this framework.  Operators are licensed and investigated by the States in which they operate; their systems are audited; and their platforms are built to incorporate geolocation, identity verification, and reporting requirements.  They provide States with revenue, investments, and compliance functions designed to ensure that gaming is a safe, responsible form of entertainment.  The States, in return, provide a market in which all competitors are subject to the same standards of integrity, consumer protection, and responsibility.  That level playing field has created settled expectations for regulators and operators alike.

---

[29] American Gaming Ass'n, *Gaming by the Numbers: Tennessee* (Dec. 31, 2024), https://perma.cc/VRD6-YYHG.

[30] American Gaming Ass'n, *Gaming by the Numbers: Ohio* (Dec. 31, 2024), https://perma.cc/4VLK-QDH2.

## IV. Kalshi's Vision Would Upend the Longstanding Framework Governing Sports Betting.

Kalshi's far-fetched legal theory would allow prediction markets to circumvent state restrictions on sports betting that protect minors, confine wagering to authorized jurisdictions, regulate advertising, provide meaningful responsible-gaming safeguards, monitor suspicious activity, and generate considerable tax revenues. Endorsing Kalshi's argument would destroy the framework on which Congress, States, and licensed operators have relied for decades.

*Age Limits.* In most states, persons under age 21 are prohibited from placing sports wagers. *See, e.g.*, Tenn. Comp. R. & Regs. 1350-01-.02(4); Ohio Rev. Code § 3775.99(A)(2). But Kalshi ignores these laws, offering sports bets to all users 18 or older.[31] Kalshi thus allows individuals as young as high school students to bet on sports, despite states' contrary judgments that such wagers would present unacceptable risks. *See Schuler* Order, RE 69, PageID #914 n.9.

*Geofencing.* State laws require licensed operators to employ geofencing technology to confine wagering to authorized jurisdictions and

---

[31] *See* Kalshi, *Signing Up as an Individual* (Mar. 10, 2026), https://perma.cc/GA9G-8PRW.

31

to verify a bettor's location before a wager may be accepted.  *See, e.g.*, Ohio Admin. Code 3775-17-01, 3775-9-03; Tenn. Comp. R. & Regs. 1350-01-.03, 1350-01-.06(7).  Geofencing allows an online sportsbook to tailor the wagers it offers to each state's requirements and to block users from states in which the operator is not licensed.

Kalshi bypasses these requirements as well.  It offers sports wagers nationwide without regard for whether a State has prohibited sports betting or has ordered Kalshi to cease and desist from offering unlicensed gaming.

***Advertising.***  States restrict the nature and content of gaming advertising.  Licensed operators must avoid targeting minors, ensure that individuals who have self-excluded from gaming do not receive solicitations, and include prominent responsible gaming messages in their advertisements.  *See, e.g.*, Ohio Admin. Code 3775-16-08.

Kalshi's advertising is not similarly tailored.  Its advertisements describe the company's wagers as "kind of addicting"[32] and do not include responsible gaming messages.  *See supra* at 9-10.  Moreover, there is no

---

[32] Dustin Gouker, *Kalshi Says It's 'Kind of Addicting' in Instagram Post*, Event Horizon (Oct. 21, 2025), https://perma.cc/5W6T-5UZK.

evidence that Kalshi prevents its advertisements from reaching minors and self-excluded individuals.

***Responsible Gaming.*** State regimes also require robust responsible-gaming protections, including voluntary limits; self-exclusion from *all* licensed gaming operations and advertising; and broader mechanisms to identify risky play. *See, e.g.*, Ohio Rev. Code § 3772.031; Tenn. Comp. R. & Regs. 1350-01-.06(8). These protections allow bettors to opt out across state-regulated systems.

Kalshi does not participate in state self-exclusion programs, instead offering narrower tools that fall short of industry standards,[33] and noting that "it is ultimately [the trader's] responsibility not to trade."[34] Consistent with that hands-off approach, there is no evidence that Kalshi affirmatively monitors for indicators of problem gaming or contacts users who exhibit signs of irresponsible use—steps that state-licensed operators must take. *See* Tenn. Comp. R. & Regs. 1350-01-.06(8). To the contrary, Kalshi *encourages* irresponsible wagering, promoting ads

---

[33] Kalshi, *Responsible Trading Tools* (accessed May 11, 2026), https://perma.cc/RA53-GT69.

[34] *See* Kalshi, *Trading Break* (Mar. 10, 2026), https://perma.cc/4NZS-28FB.

featuring users who say they were "about to be unable to pay [their] rent" but for a last-ditch bet.[35]

***Gaming Taxes.*** Finally, state-regulated sports betting generates billions of dollars in tax payments to states, as outlined above. *See supra* at 29-30. Kalshi offers sports bets without paying these taxes, costing states substantial revenue and inflicting serious damage to the public fisc.

* * *

Kalshi's vision would substantially weaken the core restrictions that States have long used to govern sports betting: age limits, geofencing, advertising rules, responsible-gaming protections, and taxes. Instead, Kalshi would force the CFTC to serve as the Nation's sports-betting regulator even though the agency, by its own admission, "is not a gaming regulator" and does not have "the statutory mandate nor specialized experience appropriate to oversee it." Event Contracts, 89 Fed. Reg. 48,968, 48,982-83 (June 10, 2024). This dramatic shift would result in fewer protections for consumers, reduced revenues for States, and a competitive imbalance for licensed gaming operators. There is no

---

[35] Mehta, *supra* note 16.

34

indication—let alone the necessary clear and manifest intent, *supra* at 22-23—that Congress designed federal commodities law to produce such upheaval, and these public-interest considerations weigh against a preliminary injunction as well.

## CONCLUSION

The Court should reverse and reject Kalshi's brazen attempt to circumvent state gaming laws.

Respectfully submitted,

*/s/ Kevin F. King*

|  |  |
|---|---|
| Bruce Bennett | Kevin F. King |
| Benjamin Sovocool | *Counsel of Record* |
| COVINGTON & BURLING LLP | Matthew J. Glover |
| 30 Hudson Yards | Scott Garfing |
| New York, NY 10001 | Sameer Aggarwal |
|  | Hassan Ahmad |
|  | Jacob A. Rinear |
|  | COVINGTON & BURLING LLP |
|  | 850 Tenth Street NW |
|  | Washington, DC 20001 |
|  | (202) 662-6000 |
|  | kking@cov.com |

*Counsel for Amicus Curiae*

May 26, 2026
*American Gaming Association*

35

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 6,499 words, including the 388 words in the images on pages 6, 7, 8, and 10, but excluding the parts of the brief exempted by Rule 32(f).  This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word  in 14-point, Century Schoolbook font.

/s/ *Kevin F. King*
Kevin F. King

May 26, 2026

36

## CERTIFICATE OF SERVICE

I hereby certify that, on May 26, 2026, I caused a true and correct copy of the foregoing brief to be filed with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Kevin F. King*
Kevin F. King