No. 26-3196 / 26-5235

In The
# United States Court of Appeals
# for the Sixth Circuit

KALSHIEX LLC,

*Plaintiff-Appellant [26-3196]*,

*Plaintiff-Appellee [26-5235]*,

v.

MATTHEW T. SCHULER; THOMAS J. STICKRATH; SHEETAL BAJORIA; SCOTT P. BORGEMENKE; KEITH CHENEY; PENELOPE R. CUNNINGHAM; CHRISTOPHER SMITHERMAN; TRIFFON CALLOS; OHIO CASINO CONTROL COMMISSION; DAVE YOST, *Ohio Attorney General*,

*Defendants-Appellees [26-3196]*,

WILLIAM ORGEL, *in his official capacity as Chairman of the Tennessee Sports Wagering Council*; MARY BETH THOMAS, *in her official capacity as the Executive Director of the Tennessee Sports Wagering Council*; JONATHAN THOMAS SKRMETTI, *in his official capacity as Attorney General of Tennessee*,

*Defendants-Appellants [26-5235]*.

On Appeal from the United States District Court
for the Middle District of Tennessee,
No. 3:26-cv-34 (Hon. Aleta A. Trauger)

**RESPONSE BRIEF FOR APPELLEE KALSHIEX LLC
IN NO. 26-5235**

*Counsel listed on inside cover*

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

NEAL KUMAR KATYAL
   *Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

June 17, 2026

*Counsel for Plaintiff-Appellee in No. 26-5235*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 26-5235                    Case Name: KalshiEX LLC v. William Orgel, et al.

Name of counsel: Neal Kumar Katyal

Pursuant to 6th Cir. R. 26.1, KalshiEX LLC
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No. KalshiEX LLC's parent company, Kalshi Inc., is a private company, and KalshiEX LLC has no publicly held affiliates. No publicly held corporation owns 10% or more of KalshiEX LLC's stock.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

CERTIFICATE OF SERVICE

I certify that on _____ June 17, 2026 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Neal Kumar Katyal
Neal Kumar Katyal
Milbank LLP

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................1

JURISDICTIONAL STATEMENT...................................................................4

STATEMENT OF ISSUES FOR REVIEW ...................................................4

STATEMENT OF THE CASE ..........................................................................4

I.    LEGAL BACKGROUND ...........................................................................4

    A.    The CEA's Federal Framework For Derivatives Trading............ 6

    B.    The CEA And The States .........................................................10

    C.    The CFTC's Regulation Of Event Contracts.............................16

II.    FACTUAL AND PROCEDURAL BACKGROUND.................................19

SUMMARY OF ARGUMENT ....................................................................... 22

STANDARD OF REVIEW ............................................................................. 25

ARGUMENT ...................................................................................................... 26

I.    THE CEA PREEMPTS STATE GAMBLING LAWS AS APPLIED TO KALSHI ..... 26

    A.    Tennessee's Sports-Gambling Laws Are Expressly
       Preempted As Applied To Kalshi ............................................. 26

    B.    Tennessee's Sports-Gambling Laws Are Field-Preempted
       As Applied To Kalshi ................................................................. 33

    C.    Tennessee's Sports-Gambling Laws Are Conflict-
       Preempted As Applied to Kalshi ............................................. 35

II.    TENNESSEE'S CONTRARY ARGUMENTS FAIL ......................................... 38

    A.    Kalshi's Contracts Are Swaps.................................................. 38

ii

**TABLE OF CONTENTS—Continued**

Page

B. Tennessee's Arguments Against Preemption Fail ......................51

C. Kalshi Has A Cause Of Action ....................................................59

III. THE EQUITIES SUPPORT AN INJUNCTION ....................................................61

IV. DEFENDANTS' RULE 65(D) ARGUMENT PROVIDES NO BASIS FOR REVERSAL .........................................................................................63

CONCLUSION ......................................................................................65

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Allard Enters., Inc. v. Advanced Programming Res., Inc.,*
146 F.3d 350 (6th Cir. 1998).................................................. 64

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.,*
977 F.2d 1147 (7th Cir. 1992)................................2, 32, 35, 36, 39, 54, 55

*Am. Energy Corp. v. Rockies Express Pipeline LLC,*
622 F.3d 602 (6th Cir. 2010)................................................. 27

*Arizona v. United States,*
567 U.S. 387 (2012) ................................................26, 35, 37

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ........................................................... 60

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.,*
198 U.S. 236 (1905) ........................................................... 11

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.,*
972 F.3d 83 (D.C. Cir. 2020)................................................. 39

*Bibbo v. Dean Witter Reynolds, Inc.,*
151 F.3d 559 (6th Cir. 1998) ................................................ 26

*Boaz v. FedEx Customer Info. Servs., Inc.,*
725 F.3d 603 (6th Cir. 2013) ................................................ 32

*Bob Jones Univ. v. United States,*
461 U.S. 574 (1983)........................................................... 59

*California v. FERC,*
495 U.S. 490 (1990)........................................................... 38

*CFTC v. Erskine,*
512 F.3d 309 (6th Cir. 2008)................................................. 49

iv

## TABLE OF AUTHORITIES—Continued

Page(s)

*Chi. Mercantile Exch. v. SEC,*
  883 F.2d 537 (7th Cir. 1989) ........................................................ 32

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,*
  162 F.4th 631 (6th Cir. 2025) ......................................51, 62, 63

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,*
  767 F. Supp. 3d 556 (W.D. Mich. 2025)......................................61

*City of Pontiac Retired Emps. Ass'n v. Schimmel,*
  751 F.3d 427 (6th Cir. 2014) ....................................................... 25

*Cothran v. Ellis,*
  16 N.E. 646 (Ill. 1888) ..................................................................10

*Coventry Health Care of Mo., Inc. v. Nevils,*
  581 U.S. 87 (2017).......................................................................... 53

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) ......................................................... 26, 33, 35

*Dickson v. Uhlmann Grain Co.,*
  288 U.S. 188 (1933) ....................................................................... 11

*Duke Energy Trading & Mktg., L.L.C. v. Davis,*
  267 F.3d 1042 (9th Cir. 2001) ............................................... 27, 28

*EOG Res. Inc. v. Lucky Land Mgmt., LLC,*
  134 F.4th 868 (6th Cir. 2025)...................................................... 25

*Ex parte Young,*
  209 U.S. 123 (1908) ................................................................59, 60

*Farina v. Nokia Inc.,*
  625 F.3d 97 (3d Cir. 2010)........................................................... 55

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ...................................................................... 50

# TABLE OF AUTHORITIES—Continued

Page(s)

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
  841 F.3d 133 (2d Cir. 2016) ........................................................ 60

*FTC v. Ken Roberts Co.,*
  276 F.3d 583 (D.C. Cir. 2001) .................................................... 32

*Fulgenzi v. PLIVA, Inc.,*
  711 F.3d 578 (6th Cir. 2013) ...................................................... 57

*Garcia v. United States,*
  469 U.S. 70 (1984) ....................................................................... 34

*Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.,*
  123 F.3d 1098 (8th Cir. 1997) ..................................................... 52

*Hughes v. Talen Energy Mktg., LLC,*
  578 U.S. 150 (2016) ............................................................... 27, 52

*In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.,*
  65 F.4th 851 (6th Cir. 2023) ....................................................... 38

*In re NOS Commc'ns,*
  495 F.3d 1052 (9th Cir. 2007) ............................................... 55, 56

*James B. Oswald Co. v. Neate,*
  98 F.4th 666 (6th Cir. 2024) ...................................................... 64

*KalshiEX LLC v. CFTC,*
  No. 23-3257, 2024 WL 4164694 (D.D.C. Sep. 12, 2024) .......... 19, 58

*KalshiEX LLC v. Flaherty,*
  172 F.4th 220 (3d Cir. 2026) ........................................ 2, 35, 36, 40, 41

*KalshiEX LLC v. Johnson,*
  --- F. Supp. 3d ---, No. CV-26-1715, 2026 WL 1223373
  (D. Ariz. May 5, 2026) ........................................................... 22, 41

vi

# TABLE OF AUTHORITIES—Continued

Page(s)

*KalshiEX LLC v. Schuler*,
No. 26-3196, 2026 WL 1295806
(6th Cir. Apr. 24, 2026) ....................................................54, 55

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) ............................................ 2, 32

*Lockhart v. United States*,
577 U.S. 347 (2016)............................................................ 39

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................................... 33

*Loving v. IRS*,
742 F.3d 1013 (D.C. Cir. 2014) ......................................... 43

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ................................................ 9, 13, 14, 34

*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
774 F.3d 895 (6th Cir. 2014) ............................................. 60

*Mississippi v. Louisiana*,
506 U.S. 73 (1992) ............................................................. 27

*Murphy v. NCAA*,
584 U.S. 453 (2018)............................................................ 59

*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012) ........................................................... 37

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022).............................................. 42, 46, 53

*Omnipoint Commc'ns, Inc. v. City of Huntington Beach*,
738 F.3d 192 (9th Cir. 2013)............................................. 28

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998) ............................................................ 47

vii

## TABLE OF AUTHORITIES—Continued

Page(s)

*Pickens v. Hamilton-Ryker IT Sols., LLC,*
  133 F.4th 575 (6th Cir. 2025) ................................................ 58

*Polyweave Packaging, Inc. v. Buttigieg,*
  51 F.4th 675 (6th Cir. 2022) ........................................... 39, 40

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
  579 U.S. 115 (2016) ............................................................. 51

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.,*
  608 F.2d 175 (5th Cir. 1979) ................................................ 32

*Rice v. Bd. of Trade of Chi.,*
  331 U.S. 247 (1947) ........................................................ 28, 29

*Shaw v. Delta Air Lines, Inc.,*
  463 U.S. 85 (1983) .......................................................... 59, 60

*Sherfel v. Newsom,*
  768 F.3d 561 (6th Cir. 2014) ................................................ 36

*Slaney v. Int'l Amateur Athletic Fed'n,*
  244 F.3d 580 (7th Cir. 2001) ............................................... 52

*Tafflin v. Levitt,*
  493 U.S. 455 (1990) ........................................................ 52, 53

*Tennessee v. FCC,*
  832 F.3d 597 (6th Cir. 2016) ................................................ 50

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.,*
  108 F.4th 144 (3d Cir. 2024) ................................................ 27

*Union Home Mortg. Corp. v. Cromer,*
  31 F.4th 356 (6th Cir. 2022) ................................................ 63

*United States v. Brien,*
  617 F.2d 299 (1st Cir. 1980) ................................................ 32

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Phillips,*
　155 F.4th 102 (2d Cir. 2025)....................................................... 42

*United States v. Veloz-Alonso,*
　910 F.3d 266 (6th Cir. 2018) ..................................................... 59

*West Virginia v. EPA,*
　597 U.S. 697 (2022) ............................................................. 49, 50

**CONSTITUTION:**

U.S. Const. art. VI, cl. 2 ................................................................. 26

**STATUTES:**

5 U.S.C. § 551(13)........................................................................... 39

7 U.S.C. §§

　1a(6)................................................................................................7

　1a(9)........................................................................................ 5, 34

　1a(19) .....................................................................................15, 34

　1a(19)(i) .......................................................................................... 5

　1a(19)(iii) ....................................................................................... 5

　1a(19)(iv) .........................................................................5, 30, 40

　1a(37)..............................................................................................7

　1a(40) ...........................................................................................15

　1a(47)............................................................................................34

　1a(47)(A) ......................................................................................... 5

## TABLE OF AUTHORITIES—Continued

Page(s)

1a(47)(A)(ii) .................................................................5, 16, 17, 34, 40, 41, 42, 43

1a(47)(A)(iii) ............................................................................................ 43, 47

1a(47)(A)(iv) .......................................................................................... 5, 40, 43

1a(51)(A) .................................................................................................................7

2(a)(1)(A) ............... 1, 6, 12, 16, 17, 26, 27, 28, 38, 39, 40, 48, 50, 53, 55

2(e) ........................................................................................................................ 48

5(a) ..............................................................................................................6, 7, 9, 37

5(b) .......................................................................................................................... 6

6(a) .......................................................................................................................... 6

6a ........................................................................................................................ 7, 8

6b ........................................................................................................................ 7, 8

6c ........................................................................................................................ 7, 8

6c (1936) ............................................................................................................. 28

7 .............................................................................................................................7

7(d)(1)(A)(ii) .................................................................................................. 57, 58

7(d)(2) .....................................................................................................................7

7(d)(4) .....................................................................................................................7

7(d)(5)(A) ...............................................................................................................7

7(d)(6) .....................................................................................................................7

7(d)(11)-(16) ..........................................................................................................7

## TABLE OF AUTHORITIES—Continued

Page(s)

7(d)(18)......................................................................................7

7a-1(c)(2) ..................................................................................7

7a-2(c) ...................................................................................... 8

7a-2(c)(1) .................................................................................. 8

7a-2(c)(5)(B) ............................................................................. 8

7a-2(c)(5)(C)(i)............................8, 9, 10, 16, 17, 34, 35, 37, 47, 50, 58

7a-2(c)(5)(C)(ii) ...............................................................9, 10, 56

7b-3(d)(2) .............................................................................. 54

8(b) ......................................................................................... 8

9   ...................................................................................... 7, 8

9(10)(C) ................................................................................. 8

12a(5)............................................................................... 57, 58

13  .......................................................................................... 8

13a-2 ................................................................................ 13, 14

13a-2(1)................................................................. 14, 29, 30, 40, 55

13a-2(7) ..........................................................................14, 29, 55

16(e)(1) ...........................................................................14, 55

16(e)(1)(B)(i) ....................................................................30, 48

16(e)(2) ...................................................................... 15, 31, 53, 54

16(h) .............................................................................. 53, 54

# TABLE OF AUTHORITIES—Continued

Page(s)

25 ..............................................................................................61

25(a)(2) ......................................................................................61

25(b)(5) ......................................................................................61

15 U.S.C. § 8302(d)(1) ....................................................... 48, 49

28 U.S.C. § 1331 ............................................................................ 4

31 U.S.C. §§

5362(1)(A) ............................................................................31

5362(1)(E)(ii) ...........................................15, 16, 31, 50, 59

5362(10) ...............................................................................15

5362(10)(A) .........................................................................31

47 U.S.C. § 414 .......................................................................... 55

Commodity Exchange Act of 1936,
    Pub. L. No. 74-675, 49 Stat. 1491.....................................11, 12

Commodity Futures Modernization Act of 2000,
    Pub. L. No. 106-554, 114 Stat. 2763A-365........................30, 31

Grain Futures Act of 1922,
    Pub. L. No. 67-331, 42 Stat. 998......................................... 11

Tenn. Code Ann. § 4-49-111(a) ................................................ 36

Tenn. Code Ann. § 39-17-501(2)(A) ......................................... 35

Tenn. Code Ann. § 39-17-501(5) .............................................. 35

## TABLE OF AUTHORITIES—Continued

Page(s)

**REGULATIONS:**

17 C.F.R. §§

pt. 38 ...................................................................................7

38.5(b).................................................................................19

38.151(b)........................................................................21, 37

40.2.................................................................................... 8

40.3.................................................................................... 8

40.3(b)................................................................................ 8

40.11(c) .........................................................................17, 56

Concept Release on the Appropriate Regulatory Treatment of Event
Contracts,
73 Fed. Reg. 25,669 (May 7, 2008) ...................................... 16, 33, 40, 42

Event Contracts,
89 Fed. Reg. 48,968 (June 10, 2024)..............................................17, 33

Event Contracts; Withdrawal of Proposed Regulatory Action,
91 Fed. Reg. 5,386 (Feb. 6, 2026) ..........................................................17

Further Definition of "Swap,"
77 Fed. Reg. 48,208 (Aug. 13, 2012) ..........................................44, 48, 49

Prediction Markets; Public Interest Determinations,
91 Fed. Reg. 35,806 (June 12, 2026).........................18, 37, 38, 44, 56, 58

Provisions Common to Registered Entities,
76 Fed. Reg. 44,776 (July 27, 2011)..........................................................17

# TABLE OF AUTHORITIES—Continued

Page(s)

**LEGISLATIVE MATERIALS:**

120 Cong. Rec. 30,464 (Sep. 9, 1974)............................................................ 29

156 Cong. Rec. S3063 (daily ed. May 4, 2010)............................................. 47

*Hearings Before the H. Comm. on Agric.*, 93d Cong. (1974)....................... 12

*Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong. (1974) ................................... 12

H.R. Rep. No. 74-421 (1935) ........................................................................ 12

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.) ................................... 1, 2, 13, 34

H.R. Rep. No. 97-565, pt. 1 (1982) ....................................................... 14, 30

H.R. Rep. No. 106-711, pt. 2 (2000)......................................... 15, 31, 53, 54

S. Rep. No. 93-1131 (1974)...............................................................13, 28, 29

**OTHER AUTHORITIES:**

Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5 ............................................................. 45

Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679........................................................ 44, 45

*Associate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ........ 43

*Associated*, Oxford American Dictionary and Thesaurus (2d ed. 2009)................................................................................................... 43

Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win.  Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM .................. 44, 45

# TABLE OF AUTHORITIES—Continued

Page(s)

Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 22, 2025), https://perma.cc/BT4A-BK8T ................................................................ 45

CFTC, *Futures Glossary*, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm (last visited June 17, 2026) ............................ 4, 5

*Contingency*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ............................................................................................... 41, 42

*Contingency*, Webster's II New College Dictionary (3d ed. 2005) ........ 41, 42

*Event*, Oxford American Dictionary and Thesaurus (2d ed. 2009) ............. 41

*Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001) ................................................................................................... 41

*Event*, Webster's II New College Dictionary (3d ed. 2005) ......................... 41

*Exclusive*, American Heritage Dictionary (5th ed. 2022) ........................... 27

*Impartial*, Oxford American Dictionary and Thesaurus (2d ed. 2009) ...... 37

John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825 (1982) ............................................................. 11

John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1 (1977) .................................................... 10

Kaja Andric, *The Knicks Are the Hottest Ticket in Town.  Hottest Jersey, Too.*, N.Y. Times (June 13, 2026), https://perma.cc/L674-XU9T ................................................................................................... 44

Kalshi, *Mandatory KYC and Surveillance*, https://kalshi.com/market-integrity/kyc-surveillance (last visited June 17, 2026) .................................................................................. 62, 63

# TABLE OF AUTHORITIES—Continued

Page(s)

Kalshi, *Responsible Trading*,
https://help.kalshi.com/en/collections/18616607-responsible-trading (last visited June 17, 2026) ................................................. 62, 63

Kelly Cloonan, *Betting markets nailed Trump's decisive win — and it's a good reminder they can be more accurate than polls*, Bus. Insider (Nov. 9, 2024), https://perma.cc/5W7W-S76X ..........................19

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*,
58 Chi.-Kent L. Rev. 657 (1982) ................................................. 13, 29, 30

Michael J. de la Merced, *Prediction Markets' Next Major Bet: Wall St. Traders*, N.Y. Times (June 17, 2026), https://perma.cc/H6XW-FS5U .............................................................................................. 44

Paul Mueller, *The Knicks playoff run is a billion-dollar slam dunk for New York*, Fast Co. (June 5, 2026), https://perma.cc/DR28-UFPV ..... 44

*Potential*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003)......... 43

## INTRODUCTION

In the seminal 1974 amendments to the Commodity Exchange Act ("CEA"), Congress created the Commodity Futures Trading Commission ("CFTC") and gave it "exclusive jurisdiction" over nationwide derivatives exchanges. 7 U.S.C. § 2(a)(1)(A). Last year, Tennessee officials nonetheless threatened to criminally prosecute Kalshi under state gaming laws for offering certain event contracts on its nationwide derivatives exchange. Because that assertion of concurrent regulatory jurisdiction conflicts with the CEA's plain text, the district court granted a preliminary injunction to prevent state officials from violating federal law. Defendants' challenges to that decision cannot be reconciled with the statutory text, conflict with the only appellate merits decision addressing the issue, and contravene the CFTC's own understanding of its jurisdiction. This Court should affirm.

Kalshi is a CFTC-licensed and regulated exchange, known as a designated contract market ("DCM"). Federal law therefore preempts state regulation of trading on Kalshi, as every conceivable marker of legislative intent confirms. The CEA's text expressly preempts state law by granting the CFTC "exclusive jurisdiction" over on-DCM trading. 7 U.S.C. § 2(a)(1)(A). Congress in 1974 deleted the provision that previously preserved concurrent state jurisdiction, announcing its intent to "preempt the field." H.R. Rep.

1

No. 93-1383, at 35 (1974) (Conf. Rep.).   And Congress repeatedly reaffirmed—indeed, expanded—the CFTC's exclusive jurisdiction after courts uniformly recognized that the CEA "preempts the application of state law" regarding trading on federal exchanges.  *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.).

Federal law therefore bars Tennessee from regulating Kalshi's contracts under straightforward preemption principles.  Holding otherwise would contravene Congress's judgment that a "contract market could not operate efficiently, and perhaps not at all," if subject to "varying and potentially contradictory legal standards."  *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992).  If Tennessee could enforce its laws against Kalshi, so could 49 other states, creating a patchwork of contradictory regulation, interfering with the CFTC's uniform oversight, and conflicting with Kalshi's federally imposed obligation to provide impartial access.  For that reason, the Third Circuit recently rejected a similar attempt by a state to regulate trading on Kalshi.  *KalshiEX LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026).  And the CFTC has initiated lawsuits against states to put an end to "power-grab[s]" that "threaten the Commission's exclusive jurisdiction over derivatives transactions."  CFTC Amicus Br. 27,

2

*KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), Dkt. No. 31 ("CFTC Br.").

Defendants have no response to the clear statutory text or to this Court's precedent holding that state gambling laws are preempted in similar circumstances. Lacking support from the text, Defendants rely heavily on the strawman argument that finding preemption here would bring all sports betting within the CFTC's exclusive jurisdiction. But the CEA's exclusive jurisdiction extends *only* to on-DCM trading, leaving states free to regulate off-DCM transactions, including run-of-the-mill sports bets that are not—and could not be—traded on DCMs.

By contrast, blessing Defendants' efforts to prohibit Kalshi's event contracts would decimate the CFTC's exclusive jurisdiction. It would give state regulators free rein to regulate on-DCM trading whenever they argue that the instruments they seek to regulate are gambling rather than derivatives. Many states prohibited derivatives trading as a form of gambling a century ago, but Congress in 1974 put an emphatic end to that practice. Defendants would have this Court restore it, undermining the uniformity of regulation necessary for derivatives exchanges to function as nationwide markets.

3

## JURISDICTIONAL STATEMENT

Kalshi agrees with Defendants' jurisdictional statement, and further states that the district court had subject-matter jurisdiction under 28 U.S.C. § 1331, because Kalshi's cause of action to enjoin enforcement of preempted state laws arises under federal law.

## STATEMENT OF ISSUES FOR REVIEW

1. Whether Kalshi is likely to succeed on the merits of its claim that the CEA preempts Defendants from prohibiting the trading of Kalshi's sports-event contracts.

2. Whether the balance of harms and the equities favor a preliminary injunction.

## STATEMENT OF THE CASE

### I.    LEGAL BACKGROUND

Speculation about the future is inherent to the human condition.  It undergirds myriad economic transactions—from purchasing insurance and making loans to trading stocks and bonds. This case involves another such activity: derivatives trading under the CEA.

Derivatives are tradeable financial instruments whose prices depend on underlying commodities.  Derivatives take a wide variety of forms under the CEA.  For example, "futures" are contracts obligating a party to buy or sell a commodity at a price fixed now for delivery in the future.  *See* CFTC,

4

*Futures Glossary*.[1]  "Options" give a party the right (but not the obligation) to buy or sell a commodity in the future at a price fixed now.  *See id.*  And "swaps" are contracts where parties trade revenue streams, liabilities, or promises to pay.  *See* 7 U.S.C. § 1a(47)(A).  As most relevant here, Congress has defined "swap" to include any contract providing for payment "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence," as well as any other "transaction that is, or in the future becomes, commonly known to the trade as a swap."  *Id.* §§ 1a(47)(A)(ii), (iv).

Commodities also come in many forms under the CEA.  The term "commodity" is defined to include everything from grain, to gold, to Tennessee Titans jerseys.  7 U.S.C. § 1a(9).  The statute additionally defines "excluded commodit[ies]"—so named because they were initially excluded from certain statutory requirements—to include intangibles such as "interest rate[s]" or "commercial index[es]."  *Id.* §§ 1a(19)(i), (iii).  As most relevant here, this category includes "occurrence[s]" that are "beyond the control of the parties" to the transaction and "associated with a financial, commercial, or economic consequence."  *Id.* § 1a(19)(iv).

---

[1] https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm (last visited June 17, 2026)

This breadth is intentional. In the CEA, Congress explained that derivatives trading is "affected with a national public interest" because it is "a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). By defining derivatives and commodities broadly, Congress ensured that individuals and entities can hedge an ever-evolving range of risks. And because the exchange prices of derivatives reflect the views of market participants with incentives to predict accurately, a broader range of derivatives means a broader range of opportunities for market-watchers to benefit from the wisdom of crowds.

### A.    The CEA's Federal Framework For Derivatives Trading

1. The CEA establishes a uniform, national framework designed to prevent market manipulation, ensure the financial integrity of derivatives transactions, and promote fairness. 7 U.S.C. § 5(b). To accomplish these goals, the CEA provides for derivatives trading on nationwide DCMs, *see id.* § 6(a), and it grants the CFTC "exclusive jurisdiction" over trading on those DCMs, *id.* § 2(a)(1)(A). Specifically, the statute provides that "[t]he Commission shall have exclusive jurisdiction ... with respect to accounts, agreements[,]... and transactions involving swaps or" futures "traded or executed on a contract market designated" under the CEA. *Id.*

6

The CFTC's "exclusive jurisdiction" is the cornerstone of Congress's comprehensive scheme for regulating derivatives trading. The CFTC is charged with deciding whether to designate an exchange as a DCM based on the exchange's ability to comply with various requirements enumerated in the CEA and CFTC regulations. *See* 7 U.S.C. §7; 17 C.F.R. pt. 38. Those requirements cover myriad subjects, including recordkeeping, 7 U.S.C. §7(d)(18), rules DCMs must impose on market participants, *id.* §§7(d)(2), (5)(A), (6), (11)-(16), prevention of market manipulation, *id.* §7(d)(4), and liquidity requirements, *id.* §7a-1(c)(2).

The CFTC must also enforce numerous statutory provisions that govern how trading on DCMs must be carried out. For example, under the CEA, all DCMs are "trading facilit[ies]," 7 U.S.C. §§1a(6), (37), defined as systems in which participants can trade contracts either "by accepting bids or offers made by other participants that are open to multiple participants," or "through the interaction of multiple bids or multiple offers within a system with a pre-determined non-discretionary automated trade matching and execution algorithm," *id.* §1a(51)(A). These provisions ensure that prices are set by market forces, as needed to serve DCMs' hedging and price-discovery purposes. *Id.* §5(a). They also ensure that DCMs cannot establish, adjust, or manipulate contract prices to ensure their own profits. Numerous other

7

provisions further serve those purposes, including prohibitions on fraud, manipulation, and disruptive trading, as well as requirements for position-size limits in certain transactions. *Id.* §§ 6a, 6b, 6c, 9.

The CEA also charges the CFTC with overseeing listing of contracts on DCMs. *See* 7 U.S.C. § 7a-2(c). When DCMs wish to list new contracts for trading, they must submit detailed certifications to the CFTC to demonstrate compliance with the CEA and CFTC regulations. *Id.* § 7a-2(c)(1); 17 C.F.R. §§ 40.2, 40.3. The CFTC may review these certifications and determine whether the contracts violate applicable law. 7 U.S.C. § 7a-2(c)(5)(B); *see* 17 C.F.R. § 40.3(b).

Congress gave the CFTC a variety of enforcement tools to ensure that DCMs adhere to the agency's dictates. Those tools include civil penalties, 7 U.S.C. § 9(10)(C), revocation of licensing, *id.* § 8(b), and referral for criminal enforcement, *id.* § 13.

2. The CEA grants the CFTC a special role with respect to "[e]vent contracts"—derivatives where the contractual payment depends on whether or to what extent a future event occurs. 7 U.S.C. § 7a-2(c)(5)(C)(i). Farmers, for example, may buy contracts that pay out if there is a drought to hedge crop losses. Or a Titans jersey retailer might purchase a contract that pays out if the Titans miss the playoffs. The price participants pay for the event

8

contract reflects their predictions for the future. Farmers might pay more if they predict drought; sporting goods retailers might pay more if they predict the Titans will underperform. Prices are therefore crowd-sourced by parties with economic incentives to predict accurately. In this respect, these contracts advance the national interests specified in the CEA—to "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a).

Like all derivatives, event contracts attract parties seeking to hedge risk and speculators seeking profit. A party's "ability to engage in hedging depends on the availability of investors willing to assume or to share the hedger's risk in the hope of making a profit." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 390 (1982). Congress thus recognized that speculators play a "crucial role in an effective and orderly futures market." *Id.*

At the same time, Congress recognized that certain event contracts might warrant closer CFTC scrutiny. Congress therefore established a "Special [R]ule" that authorizes the CFTC to review and prohibit six categories of contracts if it concludes they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(ii). The Special Rule provides that the

9

CFTC "may"—but need not—"determine" that event contracts are contrary to the public interest if they "involve":

(I)    activity that is unlawful under any Federal or State law;
(II)   terrorism;
(III) assassination;
(IV) war;
(V)   gaming; or
(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.* § 7a-2(c)(5)(C)(i).  If an event contract is "determined by the [CFTC] to be contrary to the public interest," it may not be listed on a DCM.  *Id.* § 7a-2(c)(5)(C)(ii).  Absent an adverse public-interest determination, however, Congress did not bar event contracts involving the Special Rule's enumerated activities.

### B.  The CEA And The States

1.  The CEA currently establishes a uniform, nationwide scheme for regulating derivatives trading.  But that has not always been true.  When futures markets were in their infancy, states frequently attempted to regulate—or even ban—derivatives trading, which they decried as "gambling in grain."  *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888); *see also* John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977) (documenting states' treatment of futures trading as unlawful gambling).

10

The first organized futures market in the United States was the Chicago Board of Trade, established in 1848.  Traders exchanged contracts for future delivery of commodities, settling in cash at day's end.  *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 245 (1905).  The Board then telegraphed price information to interested parties nationwide.  *Id.* at 245-246.  During this time, many "anti-gaming" and "anti-bucket shop" laws were enacted to make it "as difficult as humanly possible to trade futures." John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825, 826 (1982) (quotation marks omitted); *see* Addendum B (enumerating early state statutes banning futures trading as gambling).

2.  Congress first ventured into derivatives regulation with the Grain Futures Act of 1922, which sought to centralize futures trading on federally approved "contract market[s]."  Pub. L. No. 67-331, 42 Stat. 998, 1000-02. But that statute did not preempt state laws.  Thus, in 1933, the Supreme Court upheld the application of a "Missouri law making gambling in grain futures illegal," holding that derivatives transactions on federally regulated exchanges may nonetheless constitute illegal gambling under state law. *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

In 1936, Congress enacted the original CEA, which subjected additional commodities to the framework governing grain futures and added

11

anti-fraud protections for market participants. Pub. L. No. 74-675, 49 Stat. 1491, 1491-99. But Congress again stopped short of preemption, instead preserving "any State law applicable" to "transaction[s]" regulated by the Act. *Id.* at 1494. The drafters' "intention" was "not to occupy the field." H.R. Rep. No. 74-421, at 5 (1935).

Over the following decades, that decision produced a patchwork of regulations, leading exchanges to recommend that "federal policy … be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." *Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1974) ("House Hearings").

Congress responded with the Commodity Futures Trading Commission Act of 1974, designed to "[b]ring[ ] all futures trading under federal regulation." *Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 848 (1974) ("Senate Hearings"). Congress accomplished that goal by creating the CFTC and giving it "exclusive jurisdiction" over trading on DCMs. 7 U.S.C. § 2(a)(1)(A). This broad grant of "exclusive jurisdiction" over instruments traded on federal exchanges was intended to "prevent any possible conflicts over jurisdiction." *House Hearings* at 128. "[D]ifferent State laws would just lead to total chaos" absent "preemption." *Senate Hearings* at 685 (statement of Sen. Clark).

12

The Senate was so concerned about preserving the CFTC's exclusive jurisdiction that—after House drafters introduced a state-law savings clause—the Senate added language making clear that the clause applied "except as hereinabove provided" in the exclusive-jurisdiction provision. S. Rep. No. 93-1131, at 31 (1974). The language ensured "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." *Id.* at 6. Further, the Senate "struck" the provision in the 1936 CEA that had preserved "any State law applicable" to derivatives transactions. H.R. Rep. No. 93-1383, at 35 (quotation marks omitted). The amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id.* Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States." *Id.* at 36. These amendments were immediately understood to preempt state laws that would otherwise bar futures as "illegal gambling contracts." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 700 (1982) (citation omitted).

3. In subsequent CEA amendments, Congress further addressed states' role in policing derivatives trading. In 1978, Congress gave the states a circumscribed role in enforcing the CEA, allowing them to bring "*parens patriae* actions, seeking injunctive or monetary relief for certain violations

13

of the CEA." *Curran*, 456 U.S. at 366-367; *see* 7 U.S.C. § 13a-2.  But Congress specified that states' authority extends only to suits against defendants "*other than a [designated] contract market.*"  7 U.S.C. § 13a-2(1) (emphasis added).  The sole exception was that states could enforce their "general civil or criminal antifraud statute[s]."  *Id*. § 13a-2(7).

In 1982, Congress recognized that the 1974 amendments "bestowed on the CFTC exclusi[ve] jurisdiction to regulate futures trading" on DCMs, "thereby preempting any State regulatory laws."  H.R. Rep. No. 97-565, pt. 1, at 44 (1982).  But Congress was concerned about "off-exchange commodities activities" and believed "States should be extensively involved in … policing transactions outside those preserved exclusively" for the CFTC.  *Id*.  Congress therefore added what is now Section 16(e)(1),[2] which provides that "[n]othing in this chapter shall supersede or preempt" the application of state law to a transaction "that is not conducted on or subject to the rules" of a DCM.  Congress thus reaffirmed the grant of "exclusive CFTC jurisdiction over exchange-traded futures" while permitting states to police "transactions outside those preserved exclusively for the jurisdiction of the CFTC."  H.R. Rep. No. 97-565, pt. 1, at 44.

---

[2] Statutory provisions are referred to by their section in the U.S. Code rather than their section in the CEA.

Congress revisited this provision when it amended the CEA in 2000 to allow "excluded commodit[ies]"—including "occurrence[s]"—to be traded off-exchange by certain sophisticated traders.  7 U.S.C. § 1a(19).  To ensure that gaming laws were not used to prohibit those trades, Congress created an exception to the states' authority to regulate off-DCM transactions.  That exception "supersede[s] and preempt[s] the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops" as to permissible off-DCM transactions.  *Id.* § 16(e)(2).  The Committee Report explained that the then-"current" CEA already "supersede[d] and preempt[ed]" state laws "in the case of transactions conducted on a registered entity," such as a DCM.  H.R. Rep. No. 106-711, pt. 2, at 71 (2000).  The new preemption provision clarified that the CEA likewise "supersedes and preempts State gaming and bucket shop laws" as to excluded off-DCM transactions.  *Id.*; *see also* 7 U.S.C. § 1a(40) (defining "registered entity" to include DCMs).

More recently, Congress addressed the application of gambling laws to derivatives in the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA").  That statute generally treats a "bet or wager" made over the internet as "unlawful" if it is illegal in the state where it is initiated or received, 31 U.S.C. § 5362(10), but it makes clear that the term "bet or wager"

15

"does not include" "any transaction conducted on" a DCM, *id.* §§ 5362(1)(E)(ii).

### C.    The CFTC's Regulation Of Event Contracts

Event contracts have been part of the CFTC's regulatory jurisdiction since 2000, when Congress added financially consequential "occurrences" to the range of commodities covered by the CEA.  Over the next several years, certain entities began to offer trading in event contracts.  And in 2008, the CFTC solicited public comment regarding regulation of "event contracts," recognizing they may be based on "varied" eventualities, such as "the results of political elections, or the outcome of particular entertainment events," and which "can be designed to exhibit the attributes of either options or futures contracts."  Concept Release, 73 Fed. Reg. 25,669, 25,669-70 (May 7, 2008). The CFTC explained that the CEA "supersedes and preempts other laws, including state and local gaming … laws" as to on-DCM transactions.  *Id.* at 25,673.  It therefore sought comments on "the implications of possibly preempting state gaming laws with respect to event contracts" by permitting them to be traded on-DCM.  *Id.*

Before the CFTC's contemplated rulemaking was finalized, Congress stepped in, expressly addressing event contracts in the Dodd-Frank Act of 2010.  Among other reforms, Dodd-Frank included "event" contracts in the

CEA's definition of "swap," 7 U.S.C. § 1a(47)(A)(ii), placed exchange-traded swaps within the CFTC's "exclusive jurisdiction," *id.* § 2(a)(1)(A), and enacted the Special Rule allowing the CFTC to prohibit certain categories of event contracts if it determines they are contrary to the public interest, *id.* § 7a-2(c)(5)(C)(i).

The CFTC implemented Dodd-Frank in various regulations. As relevant here, the CFTC implemented the Special Rule by authorizing the CFTC to "issue an order approving or disapproving" contracts involving the enumerated categories on a case-by-case basis. 17 C.F.R. § 40.11(c); *see* Provisions Common to Registered Entities, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011) (explaining that DCMs "may always" self-certify contracts subject to review "on a case-by-case basis"). Then, in 2024, the CFTC proposed a regulation that would have interpreted "gaming" to include sports-event contracts and would have categorically determined that event contracts involving "gaming" are contrary to the public interest. Event Contracts, 89 Fed. Reg. 48,968, 48,978 (June 10, 2024). But the proposal was never finalized, and the CFTC formally withdrew it in February 2026. 91 Fed. Reg. 5,386 (Feb. 6, 2026). Thus, the CFTC never categorically prohibited event contracts involving gaming.

17

In June 2026, the CFTC promulgated a Notice of Proposed Rulemaking ("NPRM") announcing a comprehensive framework for regulating event contracts under the Special Rule. *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026). The NPRM confirms that the CEA "expressly preempts state laws" with respect to event contracts on DCMs. *Id.* at 35,808. It recognizes event contracts are "swaps" that serve "price discovery" functions and "allow market participants to hedge exposure to a wide array of events for which no traditional financial instrument otherwise exists," including "sporting events" that "generate billions of dollars in economic activity." *Id.* at 35,807-08. And it proposes revisions to Rule 40.11 by: (1) specifically defining "gaming" to include sports-event contracts, (2) making clear that sports-event contracts are *not* (and never have been) categorically prohibited, but instead are subject to case-by-case public-interest review, (3) providing a framework for the CFTC to evaluate whether event contracts comport with the public interest, and (4) explaining that many (but not all) sports-event contracts "can be operated consistent with the public interest." *Id.* at 35,818, 35,836, 35,853. The NPRM's comment period closes on July 27, 2026. *Id.* at 35,806.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

1.  In 2020, the CFTC designated Kalshi as a DCM.  *See KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at \*4 (D.D.C. Sep. 12, 2024). Kalshi has since been federally regulated alongside other DCMs like the Chicago Mercantile Exchange.

Kalshi offers many kinds of event contracts related to climate, technology, popular culture, economics, and agricultural and tangible commodities.  Each contract has a yes (the event will occur) and a no (it will not) position, allowing customers to hedge and trade on financially significant events.   Prices fluctuate based on market participants' perceptions of the likelihood the event will occur, giving these contracts significant predictive value.  Kalshi's contracts on the 2024 presidential election, for example, were more accurate than polling.[3]

In January 2025, Kalshi began offering contracts on sports events after a competitor began listing similar contracts.  When Kalshi first self-certified its sports-event contracts, the CFTC requested a "[d]emonstration of compliance" with the CEA.  17 C.F.R. § 38.5(b).  Kalshi responded with detailed filings describing the contracts' compliance with the CEA and CFTC

---

[3] Kelly Cloonan, *Betting markets nailed Trump's decisive win — and it's a good reminder they can be more accurate than polls*, Bus. Insider (Nov. 9, 2024), https://perma.cc/5W7W-S76X.

regulations. Mem. Op. of the Ct., R.48, PageID#878 ("Op."). The CFTC took no further action. It has since permitted Kalshi and other DCMs to list tens of thousands of sports-event contracts without objection. *Id.*

2. In January 2026, the Tennessee Sports Wagering Council ("SWC") sent Kalshi a cease-and-desist letter asserting that Kalshi's sports-event contracts are prohibited by Tennessee law and demanding that Kalshi cease offering them in Tennessee. Ex. 6 to Compl., R.1-6, PageID#123-126. The SWC threatened to impose civil and criminal penalties, including referral "to law enforcement for further [criminal] investigation." *Id.* PageID#126. Kalshi filed this suit on the ground that the CEA preempts state regulation of Kalshi's on-DCM transactions.

3. On February 19, 2026, the district court granted Kalshi a preliminary injunction. The court first concluded Kalshi's contracts are swaps. Op., R.48, PageID#881. It determined that a sports event's outcome is an "occurrence[ ] of [an] event[ ]" within the CEA's "swap" definition. *Id.* PageID#882-883. Such outcomes also are "*associated* with *potential* financial consequences" as the definition requires. *Id.* PageID#885. The court added that sporting events, including "individual player performance, and how a team performs, *can* have financial consequences, even if not right away." *Id.* (emphasis added).

20

Second, without "address[ing] express or field preemption," the district court held that state gaming laws are conflict-preempted. Op., R.48, PageID#886-887. Tennessee's requirement that bettors be "'physically located in' Tennessee" would require Kalshi to "create a Tennessee-only exchange." *Id.* PageID#887. But doing so would "violate" Kalshi's impartial-access obligation, making it "impossib[le]" to comply with both state and federal law. *Id.*; *see* 17 C.F.R. § 38.151(b). The court also agreed that "state law likely stands as an obstacle to ... the CEA's primary objective: uniform regulation of the derivatives market," because it "would directly affect trading on Kalshi by limiting who can trade with whom." Op., R.48, PageID#888.

Finally, the district court held that the equities favored injunctive relief. The court recognized that Kalshi faces numerous irreparable harms, including "potential civil and criminal liability," "lost profits and reputational harm," and risk of noncompliance "with CFTC regulations." *Id.* PageID#889-890. Moreover, "enjoining the enforcement of a law that violates constitutional rights 'is always in the public interest,'" and Tennessee likely faces no harm because state gaming laws are "likely preempted." *Id.* PageID#891 (citation omitted). Defendants appealed.

21

4. Meanwhile, the CFTC has confirmed its exclusive jurisdiction over DCM-traded event contracts, including sports-event contracts. It has filed preemption suits against multiple states that have sought to enforce state law against DCMs. *See, e.g.*, *KalshiEX LLC v. Johnson*, --- F. Supp. 3d ---, No. CV-26-1715, 2026 WL 1223373 (D. Ariz. May 5, 2026) (granting CFTC's motion for preliminary injunction against Arizona). It has also filed amicus briefs explaining that "[s]tates cannot invade the CFTC's exclusive jurisdiction ... by re-characterizing swaps trading on DCMs as illegal gambling" and that the states' theory presents "a fundamental threat to Congress's statutory design" that would create "a seismic shift in the longstanding status quo between CFTC and state authority." CFTC Amicus Br. 2, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2.

## SUMMARY OF ARGUMENT

**I.A.** The CEA expressly preempts state regulation of trading on DCMs like Kalshi. Section 2(a) grants the CFTC "exclusive jurisdiction" to regulate on-DCM trading, necessarily denying jurisdiction to state regulators. Congress deleted a provision that would have preserved state regulation and repeatedly amended the CEA to confirm that state regulation of on-DCM trading is preempted.

22

**B.**   Congress's purpose in establishing uniform rules for on-DCM trading was to "preempt the field."   And the comprehensive regulatory framework Congress created leaves no room for parallel state regulation. Accordingly, the Third Circuit recently agreed that the CEA preempts the field of regulating on-DCM trading, consistent with decades of precedent.

**C.**   Tennessee's sports-gambling laws are also conflict-preempted as applied to Kalshi.  Letting 50 states regulate on-DCM trading would thwart Congress's objective of uniform federal regulation of DCMs.  And Kalshi's federal obligation to provide impartial access to its nationwide exchange renders compliance with Tennessee law—which prohibits accepting wagers from outside the state—impossible.  Tennessee's laws also create a conflict by criminalizing conduct that the CFTC, exercising congressionally delegated discretion, has permitted.

**II.**  Defendants' contrary arguments fail.

**A.**  Kalshi's contracts are swaps.  *First*, the CEA preempts states from regulating *all* on-DCM transactions.  Defendants dispute whether Kalshi's contracts *should* be traded on a DCM, but that is a determination for the CFTC to make.  *Second*, Kalshi's contracts are swaps under the CEA's intentionally broad definition.  Defendants' counterarguments—that the term "event" excludes outcomes and that swaps require a "close" connection

23

to potential financial consequences—contradict the CEA's text and decades of settled practice. *Third*, recognizing Kalshi's contracts as swaps will not disturb state regulation of sports betting; the CFTC's exclusive jurisdiction preempts state regulation of *on-DCM* transactions while allowing states to regulate *off-DCM* transactions like sports bets.

**B.** Defendants' preemption arguments fare no better. Defendants invoke a presumption against preemption, but no presumption applies where, as here, a statute contains an express-preemption clause and where a state seeks to regulate *interstate* gambling. Defendants overlook the Special Rule's reference to "[e]vent contracts" involving "gaming" as one type of "swap[ ]"—irrefutable textual evidence that Congress placed contracts involving gaming within the CFTC's exclusive jurisdiction. And Defendants do not dispute that Tennessee law would require Kalshi to exclude *all* non-Tennessee users—an obvious violation of Kalshi's obligation to provide impartial access to its exchange, as the CFTC has confirmed.

**C.** Kalshi has a cause of action in equity for an anti-suit injunction against Defendants. Nothing in the CEA implicitly withdraws this cause of action. And because Kalshi has a cause of action, sovereign immunity does not apply.

**III.**    The equities support injunctive relief.   Kalshi does not have unclean hands, because its self-certifications did not violate federal law.  The balance of harms also favors Kalshi.   Preventing a Supremacy Clause violation serves the public interest, and Defendants' claimed harms from the injunction are speculative and reparable, in contrast to Kalshi's concrete, irreparable harms.

**IV.**    The injunction complies with Rule 65(d) because it clearly identifies the conduct Defendants may not engage in.  In any case, even if the injunction had to describe the enjoined conduct with greater specificity, that would not support reversal on the merits as Defendants request.

## STANDARD OF REVIEW

"To secure a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *EOG Res. Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (citation omitted).  This Court reviews the grant of a preliminary injunction "for abuse of discretion." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (citation omitted).

25

## ARGUMENT

### I. THE CEA PREEMPTS STATE GAMBLING LAWS AS APPLIED TO KALSHI.

The Supreme Clause sets out a "fundamental principle of the Constitution" that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *see* U.S. Const. art. VI, cl. 2. Express preemption "exists when Congress expresses a clear intent to pre-empt state law in the language of the statute." *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 562 (6th Cir. 1998). Field preemption exists where states regulate in a field that Congress "has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Conflict preemption exists where compliance with both state and federal law is an "impossibility" or where state law stands as an "obstacle" to Congress's objectives. *Id.* (citations omitted). These "categories of preemption are not 'rigidly distinct.'" *Crosby*, 530 U.S. at 372 n.6 (citation omitted). Tennessee gambling laws are preempted as applied to Kalshi under all three principles.

### A. Tennessee's Sports-Gambling Laws Are Expressly Preempted As Applied To Kalshi.

1. Section 2(a)(1)(A) expressly preempts state law by granting the CFTC "exclusive jurisdiction … with respect to accounts, agreements …, and transactions involving swaps or contracts of sale of a commodity for future

delivery" that are "traded or executed on a contract market designated" by the CFTC. That sweeping language prevents states from asserting jurisdiction over *any* DCM-traded instrument, including Kalshi's sports-event contracts.

There is no other plausible reading of Congress's grant of "exclusive jurisdiction." As the Supreme Court has explained, the "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities not named in that provision. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992); *see also Exclusive*, American Heritage Dictionary (5th ed. 2022) ("Not divided or shared with others"; "sole"; "incompatible"). A grant of "exclusive jurisdiction" to a federal agency preempts state efforts to intrude on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016).

This Court agrees: "Exclusive means exclusive." *Am. Energy Corp. v. Rockies Express Pipeline LLC*, 622 F.3d 602, 605 (6th Cir. 2010). Other circuits, too, have repeatedly recognized "[t]he explicit statutory conferral of exclusive jurisdiction" to a federal authority "is a form of express preemption" because it "withdraws any concurrent jurisdiction" that state authorities may have. *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024); *see Duke Energy Trading & Mktg.,*

27

*L.L.C. v. Davis*, 267 F.3d 1042, 1057 (9th Cir. 2001) (where there is "exclusive federal jurisdiction," "the States cannot have jurisdiction" (citation modified)).

2.  Other features of Section 2(a)'s text confirm express preemption. Section 2(a)(1)(A)'s savings clause provides that it does not "supersede" the jurisdiction of "other regulatory authorities" under the laws "of any State." Crucially, the clause applies "*[e]xcept as hereinabove provided*" by the grant of exclusive jurisdiction to the CFTC over on-DCM trading. *Id.* (emphasis added).  That language enables a "logical inference" of preemption as to matters within the CFTC's exclusive jurisdiction. *See Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 194-196 (9th Cir. 2013) (interpreting savings clause with "[e]xcept as provided" proviso). Specifying that state law is *not* superseded as to *off-DCM* transactions confirms that state law *is* superseded as to *on-DCM* transactions.  Indeed, Congress added the proviso to ensure that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies."  S. Rep. No. 93-1131, at 6.

3.  Statutory history reaffirms that the express-preemption provision means what it says.  Before 1974, the CEA did not "impair any State law applicable to any transaction" regulated by the statute.  7 U.S.C. § 6c (1936). The Supreme Court had explained that *without* this proviso, the CEA would

28

"almost certainly" preempt state laws, but that this proviso "serve[d] the function of preventing supersedure and preserving state control." *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947). Senate drafters accordingly "deleted" this clause "to assure that Federal preemption is complete." 120 Cong. Rec. 30,464 (Sep. 9, 1974) (statement of Sen. Curtis). The Senate also clarified the state-law savings clause to apply "except as hereinabove provided" by the CFTC's exclusive jurisdiction over on-DCM trading. S. Rep. No. 93-1131, at 31. These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court previously relied on "to hold that the CEA did not preempt state regulation." Van Wart, *supra*, at 692-693. They would be incomprehensible if Congress intended for states to regulate on-DCM trading.

4. Later-enacted provisions further confirm preemption. Following the 1974 amendments, Congress enacted other provisions addressing states' authority, and each underscores that the CFTC's exclusive jurisdiction prohibits states from applying their gambling laws to DCMs.

The 1978 amendments, for example, authorize state officials to sue over "any act or practice constituting a violation of any provision of [the CEA] or any [CFTC] rule." 7 U.S.C. § 13a-2(1). They also let states enforce general state "antifraud statute[s]"—but not state gambling laws. *Id.* § 13a-2(7).

29

And, as relevant here, they expressly provide that states may enforce the CEA *only* against a party "*other than a [designated] contract market.*" *Id.* § 13a-2(1) (emphasis added). Congress included this limitation because it "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC." Van Wart, *supra*, at 708.

Similarly, the 1982 amendments instruct that the CEA does *not* "supersede or preempt" state law as to transactions "*not* conducted on" a DCM. 7 U.S.C. § 16(e)(1)(B)(i) (emphasis added). The only coherent inference of specifying no preemption as to off-DCM transactions is that Congress *did* intend preemption as to on-DCM transactions. Indeed, Congress in 1982 expressly recognized that the 1974 amendments already "bestowed on the CFTC exclusi[ve] jurisdiction to regulate futures trading" on DCMs, "thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, pt. 1, at 44.

The 2000 amendments are equally on-point. That year, Congress expanded the CEA to cover event contracts by defining "excluded commodity" to include an "occurrence" or "contingency" that is "beyond the control of the parties" to the transaction and "associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv). Congress also provided that "excluded commodit[ies]" could be traded *off*-DCM by certain

sophisticated market participants, known as "eligible contract participants." Pub. L. No. 106-554, 114 Stat. 2763A-365, 2763A-377, 2763A-379. To protect these off-exchange trades from state gaming laws, Congress amended the CEA to "supersede and preempt" "any State or local law that prohibits or regulates gaming" with respect to these newly permitted off-DCM transactions. 7 U.S.C. § 16(e)(2). That targeted preemption was necessary only because off-DCM transactions would not be subject to the CFTC's exclusive jurisdiction, which Congress recognized already "supersede[d] and preempt[ed]" state laws as to on-DCM transactions. H.R. Rep. No. 106-711, pt. 2, at 71.

A subsequent federal statute specifically governing gambling supports this conclusion. UIGEA, enacted in 2006, generally treats "internet gambling" as "unlawful" if the "bet or wager" is unlawful in the state where it is "initiated, received, or otherwise made." 31 U.S.C. § 5362(10)(A). Congress defined "bet or wager" to include risking "something of value upon the outcome of a contest of others," including "a sporting event." *Id.* § 5362(1)(A). But Congress expressly provided that "bet or wager" "does *not include*" "any transaction conducted on or subject to the rules of a" DCM. *Id.* § 5362(1)(E)(ii) (emphasis added). UIGEA thus confirms Congress's intent to prevent state gambling laws from applying to on-DCM transactions.

31

5.  Precedent further reinforces preemption.  When Congress returned to the CEA following 1974, courts of appeals had repeatedly and uniformly held that the CEA's exclusive jurisdiction over DCMs "preempts the application of state law."  *Leist*, 638 F.2d at 322; *see Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (state-law "commercial gambling" claim could not proceed because the CEA "preempts all state laws inconsistent with its provisions"); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("Congress intended the CFTC to occupy the entire field of commodities futures regulation."); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (per curiam) (where "the CFTC has jurisdiction, its power is exclusive"); *Am. Agric.*, 977 F.2d at 1157 (state-law claims "are preempted by the CEA" as applied to "the operation of a contract market"); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-591 (D.C. Cir. 2001) (the CFTC's jurisdiction is "exclusive with regard to the trading of futures *on organized contract markets*" (citation omitted)).

This Court "presume[s] that Congress is aware of the law (including judicial precedent) relevant to legislation it enacts." *Boaz v. FedEx Customer Info. Servs., Inc.*, 725 F.3d 603, 607 (6th Cir. 2013).  In light of the overwhelming authority supporting preemption, Congress would have

understood when it revisited the CEA in Dodd-Frank that granting the CFTC exclusive jurisdiction over event contracts would preempt state law.

6. The CFTC has long shared this view. In 2008, it recognized that "the CEA supersedes and preempts other laws, *including state and local gaming and bucket shop laws*, with respect to transactions executed on" a DCM, including "event contracts." 73 Fed. Reg. at 25,673 (emphasis added). Its proposed 2024 rule confirms that its "exclusive jurisdiction … preempt[s] the application of state law." 89 Fed. Reg. at 48,977 n.84. And it told the D.C. Circuit—when litigating a case *against* Kalshi—that "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant Br. 27, *KalshiEX v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024), 2024 WL 4512583. That longstanding view merits considerable weight. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388, 394, 402 (2024) (courts may account for an agency's "body of experience and informed judgment" in interpreting a statute (citation omitted)).

## B. Tennessee's Sports-Gambling Laws Are Field-Preempted As Applied To Kalshi.

The CEA also preempts the field of regulating trading on DCMs—both through its express text and by setting out a comprehensive scheme that displaces state regulation. *See Crosby*, 530 U.S. at 372 n.6 (field preemption can be express or implied).

Beginning with the text, the grant of exclusive jurisdiction to the CFTC expressly preempts the field of regulating on-DCM trading by withdrawing concurrent jurisdiction from states over that field. And while this Court need not consider legislative history given the clear statutory text and context, the conference report to the 1974 amendments confirms that Congress sought to "*preempt the field* insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (emphasis added); *see Garcia v. United States,* 469 U.S. 70, 76 (1984) (when resort to legislative history is warranted, committee reports are the "authoritative source").

The CEA's field-preemptive text is confirmed by Congress's adoption of a "comprehensive regulatory structure" to oversee the "futures trading complex." *Curran,* 456 U.S. at 356 (citation omitted). The CEA comprehensively regulates DCMs, covering everything from recordkeeping to capital requirements to market monitoring to how trades are matched and executed. *See supra* at 6-8. It also contains an elaborate set of provisions defining what types of derivatives may be traded on DCMs and what qualifies as a commodity. *See* 7 U.S.C. §§ 1a(9), (19), (47); *id.* § 7a-2(c)(5)(C)(i). As most relevant here, the CEA defines "swap" to include event contracts, *id.* § 1a(47)(A)(ii), and the Special Rule authorized *the CFTC* (not states) to decide whether to bar "event contracts" involving "gaming" or conduct

34

proscribed by state law as "contrary to the public interest." *Id.* §7a-2(c)(5)(C)(i). This comprehensive framework ensures that DCMs will operate on an interstate basis to provide 50-state markets, thereby ensuring uniform nationwide pricing of derivatives contracts.

The CEA's comprehensive regime leaves "no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (citation omitted). Indeed, Tennessee's own laws recognize as much by excluding "futures or commodities trading" from the definition of "[g]ambling." Tenn. Code Ann. §§ 39-17-501(2)(A), (5).

### C. Tennessee's Sports-Gambling Laws Are Conflict-Preempted As Applied to Kalshi.

Even if express and field preemption did not bar Defendants from regulating Kalshi's event contracts, conflict preemption would. In at least three respects, complying with Tennessee law would be "impossible" for Kalshi or pose an "obstacle" to the CEA's purposes. *Crosby*, 530 U.S. at 372-373 (citation modified).

1. Applying Tennessee's gambling laws to Kalshi subverts Congress's aim of bringing futures markets "under a uniform set of regulations." *Am. Agric.*, 977 F.2d at 1156. As the Third Circuit recently held, Congress intended "to do away with the patchwork of state regulations and bring futures trading on DCMs under the exclusive jurisdiction of the CFTC."

35

*Flaherty*, 172 F.4th at 230. Letting states enforce gambling laws against Kalshi "would create an obstacle to executing the [CEA] because" it would create "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Id.* The Seventh Circuit has likewise held that "[w]hen application of state law would directly affect trading on or the operation of a [DCM], it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Am. Agric.*, 977 F.2d at 1156-57 (citation omitted); *see Sherfel v. Newsom*, 768 F.3d 561, 568 (6th Cir. 2014) (finding conflict preemption where a state statute "interfere[d] with nationally uniform plan administration" under federal law (citation omitted)).

2. Compliance with both federal and Tennessee law is also impossible for Kalshi, as the district court held. Op., R.48, PageID#887. Tennessee law would require Kalshi to limit access to persons "physically located in" Tennessee. Tenn. Code Ann. § 4-49-111(a). Sportsbooks can comply with this requirement because they are the counterparties to bets with their customers. But DCMs like Kalshi, which match traders with other traders nationwide, cannot. If Tennessee may force all Tennessee traders to be matched only *intrastate*, 49 other states could subject DCMs to similar geographic limitations. That would create fragmented markets with separate

36

liquidity pools, meaning that the same contracts would trade at different prices in different states. Fifty different siloed markets would be anathema to the "interstate and international commerce" that informs the "national public interest" served by derivatives. 7 U.S.C. § 5(a).

Indeed, abiding by Tennessee law would violate CFTC regulations. DCMs are required to provide "impartial access to [their] markets and services." 17 C.F.R. § 38.151(b). The plain meaning of "impartial" is "treating everyone equally; not biased." *Impartial*, Oxford American Dictionary and Thesaurus (2d ed. 2009). A DCM cannot treat all users equally if forced to discriminate based on geography. Thus, as the CFTC has made clear, compliance with state geographic limitations is "impossible" for DCMs because it would violate the "impartial access" requirement. CFTC Br. 23-24 (citation modified). This is a quintessential case of impossibility preemption—where federal law "forbids what the state law requires." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012).

3. Allowing Defendants to prosecute Kalshi would also conflict with Congress's chosen "method of enforcement." *Arizona*, 567 U.S. at 406. Congress addressed event contracts involving "gaming" in the Special Rule by giving the CFTC alone authority to prohibit such contracts if they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CFTC has

37

proposed a regulation concluding that many sports-event contracts "can be operated consistent with the public interest" and setting forth detailed criteria to guide its public-interest review.  91 Fed. Reg. at 35,836-37.  Letting states ban sports-event contracts squarely conflicts with that method of enforcement, because it "would disturb and conflict with the balance embodied" in a discretionary judgment Congress delegated to a federal agency.  *California v. FERC*, 495 U.S. 490, 506 (1990); *see In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 861 (6th Cir. 2023) ("regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption" (citation modified)).  Letting every state prosecute DCMs for offering contracts that the CFTC has decided to permit would nullify the CFTC's judgment.

## II.    TENNESSEE'S CONTRARY ARGUMENTS FAIL.

### A.    Kalshi's Contracts Are Swaps.

Defendants first contend (at 24) that Kalshi's contracts are not swaps and therefore fall outside the CFTC's exclusive jurisdiction.  For multiple independent reasons, that argument fails.

1. To begin, the CFTC's exclusive jurisdiction covers *all* DCM-traded instruments.  Section 2(a)(1)(A) applies not just to swaps and futures

38

"transactions," but also to "accounts" and "agreements" "traded or executed" on a DCM. Under the rule of the last antecedent, the limiting clause—"involving swaps or contracts of sale of a commodity for future delivery"—modifies only "transactions," and not the more remote "accounts" and "agreements." *See Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("a limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows" (citation omitted)). Kalshi's contracts are DCM-traded "agreements" within the CFTC's exclusive authority. Letting states concurrently regulate those agreements would conflict with Congress's intent to subject DCMs to "a uniform set of regulations." *Am. Agric.*, 977 F.2d at 1156.

That does not leave states without recourse if DCMs list contracts that do not belong on DCMs. States may bring suit under the Administrative Procedure Act ("APA") if they believe the CFTC is improperly enforcing (or failing to enforce) the CEA against DCMs. *See* 5 U.S.C. § 551(13) ("agency action" includes "failure to act"); *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 99 (D.C. Cir. 2020) (agency approval that "took the form of inaction" could be challenged under the APA). And states may comment on the CFTC's proposed rule governing prediction markets and challenge the results through an APA action if they choose. But

39

Defendants may not "circumvent" the APA by bringing charges directly against Kalshi for offering contracts its exclusive federal regulator has permitted. *Polyweave Packaging, Inc. v. Buttigieg*, 51 F.4th 675, 684 (6th Cir. 2022). Section 13a-2(1) expressly prevents states from suing "a contract market."

2. Regardless, Kalshi's contracts are swaps.[4] The CEA defines "swap" in a broad six-part definition, including any contract providing for payment "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence," and any contract "that is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. §§ 1a(47)(A)(ii), (iv). As the Third Circuit held, "Kalshi's sports-event contracts fit comfortably" within that definition. *Flaherty*, 172 F.4th at 227 (citation omitted); *see id.* at 233 (Roth, J., dissenting) (same). "The outcome of a sports event certainly can be associated with a potential financial … consequence" for many stakeholders, "including sponsors,

---

[4] Kalshi's event contracts qualify as two other forms of agreements referenced in Section 2(a)(1)(A): options and futures. Since 2000, the CEA has included "occurrence[s]" that are "associated with a financial, commercial, or economic consequence" in the definition of "excluded commodit[ies]" that may form the basis of options and futures contracts. *Id.* § 1a(19)(iv). The CFTC itself has therefore recognized that event contracts "can be designed to exhibit the attributes of either options or futures contracts." 73 Fed. Reg. at 25,670.

advertisers, television networks, franchises, and local and national communities." *Id.* at 227-228. Defendants' contrary arguments are unpersuasive.

*First*, Defendants contend (at 25) that swaps cannot be based on "outcomes," which they assert differ from "events." But an outcome *is* an event. Dictionaries define "event" to include "the *outcome*, issue, or result of anything." *Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001) (emphasis added); *see also, e.g.*, *Event*, Webster's II New College Dictionary (3d ed. 2005) ("[t]he actual outcome or final result"). More generally, dictionaries define "event" broadly to mean "a thing that happens or takes place." *Event*, Oxford American Dictionary and Thesaurus (2d ed. 2009). An outcome is "a thing that happens." For example, one would naturally refer to the Knicks winning the NBA Finals or President Trump winning the 2024 presidential election as events, even though they are outcomes. "That an event or occurrence has an antecedent cause does not mean it is not an event or occurrence." *Johnson*, 2026 WL 1223373, at *4.

Defendants ignore that swaps may be based not just on "an event," but also on the "*extent of the occurrence* of an event *or contingency*." 7 U.S.C. § 1a(47)(A)(ii) (emphases added). A "contingency" includes "something liable to happen as an adjunct to or result of something else." *Contingency*,

41

Merriam-Webster's Collegiate Dictionary (11th ed. 2003); *see also, e.g.*, *Contingency*, Webster's II New College Dictionary (3d ed. 2005) ("[s]omething incidental to something else"). That definition comfortably encompasses outcomes of sports events. And contracts that turn on the extent of a victory involve the "extent of the occurrence of an event." As the district court explained, these contracts are structured the same way as other derivatives traded on DCMs. Op., R.48, PageID#883-884 (citing the discussion of "one-touch barrier option[s]" in *United States v. Phillips*, 155 F.4th 102 (2d Cir. 2025)).

The CFTC has long recognized that event contracts may be based on "the outcome of particular entertainment events." 73 Fed. Reg. at 25,669; *see* 91 Fed. Reg. at 35,863 ("every event contract stakes value on a contingent outcome"). Defendants' contrary theory would make the CFTC's jurisdiction rise and fall based on semantics, because any event can be characterized as the outcome of some other event.

*Second*, Defendants argue (at 28) that an event underlying a swap "must be closely connected with a financial" result. "The fundamental problem" with this argument is that the CEA's text "says no such thing." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). The CEA requires only that the event underlying a swap be "associated with a potential"

42

financial consequence.    7 U.S.C. § 1a(47)(A)(ii).    "Associated" means "connected." *See Associated*, Oxford American Dictionary and Thesaurus (2d ed. 2009).    "Potential" means "existing in possibility."    *Potential*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003).    Thus, an event must be connected to a possible financial consequence.    Defendants cite one dictionary (at 28) defining the *adjective* "associate" (as in "associate judges") to mean "closely" connected or related.    But the same dictionary defines "associat*ed*"—the term the CEA actually uses—to mean "join[ed] or connect[ed] together" without any "close" requirement.    *Associate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003).

Defendants are wrong (at 33) that their narrowing construction is needed to avoid "surplusage."    Subsection (ii) of the swap definition encompasses swaps based on "an event or contingency," whereas subsection (iii) encompasses swaps "based on the value" of interest rates, commodities, and other instruments.    True, the six definitions of "swap" overlap— subsection (iv)'s reference to contracts "commonly known" as swaps overlaps entirely with the swaps enumerated in subsection (iii).    But that overlap is compelled by the text.    It underscores that Congress sought to "remove any doubt and make doubly sure" to capture a broad array of instruments. *Loving v. IRS*, 742 F.3d 1013, 1019 (D.C. Cir. 2014) (Kavanaugh, J.).

43

Congress intentionally used "broad language" to define swap. Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,259 (Aug. 13, 2012). Adopting Defendants' narrowing construction would flout that decision.

*Third*, Defendants' contention (at 29) that "[s]ports events do not have economic consequences outside the game itself" is obviously incorrect. As the CFTC explains, "[s]ports teams are economic enterprises … that generate economic activity and materially affect both regional and national markets" with "billions" of dollars at stake. 91 Fed. Reg. at 35,807, 35,830. To take just one example, each 2026 New York Knicks "home playoff game was worth roughly $91 million" to New York City businesses, with the full postseason generating "as much as $832 million."[5] Retailers, merchandisers, and sponsors also experienced a surge in demand for their products with each new win.[6]

Given these financial consequences, customers "have started using prediction markets" to "hedge their risks."[7] Bars in New York and Washington D.C. have used Kalshi "to hedge" on promotions offering free

---

[5] Paul Mueller, *The Knicks playoff run is a billion-dollar slam dunk for New York*, Fast Co. (June 5, 2026), https://perma.cc/DR28-UFPV.

[6] Kaja Andric, *The Knicks Are the Hottest Ticket in Town. Hottest Jersey, Too.*, N.Y. Times (June 13, 2026), https://perma.cc/L674-XU9T.

[7] Michael J. de la Merced, *Prediction Markets' Next Major Bet: Wall St. Traders*, N.Y. Times (June 17, 2026), https://perma.cc/H6XW-FS5U.

tabs if particular teams win.[8]  An insurance company "expects to hedge about $30 million annually through" Kalshi to help "college athletics departments, sports teams and sponsors to manage the financial risks of performance incentives in athletes' and coaches' contracts."[9]  State-regulated sportsbooks themselves face direct economic exposure to sports events, and have used Kalshi to hedge their risk accordingly.[10]

Defendants have no real answer.  They cherry-pick (at 27-28) a handful of Kalshi contracts that they claim involve events with no financial consequences.  That argument fails on its own terms—points scored in a game, player performance, and the magnitude of victories, for example, can have significant consequences for sponsors, networks, and advertisers.  More importantly, these examples do not remotely support the contention that *no* sporting event is associated with even *potential* economic consequences, as

---

[8] Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win.  Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM; Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679.

[9] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.

[10] Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management,* InGame (Oct. 22, 2025), https://perma.cc/BT4A-BK8T.

Defendants claim.  Defendants retreat to the contention (at 35) that financial consequences of sports events are "downstream."  But the statute does not exclude "downstream" consequences.  Traders commonly hedge against risk from events with downstream consequences—for example, weather events have only downstream financial consequences, yet weather contracts have been traded on DCMs for decades.

This does not make the swap definition (at 29) "limitless."  Congress defined swap broadly, but the definition excludes events without any prospect of financial consequences, subject to normal principles of causation.  Kalshi accordingly does not offer trades on events that are commonly the subject of sportsbook bets—from the winner of a coin flip to the color of a Gatorade shower to the precise scores of football, baseball, or basketball games.  And, contrary to Defendants' claim (at 30), Kalshi does not ask this Court to ignore the statute's "ordinary" meaning in favor of a "literalist" one.  Rather, Defendants contort the statute's plain meaning to accord with extratextual assumptions about Congress's intent.  But "assumptions are not laws," and the text governs.  *Castro-Huerta*, 597 U.S. at 648.

*Fourth*, Defendants argue (at 32) that because Dodd-Frank "'aimed at systemic risks in the financial sector,'" the CEA's "swap" definition should

46

exclude anything that Defendants deem to be "betting." But statutes often reach beyond the "principal evil" that animated them, and "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). And Defendants' speculation about legislators' motives is wrong: The Congressional Record is replete with references to "gambling with credit default swaps" as a reason why "Wall Street reform" was needed. 156 Cong. Rec. S3063 (daily ed. May 4, 2010) (statement of Sen. Boxer). Many legislators wanted swaps regulated by the CFTC precisely because they considered certain swaps trading akin to gambling.

Defendants ignore the statutory text that refutes their cramped view of congressional intent. They claim (at 32) the swap definition involves "financial measures, indices, or instruments." But it also includes swaps on "weather," "energy," and "metal," none of which is a financial measure, index, or instrument. 7 U.S.C. § 1a(47)(A)(iii). Most glaringly, Defendants ignore the Special Rule, which gives the CFTC authority over "agreements, contracts, transactions, *or swaps* in excluded commodities," including contracts involving "*gaming.*" *Id.* § 7a-2(c)(5)(C)(i) (emphases added). Defendants' assertion (at 39) that Dodd-Frank does not create a "gaming

47

framework" contradicts Dodd-Frank's text allowing the CFTC to allow "swaps" involving "gaming."

3.  Defendants fall back (at 37) on the argument that Kalshi's position would "make the CFTC the sole sports gambling regulator" and thereby violate various interpretive canons.  Defendants are wrong.

The CEA preempts state law as to on-DCM trading, but leaves states free to regulate off-DCM transactions like bets offered by sportsbooks. Section 2(a)(1)(A)'s savings clause makes clear that, except as provided by the grant of exclusive jurisdiction to the CFTC over *on*-DCM trading, "nothing" in the remainder of Section 2 shall "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws."  *See* 7 U.S.C. § 16(e)(1)(B)(i) ("[n]othing" in the CEA "shall supersede or preempt" state law applied to off-exchange transactions).

Moreover, holding that Kalshi's sports-event contracts are swaps does not mean that run-of-the-mill sports bets are also swaps.  Like all CFTC-regulated derivatives, swaps are financial instruments capable of being "traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). Section 2(e) itself makes that clear, providing that swaps must be "entered into" or "subject to the rules of" a "board of *trade*" (emphasis added).  That is why, pursuant to an express delegation from Congress, *see* 15 U.S.C.

48

§ 8302(d)(1), the CFTC and SEC have clarified that swaps must be "*traded on organized markets and over the counter,*" 77 Fed. Reg. at 48,217 (emphasis added). By contrast, "consumer and commercial transactions" that "are not traded on an organized market or over-the-counter" are not swaps. *Id.* at 48,247. Event contracts are tradeable instruments because their terms are fixed at the outset to provide set payouts at prices established by the market according to supply and demand. Not so for sports bets, where the sportsbook is the counterparty and sets the price.

Similar logic explains the distinction between many other derivatives and state-regulated products. This Court, for example, has distinguished "forward contract[s]" (which need not be traded on DCMs) from "futures" (which must be), because futures are "standardized," "fungible," and "*traded on an exchange.*" *CFTC v. Erskine,* 512 F.3d 309, 323-324 (6th Cir. 2008) (emphasis added, citation modified). Credit default swaps likewise resemble bond insurance—both pay out when an entity defaults on a bond—but bond insurance is not a swap principally because it was not "traditionally" traded on an exchange. 77 Fed. Reg. at 48,214-15.

Defendants' references to the major-questions doctrine and federalism canon therefore fail. Dodd-Frank's addition of DCM-traded swaps to the CFTC's exclusive jurisdiction does not result in an "[e]xtraordinary grant[]

49

of regulatory authority" to the CFTC or use vague language to entrust to the CFTC "decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716, 723 (2022) (citation modified). Instead, it makes clear that DCM-traded event contracts (but not off-DCM transactions) are subject to the CFTC's "exclusive jurisdiction," even if they "involve" "gaming." 7 U.S.C. §§ 2(a)(1)(A), 7a-2(c)(5)(C)(i).

This case is nothing like *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), cited by Defendants (at 36), where the FDA claimed authority to regulate tobacco products after having "expressly disavowed" that authority for decades. *Id.* at 125. Here, the CFTC disclaims any jurisdiction to regulate off-DCM sports bets and has always maintained that the CEA preempts state laws. *See* CFTC Br. 18. And, unlike in *Brown & Williamson*, where other "tobacco-specific statutes" had "effectively ratified the FDA's long-held position that it lacks jurisdiction" over tobacco products, 529 U.S. at 144, Congress confirmed just four years before Dodd-Frank that the term "bet or wager" "does not include" any transaction on a DCM. 31 U.S.C. § 5362(1)(E)(ii). Nor, as Defendants claim (at 38), is this case "just like" *Tennessee v. FCC*, 832 F.3d 597 (6th Cir. 2016), where, unlike here, the agency lacked exclusive jurisdiction to regulate.

50

### B.    Tennessee's Arguments Against Preemption Fail.

Defendants argue that even if Kalshi's contracts are swaps, the CFTC's exclusive jurisdiction does not preempt state law.  These arguments fail.

1.  No Presumption Against Preemption.  Defendants urge application (at 44) of a "strong presumption" against preemption.  But this Court recently rejected a nearly identical argument.  In *Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board*, 162 F.4th 631 (6th Cir. 2025), this Court held that "the presumption against preemption doesn't apply" to a challenge to Michigan gambling laws, both because the federal statute's "plain text foreclose[d]" Michigan's argument and because "the regulation of *interstate* gambling isn't a traditional area of state regulation."  *Id*. at 641 n.4.  Defendants deride that (at 50) as an "odd notion," but they do not otherwise address it even though the same logic controls here.  *See also Puerto Rico v. Franklin Cal. Tax-Free Tr*., 579 U.S. 115, 125 (2016) (courts "do not invoke any presumption against pre-emption" where a statute "contains an express pre-emption clause" (citation modified)).  And Defendants' assertion (at 51) that Kalshi's contracts constitute "*intra*state sports wagering" is incorrect; traders on Kalshi enter contracts with counterparties nationwide.

51

2. Express Preemption. Even if a presumption applies, the CEA's textual grant of "exclusive jurisdiction" to the CFTC overcomes it.

Defendants assert (at 46) that the exclusive-jurisdiction provision does not "have anything to do with preemption." This is a radical contention; it would give states free rein to regulate DCMs under state laws. Defendants claim (*id.*) that "exclusive jurisdiction" refers to the jurisdiction of courts rather than agencies. This contention overlooks the distinction between adjudicative and regulatory jurisdiction. Granting exclusive jurisdiction to federal courts prevents state courts from hearing cases because courts are *adjudicative* bodies. Granting exclusive jurisdiction to federal agencies, by contrast, prevents state agencies from regulating because agencies are *regulatory* bodies. Courts have therefore readily held that grants of exclusive jurisdiction to agencies preempt state laws. *See Hughes*, 578 U.S. at 163 (federal agency's "exclusive jurisdiction" preempts state law); *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 595 (7th Cir. 2001) (statutory grant of "exclusive jurisdiction" to federal committee preempted state law); *Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.*, 123 F.3d 1098, 1103 (8th Cir. 1997) (similar).

Defendants' cases (at 45-46) undermine their position. *Tafflin v. Levitt*, 493 U.S. 455 (1990), underscores that the presumption in favor of

52

concurrent jurisdiction is "rebutted" where Congress grants "exclusive jurisdiction" to a federal authority—exactly the case here. *Id.* at 459 (citation modified).   And while Defendants claim that *Castro-Huerta* rejected preemption when the statute included an "exclusive jurisdiction" clause, the Court in fact rejected preemption because the statute "does not say" either "that federal jurisdiction is exclusive ... or that state jurisdiction is preempted."  597 U.S. at 639.

Defendants note (at 45) that Section 2(a) does not use the words "preempt" or "supersede."   But preemption does not require "a particular linguistic formulation." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 99 (2017).   And Section 2(a)(1)(A) provides that Section 2 does not "supersede or limit the jurisdiction" of state "regulatory authorities" "*[e]xcept as hereinabove provided*" in Section 2(a)(1)(A)'s grant of exclusive jurisdiction (emphasis added).   That language confirms the CFTC's "exclusive jurisdiction" *does* "supersede" and "limit" Defendants' jurisdiction over DCMs. *Id.*

Defendants rely (at 48) on Sections 16(e)(2) and 16(h), but both provisions support Kalshi.   They bar state regulation of certain *off-DCM* transactions, *outside* the CFTC's exclusive jurisdiction.   When Congress added Section 16(e)(2) to the CEA in 2000, it recognized that "the current"

53

CEA already "supersedes and preempts" state law "in the case of transactions conducted on a registered entity" like a DCM.  H.R. Rep. No. 106-711, pt. 2, at 71.  Section 16(e)(2) merely "add[ed]" that preemption of "gaming and bucket shop laws" extends to "excluded" (then permissibly off-DCM) transactions as well.  *Id.*  Likewise, Section 16(h) prevents states from applying insurance law to all swaps—including over-the-counter swaps outside the CFTC's exclusive jurisdiction.  *See* 7 U.S.C. § 7b-3(d)(2).  While Defendants claim (at 48) these provisions prove that Congress "would have used" the words "preempt" or "supersede" if it intended the exclusive-jurisdiction provision to preempt state law, Section 16(h) itself uses neither word.

3.  Field Preemption.  Defendants' arguments against field preemption suffer from additional deficiencies.  Defendants argue (at 49) that field preemption requires a "dominant" "federal interest."  But a dominant federal interest exists here:  Congress concluded that a "contract market could not operate efficiently, and perhaps not at all," if subject to "varying and potentially contradictory legal standards."  *Am. Agric.*, 977 F.2d at 1156.

Defendants insist (at 49) that the CEA cannot preempt the field because it contains "references to state involvement," citing this Court's interim *Schuler* decision.  *See KalshiEX LLC v. Schuler*, No. 26-3196, 2026

54

WL 1295806, at *5 (6th Cir. Apr. 24, 2026).  The answer to each of these provisions is the same:  They all preserve state authority *outside* the field the CEA preempts, which is the regulation of trading *on DCMs*.  Section 2(a)(1)(A)'s savings clause preserves state authority, but only over *off-DCM* transactions.  Likewise, Section 16(e)(1) makes clear that state law may still apply to *off-DCM* transactions.  Section 13a-2(1) permits states to enforce the CEA, but *not against DCMs*.  Section 13a-2(7) permits state enforcement of general antifraud statutes, which falls outside the preempted field because it does not "directly affect trading on or the operation of" a DCM.  *Am. Agric.*, 977 F.2d at 1156.  And while Defendants observe (at 50) that state law can still apply in suits for "breach of contract" involving DCMs, the application of state law to a contract dispute does not intrude on the preempted field because it does not regulate trading on a DCM.

These provisions are nothing like provisions held to negate field preemption.  For example, *Schuler* cited cases arising under the Federal Communications Act, which contains a savings clause providing that "[n]othing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."  47 U.S.C. § 414; *see Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cir. 2010); *In re NOS Commc'ns*, 495 F.3d

55

1052, 1058 (9th Cir. 2007).  That across-the-board preservation of remedies is nothing like the CEA's preservation of state authority over *off-DCM* transactions, which are outside the preempted field.

4. Conflict Preemption.  Defendants dispute conflict preemption principally by relying (at 52-53) on a CFTC regulation that they contend "categorically bans all contracts" related to "gaming."  The CFTC has rejected that interpretation, explaining that the agency "has consistently applied § 40.11 to operate a discretionary review framework rather than a self-executing *per se* prohibition, because the opposite interpretation would violate the statute."  91 Fed. Reg. at 35,815; *see* 7 U.S.C. § 7a-2(c)(5)(C)(ii) (the CFTC may prohibit a contract involving an enumerated category *only* if it "determine[s]" the contract is "contrary to the public interest").  Even Defendants concede (at 16) that Rule 40.11(c) permits the CFTC to "approve" gaming contracts.

Regardless, the CFTC has now proposed to replace Rule 40.11 with a new rule clarifying that sports-event contracts are *not* categorically prohibited, that they are instead subject to public-interest review (as the Special Rule requires), and that many sports-event contracts "can be operated consistent with the public interest."  91 Fed. Reg. at 35,813, 35,836.

56

Letting Tennessee—and 49 other states—ban all sports-event contracts would contravene that public-interest determination.

Defendants theorize (at 55-56) that Kalshi can offer "impartial access" to its exchange even if it blocks traders from particular states. But they fail to identify any DCM in CFTC history that has operated state-by-state. Their assertion (at 60) that there is nothing but "*ipse dixit* that the CFTC would" prohibit geographic restrictions is refuted by the CFTC's position that "impartial access" is incompatible with "offer[ing] event contracts to residents of some States but not others." CFTC Br. 23-24. And while Defendants suggest the CFTC might choose not to discipline Kalshi for complying with Tennessee law, they cite no case rejecting conflict preemption based on speculation that an agency might exercise discretion to excuse a violation of the law. The only case they cite, *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578 (6th Cir. 2013), rejected preemption because "compliance with federal and state duties was not just possible," but "required," *id.* at 584— nothing like the situation here.

Defendants argue (at 56-57) that regulations cannot preempt state law at all. But the relevant mandate here is not from the CFTC, but from Congress, which expressly delegated to the CFTC authority "to make and promulgate ... rules and regulations ... reasonably necessary to effectuate"

57

the CEA, 7 U.S.C. §12a(5), and mandated that DCMs "shall comply with" "any requirement that the [CFTC] may impose" pursuant to that delegation, *id.* §7(d)(1)(A)(ii). As this Court has recognized, *Loper Bright* does not prevent agencies from exercising authority pursuant to this sort of "express delegation of power" from Congress. *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587 (6th Cir. 2025).

Defendants argue (at 57) that the Special Rule "suggests a regime that might vary by state." But Defendants misread the Special Rule. Contracts that "involve" "activity that is unlawful under" "State law" can be prohibited if *the CFTC* determines they are "contrary to the public interest." 7 U.S.C. §7a-2(c)(5)(C)(i) (emphasis added). The CFTC thus can make a nationwide determination as to whether a contract should be prohibited where it involves a violation of state laws. *See* 91 Fed. Reg. at 35,834 (discussing the Special Rule's "unlawful" activity provision). Nothing about this provision allows states to use their laws to nullify the CFTC's exclusive jurisdiction. *See KalshiEX*, 2024 WL 4164694, at *12 (describing the contrary interpretation as not "plausible" given that "the CEA specifically preempts the application of state law over derivative markets").

5. Implied Repeal. Defendants' argument (at 38) that Kalshi's position results in "implied repeals" of certain federal statutes is mistaken.

58

As to PASPA, which the Supreme Court invalidated in *Murphy v. NCAA*, 584 U.S. 453 (2018), granting *the CFTC* discretion to permit event contracts that "involve" "gaming" to trade on DCMs is entirely consistent with PASPA's prohibition on *states* legalizing sports gambling.

Nor does the CEA impliedly repeal IGRA and the Wire Act, because neither statute applies to DCM-traded instruments in the first place. UIGEA—a statute Defendants ignore—excludes on-DCM transactions from the definition of "bet or wager." 31 U.S.C. § 5362(1)(E)(ii). UIGEA postdates both IGRA and the Wire Act, and UIGEA's definition is entitled "to great weight" in resolving the meaning of prior statutes addressing the same subject matter. *Bob Jones Univ. v. United States*, 461 U.S. 574, 587 n.10 (1983) (citation omitted). Interpreting IGRA and the Wire Act to exclude on-DCM trading harmonizes them with the CEA and UIGEA, fulfilling the obligation to "regard each as effective" to the extent they "are capable of co-existence." *United States v. Veloz-Alonso*, 910 F.3d 266, 268 (6th Cir. 2018) (citation omitted).

## C.    Kalshi Has A Cause Of Action.

Defendants are wrong that Kalshi lacks a cause of action. "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials" from enforcing state law that "is pre-empted by a federal statute."

59

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *see Ex parte Young*, 209 U.S. 123, 155-156 (1908).

Defendants do not dispute that in cases where a party invokes federal law as a defense to state enforcement, it "may use *Ex parte Young* as a *shield* against the enforcement of contrary (and thus preempted) state laws," because "an existing cause of action" is available in the form of "an equitable anti-suit injunction." *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014). Defendants instead argue that the CEA implicitly withholds this cause of action, citing (at 62-66) *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). But *Armstrong* rejected an effort to use the Medicaid Act as a *sword* to enforce federal law where Congress withheld a cause of action. *Armstrong* specifically "recognized" that where a party "claims federal law immunizes him from state regulation," courts "may issue an injunction upon finding the state regulatory actions preempted." *Id.* at 326. *Armstrong* does not preclude a cause of action where, as here, plaintiffs invoke federal jurisdiction "not to enforce the federal law themselves, but to preclude a [state] from subjecting them" to preempted laws. *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 146 (2d Cir. 2016).

Defendants err in claiming the CEA's private right to collect damages implicitly forecloses this suit. 7 U.S.C. §25. That provision provides exclusive damages remedies available to a person "who sustains loss" from violations of the CEA. *Id.* §§ 25(a)(2), (b)(5). Nothing about that limitation on *damages* deprives parties of the settled right to obtain *prospective injunctive* relief against enforcement of preempted laws. *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 767 F. Supp. 3d 556, 569 (W.D. Mich. 2025) (rejecting a similar argument). And, as Defendants conceded below, Opp'n to Prelim. Inj., R.34, PageID#302, where *Ex parte Young* applies, sovereign immunity is not a defense.

## III.   THE EQUITIES SUPPORT AN INJUNCTION.

The district court correctly found that Kalshi would suffer multiple irreparable harms absent a preliminary injunction, including "potential civil and criminal liability" and "lost profits and reputational harm." Op., R.48, PageID#889-890. Defendants do not challenge that finding of irreparable harm. Defendants' equitable arguments fail.

*First*, Kalshi does not have unclean hands. Kalshi's self-certifications did not violate federal law because Rule 40.11 does not prohibit Kalshi's contracts. *See supra* at 56. Nor, as Defendants falsely claim (at 68), did Kalshi tell the D.C. Circuit that sports-event contracts "would violate federal

law." That litigation concerned whether Kalshi's *election* contracts involved "gaming" and thus could be subject to public-interest review under the Special Rule. Kalshi distinguished election contracts—which did not involve gaming—from sports-event contracts—which did—and contended that the Special Rule "empower[ed] the CFTC to at least *review* the category of game-based contracts." Appellee Br. 45, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024), 2024 WL 4802698. Kalshi further confirmed that "the CFTC's 'exclusive jurisdiction' over the derivatives markets preempts any state law that purports to prohibit the trading of a contract on a regulated exchange." *Id.* at 31. That is the same position Kalshi takes here. It had nothing to do with whether sports-event contracts are swaps.

*Second*, Defendants claim (at 68) that "a State is always injured when its laws are enjoined." But that contention turns on the premise that its laws are *valid*. Here, Defendants' laws violate the Supremacy Clause. As this Court has held, "it's always in the public interest to prevent constitutional violations." *Churchill Downs*, 162 F.4th at 642 (citation modified).

*Third*, Defendants assert (at 68) an interest in "protecting [Tennessee's] citizens from problem gambling." *Churchill Downs* rejected a similar argument that a state's "interest in regulating gambling and its residents' interest in the protections" of state gambling laws precluded a

62

preliminary injunction. 162 F.4th at 643. In any event, Kalshi employs many of the same protections Defendants tout (at 8-9)—including Know-Your-Customer procedures, voluntary opt-outs, self-exclusions, and deposit limits—and does not offer contracts on injuries, penalties, or individual college athletes' performance.[11]

*Fourth*, while Defendants cite lost tax revenue, they do not claim *irreparable* monetary harm. Indeed, Defendants do not dispute the district court's finding that they may be able to obtain civil penalties against Kalshi if they ultimately prevail here. Op., R.48, PageID#893. Defendants' speculative, reparable harms cannot outweigh the concrete, irreparable harms the district court found Kalshi would suffer absent a preliminary injunction.

## IV. DEFENDANTS' RULE 65(D) ARGUMENT PROVIDES NO BASIS FOR REVERSAL.

Defendants' Rule 65(d) arguments fail. They claim no "uncertainty" or "confusion" about what the injunction prohibits. *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 362 (6th Cir. 2022) (citation omitted). Kalshi's proposed order submitted with its preliminary injunction motion specified

---

[11] Kalshi, *Mandatory KYC and Surveillance*, https://kalshi.com/market-integrity/kyc-surveillance (last visited June 17, 2026); Kalshi, *Responsible Trading*, https://help.kalshi.com/en/collections/18616607-responsible-trading (last visited June 17, 2026).

that Defendants should be enjoined from enforcing "Tenn. Code Ann. §§ 4-49-101, *et seq.* and Tenn Code Ann. §§ 39-17-501, *et seq.*"  Proposed Order, R.6-1, PageID#141.  And the district court "grant[ed]" Kalshi's motion in an opinion that addressed those same provisions.  Op., R.48, PageID#876, 879, 893.  That adequately specified "what [Defendants] must do or refrain from doing."  *James B. Oswald Co. v. Neate*, 98 F.4th 666, 678 (6th Cir. 2024) (citation omitted).  Regardless, any Rule 65(d) issues do not warrant reversal and can be addressed by the district court on remand.  *See Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 361 (6th Cir. 1998) (affirming district court's merits determination but remanding with instructions to tailor injunction).

## CONCLUSION

This Court should affirm.

Dated: June 17, 2026

Respectfully submitted,

/s/ *Neal Kumar Katyal*

NEAL KUMAR KATYAL
  *Counsel of Record*
JOSHUA B. STERLING
COLLEEN E. ROH SINZDAK
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com

GRANT R. MAINLAND
ANDREW L. PORTER
NICOLE D. VALENTE
DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

*Counsel for Plaintiff-Appellee
KalshiEX LLC*

65

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,999 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(b).

This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in 14-point Georgia font.

June 17, 2026

*/s/ Neal Kumar Katyal*
Neal Kumar Katyal

*Counsel for Plaintiff-Appellee
KalshiEX LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on June 17, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


June 17, 2026                              */s/ Neal Kumar Katyal*
                                          Neal Kumar Katyal

                                          *Counsel for Plaintiff-Appellee*
                                          *KalshiEX LLC*

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(g), Plaintiff-Appellee KalshiEX LLC

hereby designates the following relevant district court documents:

| Record # | Description | PageID |
|---|---|---|
| 1 | Compl. | 1-25 |
| 1-6 | Ex. 6 to Compl. (Cease & Desist Letter) | 123-126 |
| 6 | Mot. for Prelim. Inj. & TRO | 136-139 |
| 6-1 | Proposed Order | 140-141 |
| 7 | Mem. in Supp. of Mot. for Prelim. Inj. & TRO | 142-175 |
| 9 | Decl. of Xavier Sottile in Supp. of Mot. for Prelim. Inj. & TRO | 196-215 |
| 34 | Response in Opp'n to Mot. for Prelim. Inj. & TRO | 283-326 |
| 41 | Reply in Supp. of Mot. for Prelim. Inj. | 460-476 |
| 48 | Mem. Op. of the Ct. | 869-893 |
| 49 | Order Granting Mot. for Prelim. Inj. | 894 |
| 54 | Notice of Appeal | 921-923 |

**ADDENDUM A:**

**Pertinent Statutes and Regulations**

# TABLE OF CONTENTS

Provisions from the Commodity Exchange Act (as codified at 7 U.S.C.):

7 U.S.C. § 1a(9)................................................................................. A1

7 U.S.C. § 1a(19) .............................................................................. A1

7 U.S.C. § 1a(27) ..............................................................................A2

7 U.S.C. § 1a(36) ..............................................................................A2

7 U.S.C. § 1a(47) ..............................................................................A2

7 U.S.C. § 2(a)(1)(A) ........................................................................A7

7 U.S.C. § 2(e) ..................................................................................A7

7 U.S.C. § 7a-2(c)(5)(C)....................................................................A8

7 U.S.C. § 13a-2 ...............................................................................A9

7 U.S.C. § 16(e).................................................................................A11

Provisions from the Commodity Futures Modernization Act of 2000
(Pub L. No. 106-554, Appendix E, 114 Stat. 2763A-365)

Section 103 - 114 Stat. at 2763A-377-378......................................... A12

Provisions from the Dodd-Frank Act of 2010
(Pub. L. No. 111-203, 124 Stat. 1376)

Section 712(d)(1) - 124 Stat. at 1644 .............................................. A12

Provisions from Title 17 of the Code of Federal Regulations:

17 C.F.R. § 38.4 ............................................................................... A13

17 C.F.R. § 38.5 ............................................................................... A14

17 C.F.R. § 40.2 ............................................................................... A15

17 C.F.R. § 40.3 ............................................................................... A17

17 C.F.R. § 40.11 ............................................................................. A20

## **Provisions from the Commodity Exchange Act (as codified at 7 U.S.C.):**

### **7 U.S.C. § 1a(9)**

The term "commodity" means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13-1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

### **7 U.S.C. § 1a(19)**

The term "excluded commodity" means—

(i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;

(ii) any other rate, differential, index, or measure of economic or commercial risk, return, or value that is—

> (I) not based in substantial part on the value of a narrow group of commodities not described in clause (i); or

> (II) based solely on one or more commodities that have no cash market;

(iii) any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or

(iv) an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is—

> (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and

> (II) associated with a financial, commercial, or economic consequence.

A1

## 7 U.S.C. § 1a(27)

The term "future delivery" does not include any sale of any cash commodity for deferred shipment or delivery.

## 7 U.S.C. § 1a(36)

The term "option" means an agreement, contract, or transaction that is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty".

## 7 U.S.C. § 1a(47)

(A) In general

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction—

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

(iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—

(I) an interest rate swap;

A2

(II) a rate floor;

(III) a rate cap;

(IV) a rate collar;

(V) a cross-currency rate swap;

(VI) a basis swap;

(VII) a currency swap;

(VIII) a foreign exchange swap;

(IX) a total return swap;

(X) an equity index swap;

(XI) an equity swap;

(XII) a debt index swap;

(XIII) a debt swap;

(XIV) a credit spread;

(XV) a credit default swap;

(XVI) a credit swap;

(XVII) a weather swap;

(XVIII) an energy swap;

(XIX) a metal swap;

(XX) an agricultural swap;

(XXI) an emissions swap; and

(XXII) a commodity swap;

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

(v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

A3

(B) Exclusions

The term "swap" does not include—

(i) any contract of sale of a commodity for future delivery (or option on such a contract), leverage contract authorized under section 23 of this title, security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) of this title or section 2(c)(2)(D)(i) of this title;

(ii) any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled;

(iii) any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof, that is subject to—

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(iv) any put, call, straddle, option, or privilege relating to a foreign currency entered into on a national securities exchange registered pursuant to section 6(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78f(a));

(v) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a fixed basis that is subject to—

(I) the Securities Act of 1933 (15 U.S.C. 77a et seq.); and

(II) the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(vi) any agreement, contract, or transaction providing for the purchase or sale of 1 or more securities on a contingent basis that is subject to the Securities Act of 1933 (15 U.S.C. 77a et seq.) and the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), unless the agreement, contract, or transaction predicates the purchase or sale on the occurrence of a bona fide contingency that might reasonably be expected to affect or be affected by the creditworthiness of a party other than a party to the agreement, contract, or transaction;

(vii) any note, bond, or evidence of indebtedness that is a security, as defined in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1));

(viii) any agreement, contract, or transaction that is—

(I) based on a security; and

(II) entered into directly or through an underwriter (as defined in section 2(a)(11) of the Securities Act of 1933 (15 U.S.C. 77b(a)(11)) by the issuer of such security for the purposes of raising capital, unless the agreement, contract, or transaction is entered into to manage a risk associated with capital raising;

(ix) any agreement, contract, or transaction a counterparty of which is a Federal Reserve bank, the Federal Government, or a Federal agency that is expressly backed by the full faith and credit of the United States; and

(x) any security-based swap, other than a security-based swap as described in subparagraph (D).

(C) Rule of construction regarding master agreements

(i) In general

Except as provided in clause (ii), the term "swap" includes a master agreement that provides for an agreement, contract, or transaction that is a swap under subparagraph (A), together with each supplement to any master agreement, without regard to whether the master agreement contains an agreement, contract, or transaction that is not a swap pursuant to subparagraph (A).

(ii) Exception

For purposes of clause (i), the master agreement shall be considered to be a swap only with respect to each agreement, contract, or transaction covered by the master agreement that is a swap pursuant to subparagraph (A).

(D) Mixed swap

The term "security-based swap" includes any agreement, contract, or transaction that is as described in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)) and also is based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence (other than an event described in subparagraph (A)(iii)).

A5

(E) Treatment of foreign exchange swaps and forwards

(i) In general

Foreign exchange swaps and foreign exchange forwards shall be considered swaps under this paragraph unless the Secretary makes a written determination under section 1b of this title that either foreign exchange swaps or foreign exchange forwards or both—

(I) should be not be regulated as swaps under this chapter; and

(II) are not structured to evade the Dodd-Frank Wall Street Reform and Consumer Protection Act in violation of any rule promulgated by the Commission pursuant to section 721(c) of that Act.

(ii) Congressional notice; effectiveness

The Secretary shall submit any written determination under clause (i) to the appropriate committees of Congress, including the Committee on Agriculture, Nutrition, and Forestry of the Senate and the Committee on Agriculture of the House of Representatives.  Any such written determination by the Secretary shall not be effective until it is submitted to the appropriate committees of Congress.

(iii) Reporting

Notwithstanding a written determination by the Secretary under clause (i), all foreign exchange swaps and foreign exchange forwards shall be reported to either a swap data repository, or, if there is no swap data repository that would accept such swaps or forwards, to the Commission pursuant to section 6r of this title within such time period as the Commission may by rule or regulation prescribe.

(iv) Business standards

Notwithstanding a written determination by the Secretary pursuant to clause (i), any party to a foreign exchange swap or forward that is a swap dealer or major swap participant shall conform to the business conduct standards contained in section 6s(h) of this title.

(v) Secretary

For purposes of this subparagraph, the term "Secretary" means the Secretary of the Treasury.

(F) Exception for certain foreign exchange swaps and forwards

(i) Registered entities

A6

Any foreign exchange swap and any foreign exchange forward that is listed and traded on or subject to the rules of a designated contract market or a swap execution facility, or that is cleared by a derivatives clearing organization, shall not be exempt from any provision of this chapter or amendments made by the Wall Street Transparency and Accountability Act of 2010 prohibiting fraud or manipulation.

(ii) Retail transactions

Nothing in subparagraph (E) shall affect, or be construed to affect, the applicability of this chapter or the jurisdiction of the Commission with respect to agreements, contracts, or transactions in foreign currency pursuant to section 2(c)(2) of this title.

## 7 U.S.C. § 2(a)(1)(A)

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws.  Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

## 7 U.S.C. § 2(e)

It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.

A7

**7 U.S.C. § 7a-2(c)(5)(C)**

(i) Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i) of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—

(I) activity that is unlawful under any Federal or State law;

(II) terrorism;

(III) assassination;

(IV) war;

(V) gaming; or

(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

(ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

(iii) Swaps contracts

(I) In general

In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

(II) Requirements

Any such criteria, conditions, or rules shall consider—

(aa) the financial integrity of the derivatives clearing organization; and

A8

(bb) any other factors which the Commission determines may be appropriate.

(iv) Deadline

The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation.

### 7 U.S.C. § 13a-2

(1) Whenever it shall appear to the attorney general of any State, the administrator of the securities laws of any State, or such other official as a State may designate, that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader) has engaged in, is engaging or is about to engage in, any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity or an action at law on behalf of its residents to enjoin such act or practice, to enforce compliance with this chapter, or any rule, regulation, or order of the Commission thereunder, to obtain damages on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

(2) The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia, shall have jurisdiction of all suits in equity and actions at law brought under this section to enforce any liability or duty created by this chapter or any rule, regulation, or order of the Commission thereunder, or to obtain damages or other relief with respect thereto. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder, including the requirement that the defendant take such action as is necessary to remove the danger of violation of this chapter or of any such rule, regulation, or order. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

(3) Immediately upon instituting any such suit or action, the State shall serve written notice thereof upon the Commission and provide the

A9

Commission with a copy of its complaint, and the Commission shall have the right to (A) intervene in the suit or action and, upon doing so, shall be heard on all matters arising therein, and (B) file petitions for appeal.

(4) Any suit or action brought under this section in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

(5) For purposes of bringing any suit or action under this section, nothing in this chapter shall prevent the attorney general, the administrator of the State securities laws, or other duly authorized State officials from exercising the powers conferred on them by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

(6) For purposes of this section, "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

(7) Nothing contained in this section shall prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State.

(8)

(A) Nothing in this chapter shall prohibit an authorized State official from proceeding in a State court against any person registered under this chapter (other than a floor broker, floor trader, or registered futures association) for an alleged violation of any antifraud provision of this chapter or any antifraud rule, regulation, or order issued pursuant to the chapter.

(B) The State shall give the Commission prior written notice of its intent to proceed before instituting a proceeding in State court as described in this subsection and shall furnish the Commission with a copy of its complaint immediately upon instituting any such proceeding.  The Commission shall have the right to (i) intervene in the proceeding and, upon doing so, shall be heard on all matters arising therein, and (ii) file a petition for appeal. The Commission or the defendant may remove such proceeding to the district court of the United States for the proper district by following the procedure for

A10

removal otherwise provided by law, except that the petition for removal shall be filed within sixty days after service of the summons and complaint upon the defendant.  The Commission shall have the right to appear as amicus curiae in any such proceeding.

**7 U.S.C. § 16(e)**

(1) Nothing in this chapter shall supersede or preempt—

(A) criminal prosecution under any Federal criminal statute;

(B) the application of any Federal or State statute (except as provided in paragraph (2)), including any rule or regulation thereunder, to any transaction in or involving any commodity, product, right, service, or interest—

(i) that is not conducted on or subject to the rules of a registered entity or exempt board of trade;

(ii) (except as otherwise specified by the Commission by rule or regulation) that is not conducted on or subject to the rules of any board of trade, exchange, or market located outside the United States, its territories or possessions; or

(iii) that is not subject to regulation by the Commission under section 6c or 23 of this title; or

(C) the application of any Federal or State statute, including any rule or regulation thereunder, to any person required to be registered or designated under this chapter who shall fail or refuse to obtain such registration or designation.

(2) This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of—

(A) an electronic trading facility excluded under section 2(e) of this title; and

(B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

**Provisions from the Commodity Futures Modernization Act of 2000 (Pub L. No. 106-554, Appendix E, 114 Stat. 2763A-365)**

**Section 103 – 114 Stat. at 2763A-377-378**

Section 2 of the Commodity Exchange Act (7 U.S.C. 2, 2a, 3, 4, 4a) is further amended by adding at the end the following:

"(d) EXCLUDED DERIVATIVE TRANSACTIONS.—

"(1) IN GENERAL—Nothing in this Act (other than section 5b or 12(e)(2)(B)) governs or applies to an agreement, contract, or transaction in an excluded commodity if—

"(A) the agreement, contract, or transaction is entered into only between persons that are eligible contract participants at the time at which the persons enter into the agreement, contract, or transaction; and

"(B) the agreement, contract, or transaction is not executed or traded on a trading facility.

"(2) ELECTRONIC TRADING FACILITY EXCLUSION.—Nothing in this Act (other than section 5a (to the extent provided in section 5a(g)), 5b, 5d, or 12(e)(2)(B)) governs or applies to an agreement, contract, or transaction in an excluded commodity if—

"(A) the agreement, contract, or transaction is entered into on a principal-to-principal basis between parties trading for their own accounts or as described in section 1a(12)(B)(ii);

"(B) the agreement, contract, or transaction is entered into only between persons that are eligible contract participants described in subparagraph (A), (B)(ii), or (C) of section 1a(12)) at the time at which the persons enter into the agreement, contract, or transaction; and

"(C) the agreement, contract, or transaction is executed or traded on an electronic trading facility.".

**Provisions from the Dodd-Frank Act of 2010 (Pub. L. No. 111-203, 124 Stat. 1376):**

**Section 712(d)(1) – 124 Stat. at 1644**

IN GENERAL—Notwithstanding any other provision of this title and subsections (b) and (c), the Commodity Futures Trading Commission and the Securities and Exchange Commission, in consultation with the Board of

A12

Governors, shall further define the terms "swap", "security-based swap", "swap dealer", "security-based swap dealer", "major swap participant", "major security-based swap participant", "eligible contract participant", and "security-based swap agreement" in section 1a(47)(A)(v) of the Commodity Exchange Act (7 U.S.C. 1a(47)(A)(v)) and section 3(a)(78) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(78)).

**Provisions from Title 17 of the Code of Federal Regulations:**

**17 C.F.R. § 38.4**

(a) Request for Commission approval of rules and products.

(1) An applicant for designation, or a designated contract market, may request that the Commission approve under section 5c(c) of the Act, any or all of its rules and contract terms and conditions, and subsequent amendments thereto, prior to their implementation or, notwithstanding the provisions of section 5c(c)(4) of the Act, at any time thereafter, under the procedures of § 40.3 or § 40.5 of this chapter, as applicable.  A designated contract market may label a future, swap or options product in its rules as "Listed for trading pursuant to Commission approval," if the future, swap or options product and its terms or conditions have been approved by the Commission, and it may label as "Approved by the Commission" only those rules that have been so approved.

(2) Notwithstanding the timeline under §§ 40.3(c) and 40.5(c) of this chapter, the operating rules, and terms and conditions of futures, swaps and option products that have been submitted for Commission approval at the same time as an application for contract market designation or an application under § 38.3(b) of this part to reinstate the designation of a dormant designated contract market, as defined in § 40.1 of this chapter, or while one of the foregoing is pending, will be deemed approved by the Commission no earlier than when the facility is deemed to be designated or reinstated.

(b) Self-certification of rules and products.  Rules of a designated contract market and subsequent amendments thereto, including both operational rules and the terms or conditions of futures, swaps and option products listed for trading on the facility, not voluntarily submitted for prior Commission approval pursuant to paragraph (a) of this section, must be submitted to the Commission with a certification that the rule, rule amendment or futures, swap or options product complies with the Act or rules thereunder pursuant to the procedures of § 40.6 of this chapter, as

A13

applicable.  Provided, however, any rule or rule amendment that would, for a delivery month having open interest, materially change a term or condition of a swap or a contract for future delivery in an agricultural commodity enumerated in section 1a(9) of the Act, or of an option on such contract or commodity, must be submitted to the Commission prior to its implementation for review and approval under § 40-4 of this chapter.

(c) An applicant for designation, or a designated contract market, may request that the Commission consider under the provisions of section 15(b) of the Act any of the contract market's rules or policies, including both operational rules and the terms or conditions of products listed for trading.

## 17 C.F.R. § 38.5

(a) Requests for information.  Upon request by the Commission, a designated contract market must file with the Commission information related to its business as a designated contract market, including information relating to data entry and trade details, in the form and manner and within the time specified by the Commission in its request.

(b) Demonstration of compliance.  Upon request by the Commission, a designated contract market must file with the Commission a written demonstration, containing supporting data, information and documents, in the form and manner and within the time specified by the Commission, that the designated contract market is in compliance with one or more core principles as specified in the request, or that is requested by the Commission to show that the designated contract market satisfies its obligations under the Act.

(c) Equity interest transfers—

(1) Equity interest transfer notification.  A designated contract market shall file with the Commission a notification of each transaction that the designated contract market enters into involving the transfer of ten percent or more of the equity interest in the designated contract market.

(2) Timing of Notification.  The equity transfer notice described in paragraph (1) shall be filed electronically with the Secretary of the Commission at its Washington, DC headquarters at submissions@cftc.gov and the Division of Market Oversight at DMOSubmissions@cftc.gov, at the earliest possible time but in no event later than the open of business ten business days following the date upon which the designated contract market enters into a firm obligation to transfer the equity interest.

A14

(3) Rule filing.  Notwithstanding the foregoing, any aspect of an equity interest transfer described in paragraph (c)(1) of this section that necessitates the filing of a rule as defined in part 40 of this chapter shall comply with the requirements of 5c(c) of the Act and part 40 of this chapter, and all other applicable Commission regulations.

(d) Delegation of authority.  The Commission hereby delegates, until it orders otherwise, the authority set forth in paragraph (b) of this section to the Director of the Division of Market Oversight or such other employee or employees as the Director may designate from time to time.  The Director may submit to the Commission for its consideration any matter that has been delegated in this paragraph.  Nothing in this paragraph prohibits the Commission, at its election, from exercising the authority delegated in this paragraph.

## 17 C.F.R. § 40.2

(a) Submission requirements.  A designated contract market or a swap execution facility must comply with the submission requirements of this section prior to listing a product for trading that has not been approved under § 40.3.  A submission shall comply with the following conditions:

(1) The designated contract market or the swap execution facility has filed its submission electronically in a format and manner specified by the Commission;

(2) The Commission has received the submission by the open of business on the business day preceding the product's listing; and

(3) The submission includes:

(i) The information required by appendix D to this part;

(ii) A copy of the rules that set forth the contract's terms and conditions;

(iii) The intended listing date;

(iv) A certification by the designated contract market or the swap execution facility that the product to be listed complies with the Act and Commission regulations thereunder;

(v) A concise explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the

A15

Commission's regulations thereunder.  This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(vi) A certification that the registered entity posted a notice of a pending product certification with the Commission and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website. Information that the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(c)(4); and

(vii) A request for confidential treatment, if appropriate, as permitted under § 40.8.

(b) Additional information.  If requested by Commission staff, a registered entity shall provide any additional evidence, information or data that demonstrates that the contract meets, initially or on a continuing basis, the requirements of the Act or the Commission's regulations or policies thereunder.

(c) Stay.  The Commission may stay the listing of a contract pursuant to paragraph (a) of this section during the pendency of Commission proceedings for filing a false certification or during the pendency of a petition to alter or amend the contract terms and conditions pursuant to Section 8a(7) of the Act.  The decision to stay the listing of a contract in such circumstances shall not be delegable to any employee of the Commission.

(d) Class certification of swaps.

(1) A designated contract market or swap execution facility may list or facilitate trading in any swap or number of swaps based upon an "excluded commodity," as defined in section 1a(19)(i) of the Act, not including any security, security index, and currency other than the United States Dollar and a "major foreign currency," as defined in § 15.03(a) of this chapter, or an "excluded commodity," as defined in section 1a(19)(ii)-(iv) of the Act, provided the designated contract market or swap execution facility certifies, under paragraphs (a)(1) and (2) and (a)(3)(i), (iv), and (vi) of this section, the following:

A16

(i) Each particular swap within the certified class of swaps is based upon an excluded commodity specified in paragraph (d)(1) of this section;

(ii) Each particular swap within the certified class of swaps is based upon an excluded commodity with an identical pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations;

(iii) The pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in each particular swap within the certified class of swaps is identical to a pricing source, formula, procedure, and methodology for calculating reference prices and payment obligations in a product previously submitted to the Commission and certified or approved pursuant to this section or § 40.3; and

(iv) Each particular swap within the certified class of swaps is based upon an excluded commodity involving an identical currency or identical currencies.

(2) The Commission may in its discretion require a registered entity to withdraw its certification under paragraph (d)(1) of this section and to submit each individual swap or certain individual swaps within the submission for Commission review pursuant to this section or § 40.3.

**17 C.F.R. § 40.3**

(a) Request for approval. Pursuant to section 5c(c) of the Act, a designated contract market, a swap execution facility, or a derivatives clearing organization may request that the Commission approve a new product prior to listing the product for trading or accepting the product for clearing, or if a product was initially submitted under § 40.2 or § 39.5 of this chapter, subsequent to listing the product for trading or accepting the product for clearing. A submission requesting approval shall:

(1) Be filed electronically in a format and manner specified by the Commission;

(2) Include the information required by appendix D to this part;

(3) Include a copy of the rules that set forth the contract's terms and conditions;

A17

(4) Include an explanation and analysis that is complete with respect to the product's terms and conditions, the underlying commodity, and the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder.  This explanation and analysis shall either be accompanied by the documentation relied upon to establish the basis for compliance with the applicable law, or incorporate information contained in such documentation, with appropriate citations to data sources;

(5) Describe any agreements or contracts entered into with other parties that enable the registered entity to carry out its responsibilities;

(6) Include the certifications required in § 41.22 for product approval of a commodity that is a security future or a security futures product as defined in Sections 1a(44) or 1a(45) of the Act, respectively;

(7) Include, if appropriate, a request for confidential treatment as permitted under § 40.8;

(8) Include the filing fee required under appendix A to this part;

(9) Certify that the registered entity posted a notice of its request for Commission approval of the new product and a copy of the submission, concurrent with the filing of a submission with the Commission, on the registered entity's website.  Information the registered entity seeks to keep confidential may be redacted from the documents published on the registered entity's website but must be republished consistent with any determination made pursuant to § 40.8(c)(4); and

(10) Include, if requested by Commission staff, additional evidence, information or data demonstrating that the contract meets, initially or on a continuing basis, the requirements of the Act, or other requirement for designation or registration under the Act, or the Commission's regulations or policies thereunder.  The registered entity shall submit the requested information by the time specified by Commission staff, or at the conclusion of any extended period agreed to by Commission staff after timely receipt of a written request from the registered entity.

(b) Standard for review and approval.  The Commission shall approve a new product unless the terms and conditions of the product violate the Act or the Commission's regulations.

A18

(c) Commission review.

(1) All products submitted for Commission approval pursuant to, and in compliance with the submission requirements of, paragraph (a) of this section shall be subject to review by the Commission for a period of 45 days after receipt by the Commission.

(2) The Commission may extend the initial 45-day review period for up to an additional 45 days if the product raises novel or complex issues that require additional time to analyze, the submission is incomplete or the requestor does not respond completely to Commission questions in a timely manner, in which case the Commission shall notify the submitting registered entity within the initial 45-day review period and shall briefly describe the nature of the specific issues for which additional time for review shall be required.

(3) At any time during its review of a proposed product under this section, the Commission may extend the review period for any period of time to which the registered entity agrees in writing.

(4) Any amendment or supplementation made by the registered entity to the submission will be treated as the filing of a new submission under this section and be subject to the initial 45-day review period in accordance with paragraph (c)(1) of this section, unless the amendment or supplementation is requested by the Commission or is made for correction of typographical errors, renumbering or other non-substantive revisions.

(5) If the review period described in paragraph (c)(1) of this section would end on a day that is not a business day, such review period shall instead be extended to end on the next business day.

(d) Commission Determination—

(1) Approval.  Any product submitted for Commission approval in compliance with paragraph (a) of this section shall be deemed approved by the Commission under section 5c(c) of the Act at the conclusion of the applicable review period under paragraph (c) of this section, unless the Commission issues a notice of non-approval to the registered entity under paragraph (d)(2) of this section within the applicable review period.

(2) Notice of non-approval.  Any time during its review under this section, the Commission may notify the registered entity that it will

A19

not, or is unable to, approve the new product.  This notification will briefly specify the nature of the issues raised and the specific provision of the Act or the Commission's regulations, including the form or content requirements of this section, with which the new product is inconsistent or appears to be inconsistent with the Act or the Commission's regulations.

(e) Effect of non-approval.

(1) Notification to a registered entity under paragraph (d)(2) of this section of the Commission's determination not to approve a product does not prevent the entity from subsequently submitting a revised version of the product for Commission approval, or from submitting the product as initially proposed, in a supplemented submission; the revised or supplemented submission will be reviewed without prejudice.

(2) Notification to a registered entity under paragraph (d)(2) of this section of the Commission's determination not to approve a product shall be presumptive evidence that the entity may not truthfully certify under § 40.2 that the same, or substantially the same, product complies with the Act and the Commission's regulations thereunder.

**17 C.F.R. § 40.11**

(a) Prohibition.  A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

(1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

(2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b) [Reserved]

(c) 90-day review and approval of certain event contracts.  The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract,

A20

transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90-day review.  The 90-day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

(1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90-day review period.  The Commission shall post on the Web site a notification of the intent to carry out a 90-day review.

(2) Final determination.  The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90-day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at the conclusion of such extended period agreed to or requested by the registered entity.

A21

**ADDENDUM B:**

**State Gambling and Bucket-Shop Laws Regulating Futures Before the Commodity Exchange Act's Enactment in 1936**

**ALABAMA**

- "If any person, corporation, or other association of persons ... shall establish or open an office or other place of business in this state for the purpose of carrying on or engaging in any business of making contracts to sell and deliver any cotton, Indian corn, wheat, rye, oats, tobacco, meal, lard, bacon, salt pork, salt fish, beef cattle, sugar, coffee, stocks, bonds, or choses ... when ... **it is not intended by the parties thereto that the articles or things so agreed to be sold and delivered shall be actually delivered or the value thereof paid,** but it is intended and understood by then, that money or other thing of value shall be paid to the one party by the other, ... he shall be guilty of a misdemeanor." Ala. Code § 3579 (1928).

**ARKANSAS**

- "[T]he buying or selling or otherwise [dealing] in what is known as futures, either in cotton, grain or anything whatsoever, with a view to profit, is hereby declared to be **gambling**." Act of March 30, 1883, 1883 Ark. Acts 29.

**CALIFORNIA**

- Outlawing "'[b]ucketing' or 'bucket shopping,'" which "shall mean," in relevant part, "[t]he making of or offering to make any contract respecting the purchase or sale of any securities or commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in and **without a bona fide purchase or sale of the same**." Cal. Gen. L., tit. 75, § 2 (1923).

**COLORADO**

- Outlawing bucket-shop transactions "respecting the purchase or sale ... of any ... commodities, ... intending that such contract or other transaction shall be terminated, closed or settled according to, or upon the basis of the public market quotations of or prices made on any board of trade or exchange or market upon which such commodities ... are dealt in, **and without intending a bona fide purchase or sale of the same**." Colo. L. ch. 57, § 1(a) (1931).

- "All contracts, agreements, trades or transactions of the nature described in Section 1 of this Act [on bucket shops]," including those

B1

"respecting the purchase or sale" of "commodities, not intending the actual bona fide receipt or delivery of any such … commodities, but intending a settlement of such contract or other transaction based upon the difference in such public market quotations of or such prices at which said … commodities are, or are asserted to be, bought or sold," "are hereby declared **gambling** and criminal Acts and absolutely null and void."  Colo. L., ch. 57, §§ 1(c), 5 (1931).

**CONNECTICUT**

- Outlawing bucket shops, which are defined as, in relevant part, "office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … shall conduct the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of any … grain, provisions or other commodity …, wherein both parties thereto, or such proprietor or keeper, shall contemplate or intend that such contracts, agreements, trades or transactions shall be or may be closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**."  Conn. Gen. Stat. §§ 6345-6346 (1930).

**DISTRICT OF COLUMBIA**

- Outlawing "'[b]ucketing' or 'bucket-shopping,'" which "shall mean," in relevant part, "[t]he making of or offering to make any contract respecting the purchase or sale … of any … commodities wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said … commodities are dealt in and **without a bona fide purchase or sale of the same**." D.C. Code tit. 6, §§ 158-159 (1929).

**FLORIDA**

- "[D]eclaring unlawful all the transactions conducted in and through a bucket shop," which is defined "to be an office, store, or other place wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of

B2

any … cotton, grain, provisions or other commodities … wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades or transactions shall be or may be closed, adjusted, or settled according to or on the basis of the market quotations or prices made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in and **without a bona fide transaction on such board of trade or exchange**." Fla. Comp. L. § 7899 (1927).

**GEORGIA**

- Futures contracts are valid when they are "(1) made in accordance with the rules of any board of trade, exchange, or similar institution, and (2) actually executed on the floor of such board of trade, exchange, or similar institution, and performed or discharged according to the rules thereof, and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution, organized under the laws of the State of Georgia or any other State." Ga. Code Ann. § 4264(2) (1926 Code, 1930 Supp.).

- Outlawing bucket shops, which are "defined to be and mean any place of business where" persons make "any contract of sale for future delivery of cotton, grain, stocks, or other commodities, **where it is not the bona fide intention of parties that the things mentioned therein are to be delivered**, but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, **without any actual bona fide execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution**, in accordance with the rules thereof." Ga. Code Ann. §§ 4264(3)-(4) (1926 Code, 1930 Supp.).

**ILLINOIS**

- "Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, or other commodity … shall be fined not less than $10 nor more than $1,000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered **gambling contracts,** and shall be void." Ill. Rev. Stat. Crim. Code § 130 (1874).

B3

- Outlawing "any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of … petroleum, cotton, grain, provisions or other produce … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**."  Ill. Rev. Stat. ch. 38, §§ 317-318 (1931).

**INDIANA**

- Outlawing bucket shops, which are defined, in relevant part, "to be … office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any … grain, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**."  Act of April 10, 1907 §§ 3837-3838.

**IOWA**

- Outlawing bucket shops, which are defined to include "office[s], store[s], or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale, or purchase and sale, of any … grain, provisions, cotton, or other commodity…" "[w]herein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be, or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades, or transactions are dealt in by competitive buying and selling, and **without a bona fide transaction on such board of trade or exchange**."  Iowa Code §§ 9895, 9899, 9901 (1931).

B4

KANSAS

- Outlawing bucket shops, which are defined, in relevant part, "to be ... office[s], store[s] or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any ... grain, provisions, cotton or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplate or intend that the contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities ... referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Kan. Rev. Stat. Ann., ch. 50, § 122 (1923) (citing Kan. L., ch. 121 § 2 (1909)).

- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts." Kan. Rev. Stat. Ann., ch. 50, § 123 (1923) (citing Kan. L., ch. 121 § 2 (1909)).

MAINE

- Outlawing bucket shops, which are defined, in relevant part, "to be ... office[s], store[s], or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale of any ... grain, provisions, or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be, or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities ... referred to in such contracts, agreements, trades, or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Me. Rev. Stat., ch. 136, §§ 14-15 (1930).

B5

**MASSACHUSETTS**

- Outlawing bucket shops, which are defined to include places where "[t]he making of, or offering to make, any contract respecting the purchase or sale ... of any ... commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which said ... commodities are dealt in, and **without a bona fide purchase or sale of the same**" takes place. Mass. Gen. L., ch. 271, §§ 35-36 (1921).

**MICHIGAN**

- Outlawing bucket shops, which are defined, in relevant part, "to be ... office[s], store[s] or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale of any ... grains, provisions or other commodity ... wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades or transactions shall be, or may be closed, adjusted or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange, upon which the commodities ... referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Mich. Acts, no. 328 §§ 126-128 (1931).

- The "pretended buying or selling of ... petroleum, cotton, grain, provisions or other produce, ... without any intention of receiving and paying for the property so bought or of delivering the property so sold" is "hereby declared **gambling** and [a] criminal act[]." Mich. Acts, no. 328 § 311 (1931).

**MINNESOTA**

- Outlawing bucket shops, which are defined, in relevant part, to be "office[s], store[s] or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any ... grain, provisions, or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplates or intends that such contracts, agreement, trades or transactions, shall be, or may be, closed, adjusted or settled,

B6

according to, or upon the basis of the public market quotations, of prices made on any board of trade or exchange, upon which the commodities ... referred to in said contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**."  Minn. Stat. §§ 10488-10489 (1927).

MISSISSIPPI

- As "**[g]ambling [c]ontracts**," "contract[s] for the purchase or sale of a commodity of any kind, to be delivered at a future date, the parties not intending that the commodity is to be actually delivered in kind and the price paid, shall not be enforced by any court; nor shall any contract of the kind commonly called 'futures' be enforced ...."  Miss. Code Ann., ch. 31, § 2034 (1927) (citing 1882 Miss. Laws 140).

MISSOURI

- Outlawing bucket shops, which are defined as "place[s] wherein the person carrying on the bucket shop, then and there, either as principal or agent, pretends to buy or sell, or goes through the form of buying or selling, to or for any other person or persons, ... petroleum, cotton, grain, provisions and other commodities, or any one or more of the same, at prices fixed or pretended to be fixed by trades or transactions made or offered to be made in same on boards of exchange or otherwise, but **wherein there is in fact no actual purchase and sale, or sale and purchase of such commodity for or on account of the party or parties thereto**."  Mo. Rev. Stat. §§ 4316-4318 (1929) (citing Mo. Rev. Stat. § 3565 (1919)).

- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts."  Mo. Rev. Stat. § 4318 (1929) (citing Mo. Rev. Stat. § 3566 (1919)).

NEBRASKA

- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, where there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the

party or parties thereto, are hereby declared **gambling** and criminal acts." Neb. Comp. Stat. § 9813 (1922) (citing Neb. Rev. Stat. § 8817 (1913)).

- Outlawing bucket shops, which are defined, in relevant part, to be "office[s], store[s], **board-of-trade room[s]**, or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or purchase and sale, of any ... grains, provisions, cotton or other commodity ... wherein said proprietor or keeper or patron contemplates or intends that the contracts, agreements, trades or transactions shall be or may be, closed, adjusted or settled according to or upon the basis of the market quotations or prices made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities ... referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board-of-trade**." Neb. Comp. Stat. §§ 28-955, 28-959 (1929).

## NEW HAMPSHIRE

- Considered a form of "**[g]ambling**," "[n]o person or corporation shall keep, or cause to be kept, an office, store, or other place in which is conducted or permitted the pretended buying or selling of ... petroleum, cotton, grain, provisions, pork or other produce... without any intention of receiving and paying for the property so bought, or of delivering the property so sold, or in which is conducted or permitted the pretended buying or selling of such property on margins, or when the party buying, or offering to buy, such property, does not intend actually to receive the same if purchased, or deliver it if sold." N.H. Pub. L., ch. 384, § 23 (1925).

## NEW YORK

- Outlawing bucket shops, which are defined to include places where a person "[m]ake[s] or offer[s] to make, or assist[s] in making or offering to make any contract respecting the purchase or sale ... of any ... commodities ... intending that such contract shall be terminated, closed or settled according to, or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which such commodities ... are dealt in, and **without intending a bona fide purchase or sale of the same**." N.Y. Penal Law § 390 (1909).

B8

**NORTH CAROLINA**

- "The test of the validity of a contract for 'future' which this section requires is the 'intention not to actually deliver' the articles bought or sold for future delivery.  No matter how explicit the words in any contract which may require a delivery, if in fact there is no intention to deliver, but the real understanding is that on the stipulated date the losing party shall pay to the other the difference between the market price and the contract price, this is a **gambling contract**." Ed.'s Note, N.C. Code Ann. § 2144 (1931).

**NORTH DAKOTA**

- Bucket shops, considered a "place for **gaming**," are "unlawful" where they are used for "the pretended buying or selling of grain, pork, lard or any mercantile or agricultural products on margins, without any intention of future delivery."  N.D. Comp. L. Ann. § 9699 (1913).

**OHIO**

- "[I]t shall be unlawful for any corporation, association, chamber of commerce, **board of trade**, copartnership or person to keep or cause to be kept within this state any bucket shop, office or other place wherein is conducted or permitted the pretended buying or selling of ... petroleum, cotton, grain, provisions or other produce ... **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Ohio Gen. Code § 6934a-1 (1902).

- It is unlawful for a person to use a building for a "'bucket shop' or grain **gambling**."  Ohio Gen. Code § 6934a-5 (1902).

**OKLAHOMA**

- "[A]ll contracts of sales for future delivery of cotton, grain, stocks or other commodities" that are "(1) made in accordance with the rules of any board of trade, exchange or similar institution where such contracts of sale are executed and (2) actually executed on the floor of such board of trade, exchange or similar institution and performed or discharged according to the rules thereof; and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton, exchange, grain exchange, board of trade, or similar institution organized under the laws of the State of Oklahoma or any other State shall be, and they are hereby declared to be valid

B9

and enforceable in the courts of this State according to their terms." Okla. Comp. Stat. Ann. § 3883 (1921).

- Prohibiting bucket shops, which are "defined to be and mean any place of business wherein are made" "contract[s] of sale for the future delivery of cotton, grain, stocks or other commodities, which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange or similar institutions, upon which contracts of sale for future delivery are executed and dealt in **without any actual bonafide execution and the carrying out or discharge of such contracts upon the floor of such exchange, board of trade, or similar institution in accordance with the rules thereof**." Okla. Comp. Stat. Ann. §§ 3885-3888 (1921).

**OREGON**

- Outlawing when a person, "as broker," "[m]ake[s] or offer[s] to make, or assist[s] in making or offering to make any contract respecting the purchase or sale ... of any ... commodities, intending that such contract shall be terminated, closed or settled according to, or upon the basis of the public market quotations of or prices made on any board of trade or exchange or market upon which such commodities ... are dealt in, and **without intending a bona fide purchase or sale of the same**." Ore. L., ch. 395, § 2 (1931).

**PENNSYLVANIA**

- Outlawing bucket shops, which are defined to include "an office, store, or other place, wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale, or purchase and sale, of any ... grains, provisions, or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices, made on any board of trade or exchange upon which the commodities ... referred to in such contracts, agreements, trades, or transactions, are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Dig. Pa. Stat. L. § 2413 (1920) (citing Act of June 1, 1907).

- "All contracts, agreements, trades, or transactions of the nature described in section one of this act [on bucket shops] are hereby declared **gambling**, and criminal acts, and absolutely null and void." Dig. Pa. Stat. L. § 2418 (1920) (citing Act of June 1, 1907).

RHODE ISLAND

- Outlawing bucket-shopping, which includes "[t]he making of or offering to make any contract respecting the purchase or sale ... of any ... commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in, and **without a bona fide purchase or sale of the same**." R.I. Gen. L., ch. 406, § 1 (1923) (citing R.I. Gen. L., ch. 353 (1909)).

SOUTH CAROLINA

- "[A]ll contracts of sale for future delivery of cotton, grain, stocks, or other commodities, (1) made in accordance with the rules of any board of trade, exchange, or similar institution, and (2) actually executed on the floor of such board of trade, exchange or similar institution, and performed or discharged according to the rules thereof, and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution, organized under the laws of the State of South Carolina, or any other State, shall be and they hereby are declared to be valid and enforceable in the Courts of this State, according to their terms." S.C. Acts, no. 711 § 2 (1928).

- Bucket shops are unlawful; "[a]ny contract of sale for future delivery of cotton, grain, stocks, or other commodities **where it is not the bona *fide* intention of parties that the things mentioned therein are to be delivered** but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, **without any actual bona *fide* execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution, in accordance with the rules thereof**, shall be null and void and unenforceable in any Court of this State, and no action shall be maintainable thereon at the suit of any party." S.C. Acts, no. 711 §§ 3-4 (1928).

B11

SOUTH DAKOTA

- Bucket shops, as a form of "**[g]ambling in [f]utures**," are unlawful where they are used for "the pretended buying or selling of grain, pork, lard or any mercantile, mining or agricultural products or corporation stocks, on margins, without any intention of future delivery, whether such pretended contracts are to be performed within or without the state."  S.D. Comp. L. § 3925 (1929).

TENNESSEE

- "[H]ereafter any sale, contract or agreement for the sale of … grain, cotton or other produce, property, commodity, article or thing, for future delivery, where either of the contracting parties, buyer or seller, in dealing simply for the margin, or on the prospective rise or fall in the price of the article or thing sold, and where either of the said contracting parties have had no intention or purpose of making actual delivery or receiving the property or thing in specie, shall be deemed and is hereby declared **gambling**."  Act of March 30, 1883, 1883 Tenn. Pub. Acts 331.

VERMONT

- As a form of "**[g]ambling**," a bucket shop is unlawful where it is used for "the pretended buying or selling of … petroleum, cotton, grain, provisions, pork or other produce … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**."  Vt. Gen. L. § 7081 (1917).

VIRGINIA

- Outlawing "bucket-shopping," which includes "[t]he making of, or offering to make, any contract respecting the purchase or sale … of any … commodities wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which said … commodities are dealt in, and **without a bona fide purchase or sale of the same**."  Va. Code Ann. §§ 4714-4715 (1924).

WASHINGTON

- Outlawing bucket shops, which are "defined to be shed[s], tent[s], tenement[s], booth[s], building[s], float[s] or vessel[s], or any part

B12

thereof, wherein may be made contracts respecting the purchase or sale ... of any commodities ... wherein both parties, intend that such contract shall or may be terminated, closed and settled" **(1) "[u]pon the basis of the market prices quoted or made on any board of trade or exchange upon which such commodities** ... **may be dealt in," (2) "[w]hen the market prices for such commodities ... shall reach a certain figure in any such board of trade or exchange,' or (3) "[o]n the basis of the difference in the market prices at which said commodities ... are, or purport to be, bought and sold."** Wash. Code § 8932 (1919).

## WEST VIRGINIA

- "If any person shall carry on in this State what is commonly known as a bucket shop, or act as agent for any person, firm or corporation carrying on such business, or engage in transactions for the purchase or sale for others of grain, provisions, ... or other property wherein the parties thereto or the broker intend that such transaction shall be settled according to the public market quotations on any board of trade or exchange, or intend that such transaction may be deemed terminated when such public market quotations shall reach a certain figure, or intend that such property shall be resold before or at the time fixed in such transaction for the delivery of such property and that the difference between the contract price and the market price thereof shall be paid or received **without the prior receipt or delivery of such property under the former sale**, he shall be guilty of a felony, and, upon conviction thereof, shall be confined in the penitentiary not less than two nor more than five years." W. Va. Code, ch. 61, art. 10, § 18 (1930).

## WISCONSIN

- Outlawing bucket shops, which are "defined to be an office, store or other place wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any ... grains, provisions or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities ... referred to in such

B13

contract, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**.” Wis. Stat. §§ 348.175-348.178 (1929).

## WYOMING

- It is “unlawful for any corporation, association, co-partnership or person to keep or cause to be kept within this state any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of the shares of stocks or bonds of any corporation, or petroleum … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold** or wherein is conducted or permitted the pretended buying or selling of such property on margins.” Wyo. Rev. Stat. Ann. § 32-924 (1931).