No. 26-3196 / 26-5235

# United States Court of Appeals
# for the Sixth Circuit

KALSHIEX, LLC,

> Plaintiff-Appellant [26-3196],

> Plaintiff-Appellee [26-5235],

v.

MATTHEW T. SCHULER, THOMAS J. STICKRATH; SHEETAL BAJORIA; SCOTT P. BORGEMENKE; KEITH CHENEY; PENELOPE R. CUNNINGHAM; CHRISTOPHER SMITHERMAN; TRIFFON CALLOS; OHIO CASINO CONTROL COMMISSION; DAVE YOST, Ohio Attorney General,

> Defendants-Appellees [26-3196],

WILLIAM ORGEL, in his official capacity as Chairman of the Tennessee Sports Wagering Council; MARY BETH THOMAS, in her official capacity as the Executive Director of the Tennessee Sports Wagering Council; JONATHAN THOMAS SKRMETTI, in his official capacity as Attorney General of Tennessee,

> Defendants-Appellants [26-5235].

On Appeal from the United States District Court
for the Middle District of Tennessee,
No. 3:26-cv-34 (Trauger, J.)

**AMICUS BRIEF OF THE COMMODITY FUTURES TRADING COMMISSION IN NO. 26-5235 IN SUPPORT OF APPELLEE AND IN SUPPORT OF AFFIRMANCE**

*COUNSEL LISTED ON INSIDE COVER*

TYLER S. BADGLEY
GENERAL COUNSEL
M. JORDAN MINOT
DEPUTY GENERAL COUNSEL
HENRY J. DICKMAN
SENIOR ASSISTANT GENERAL COUNSEL
ANNE STUKES
SENIOR ASSISTANT GENERAL COUNSEL
**U.S. COMMODITY FUTURES
TRADING COMMISSION**
1155 21st Street, N.W.
Washington, DC 20581
(202) 418-5607
hdickman@cftc.gov

June 24, 2026

ii

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF AMICI CURIAE ...................................................1

INTRODUCTION ................................................................................................2

ARGUMENT ......................................................................................................4

I.    The event contracts targeted by Tennessee are swaps. .....................................4

    A.  The definition of "swaps" straightforwardly encompasses sports-related event contracts.........................................................................4

    B.  No clear-statement rule applies.................................................................10

    C.  Sports event contracts are known to the trade as swaps ............................16

    D.  Tennessee's theory would leave a gaping hole in federal regulation .........17

II.    The CEA preempts state law as applied to event contracts on CFTC-regulated exchanges .................................................................................20

    A.  The CEA expressly preempts state regulation of derivatives transactions on DCMs ..............................................................................21

    B.  The CEA preempts the field of on-DCM trading ......................................26

    C.  Tennessee's enforcement effort is conflict-preempted ..............................27

CONCLUSION ..................................................................................................29

i

**TABLE OF AUTHORITIES**

<u>Cases</u>

*American Agric. Movement, Inc. v. Bd. of Trade of Chicago*,
  977 F.2d 1147 (7th Cir. 1992)......................................................................20

*Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162
  2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) .......................................14

*Bufkin v. Collins*,
  604 U.S. 369 (2025).................................................................................9, 10

*CFTC v. Spagnuolo*,
  No. 1:26-cv-4419 (S.D.N.Y).......................................................................19

*CFTC v. Van Dyke*,
  No. 1:26-cv-3369 (S.D.N.Y)..................................................................18, 19

*Churchill Downs Technology Initiatives Co. v. Michigan Gaming
  Control Board.*,
  162 F.4th 631 (6th Cir. 2025) ....................................................................14

*Effex Cap., LLC v. National Futures Association*,
  933 F.3d 882 (7th Cir. 2019)......................................................................22

*Fidelity Federal Savings & Loan Association v. de la Cuesta*,
  458 U.S. 141 (1982)....................................................................................28

*KalshiEX, LLC v. Flaherty*,
  172 F.4th 220 (3d Cir. 2026)..................................................3, 6, 12, 26

*KalshiEX, LLC v. Johnson*, No. 26-01715,
  __ F. Supp. 3d __, 2026 WL 1223373 (D. Ariz. May 5, 2026)...........................22

*Leist v. Simplot*,
  638 F.2d 283 (2d Cir. 1980)........................................................................22

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982).......................................................................................2

*Michigan v. Bay Mills Indian Community*,
  572 U.S. 782 (2014).....................................................................................14

*QCX LLC v. Nessel,*
  No. 1:26-cv-710 (W.D. Mich. June 17, 2026) ........................................... 8, 9,15, 22

*SEC v. Terraform Labs Pte. Ltd.,*
  684 F. Supp. 3d 170 (S.D.N.Y. 2023) ....................................................... 13

*Sedima, S.P.R.L. v. Imrex Co.,*
  473 U.S. 479 (1985) ................................................................................ 15

*United States v. Spagnuolo,*
  No. 1:26-mj-02020 (S.D.N.Y.) ................................................................. 19

*United States v. Van Dyke,*
  No. 1:26-cr-156 (S.D.N.Y.) ..................................................................... 19

*Utility Air Regulatory Group v. EPA,*
  573 U.S. 302 (2014) ................................................................................ 12

*Wells Fargo Bank, National Association v. Lake of the Torches*
  *Economic Development Corp.,*
  658 F.3d 684 (7th Cir. 2011) .............................................................. 22, 23

*Whitman v. American Trucking Association,*
  531 U.S. 457 (2001) ................................................................................ 13

Statutes

7 U.S.C. § 1a(47), CEA § 1a(47) ................................................................ passim

7 U.S.C. § 1a(51), CEA § 1a(51) ................................................................. 11

7 U.S.C. § 2(a)(1), CEA § 2(a)(1) ............................................................... passim

7 U.S.C. § 2(c), CEA § 2(c) ......................................................................... 24

7 U.S.C. § 2(d), CEA § 2(d) .................................................................... 25, 27

7 U.S.C. § 2(e), CEA § 2(e) ......................................................................... 11

7 U.S.C. § 2(f), CEA § 2(f) .......................................................................... 24

7 U.S.C. § 2(g), CEA § 2(g) ......................................................................... 24

7 U.S.C. § 6(c), CEA § 4(c) ......................................................................... 24

7 U.S.C. § 7(d), CEA § 7(d) ......................................................................... 17

7 U.S.C. § 7a-2(c)(5)(C), CEA § 5c(c)(5)(C) ...................................................passim

7 U.S.C. § 13a-1(a), CEA § 6c(a) ...............................................................18

7 U.S.C. § 13a-2(1), CEA § 6d(1).............................................................23, 27

7 U.S.C. § 13a-2(7), CEA § 6d(7).................................................................23

7 U.S.C. § 16(e), CEA § 12(e) ...........................................................2, 23, 24, 25

7 U.S.C. § 27-27f .................................................................................24

15 U.S.C. § 8302(d)(1)......................................................................10, 12, 16

15 U.S.C. § 8321(a)(2)..............................................................................16

15 U.S.C. § 8321(b) ..............................................................................9, 16

25 U.S.C. § 2703(6) ................................................................................23

31 U.S.C. § 5362(1)(E) ...................................................................3, 10, 12, 14

Regulations

17 C.F.R. § 38.4(a) ...................................................................................9

17 C.F.R. § 38.4(b)...................................................................................9

Concept Release on the Appropriate Regulatory Treatment of Event Contracts,
   73 Fed. Reg. 25,669 (May 7, 2008) ...............................................................26

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap
   Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,
   77 Fed. Reg. 48,208 (August 13, 2012).............................................................12

Prediction Markets; Public Interest Determinations,
   91 Fed. Reg. 35,806 (proposed June 12, 2026) .....................................1, 12, 18, 27

Legislative Materials

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010)..........................................13, 15

Other Authorities

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. Bus. Rev.  (2019).........................................................24, 25

Catherina Gioino, *This NYC bar just covered everyone's tabs because the Knicks won, and used Kalshi to hedge their bets*, Fortune (June 3, 2026), https://fortune.com/2026/06/03/nyc-bar-knicks-kalshi-win-prediction-market/.....7

Chick-fil-A Free Chicken Promotion, https://www.mlb.com/reds/tickets/ specials/chick-fil-a-runs (last visited June 24, 2026) ................................................7

CFTC, Designated Contract Market Products, https://www.cftc.gov/IndustryOversight/IndustryFilings/ TradingOrganizationProducts (last visited June 24, 2026)....................................16

CFTC, Transaction Dollar Volume, https://www.cftc.gov/MarketReports/SwapsReports/L3TransDollarVol.html (last visited June 24, 2026) .................................................................................13

CME Group, Prediction Markets, https://www.cmegroup.com/markets/prediction-markets.html (last visited June 24, 2026)..............................................................................................4

CME Rulebook, Chapter 22 Event Contract Swaps, https://www. cmegroup.com/rulebook/CME/I/22.pdf (last visited June 24, 2026) .................................................................................16

CNBC, *Knicks' postseason run brought $380m in economic activity, says NYCEDC's Jeanny Pak*, (June 18, 2026), https://www.cnbc.com/video/2026/06/18/knicks-postseason-run-brought-380m-in-economic-activity-says-nycedcs-jeanny-pak.html ............................................6

Contingency, Merriam-Webster, https://www.merriam-webster.com/ dictionary/contingency (last visited June 24, 2026) ...............................................5

Event, Webster's II New College Dictionary (3d ed. 2025) .....................................4

Henry Bushnell, *USMNT ticket prices for World Cup knockout route skyrocket on resale sites*, The Athletic (June 22, 2026), https://www.nytimes.com/athletic/7379054/2026/06/20/usa-ticket-prices -world-cup-knockouts/?eafs_enabled=false ............................................................6

*In re: Blockratize, Inc.*, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Actions (Jan. 3, 2022), https://www.cftc.gov/media/6891/enfblockratizeorder010322/download ............19

*In re: Self-Certification by Nadex*, Order Prohibiting the Listing or Trading of Political Event Contracts (Apr. 2, 2012), https://www.cftc.gov/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf ...............................................................................18

Jack Pitcher & Andrew Beaton, *The Only Thing Hotter Than the Knicks Is Their Stock Price*, Wall St. J. (June 8, 2026), https://www.wsj.com/sports/basketball/knicks-nba-finals-msg-stock -b0f2dd31 ..............................................................................................................6

Jeff Legwold, *Broncos top Chargers, secure AFC's No. 1 seed for playoffs*, ESPN (Jan. 4, 2026), https://www.espn.com/nfl/story/_/id/47507514/broncos-top-chargers-secure -afc-no-1-seed-playoffs......................................................................................6

Letter from CBOE Global Markets to CFTC, Re: Advanced Notice of Proposed Rulemaking Relating to Prediction Markets (Release No. 9194-26; RIN 3038-AF65) (May 5, 2026)......................................16

Statement of Commissioner Brian D. Quintenz on ErisX RSBIX NFL Contracts and Certain Event Contracts (Mar. 25, 2021), https://www.cftc.gov/PressRoom/SpeechesTestimony/ quintenzstatement032521 ...............................................................................18

Strikeouts for Slices, https://www.mlb.com/reds/tickets/specials/strikeouts-larosas (last visited June 24, 2026) ..................................................................................7

Zak Koeppel, *NFL contract incentives tracker: Which players cashed in during Week 18?*, NFL (Jan. 4, 2026), https://www.nfl.com/news/2025-nfl-contract-incentives-tracker-which -players-can-cash-in-during-week-18..................................................................7

## IDENTITY AND INTEREST OF AMICUS CURIAE

The Commodity Futures Trading Commission ("CFTC" or "Commission") files this brief in support of appellee and affirmance in Case No. 26-5235. This appeal concerns the meaning of the Commodity Exchange Act ("CEA"), which is exclusively administered by the CFTC. The United States and the CFTC are suing nine States for infringing on the Commission's exclusive jurisdiction by attempting to regulate the trading of event contracts on "prediction markets," which are CFTC-registered Designated Contract Markets ("DCMs"). The Commission is also actively engaged in providing further clarity as to how its existing regulatory framework applies to prediction markets, *see* 91 Fed. Reg. 35,806 (proposed June 12, 2026), and the federal government is bringing criminal and civil enforcement actions under the CEA for abuses on prediction markets. The Commission therefore has a significant interest in this Court recognizing that event contracts are covered by the CEA and upholding the Commission's exclusive jurisdiction against state intrusion.

The Commission expressed its views on these matters in the companion case and will not rehash those points here. *See KalshiEX, LLC v. Schuler*, No. 26-3196, Dkt. 31 (6th Cir. May 12, 2026) ("CFTC-Ohio Br."). This brief is aimed at the arguments of Tennessee ("Tenn. Br.") and amici that require further response.

1

## INTRODUCTION

Tennessee gets the legal issues in this case backwards. It insists that sports event contracts are gambling under *state* law, and therefore, they cannot be subject to the *federal* Commodity Exchange Act. That is not how preemption works. Under the CEA's plain text, event contracts—including those tied to sporting events—are "swaps," and Congress vested the Commission with "exclusive jurisdiction" to regulate them. That being the case, all of Tennessee's maneuvers for twisting the CEA's text—the major-questions doctrine, "structural federalism," state-versus-federal expertise in gambling regulation—go by the wayside.

Tennessee is hardly the first state to confuse derivatives and gambling. Long before the Commission was created, States routinely invoked their gambling laws to void futures contracts, but Congress rejected that approach and created "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). It crafted a super-preemption rule for state gambling laws, ensuring that such laws are inapplicable *even* as to derivatives largely beyond CFTC oversight. 7 U.S.C. § 16(e)(2). It expressly recognized that "swaps" can "involve" "gaming," and it gave the Commission discretion to prohibit such swaps when contrary to the public interest. *Id.* § 7a-2(c)(5)(C)(i). And in the Unlawful Internet Gaming Enforcement Act ("UIGEA")—which regulates interstate "bets or wagers"

2

over the Internet—Congress acknowledged that a "bet or wager" can pertain to "a sporting event," 31 U.S.C. § 5362(1)(A), but nonetheless provided that "any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the Commodity Exchange Act" is *not* a "bet or wager," *id.* § 5362(1)(E)(ii). The throughline is unmistakable: once a contract falls within the CEA, gambling law drops out—not the other way around.

Tennessee's cramped view of the Commission's jurisdiction is far more disruptive than it lets on. It first claims that sports event contracts are not federally regulated "swaps." Getting there, however, constricts the "swap" definition so severely that the Commission would lose jurisdiction over event contracts that have traded on CFTC-registered exchanges for years—including contracts about weather and government action—leaving behind a vacuum in federal enforcement and regulation. Tennessee then argues that the CEA does not preempt state regulation of swaps—a theory that would allow each State to regulate (or ban altogether) any future, option, or swap, resurrecting "the patchwork that Congress replaced wholecloth by creating the CFTC." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 230 (3d Cir. 2026). The Court should enforce the plain text of the "swap" definition and uphold the Commission's exclusive jurisdiction.

3

# ARGUMENT

## I.    The event contracts targeted by Tennessee are swaps

### A. The definition of "swap" straightforwardly encompasses sports-related event contracts

A "swap" is a contract that makes payment (1) "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" that is (2) "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii). Sports event contracts tick both boxes.

***"Event or Contingency."*** Tennessee first claims that sports event contracts are "dependent" on "outcomes" as opposed to "events." Tenn. Br. 25-27. That is a false dichotomy: an "outcome" *is* an "event." *See* Event, Webster's II New College Dictionary (3d ed. 2025) (defining "event" to mean "[t]he actual outcome or final result"); CFTC-Ohio Br. 10-11. Virtually *all* event contracts, sports or otherwise, are based on outcomes. CME Group, the nation's largest derivatives exchange, offers event contracts on the next Federal Funds rate decision, which is the outcome of an event (a Federal Open Market Committee meeting).[1] Political event contracts settle based on the outcome of an election, even though the election itself is also an event. In the same way, the result of a game is an event, no less than the game itself.

---

[1] CME Group, Prediction Markets, https://www.cmegroup.com/markets/prediction-markets.html (last visited June 24, 2026).

The CEA's "Special Rule" for event contracts confirms this. That Rule allows the Commission to prohibit "swaps" that "involve" various activities, including "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). Yet on Tennessee's reading, the only "gaming" event contracts that come within this Rule are about "whether the game occurs" (*i.e.*, whether the Super Bowl happens), while contracts about "the results of that game" (*i.e.*, who wins the Super Bowl) are simply outside the CEA altogether. Tenn. Br. 27 (citation modified). That constrained view of the Rule is nonsensical.

Regardless, contracts dependent on a "contingency" are also swaps. 7 U.S.C. § 1a(47)(A)(ii). The term "contingency," while inclusive of "events," also denotes "something liable to happen as an adjunct to *or result of something else*."[2] If, as Tennessee asserts, the term "event" means only the occurrence of a game itself, then a "contingency" includes the "result" of that event. Reading "contingency" to also exclude outcomes would inevitably collapse the term into "event" and render it meaningless.

***Potential Financial, Economic, or Commercial Consequences.*** Tennessee also refuses to admit the economic consequences of sports—much less the *potential* economic consequences of sports—which is demonstrably wrong. Sports events have major commercial consequences for "sponsors, advertisers, television

---

[2] Contingency, Merriam-Webster, https://www.merriam-webster.com/ dictionary/contingency (last visited June 24, 2026) (emphasis added).

networks, franchises, and local and national communities." *Flaherty*, 172 F.4th at 227–28. Because the Denver Broncos beat the Los Angeles Chargers to close last year's regular season, they secured home-field advantage in the NFL Playoffs—which had direct commercial consequences for the franchise and the city of Denver.[3] When the U.S. soccer team qualified for a knockout-round game at Levi's Stadium, ticket prices skyrocketed by over $1,000.[4] Madison Square Garden Sports, the parent of the New York Knicks, doubled in market value over the past year because of the team's performance,[5] and the team's postseason run generated around $380 million for New York City's economy.[6] Business promotions amplify the economic consequences of sporting events: for instance, because the Knicks won the first

---

[3] Jeff Legwold, *Broncos top Chargers, secure AFC's No. 1 seed for playoffs*, ESPN (Jan. 4, 2026), https://www.espn.com/nfl/story/_/id/47507514/broncos-top-chargers-secure-afc-no-1-seed-playoffs.

[4] Henry Bushnell, *USMNT ticket prices for World Cup knockout route skyrocket on resale sites*, The Athletic (June 22, 2026), https://www.nytimes.com/athletic/7379054/2026/06/20/usa-ticket-prices-world-cup-knockouts/?eafs_enabled=false.

[5] Jack Pitcher & Andrew Beaton, *The Only Thing Hotter Than the Knicks Is Their Stock Price*, Wall St. J. (June 8, 2026), https://www.wsj.com/sports/basketball/knicks-nba-finals-msg-stock-b0f2dd31.

[6] CNBC, *Knicks' postseason run brought $380m in economic activity, says NYCEDC's Jeanny Pak*, (June 18, 2026), https://www.cnbc.com/video/2026/06/18/knicks-postseason-run-brought-380m-in-economic-activity-says-nycedcs-jeanny-pak.html.

Finals game, a local bar offered free drinks to its patrons—and hedged that potentiality using Kalshi.[7]

Granular, in-game events also carry potential economic consequences. A player's statistical performance affects his free-agency value, jersey sales, and even fantasy-league outcomes. When Seahawks quarterback Sam Darnold threw for more than 150 yards in Week 18, he triggered a $500,000 incentive bonus contingent on completing the regular season with over 4,000 passing yards; when Titans running back Tony Pollard failed to rush for 66 yards that same week, he missed a $250,000 bonus.[8] Companies also link promotions to in-game events. When the Reds hit a home run in the 4th inning, ticketholders get a reward from Chick-Fil-A,[9] and when Reds pitchers combine for 11 strikeouts, fans get a LaRosa's pizza.[10] These commercial consequences are not "attenuated," "incidental," or "down-the-line." Tenn. Br. 28. They are squarely "associated with" the underlying event. 7 U.S.C. § 1a(47)(A)(ii).

---

[7] Catherina Gioino, *This NYC bar just covered everyone's tabs because the Knicks won, and used Kalshi to hedge their bets*, Fortune (June 3, 2026), https://fortune.com/2026/06/03/nyc-bar-knicks-kalshi-win-prediction-market/.

[8] Zak Koeppel, *NFL contract incentives tracker: Which players cashed in during Week 18?*, NFL (Jan. 4, 2026), https://www.nfl.com/news/2025-nfl-contract-incentives-tracker-which-players-can-cash-in-during-week-18.

[9] Chick-fil-A Free Chicken Promotion, https://www.mlb.com/reds/tickets/specials/chick-fil-a-runs (last visited June 24, 2026).

[10] Strikeouts for Slices, https://www.mlb.com/reds/tickets/specials/strikeouts-larosas (last visited June 24, 2026).

Tennessee then pivots to the claim that the subparagraph (ii) definition of "swap" must be limited to "financial measures, indices, or instruments," like other swap definitions.[11] Tenn. Br. 32-33. That fails for several reasons.

*First*, subparagraph (ii) requires only that the event be "associated" with a "potential" economic consequence. Those qualifiers would be meaningless if the event needed an intrinsic financial character. As former Chairman Gensler notes, the "associated with a potential financial, economic, or commercial consequence" language was added "against a backdrop of the then-emerging market for OTC weather derivatives used to hedge weather-related commercial risks"—and weather is hardly a financial measure. *Schuler*, No. 26-3196, Dkt. 55 ("Gensler Br.") at 11.

*Second*, the CEA's Special Rule makes clear that swaps can "involve" events related to "terrorism," "assassination," "war," and "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), none of which is inherently financial.[12]

---

[11] In a recent opinion, the Western District of Michigan surmised that an overbroad definition of "swap" would intrude on "contract law (service contracts), property law (mortgages), and family law (prenuptial agreements), among others." *QCX LLC v. Nessel*, No. 1:26-cv-710, R.41, PageID#1110 (W.D. Mich. June 17, 2026). Those contracts are not derivatives because they are not based on an external underlying, and in any event, the CEA's exclusions from the "swap" definition guard against such far-flung scenarios. *See* 7 U.S.C. § 1a(47)(B). Were there doubt, the Commission's authority to further define "swap" could be exercised to avoid such potentialities. *See* Release No. 9257-26, CFTC, SEC Seek Public Input on Data Reporting Frameworks for Security-Based Swap and Swap Markets (June 18, 2026), https://www.cftc.gov/PressRoom/PressReleases/9257-26.

[12] The Western District of Michigan concluded it was "not clear" whether the Special Rule "represent[s] Congress's judgment that contracts involving war,

8

*Third*, while Tennessee argues that an overbroad subparagraph (ii) would make other subparagraphs surplusage, its artificial narrowing would make *subparagraph (ii)* superfluous, since other subparagraphs already cover the waterfront of finance-related contingencies. *See, e.g.*, 7 U.S.C. § 1a(47)(A)(i) (defining "swap" to include an "option of any kind that is … based on the value[] of … financial or economic interests or property of any kind"); *id.* § 1a(47)(A)(iii) (similar, with 22 illustrative examples). Although a fair interpretation of subparagraph (ii) creates some redundancy, that is inevitable. *Bufkin v. Collins*, 604 U.S. 369, 387 (2025) ("[W]hen both interpretations involve the same redundancy, the canon against surplusage simply does not apply."). Subparagraph (iv), for instance, defines "swap" to include a contract that "is, or in the future becomes, commonly known to the trade as a swap," which necessarily encompasses all the other swap definitions. 7 U.S.C. § 1a(47)(A)(iv). And Congress *still* worried its "swap" definition was not expansive enough, as it instructed the Commission to "adopt a rule to further define the term[] 'swap'" in order to "include transactions and entities that have been structured to evade this subtitle." 15 U.S.C. § 8321(b);

---

terrorism, and gaming could actually be 'swaps' as opposed to a failsafe against attempts to portray them as such." *Nessel*, R.41 at PageID#1114. But if contracts involving war, terrorism, or gaming cannot be "swaps," the Special Rule would not have been required—those contracts would simply not comply with the CEA. *See* 17 C.F.R. §§ 38.4(a) & (b) (requiring request for approval or self-certification for the "terms and conditions of futures, swaps, and option products").

9

*see also id.* § 8302(d)(1) (CFTC and SEC have authority to "further define the term[] 'swap'"). Given that context, subparagraph (ii) is best read to capture *something* that other subparagraphs already cover, rather than capture *nothing* that is not already covered. *Bufkin*, 604 U.S. at 387 ("In any event, '[s]ometimes the better overall reading of the statute contains some redundancy.'").

### B. No clear-statement rule applies

With no foothold in the text, Tennessee tries a different tack, asking the Court to apply three clear-statement rules. None applies.

***Major-Questions Doctrine.*** According to the State, whether the CEA "encompasses sports gambling" is a major question. Tenn. Br. 35. That framing stacks the deck, as it presupposes that event contracts are gambling rather than swaps. *See* 31 U.S.C. § 5362(1)(E) (CEA-regulated derivatives are not "bet[s] or wager[s]"). Consider: if the question was whether a contract was a "swap" subject to CFTC regulation or "insurance" subject to state regulation, it would be question-begging to say that whether the CEA "encompasses insurance" is major. So Tennessee's premise fails at the outset.

The State nonetheless claims that if sports event contracts are swaps, then "practically all sports wagers would be swaps"—and *that* is something Congress "surely would have said [] explicitly." Tenn. Br. 35-36 (citation modified). But the Commission does not claim, and has never claimed, jurisdiction over sports wagers

10

offered by casinos or sportsbooks. Tennessee is thus pressing a "bank-shot" major-questions argument—even if the agency's *actual* assertion of jurisdiction is not major, the alleged *implications* of that assertion might create a major question somewhere else. There is no support for that version of the doctrine.

Even if a bankshot major-questions theory was legitimate, Tennessee's shot is a brick, as it ignores the structural differences between sportsbooks that enable sports betting and CFTC-approved DCMs that list event contracts, sports-related or otherwise. Sportsbooks act as a casino or "house" that directly bets against users— if the bettor wins, she takes the "house's" money; if not, the sportsbook pockets the bettor's wager. Sportsbook bets are thus bilateral transactions priced by an in-house bookie, rather than by the market, and so are not readily susceptible to the CEA's exchange-trading requirement for swaps offered to retail participants. *See* 7 U.S.C. § 2(e).[13] DCMs that list event contracts, by contrast, are neutral exchanges that match counterparties and collect transaction fees, like other futures or swaps exchanges.[14]

---

[13] An exchange is a "trading facility," and Congress excluded from the definition of "trading facility" a platform that allows "participants to negotiate the terms of and enter into bilateral transactions as a result of communications exchanged by the parties and not from interaction of multiple bids and multiple offers within a predetermined, nondiscretionary automated trade matching and execution algorithm." 7 U.S.C. § 1a(51)(B)(i). Sportsbooks fit this exclusion.

[14] Trading facilities "accept[] bids or offers made by other participants that are open to multiple participants in the facility or system" or "through the interaction of multiple bids or multiple offers within a system with a pre-determined non-discretionary automated trade matching and execution algorithm." 7 U.S.C. § 1a(51)(A). DCMs like Kalshi fit this mold.

11

That the latter are within the Commission's jurisdiction does not demand the same of the former. *See* 31 U.S.C. § 5362(1)(E) (distinguishing CEA-regulated products from gambling). And even if the "far-fetched" concern about the Commission regulating sportsbooks had traction, Congress expressly delegated to the Commission and the SEC authority to "further define" swaps—an authority used to clarify that insurance and certain consumer transactions are not swaps. *Flaherty*, 172 F.4th at 228 (citing 15 U.S.C. § 8302(d)(1), 77 Fed. Reg. 48,208 (Aug. 13, 2012)). Indeed, the CFTC and the SEC are currently seeking public comment on the swap definition in regard to event-based contracts. *Supra* 8 n.11.

Regardless, the major-questions doctrine is inapplicable here for multiple reasons. For one, the doctrine is triggered "[w]hen an agency claims to discover in a long-extant statute an unheralded [regulatory] power." *Utility Air Regul. Grp. v EPA*, 573 U.S. 302, 324 (2014). The Commission has done no such thing: it has regulated event contracts—whether styled as binary options or swaps—for decades, and as the events underlying those contracts have evolved to include sports, the Commission has continued to exercise the same jurisdiction it always has. *See* 91 Fed. Reg. 35,806, 35,813–17 (proposed June 12, 2026) (detailing history of Commission regulation of prediction markets). It is the *States*, not the Commission, that are claiming new authority.

12

The major-questions doctrine is also animated by the principle that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001). But the CEA's "swap" definition, and the Commission's "exclusive jurisdiction" over swaps, are no mouseholes—they are among the most significant changes wrought by Dodd-Frank. Congress, moreover, directly addressed "event contracts" in the statutory Special Rule, 7 U.S.C. § 7a-2(c)(5)(C)(i), and a leading proponent of Dodd-Frank acknowledged that this authority extended to "sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament," 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (Sen. Lincoln).

Finally, while sports event contracts are big business, they are a fraction of the broader swaps market, which clears trillions of dollars in weekly trading volume.[15] If dollar value alone were enough to trigger a major question, any interpretative issue involving "swaps" would require a clear statement. *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 189 (S.D.N.Y. 2023) ("This question … of whether an industry subject to regulation is of 'vast economic and political significance' should not be

---

[15] CFTC, Transaction Dollar Volume, https://www.cftc.gov/MarketReports/ SwapsReports/L3TransDollarVol.html (last visited June 24, 2026).

13

resolved in a vacuum."). And in any event, the Supreme Court has never held that economic significance *alone* demands a clear statement.

**Federalism.** Tennessee's invocation of "structural federalism" also does not justify distorting the definition of "swap." "Gambling regulation," Tennessee says, "lies at the core of 'the police powers of a State.'" Tenn. Br. 37. Again, that begs the question whether event contracts are swaps or gambling—if swaps, they fall within the *CFTC's core jurisdiction*. *See* 7 U.S.C. § 2(a)(1)(A). Also: "the regulation of *interstate* gambling isn't a traditional area of state regulation." *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025).

**Implied Repeals.** Tennessee suggests in cursory fashion that treating sports event contracts as swaps would impliedly repeal various federal gambling statutes. Tenn. Br. 39. But if sports event contracts are swaps, there is no conflict, because federal gambling statutes do not capture CEA-regulated products in the first place. *See* 31 U.S.C. § 5362(1)(E) (CEA-regulated transactions are not bets or wagers).[16]

---

[16] The Indian Gaming Regulatory Act ("IGRA") is doubly inapplicable. "Everything—literally everything—in IGRA affords tools (for either state or federal officials) to regulate gaming *on Indian lands*, and nowhere else." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) (emphasis added). Thus, while IGRA covers "gaming activities that take place exclusively within Tribal lands," the UIGEA "cover[s] interstate … gaming transactions via the internet," *Blue Lake Rancheria v. Kalshi Inc.*, 2025 WL 3141202, at *6 (N.D. Cal. Nov. 10, 2025). And the latter expressly recognizes that CEA-regulated transactions are not gambling. *Id.*

14

***Congress Provided a Clear Statement.*** Even if a clear-statement rule applied, sports event contracts satisfy it. In the Special Rule, Congress allowed the Commission to prohibit "agreements, contracts, transactions, or swaps" based on an "occurrence, extent of an occurrence, or contingency" that "involve[s]" "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). These contracts, Senator Lincoln observed, could be constructed "around sporting events." 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010). Congress thus explicitly anticipated the potential for sports event contracts and placed them within the Commission's ambit.

Former Chairman Gensler nonetheless alleges from personal experience that no one in the Dodd-Frank Congress expected the Commission to regulate "sports betting." *See* Gensler Br. 3, 5, 7, 15, 21, 23; *see also QCX LLC v. Nessel*, No. 1:26-cv-710, R.41, PageID#1106 (W.D. Mich. June 17, 2026) ("Congress had nothing like Plaintiff's products in mind when it defined 'swap.'"). That is hard to square with the Special Rule and Senator Lincoln's remarks. Even so, the application of statutes "in situations not expressly anticipated by Congress" simply "demonstrates [the law's] breadth." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985); *see* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 101 (2012) (unexpected applications of broad language reflect only Congress's "presumed point of using general words [to] produce general coverage—not to leave room for courts to recognize ad hoc exceptions"). Congress wrote a broad definition

15

of "swap"—so broad that it encompasses contracts that "in the future become[]

commonly known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv), and could be

further expanded by rulemaking, 15 U.S.C. §§ 8302(d)(1), 8321(a)(2), (b). The

CFTC's jurisdiction over unexpected developments is a feature—not a bug—of

Dodd-Frank.

### C. Sports event contracts are known to the trade as swaps

Alternatively, sports event contracts are swaps because they are "commonly

known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv). Over the last two years,

DCMs have self-certified *hundreds* of sports event contracts as swaps.[17] This

includes not only comparatively new DCMs like Kalshi and Polymarket but also

CME, whose rulebook refers to "Event Contracts *Swaps*."[18] CBOE Global Markets

likewise acknowledged that event contracts can trade as swaps, and urged

certification of such contracts in order to promote "the Commission's goal of

fostering responsible innovation in the event contract space."[19] This evidence (just

---

[17] CFTC, Designated Contract Market Products, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts?Organization=&Type=&Status=Certified&Date_From=&Date_To=&Category=&Subcategory=&Show_All=0 (last visited June 24, 2026).

[18] CME Rulebook, Chapter 22 Event Contract Swaps, https://www.cmegroup.com/rulebook/CME/I/22.pdf (last visited June 24, 2026) (emphasis added).

[19] Letter from CBOE Global Markets to CFTC, Re: Advanced Notice of Proposed Rulemaking Relating to Prediction Markets (Release No. 9194-26; RIN 3038-AF65) (May 5, 2026).

the tip of the iceberg) offers yet another basis for classifying event contracts as swaps.

### D. Tennessee's theory would leave a gaping hole in federal regulation.

Although Tennessee only asks the Court to hold that *sports* event contracts are not swaps, nothing about its theory is confined to sports. If "outcomes" are not "events" (Tenn. Br. 25-27), or if an artificially "close[] connect[ion]" between the event and its economic consequences is required (*id.* 27-30), then event contracts tied to elections, weather, and governmental action are not swaps, either.

That would leave a massive regulatory vacuum. Event contracts, for all their advantages, pose significant risks of manipulation, and the CEA provides a comprehensive framework for mitigating potential abuses. For instance, DCMs that offer event contracts must comply with various core principles: they can only list "contracts that are not readily susceptible to manipulation," and they must have capacity to prevent market disruption, publish transaction data, ensure financial integrity in transactions, enforce disciplinary rules, and keep records. 7 U.S.C. § 7(d). None of these protections applies if event contracts are not swaps.

The CEA also equips the Commission with further tools to safeguard market integrity around event contracts subject to its jurisdiction. Under the Special Rule, it may prohibit event contracts involving "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar

17

activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.* § 7a-2(c)(5)(C). To that end, the Commission has proposed rulemaking deeming certain event contracts presumptively against the public interest—such as sports contracts based on player injuries, fights, and officiating outcomes, or contracts that pose national-security risks or are based on games of random chance. *See* 91 Fed. Reg. at 35,834-37. Indeed, under Chairman Gensler, the Commission exercised its Special Rule power to prohibit the North American Derivatives Exchange from offering structurally analogous event contracts involving election outcomes,[20] and under the prior Administration, the Commission was poised to ban NFL-related event contracts.[21] All this is contingent on event contracts coming within Commission's jurisdiction in the first place.

Furthermore, the Commission may bring enforcement actions for violations of the CEA or its regulations with respect to "any swap." 7 U.S.C. § 13a-1(a). Accordingly, the Commission has brought enforcement actions against individuals who illegally traded event contracts based on insider information, and these actions are predicated on the event contracts being subject to the CEA. *See CFTC v. Van*

---

[20] *In re: Self-Certification by Nadex*, Order Prohibiting the Listing or Trading of Political Event Contracts (Apr. 2, 2012), https://www.cftc.gov/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf.

[21] Statement of Commissioner Brian D. Quintenz on ErisX RSBIX NFL Contracts and Certain Event Contracts (Mar. 25, 2021), https://www.cftc.gov/PressRoom/SpeechesTestimony/quintenzstatement032521.

*Dyke*, No. 1:26-cv-3369 (S.D.N.Y.) (enforcement action against U.S. servicemember who used sensitive nonpublic information to trade event contracts related to the ouster of Venezuelan President Nicolás Maduro); *CFTC v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y.) (enforcement action against Google employee who used nonpublic information to trade event contracts related to Google's Year in Search list). The United States has also brought commodity-fraud charges against these persons—which, again, presupposes CEA coverage. *See United States v. Van Dyke*, No. 1:26-cr-156 (S.D.N.Y.); *United States v. Spagnuolo*, No. 1:26-mj-02020 (S.D.N.Y.). Further, the Commission can penalize persons who offer retail event contracts without registering as a DCM—indeed, the Commission fined Polymarket and ordered it to wind down its operations in the U.S. in 2022 for offering "swaps as defined by Section 1a(47) of the [CEA]" without registering with the Commission.[22] None of this oversight would be possible if event contracts lie outside the CEA.

The State amici nonetheless claim that the Commission has "no special expertise in regulating gambling," and thus has no business regulating sports event contracts. Dkt. 42 at 26. That has it backwards: *the States* lack experience regulating derivatives exchanges. Yet if the Court holds that event contracts are not swaps, it

---

[22] *In re: Blockratize, Inc.*, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Actions (Jan. 3, 2022), https://www.cftc.gov/media/6891/enfblockratize order010322/download.

will fall to the States to perform the Commission's traditional workload: licensing and monitoring exchanges, promulgating uniform rules, and bringing enforcement actions, potentially in conjunction with federal prosecutions. There is no reason to think the States are equipped for any of that.

In short, Tennessee's approach to defining "swap" would not merely permit States to apply their gambling laws against and collect revenue from the likes of Kalshi. It would rip significant regulatory authority from the federal government in favor of 50 state-level gambling commissions, leaving in its wake a tremendous vacuum in policing against market manipulation and abuse.

## II.    The CEA preempts state law as applied to event contracts on CFTC-regulated exchanges

Tennessee also disclaims the preemptive force of the CEA. That theory is far more sweeping than the State admits. If the CEA's grant of "exclusive jurisdiction" to the Commission, together with its comprehensive regulatory structure, is not preemptive, that means States could regulate or ban *any* type of swap—including interest-rate swaps, currency swaps, and energy swaps that undergird the modern financial system. Indeed, States could ban futures contracts altogether, as many did before derivatives regulation was federalized. *See* CFTC-Ohio Br. 3. Congress created the CFTC to avoid that very result. *American Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992) ("The Act's proponents

were concerned that the states … might step in to regulate the futures markets themselves.”).

### A. The CEA expressly preempts state regulation of derivatives transactions on DCMs

Congress granted the Commission "exclusive jurisdiction" over "transactions involving swaps," which precludes Tennessee's effort to regulate sports event-contract trading on DCMs. 7 U.S.C. § 2(a)(1)(A); *see* CFTC-Ohio Br. 17-21. The State's counterarguments are unavailing.

**1.** Tennessee first asserts that "all [§ 2(a)(1)'s] jurisdiction clause does is specify that the CFTC, and not the SEC, shall enforce the CEA." Tenn. Br. 46. That is patently wrong. In the very next sentence, Congress specified: "*Except as hereinabove provided*, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the [SEC] or other regulatory authorities under the laws of the United States *or of any State*, or (II) restrict the [SEC] *and such other authorities* from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A) (emphases added). Swap transactions are "hereinabove provided," meaning Congress "supersede[d]" and "limit[ed] the jurisdiction" of States, and "restrict[ed]" them "from carrying out their duties and responsibilities" as to those transactions. *Id.* That unmistakably reflects the preemptive nature of the exclusive-jurisdiction provision—if it weren't preemptive,

there would be no need for this savings clause. *KalshiEX, LLC v. Johnson*, 2026 WL 1223373, at *6 (D. Ariz. May 5, 2026).

The Seventh Circuit has said exactly that. "In order to give full effect to both the savings clause and the jurisdictional clause" in § 2(a)(1), it explained, "Congress intended to preempt some, but not all, state laws that bear upon the various aspects of commodity futures trading." *Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (citation modified). "Precisely, preemption is appropriate when application of state law would directly affect trading on or the operation of a futures market." *Id.* (citation modified); *see also Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (section "2(a)(1) of the CEA preempts the application of state law").

Tennessee nonetheless echoes the *Schuler* motions panel in calling § 2(a)(1) an "unusual" preemption provision.[23] Tenn. Br. 45. But if there is anything "unusual" about § 2(a)(1)(A), it is its robustness. Congress did not merely nullify inconsistent state law, as a "usual" preemption clause might. The CEA goes further by vesting sole *regulatory jurisdiction* in a federal agency, which displaces state law and generally displaces state enforcement. *Cf. Wells Fargo Bank, Nat'l Ass'n v. Lake of*

---

[23] Post-*Schuler*, the Western District of Michigan acknowledged that "the 'exclusive jurisdiction' clause limits the jurisdiction of state regulatory authorities to some degree," but it nonetheless held that the clause "is not best understood as an express preemption provision." *Nessel*, R. 41 at PageID#1121-22. That line lacks coherence: either the "exclusive jurisdiction" clause preempts state intrusions or it doesn't.

22

*the Torches Econ. Dev. Corp.*, 658 F.3d 684, 687 (7th Cir. 2011) (Class I gaming "is left entirely 'within the exclusive jurisdiction of the Indian tribes'" and thus "remains unregulated by state or federal law" (quoting 25 U.S.C. § 2703(6))). Congress reinforced that exclusivity elsewhere: the provision entitled "Jurisdiction of States" grants States limited authority to sue "any person" (but not "a contract market") for federal-law violations or breaches of generally applicable antifraud laws (but not gambling laws). 7 U.S.C. § 13a-2(1), (7). If States retained broad authority to enforce *their own laws* against derivatives trading, these narrow carveouts would be surplusage. These carveouts, moreover, are inapplicable here—Tennessee is (1) threatening to sue a contract market, (2) with state law other than generally applicable antifraud law, *contra id.*—which underscores the illegality of the State's enforcement approach.

**2.** Tennessee next observes that "the CEA contains two express-preemption clauses," which supposedly show that § 2(a)(1) is not preemptive. Tenn. Br. 48. Not so. *See* CFTC-Ohio Br. 20-21. In fact, § 16(e)(2) makes sense *only if* § 2(a)(1) is preemptive.

Section 16(e)(2) "supersede[s] and preempt[s] the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability)" for contracts that are "*excluded*" from the CEA or "*exempted*" by the Commission. 7 U.S.C. § 16(e)(2) (emphases

23

added). An "excluded" contract is, by definition, outside the Commission's exclusive jurisdiction. *Id.* §§ 2(c), (f), 27-27f. And the Commission's exemptive authority allows it to release certain contracts from CEA requirements. *Id.* § 6(c). Thus, § 16(e)(2) functions as a preemptive *backstop*: even for transactions largely beyond the CEA's purview, state gambling laws still cannot apply.

Tennessee's theory—that state gambling law is preempted only for contracts *beyond* the Commission's jurisdiction, but not contracts *within* its jurisdiction— makes no sense. If Congress preempted state gambling law even for excluded or exempted transactions, it follows *a fortiori* that it preempted state gambling law as to on-DCM transactions within the Commission's exclusive jurisdiction under § 2(a)(1).[24] *See* Barry Taylor-Brill, *Cracking the Preemption Code: The New Model*

---

[24] The history of § 16(e)(2) bolsters this. Before Dodd-Frank, swaps generally fell outside the CFTC's jurisdiction: former § 2(g) excluded swap transactions between "eligible contract participants" from the CEA's requirements. Yet even then, § 16(e)(2) preempted state gambling laws as to those excluded swap transactions. *See* 7 U.S.C. §§ 2(g), 16(e)(2) (2008). In short, state gambling law was unquestionably preempted for swaps between eligible contract participants.

Then in Dodd-Frank, Congress subjected all swaps to the Commission's exclusive jurisdiction and deleted the § 2(g) exclusion, which necessarily rendered § 16(e)(2)'s reference to § 2(g) swap transactions "obsolete." Taylor-Brill, *supra* at 9. Under Tennessee's interpretation, that change *eliminated* preemption of state gambling law for swaps—even as Congress placed swaps under exclusive federal supervision. That is implausible. The far more natural inference is that Congress left the CEA's preemption of state gambling law intact—and, in fact, extended its preemptive reach to *all* state law. *See id.* at 8 ("In using the CEA's exclusive jurisdiction clause to eliminate the ability of states to prohibit or otherwise regulate non-exempt swaps and swaps trading activities, Title VII extended the preemptive effect of the CEA to any state laws.").

*for OTC Derivatives*, 13 Va. L. Bus. Rev. 1, 6 (2019) ("Exclusive jurisdiction under section 2(a)(1)(A) is also preemptive jurisdiction; it has a much broader preemptive reach than gaming and bucket shop law-style preemption under section 12(e)(2)(B), which covers only excluded or exempt contracts over which the CFTC would [generally] have no jurisdiction.").

The remainder of § 16(e) confirms this reading. Section 16(e)(1) provides that "[n]othing in this chapter shall supersede or preempt … the application of any … State statute (*except as provided in paragraph (2)*) … to any transaction … that is *not* conducted on or subject to the rules of a [DCM]." 7 U.S.C. § 16(e)(1)(B) (emphases added). In other words, for *off-DCM* transactions, state law—though not state gambling law—remains available. For that savings clause to do any work, it necessarily follows that *on-DCM* transactions are subject to federal law only. And there is more: when Congress added "swaps" to the Commission's exclusive jurisdiction, it deliberately chose *not* to make § 16(e)(1) applicable to swaps. *See id.* § 2(d) ("Nothing in this chapter … governs or applies to a swap" except various provisions, including § 16(e)(2) but not § 16(e)(1).); Taylor-Brill, *supra* at 6 ("The exclusion of swaps from section 12(e)(1) was a clear expression of congressional intent as to how the new preemption model is supposed to work under section 2(a)(1)(A).").

Thus, the net effect of § 16 is to preserve (1) some state law, but not gambling law, (2) with respect to non-swap transactions, (3) conducted off DCMs. It therefore must be true that (1) state gambling law, (2) with respect to swap transactions, (3) conducted on DCMs, lies in the CEA's preemptive heartland. *See* 73 Fed. Reg. 25,669, 25,673 (May 7, 2008) (Section 16(e) "generally provides that the CEA supersedes and preempts other laws, including state and local gaming and bucket shop laws, with respect to transactions executed on or subject to the rules of a Commission-regulated market").

## B. The CEA preempts the field of on-DCM trading

Tennessee also claims field preemption does not apply because "[t]he CEA contains numerous clauses affirmatively inviting State participation." Tenn. Br. 49. But that misconceives the relevant field. As the Third Circuit explained, the pertinent field is "the regulation of trading on a DCM (a form of futures trading)," which Congress has subjected to entirely to federal regulation. *Flaherty*, 172 F.4th at 229. The CEA provisions that acknowledge potential for State participation reinforce this:

- Section 2(a)(1) subjects on-DCM swap transactions to the Commission's exclusive jurisdiction, and States retain regulatory jurisdiction only "[e]xcept as hereinabove provided"—thus, on-DCM swap transactions are *not* subject to state regulatory jurisdiction.

26

- Section 16(e)(1) insulates state laws for certain *off-DCM* transactions—ipso facto, *on-DCM* transactions are not susceptible to state law. And this carveout does not even apply to swap transactions, further bolstering preemption. 7 U.S.C. § 2(d).

- Section 13a-2(1) permits a State to sue "any person," but not a "contract market," for violations of the CEA and CFTC regulations, but not state law.

Thus, although the CEA preserves limited areas of state involvement, the field of on-DCM swap transactions is exclusively federal.

### C. Tennessee's enforcement effort is conflict-preempted

**1.** To defeat conflict preemption, Tennessee argues that sports event contracts are already "barred" under Commission Rule 40.11, which it claims "categorically bans" any contract that involves "gaming." Tenn. Br. 52-53, 58. But Rule 40.11 implements the statutory Special Rule, which provides that "the Commission may determine" that certain event contracts "are contrary to the public interest" if they involve "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). As the Commission recently explained, "[i]nterpreting that 'may' as a *per se* prohibition would conflict with the requirements of the statute." 91 Fed. Reg. at 35,815. Rather, the Special Rule "confers discretion to determine that a particular event contract is, or is not, contrary to the public interest." *Id.* The Commission has thus proposed to align Rule 40.11 with the statute, establishing a contract-by-contract public-interest framework. *Id.* at

27

35,859–61. Sports event contracts are thus not "categorically ban[ned]" by federal law. Tenn. Br. 52.

Even if one were to adopt Tennessee's reading of Rule 40.11, its effect would not be relevant here. The Commission's authority to prohibit event contracts involving "gaming" does not remove a contract from its jurisdiction, much less authorize Tennessee to require DCMs to obtain "a license and pay[] taxes" as a condition of listing federally regulated swaps. Tenn. Br. 54; *see also id.* at 68 ("[E]ach day Kalshi refuses to pay wagering tax[es], it deprives Tennessee of revenue.").

**2.** Finally, if Kalshi stopped listing its event contracts in Tennessee at the State's behest, it would necessarily violate the Commission's impartial-access rule by discriminating between Tennesseans and non-Tennesseans. CFTC-Ohio Br. 23-24. Tennessee finds it speculative whether the Commission would enforce this requirement, Tenn. Br. 56, but that only underscores the conflict: Tennessee's argument assumes that the Commission would relax *federal* requirements to accommodate *state law*—a direct contravention of the principle of federal supremacy.[25]

---

[25] Tennessee's suggestion (at 56-57) that federal regulations cannot preempt state law is simply wrong. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes.").

28

## CONCLUSION

The Court should affirm.


Dated: June 24, 2026                    Respectfully Submitted,

*/s/ Henry J. Dickman*
Henry J. Dickman

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel
ANNE STUKES
Senior Assistant General Counsel

U.S. Commodity Futures Trading
Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 418-5607
Fax:  (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov
astukes@cftc.gov

29

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Fed. R. App. 29(a)(5), the foregoing brief complies with the type-volume limitations, in that it has 6,490 words (excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1)).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in proportionally spaced typeface using Microsoft Word 365 and is set in 14-point sized Times New Roman type style.

*/s/ Henry J. Dickman*

30

**CERTIFICATE OF SERVICE**

I certify that on June 24, 2026, I electronically filed this Brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system and thereby served all participants in the case who are registered CM/ECF users.

*/s/ Henry J. Dickman*