No. 26-5235

# In the United States Court of Appeals for the Sixth Circuit

———

KALSHIEX LLC,

*Plaintiff-Appellee,*

v.

WILLIAM ORGEL, *in his official capacity as Chairman of the Tennessee Sports Wagering Council*; MARY BETH THOMAS, *in her official capacity as the Executive Director of the Tennessee Sports Wagering Council*; JONATHAN SKRMETTI, *in his official capacity as Attorney General of Tennessee,*

*Defendants-Appellants.*

———

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville, No. 3:26-cv-34

———

## BRIEF OF AMICUS CURIAE PARADIGM OPERATIONS LP IN SUPPORT OF APPELLEE KALSHIEX LLC AND AFFIRMANCE

———

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
josh@lkcfirm.com

Steven P. Lehotsky
  *Counsel of Record*
Rick W. Eberstadt
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number:  26-5235                    Case Name:  KalshiEX LLC v. William Orgel et al.

Name of counsel:  Steven P. Lehotsky

Pursuant to 6th Cir. R. 26.1, Paradigm Operations LP
*Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

---

CERTIFICATE OF SERVICE

I certify that on _____ June 24, 2026 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Steven P. Lehotsky

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08                                                                                      Page 1 of 2

TABLE OF CONTENTS

Page

Circuit Rule 26.1 Disclosure Statement ................................................................ ii

Table of Authorities ............................................................................................ iv

Interest of Amicus Curiae .................................................................................... 1

Introduction & Summary of the Argument ........................................................ 2

Argument ............................................................................................................. 5

  I.  Congress preempted state regulation of instruments within the CFTC's jurisdiction. ........................................................................ 5

    A.  Over the last century, Congress brought a largely unregulated market under a single federal regulatory regime. ............................................................................................ 6

    B.  Congress responded to nationwide regulatory confusion by making preemption of state regulations a central pillar of the 1974 CFTC Act. .............................................................. 10

    C.  The 1978 CEA amendments affirmed the CFTC's exclusive jurisdiction over futures. ................................................ 16

    D.  The 2010 Dodd-Frank Act extended the CFTC Act's preemptive reach to swaps. ............................................................ 18

  II.  Event contracts on designated contract markets fall within the CFTC's "exclusive jurisdiction." ...................................................... 20

    A.  Federal law preempts the State from applying its sports wagering laws against Kalshi. .......................................................... 21

    B.  The State's contrary arguments fight the plain meaning of federal law, and all fail. ............................................................. 24

Conclusion ......................................................................................................... 31

Certificate of Compliance .................................................................................. 32

Certificate of Service .......................................................................................... 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barton v. Barr,*
590 U.S. 222 (2020) ......................................................... 30

*Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.,*
198 U.S. 236 (1905) ......................................................... 8

*CFTC v. Erskine,*
512 F.3d 309 (6th Cir. 2008) .......................................... 26

*CFTC v. Trade Exch. Network Ltd.,*
117 F. Supp. 3d 29 (D.D.C. 2015) .................................. 27

*In re Corrin,*
849 F.3d 653 (6th Cir. 2017) .......................................... 21

*Dickson v. Uhlmann Grain Co.,*
288 U.S. 188 (1933) ......................................................... 9

*Gatewood v. North Carolina,*
203 U.S. 531 (1906) ......................................................... 6

*KalshiEX LLC v. CFTC,*
2024 WL 4164694 (D.D.C. Sept. 12, 2024) .................... 27

*KalshiEX, LLC v. Flaherty,*
172 F.4th 220 (3d Cir. 2026) ........................ 3, 22, 23, 24, 30

*MacDonald v. Gessler,*
57 A. 361 (Pa. 1904) ....................................................... 6

*North Carolina v. McGinnis,*
51 S.E. 50 (N.C. 1905) .................................................. 6, 8

*Ohio Telecom Ass'n v. FCC*,
    150 F.4th 694 (6th Cir. 2025) ........................................................... 30

*Rice v. Bd. of Trade of Chi.*,
    331 U.S. 247 (1947) ......................................................................... 10

*United States v. Phillips*,
    155 F.4th 102 (2d Cir. 2025)...................................................... 22, 29

*Williams v. Taylor*,
    529 U.S. 420 (2000) ......................................................................... 21

## Statutes and Legislation

7 U.S.C. § 1a ..................................... 3, 4, 15, 20, 21, 23, 27, 28, 29, 30

7 U.S.C. § 2 ................................................................... 2, 20, 25

Futures Trading Act of 1978,
    Pub. L. No. 95-405, 92 Stat. 865 (1978).......................................... 17

Commodity Exchange Act,
    Pub. L. No. 74-675, 49 Stat. 1491 (1936)..................................... 9, 10

Commodity Futures Trading Commission Act of 1974,
    Pub. L. No. 93-463, 88 Stat. 1389 (1974)......................................... 15

Dodd–Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010)..................................... 19

Grain Futures Act of 1922,
    Pub. L. No. 67-331, 42 Stat. 998 (1922)........................................... 9

## Regulations

*Concept Release*, 73 Fed. Reg. 25,669 (May 7, 2008) ......................... 28

*Further Definition of "Swap,"* 77 Fed. Reg. 48,208 (Aug. 13, 2012).................. 25

*Statement of Policy Concerning Swap Transactions*,
54 Fed. Reg. 30,694 (July 21, 1989) ................................................. 19

**Other Authorities**

93 Cong. Rec. S16133 (1974) ............................................................... 14

119 Cong. Rec. 41333 (1973) ............................................................... 11

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model
for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1 (2019) ............................. 19, 20

Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks
if the Knicks win. Its owner is using Kalshi to hedge the risk.*, Bus.
Insider (June 2, 2026) ........................................................................ 23

Black's Law Dictionary (12th ed. 2024) ............................................... 27

*CFTC Act of 1974: Statement by the President on Signing the Bill
Into Law*, 10 Wkly. Comp. of Pres. Docs. (No. 44) (1974) ......................... 15

*Commodity Futures Trading Commission Act: Hearings Before the S.
Comm. on Agric. & Forestry*, 93d Cong. 396 (1974) .................................... 12

David Hochfelder, *"Where the Common People Could Speculate":
The Ticker, Bucket Shops, and the Origins of Popular
Participation in Financial Markets, 1880-1920*,
93 J. Am. Hist. 335 (2006). ................................................................... 7

*Extend Commodity Exchange Act: Hearings on H.R. 10285 Before
the Subcomm. on Conservation & Credit of the H. Comm. on
Agric.*, 95th Cong. 80 (1978) ................................................................ 16

H.R. Rep. No. 93-975 (1974) ............................................................... 12, 13

John Hill, Jr., *Gold Bricks of Speculation* (1903) ................................... 7

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*,
58 Chi.-Kent L. Rev. 657 (1982) .............................. 7, 8, 9, 12, 13, 14, 15, 17

Michael Greenberger, *Overwhelming a Financial Regulatory Black Hole with Legislative Sunlight*, 6 J. Bus. & Tech. L. 127 (2011) .................... 18

Oxford English Dictionary Online (Rev. 2018) ................................................ 22

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1 (1976) ....................... 14

*Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong. 10 (1973) ................................................................................................. 11, 12

S. Rep. No. 93-1131 (1974) ................................................................................ 13

S. Rep. No. 93-1194 (1974) ................................................................................ 14

S. Rep. No. 95-850 (1978) ....................................................................... 17, 18, 23

Telford Taylor, *Trading in Commodity Futures—A New Standard of Legality?*, 43 Yale L.J. 63 (1933) ................................................................... 9

Webster's Third New Int'l Dictionary (1993) ................................................... 22

**INTEREST OF AMICUS CURIAE**

Paradigm Operations LP ("Paradigm") is a research-driven investment firm that backs entrepreneurs, companies, and protocols at the frontier of innovation. As a frontier-technology investment firm that invests and builds in crypto, AI, robotics, and across new frontiers from the earliest stages, Paradigm has an interest in this case because prediction markets are a cutting-edge application of crypto technology and are driving innovation in a field in which Paradigm invests.

Recently, Paradigm invested in Kalshi because of its leadership in the prediction market space. Paradigm also has an interest in supporting the broad availability of regulated prediction markets, which are a valuable source of public information and allow market participants (including investors and entrepreneurs) to hedge exposure to specific events. As a market participant in this developing field, Paradigm brings a valuable perspective and a wealth of experience to this case.[1]

---

[1] The undersigned counsel certifies that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money intended to fund the preparation or submission of this brief; (3) no person

### INTRODUCTION & SUMMARY OF THE ARGUMENT

For more than a century, Congress has worked steadily to ensure exclusive federal control of futures markets. That effort began in the early 20th century when—in response to complaints of "gambling in grain" that echo clearly in Tennessee's argument here—Congress first attempted to override a patchwork of "bucket-shop" laws. After those initial efforts proved insufficient, Congress emphatically declared that the Commodity Futures Trading Commission ("CFTC") had "exclusive jurisdiction" over derivatives in 1974, granting the then-new agency express jurisdiction over a wide swath of predictive financial instruments. 7 U.S.C. § 2(a)(1)(A).

Far from retreating from that position, Congress has since expanded the CFTC's "exclusive jurisdiction" to include some of the newest futures instruments, including the event contracts Kalshi offers. Nonetheless, Tennessee rejects the plain text of the Commodity Exchange Act ("CEA"), ignores a century of clear legislative direction, and seeks to prohibit those

---

other than amicus curiae, its members, or its counsel contributed money intended to fund the preparation or submission of this brief; and (4) all parties have consented to this brief's filing. *See* Fed. R. App. P. 29(a)(4)(E)

contracts here. The district court correctly recognized that Congress preempted those efforts, and this Court should affirm.

Though derivatives have changed form, States' objections to them have not. What the CFTC regulates as financial instruments States have often called "gambling." The State reasserts that same argument here, mimicking objections that long precede the CFTC: When farmers traded the first futures contracts on Chicago exchanges in the 19th century, the States called that gambling, too. Congress quashed those objections in a series of actions that brought derivatives regulation within federal law's exclusive ambit. In particular, Congress gave the CFTC "exclusive jurisdiction" over swaps, which include "any contract" providing for a purchase or sale that depends on "the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" that is "*associated* with a *potential* financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii) (emphasis added). A "plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within" that "statutory definition." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227 (3d Cir. 2026) (citation omitted).

The State's counterarguments are unavailing. The State equates Kalshi's sports-event contracts to gambling and suggests that CFTC preemption would preempt all state gambling laws. Br.37-38. But neither the text nor practice support the State's concern, because States remain free to regulate sports gambling that Congress has not directly preempted. Nor does the State's distinction between an "outcome" and an "occurrence" carry weight, because the State creates a false dichotomy between events—like a team's victory, or an individual athletic performance—that can be both.

The State's arguments that sports events lack economic significance (Br.29) miss the mark. To begin, the CEA does not require an event to have an "inherent" financial consequence. Instead it requires only that the event be "*associated* with a potential financial, economic, or commercial consequence"—the polar opposite of the extratextual inherency requirement the State seeks to impose. 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). Nor does the CEA require every trader to enter the market for hedging purposes. Derivatives markets have long included both hedgers and speculators. In any event, sporting outcomes can affect ticket and merchandise sales,

sponsorships, investments, tourism, television deals, local economies, and employment, creating economic exposures that sponsors, advertisers, and many others may wish to hedge. Finally, Kalshi's reading creates no surplusage. Congress drafted the swap definition broadly and with deliberate overlap, and Kalshi's interpretation follows the CEA's text.

This Court should affirm.[2]

## ARGUMENT

### I. Congress preempted state regulation of instruments within the CFTC's jurisdiction.

The 20th century repeatedly saw States undertake efforts to prohibit investors and businesses from engaging in what the States called unlawful gambling, but what we now call well-established financial products. Not surprisingly, decades of problems resulted from that patchwork system and, as a result, Congress passed the Commodity Futures Trading Commission Act of 1974, over States' objections, to bring order and national uniformity. Since then, Congress has only strengthened the CFTC Act's preemptive

---

[2] The arguments in this brief apply with equal force and support reversal in the companion case, *KalshiEX LLC v. Matthew Schuler*, No. 26-3196.

5

scope by granting the CFTC exclusive jurisdiction and expanding its authority to new financial instruments. Each step forward has untangled a morass of state laws that conflict with the CFTC's "exclusive jurisdiction," and each step backward—a direction Tennessee asks this Court to take—risks a return to that tried-and-failed system.

### A.    Over the last century, Congress brought a largely unregulated market under a single federal regulatory regime.

**1.** Futures-market regulations began in the early 20th century with States' efforts to pass "bucket-shop" laws. This term referred to shops at which investors would place "'bets or wagers, usually for small amounts, on the rise or fall of the prices of stocks, grain, oil, etc.,'" without facilitating the actual "'transfer or delivery of the stock or commodities nominally dealt in.'" *Gatewood v. North Carolina*, 203 U.S. 531, 536 (1906) (quoting *North Carolina v. McGinnis*, 51 S.E. 50, 51 (N.C. 1905)); *see, e.g.*, *MacDonald v. Gessler*, 57 A. 361, 362 (Pa. 1904) (presenting argument that "bucket shop" customers would "gamble upon stocks" without "purchasing [them] outright"). As with the event contracts at issue in this case, these early risk-management

6

practices were popular among customers but controversial among the States.

"Bucketeers," as they were known, faced public scrutiny and drew public officials' ire. For example, a Chicago Board of Trade member called bucket-shops "a gambling den," and his anti-bucket-shop book referred to their owners as "a class of vampires" akin to "the highwayman or the burglar." John Hill, Jr., *Gold Bricks of Speculation* pp. xv, 20 (1903). The "bucket-shop" name itself came from a derogatory term for shops that sold "drained beer kegs thrown out by pubs." David Hochfelder, *"Where the Common People Could Speculate": The Ticker, Bucket Shops, and the Origins of Popular Participation in Financial Markets, 1880-1920*, 93 J. Am. Hist. 335, 335 (2006).

States targeted this practice and passed laws that "treated 'bucketing'" as if it were "a form of gambling[.]" Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 663 (1982) ("Van Wart, *Preemption*"). They made these "futures contracts criminally illegal where the parties to the agreement never intended delivery of the underlying

7

commodity but were dealing only for its prospective rise or fall in price." *Id.*; *see*, *e.g.*, *McGinnis*, 51 S.E. at 51 (describing North Carolina's 1905 anti-bucket-shop law); 1923 N.J. Laws 125 (New Jersey's similar law).

But States' bucket-shop laws were poorly tailored for their purpose given that, even at the time, "actual delivery on futures contracts occurred on less than three percent of all such transactions." Van Wart, *Preemption* at 664. As a result, the Supreme Court quickly pushed back against the "rigid, if not unthinking, application of legislation such as bucket-shop statutes" to contracts that divorced trading from physical delivery. Van Wart, *Preemption* at 665. In a case challenging the Chicago Board of Trade as a bucket-shop, the Supreme Court explained that futures contracts serve "a legitimate and useful purpose" by allowing customers to "secure themselves against the fluctuations of the market by counter contracts for the purchase or sale." *Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 249 (1905). Nonetheless, courts continued to wrestle with States' bucket-shop laws as applied to various futures contracts.

**2.** Congress intervened in 1922 by enacting the Grain Futures Act, the first modern financial regulatory law and the precursor to the CFTC's modern regulation of designated contract markets. The Grain Futures Act made it a misdemeanor to execute certain grain futures contracts except through exchanges designated by the Secretary of Agriculture. *See* Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922). But the Supreme Court later held that Congress had failed to preempt state laws that prohibited gambling in grain futures. *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933). Contemporary commentators feared that the result of that decision would be to unleash States against futures traders and "render speculation impossible, hedging illegal, and subject all brokers to criminal liability." Telford Taylor, *Trading in Commodity Futures—A New Standard of Legality?*, 43 Yale L.J. 63, 101 (1933).

Congress responded by enacting the Commodity Exchange Act ("CEA"). *See* Pub. L. No. 74-675, 49 Stat. 1491 (1936). The Act expanded federal regulation to activities that might "affect [futures] trading on the futures exchanges." Van Wart, *Preemption* at 669. The Act also liberalized

9

speculative investing by prohibiting only *"[e]xcessive* speculation in any commodity under contracts of sale of such commodity for future delivery made on or subject to the rules on contract markets causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity." 49 Stat. at 1492 (emphasis added).

Yet Congress again failed to include an express preemption provision, so a decade later the Supreme Court again held that the Commodity Exchange Act did not preempt state trade laws. *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247 (1947). The Court explained that the Act "[p]reserv[ed] state control in two areas where state and federal law overlap," thereby allowing States to enforce their own regulations absent direct "conflict with the federal law." *Id.* at 255-56. Largely due to *Rice*, commodity futures were almost entirely self-regulated (or, in some instances, state-regulated) into the 1970s.

**B.    Congress responded to nationwide regulatory confusion by making preemption of state regulations a central pillar of the 1974 CFTC Act.**

Despite giving the States a three-decade period in which to get it right, Congress ultimately, and unequivocally, acknowledged that the lack of

federal preemption created substantial problems. In 1973, House Agricultural Committee Chairman Bob Poage explained that "many State laws are exercising jurisdiction over these same markets to fill what had become a vacuum of regulation," resulting in "[v]aried and often conflicting regulation" that "could become a burden on commerce, if it is not already." 119 Cong. Rec. 41333 (1973).

As a result, both the Senate and House held hearings on the subject, at which elected officials, witnesses, and other stakeholders reiterated to Congress that federal preemption was necessary:

- Congressman Neal Smith recommended "that trading in all futures should be under Federal regulation."[3]
- The chairman of the Chicago Board of Trade suggested giving "the commodity regulatory agency exclusive jurisdiction over futures trading" to "prevent any possible conflicts over jurisdiction over futures trading."[4]
- New York commodities exchange executives explained that the commodities industry had been mired in confusion, conflict, and mounting legal fees because federal law was "virtually silent" on commodities regulation, so it was "extremely important that

---

[3] *Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong. 10 (1973) (statement of Rep. Smith).

[4] *Id.* at 128 (statement of Mr. Uhlmann).

11

federal policy regarding commodities futures trading be uniform throughout the United States."[5]

- A Minnesota commodities exchange executive said that "State legislation would make an impossible situation for exchanges,"[6] agreeing that "[f]ederal legislation really ought to preempt State legislation" to avoid "50 different States legislating in this area."[7]

- Senate witnesses highlighted the need for "federal legislation" to "preempt the States," as failure to give the CFTC exclusive jurisdiction would result in "confusion" and a regulatory "nightmare" for exchanges.[8]

Chairman Poage introduced H.R. 11955 to amend the Commodity Exchange Act on "the basis of these hearings." Van Wart, *Preemption* at 675. As the committee developed the bill's first preemption provisions, "[r]ecognition of the need for exclusive federal jurisdiction pervaded" the committee report. *Id.* at 677-78. The committee explained that "[i]t is abundantly clear that all futures trading must be brought under a single regulatory umbrella." H.R. Rep. No. 93-975, at 41-42 (1974).

---

[5] *Id.* at 121 (statement of Mr. Clark).

[6] *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 396 (1974) (statement of Mr. Donahoo).

[7] *Id.* (statement of Sen. Clark).

[8] Van Wart, *Preemption* at 682-83 (collecting cites from 1974 S. Comm. Hearings, *supra* n.6).

Thus, the bill "provide[d] for the *exclusive jurisdiction of the CFTC* over all futures transactions and all cash transactions related thereto which are executed on not only domestic boards of trade but also on any other board of trade, exchange, or market." *Id.* at 7-8 (emphasis added). The committee's express purpose was to "put all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." *Id.* at 76. It was therefore "apparent that the committee intended that the proposed amendments to the CEA would serve as a check on renewed state regulatory efforts." Van Wart, *Preemption* at 678.

The Senate went even further, adding "clarifying amendments" confirming that "the Commission's jurisdiction over futures contract markets or other exchanges is exclusive," and stating that the Commission's jurisdiction "supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6, 23 (1974). The Senate conference report explained that this "exclusive grant of jurisdiction to the Commission" meant that CEA authority "would preempt the field," including preempting "any substantive State law regulating futures trading that was contrary to or

13

inconsistent with Federal law." S. Rep. No. 93-1194, at 35-36 (1974). The conference committee did "not contemplate that there will be a need for any supplementary regulation by the States." *Id.* at 36. The Senate rejected an amendment that would have created a presumption against impairing applicable state laws, 93 Cong. Rec. S16133 (1974), and the "major feature of the proposed [Senate] amendments" was to bring "all commodities under federal regulatory authority," Van Wart, *Preemption* at 685-86.

When Congress reconciled the two bills, "the Senate version prevailed in the Conference," with one exception: "the House's language bringing all domestic and foreign commodity markets under the CFTC's exclusive jurisdiction was accepted in lieu of the Senate's narrower provision limiting that exclusive authority to "'contract markets.'" Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 17 (1976). In other words, it was "clear that the conferees intended the CFTC to be the sole regulatory authority for the futures industry." *Id.* at 18.

14

Congress thus passed the CFTC Act, giving the CFTC "exclusive jurisdiction" over "accounts, agreements and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated" under the Act. Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389 (1974). The Act passed with an overwhelming 281-43 margin in the House and by voice vote in the Senate. *Id.* It "wholly and unequivocally eliminated each of the bases the Supreme Court had relied on in *Rice v. Board of Trade* to hold that the CEA did not preempt state regulation of commodities trading." Van Wart, *Preemption* at 692-93. The Act also enlarged the definition of "commodity" to include not only agricultural products but also "all other goods and articles and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt." 7 U.S.C. § 1a(9).

President Ford explained in signing the CFTC Act that he "fully support[ed]" the "new regulatory structure to apply to all commodity futures trading." *CFTC Act of 1974: Statement by the President on Signing the Bill Into Law*, 10 Wkly. Comp. of Pres. Docs. (No. 44), at 1366 (1974).

15

**C.    The 1978 CEA amendments affirmed the CFTC's exclusive jurisdiction over futures.**

The House Subcommittee on Conservation and Credit soon held hearings at which witnesses further underscored the common understanding that Congress had deprived States of regulatory power over the commodity-futures market. These 1978 hearings and the subsequent amendments to the Commodity Exchange Act revealed wide agreement that the Act had broad preemptive effects. In the witnesses' words:

- The CFTC Commissioner explained that "[t]he idea behind the exclusive jurisdiction provisions of the Commission was to simplify and centralize regulation of the commodity market."[9]

- A Texas securities commissioner complained that the "grant of exclusive jurisdiction to the CFTC" had "dismantled" Texas's regulations to "polic[e] the commodity option problem."[10]

- The Minnesota Secretary of State asked Congress to "abolish the exclusive jurisdiction of the CFTC and the consequent preemption of state action against commodity-related fraud."[11]

---

[9] *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th Cong. 80 (1978) (statement of Mr. Rainboldt).

[10] *Id.* at 364 (prepared statement of Mr. Latham).

[11] *Id.* at 379 (prepared statement of Mr. Guzzi).

16

- There was "virtual unanimity among participants in the [House and] Senate hearings that the 1974 amendments had preempted a state regulatory role." Van Wart, *Preemption* at 712.

Given this agreement, the Senate committee report urged even clearer, stronger federal regulation in anticipation of market changes. *See* S. Rep. No. 95-850, at 22 (1978). Congress obliged when it reauthorized the CFTC, and though it granted States a new limited role—permitting them to bring *parens patriae* actions for certain CEA regulations—it expressly excluded "contract market[s]" from States' limited enforcement power. Futures Trading Act of 1978, Pub. L. No. 95-405, § 15, 92 Stat. 865, 872 (1978).

The accompanying Senate report observed that Congress was "aware[] that futures markets would not remain static." S. Rep. No. 95-850, at 22 (1978). New technologies and financial instruments required more CFTC regulatory authority and flexibility, so the Senate explained that whenever "the futures contract serves a legitimate function, Congress has vested the Commodity Futures Trading Commission with jurisdiction." *Id.* Congress did not limit that jurisdiction to then-existing forms of hedging or

17

risk management. Instead, it vested the CFTC with authority broad enough to accommodate new instruments and evolving market uses.

Here again, Congress's focus was not whether every market participant used a contract to hedge an existing exposure, but whether the instrument belonged within the federally regulated derivatives markets. Congress entrusted that determination to the CFTC, not to fifty state regulators applying divergent views about which contracts are sufficiently connected to economic risk. Indeed, the committee clarified that "[t]he States would not, in these actions, be involved in enforcement of their local laws" regulating futures. *Id.* at 25.

### D.    The 2010 Dodd-Frank Act extended the CFTC Act's preemptive reach to swaps.

In the 1980s, swaps gained traction as a popular variant of derivative. Michael Greenberger, *Overwhelming a Financial Regulatory Black Hole with Legislative Sunlight*, 6 J. Bus. & Tech. L. 127, 131-32 (2011) ("Greenberger, *Overwhelming*"). The CFTC initially defined "swaps" through rulemaking: "an agreement between two parties to exchange a series of cash flows measured by different interest rates, exchange rates, or prices with payments

calculated by reference to a principal base (notional amount)." *Statement of Policy Concerning Swap Transactions*, 54 Fed. Reg. 30,694, 30,695 (July 21, 1989). But over time, the industry developed more complex variants that became increasingly popular. *See* Greenberger, *Overwhelming* at 136-43.

Congress stepped in again after the 2008 financial crisis, this time to "transform[] the regulation of OTC derivatives." *Id.* at 152. The Dodd-Frank Wall Street Reform and Consumer Protection Act created statutory definitions for a "swap," "swap dealer," and other key terms. Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 721, 124 Stat. 1376 (2010). The Act also imposed a variety of restrictions, including that swap dealers had to register with the CFTC, which in turn was empowered to make rules regarding those dealers. *Id.* § 731(a), (b).

Once again Congress "revisited the question of state law preemption." Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 2 (2019) ("Taylor-Brill, *Preemption Code*"). And once again Congress clarified that it preempted state law, granting the CFTC "*exclusive jurisdiction*" over transactions "involving swaps or contracts

19

of sale of a commodity for future delivery . . . , traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A) (emphasis added).

The law is the same today, putting swaps "on the same exclusive jurisdictional footing as exchange-traded commodity futures." Taylor-Brill, *Preemption Code* at 3. The CFTC has a "congressional mandate to carry out regulation of the swap markets under federal law free from potential state interference, potentially including a patchwork of conflicting laws." *Id.* at 13.

## II.   Event contracts on designated contract markets fall within the CFTC's "exclusive jurisdiction."

Whatever twists and turns the history took, the end result is clear: the CEA grants the CFTC "exclusive jurisdiction" over "swaps" that are "traded or executed on a [designated] contract market." 7 U.S.C. § 2(a)(1)(A). And swaps include "any contract" providing for "any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" that is "associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A), (A)(ii). The State's contrary position reprises a familiar argument, deriding derivatives as gambling and seeking to regulate them

20

under state law. Congress has rejected that view, and this Court should do the same because all the State's arguments to the contrary are unavailing.

### A. Federal law preempts the State from applying its sports wagering laws against Kalshi.

Statutory interpretation begins "with the language of the statute." *Williams v. Taylor*, 529 U.S. 420, 431 (2000). This Court "examines the plain meaning of [the Act's] words." *In re Corrin*, 849 F.3d 653, 657 (6th Cir. 2017). The question, then, is not whether Tennessee believes these contracts resemble gambling or whether individual market participants have a subjective purpose that is closer to hedging than speculation. It is whether Congress assigned that classification decision to the States or to the CFTC— and the history recounted above shows Congress repeatedly chose the latter.

The statutory analysis is straightforward: sports-event contracts depend upon the occurrence, nonoccurrence, or extent of an event— something that happens—and here that event is at least "associated" with a "potential" financial, economic, or commercial consequence. 7 U.S.C. § 1a(47)(A), (A)(ii). That breadth is consistent with Congress's longstanding preference for federal regulation of evolving derivatives markets rather than

21

state-by-state determinations of which instruments are sufficiently useful or distinct from gambling in each State's view. Thus, as the Third Circuit has already held, a "plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition" of swaps. *Flaherty*, 172 F.4th at 227 (citation omitted). This Court "need not go further." *Id.* at 228. It is sufficient that "Kalshi's sports-related event contracts are traded on a CFTC-licensed DCM and depend on event outcomes associated with economic consequences," and therefore "fit within the Act's definition of 'swaps' subject to the CFTC's jurisdiction." *Id.* at 227-28.

That plain reading of the statute also comports with deeper analysis of statutory definitions. "Event" is a word with a broad definition, including "something that happens," Webster's Third New Int'l Dictionary 788 (1993), and something that "takes place, esp. something significant or noteworthy; an incident, an occurrence," Oxford English Dictionary Online (Rev. 2018). Were there any doubt, courts' recognition that Congress "defined 'swap' broadly" under the statute, *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025), resolves it.

22

Application of this textual analysis to Kalshi's sports contracts clarifies that federal law categorizes them as swaps. These contracts depend upon events, and those events are "associated with" a "potential" economic or financial consequence. 7 U.S.C. § 1a(47)(A). Athletic performances and scores have substantial financial and economic consequences for television networks, streaming services, sponsors, vendors, neighborhoods, and many others.[12] Any given sports contract is at least "associated" with a "potential" such consequence. Members of Congress anticipated such results when they recognized that derivatives markets would "not remain static" and would instead evolve beyond the traditional agricultural contracts that prompted federal regulation in the first place. S. Rep. No. 95-850, at 22 (1978). Under the Act's plain text, then, a regulated "'swap' includes event contracts." *Flaherty*, 172 F.4th at 226. When those swaps occur as event contracts on a DCM, they fall under the CFTC's exclusive jurisdiction, 7 U.S.C. § 1a(47)(A), and the State's efforts to regulate them are therefore preempted.

---

[12] *See, e.g.*, Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win. Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/FE95-K7LR.

**B.    The State's contrary arguments fight the plain meaning of federal law, and all fail.**

Although the plain text of the CEA makes clear that the CFTC has exclusive jurisdiction over Kalshi's prediction markets, the extensive history of commodity regulation and the development of the CEA lay bare the shortcomings of each of the State's counterarguments. *See supra* pp.5-19.

First, the State makes several arguments that reduce to one point: its mistaken view that Kalshi's plain reading of the statute would make the CFTC the sole regulator of all sports gambling. Br.33-40. But the district court's plain-text reading held no such thing, Kalshi expressly rejects that argument (Resp.48), and this Court certainly need not adopt such a reading to affirm. *See Flaherty*, 172 F.4th at 228 (explaining, despite New Jersey's "inference upon inference" that all forms of gambling might fall under CFTC preemption, that "far-fetched scenario[]" did not prevent preemption, especially when the "District Court does not so broadly hold"). Indeed, as discussed at length above, States have long raised similar objections against all forms of futures trading. *Supra* pp.5-19. Yet Congress expressly

24

considered and rejected those views when it concluded that federal law, not state gambling law, should govern exchange-traded derivatives.

The State's concern also is misplaced. The CEA preempts state laws only to the extent that they regulate on-exchange trades; it leaves States free to regulate off-exchange transactions like bets offered by sportsbooks. *See* 7 U.S.C. § 2(a)(1)(A) (granting the CFTC "exclusive jurisdiction" over swaps only when they are "traded or executed" on a DCM); 7 U.S.C. § 2(a) (clarifying that "nothing" in Section 2 shall "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws" off-DCM); *id.* § 16(e)(1)(B)(i) ("[n]othing" in the CEA "shall supersede or preempt" state law applied to off-exchange transactions).

Unlike ordinary sports bets, derivatives like swaps are "traded on organized markets and over the counter." *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,217 (Aug. 13, 2012). Nor do the differences end there. Sportsbooks act as the counterparty to every wager and themselves set the odds offered to bettors. By contrast, event contracts are standardized instruments traded on open markets where participants *trade* with each

25

other at prices determined by supply and demand. Because those contracts are transferable (unlike casino wagers) and continuously priced by the market (again, unlike positions a gambler takes), they can serve functions beyond a one-off wager, including price discovery and transferring risk.

The CFTC has exclusive jurisdiction over these on-exchange trades, leaving States ample ability to regulate off-exchange trading. *See, e.g., CFTC v. Erskine*, 512 F.3d 309, 323 (6th Cir. 2008) (explaining that, by definition, futures contracts "can be traded on an exchange"). That leaves gambling at brick-and-mortar casinos, lotteries, pari-mutuel pools, and non-exchange sportsbooks outside the preempted field. Congress intended that division when it granted the CFTC sole jurisdiction over commodities futures precisely *because* Congress sought to preempt state laws that were insufficient and improper to address this new area, *see supra* pp.5-19, but left the remaining gambling-related questions to States. The CFTC does not have exclusive jurisdiction over sports gambling, but does have exclusive jurisdiction over contracts traded on a CFTC-designated exchange. Kalshi's sports-event swaps are the latter and so fall within that preemptive scope.

26

The State next creates a false dichotomy by arguing that Kalshi's sports-event contracts are not swaps because the contracts rely upon a sports "outcome" rather than an "occurrence, nonoccurrence, or extent of the occurrence." Br.25-27 (citing 7 U.S.C. § 1a(47)(A)(ii)). But an "occurrence" is "[s]omething that happens or takes place." Black's Law Dictionary (12th ed. 2024). A team's victory or loss is simultaneously the outcome of a sporting event and an occurrence in and of itself.

States cannot abrogate Congress's long history of granting the CFTC exclusive jurisdiction, *supra* pp.5-19, by redefining the two words as mutually exclusive. The State's contrary view would recreate the very uncertainty Congress sought to eliminate when, after lengthy and specific consideration, it vested exclusive authority in the CFTC. Besides, courts already recognize that contracts turning on outcomes fall within CFTC jurisdiction. *See, e.g.*, *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 32, 35 (D.D.C. 2015). The CFTC itself has long recognized the same: "event contracts may be based on eventualities" such as "the outcome of particular

27

entertainment events." *Concept Release*, 73 Fed. Reg. 25,669, 25,669-71 (May 7, 2008).

Congress also foreclosed another of the State's arguments when it required only a "potential" economic significance, 7 U.S.C. § 1a(47)(A)(ii), which is the functional opposite of the "inherent economic significance" requirement that the State wants to impose, Br.29. The State's implicit effort to read an inherency requirement into the CEA would upend the law's meaning and contradict the CEA's own examples that do not require "inherent" financial or economic events, including a "weather swap" and "an emissions swap." 7 U.S.C. § 1a(47)(A)(iii). Weather and emissions are not "inherently" economic but are "associated" with "potential" financial or economic consequences—just like sporting events.

Also contrary to the State's argument, athletic performances and scores have substantial financial and economic consequences for television networks, streaming services, sponsors, neighborhoods, cities, and many other stakeholders. The State incorrectly argues that sports events lack "economic consequences outside the game itself occurring." Br.29. Ticket

28

and jersey sales, sponsorships, endorsements, television and streaming revenue, investments, tourism, local economic activity, and employment decisions can be driven by a team's win-loss record or by singular individual performers, sometimes revealed in a single game or even a single memorable play. Sports-event contracts are therefore—and at the very least— "associated" with a "potential" for such consequences.

Nor is the State correct to argue that Kalshi's reading of the statute creates surplusage. Br.32-33. Congress intentionally defined swap "broadly," *Phillips*, 155 F.4th at 113—a conclusion self-evident from the statutory text, where Congress provided five different definitions of "swap" to cover a wide variety of financial arrangements. 7 U.S.C. § 1a(47)(A)(i)-(v). Congress then removed any doubt by providing a sixth definition "that is any combination or permutation of, or option on, any agreement, contract, or transaction described in" the other five definitions. *Id.* § 1a(47)(A)(vi).

Those definitions overlap; for example, subsection iv's inclusion of all instruments that "in the future become[] commonly known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv), overlaps with many instruments listed in

29

subsection (iii) that also are defined as swaps, *see id.* The Supreme Court repeatedly has held that "redundancies are common in statutory drafting," including "in a congressional effort to be doubly sure," and do not create "a license to rewrite or eviscerate another portion of the statute contrary to its text." *Barton v. Barr*, 590 U.S. 222, 239 (2020). That principle applies especially to agency-authorizing provisions, where "overlap among various enforcement provisions is not a surprising phenomenon because Congress can reasonably hand agencies a palette sufficiently sophisticated to capture the full spectrum of enforcement possibility." *Ohio Telecom Ass'n v. FCC*, 150 F.4th 694, 717 (6th Cir. 2025) (cleaned up) (citation omitted). This statute is no different and creates no problem for Kalshi.

Kalshi's sports-event contracts "fit comfortably within the statutory definition" of swaps, *Flaherty*, 172 F.4th at 227, and are executed on designated contract markets, thus giving the CFTC "exclusive jurisdiction" over their regulation. 7 U.S.C. § 1a(47)(A). The State's contrary arguments ultimately ask this Court to return to the system Congress expressly preempted: a regime in which States could characterize exchange-traded

30

derivatives as gambling and subject them to divergent local rules. The CEA was enacted, amended, and expanded to prevent exactly that result.

## CONCLUSION

For these reasons, this Court should affirm the district court's preliminary injunction.

Respectfully submitted,

/s/ *Steven P. Lehotsky*

Joshua P. Morrow
LEHOTSKY KELLER COHN LLP
7500 Rialto Blvd., Suite 1-250
Austin, TX 78735
josh@lkcfirm.com

Steven P. Lehotsky
Rick W. Eberstadt
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com

*Counsel for Amicus Curiae*

31

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,531 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky

## CERTIFICATE OF SERVICE

I certify that on June 24, 2026, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky

32