No. 26-5235

# In the United States Court of Appeals for the Sixth Circuit

KALSHIEX LLC,

*Plaintiff – Appellee,*

*v.*

WILLIAM ORGEL, in his official capacity as Chairman of the Tennessee Sports Wagering Council; MARY BETH THOMAS, in her official capacity as the Executive Director of the Tennessee Sports Wagering Council; JONATHAN THOMAS SKRMETTI, in his official capacity as Attorney General of Tennessee,

*Defendants – Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NO. 3:26-CV-00034

## BRIEF OF AMICUS CURIAE THE DIGITAL CHAMBER IN SUPPORT OF PLAINTIFF-APPELLEE

Renato Mariotti
*Counsel of Record*
Holly H. Campbell
Amiri Lampley
Margaret DePoy
PAUL HASTINGS LLP
71 S. Wacker Drive, 45th Floor
Chicago, IL 60606
(312) 499-6005
renatomariotti@paulhastings.com
*Counsel for Amicus Curiae*
*The Digital Chamber*

June 24, 2026

Michael Spafford
PAUL HASTINGS LLP
2025 M Street NW
Washington, D.C. 20036

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

## Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 26-5235          Case Name: KalshiEX LLC v. William Orgel, et al.

Name of counsel:  Renato Mariotti

Pursuant to 6th Cir. R. 26.1,          The Digital Chamber
                                        *Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

| |
|---|
| No |

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

| |
|---|
| No |

### CERTIFICATE OF SERVICE

I certify that on          June 24, 2026          the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Renato Mariotti

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26 .1 on page 2 of this form.

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ........................................................................3

INTRODUCTION............................................................................................5

SUMMARY OF ARGUMENT...........................................................................7

ARGUMENT.................................................................................................10

   I.   THE REGULATOR FOLLOWS THE INSTRUMENT AND THE VENUE, NOT RESEMBLANCE TO A STATE-REGULATED ACTIVITY. ........................................................................................10

      A.   STATES COMPREHENSIVELY REGULATE THE UNDERLYING ACTIVITIES AND OFF-EXCHANGE BUSINESSES, WHILE THE FEDERAL GOVERNMENT EXCLUSIVELY REGULATES DESIGNATED MARKETS................................................................................ 10

      B.   THE LINE WAS RESOLVED AGAINST THE STATES IN THE BUCKET SHOP FIGHT............................................. 12

      C.   THE REGULATOR FOLLOWS FORM AND VENUE, NOT ECONOMIC RESEMBLANCE............................................ 14

      D.   THE CFTC'S DOMAIN HAS NEVER BEEN LIMITED TO FINANCIAL HEDGING, AND EVENT CONTRACTS ARE NOT NEW. ....................................................................... 21

   II.   THE CEA FIELD- AND CONFLICT-PREEMPTS STATE REGULATION OF TRADING ON DESIGNATED CONTRACT MARKETS.................................................................................22

      A.   THE GRANT OF EXCLUSIVE JURISDICTION DEFINES THE FEDERAL FIELD........................................................ 22

      B.   THE OCCUPIED FIELD IS DCM TRADING, NOT GAMBLING. ........................................................................ 26

C.   STATE ENFORCEMENT CONFLICTS WITH THE FEDERAL SCHEME, AND POLICING COMPLIANCE IS FOR THE CFTC. ................................................... 29

III.  THE STATE'S THEORY CANNOT BE CABINED TO SPORTS, AND THREATENS THE FEDERAL REGULATORY FRAMEWORK UPON WHICH A WIDE RANGE OF DERIVATIVES ARE CLEARED AND SETTLED. ..................... 32

A.   NOTHING IN THE STATE'S THEORY IS SPORTS-SPECIFIC. ............................................................ 32

B.   A PATCHWORK OF STATE-BY-STATE REGULATIONS IS INCOMPATIBLE WITH UNIFIED CLEARING, SEGREGATION, AND SURVEILLANCE. .......................... 33

C.   PREEMPTION DOES NOT DEREGULATE, BUT MERELY SELECTS THE REGULATOR. .......................... 36

CONCLUSION ....................................................................37

CERTIFICATE OF COMPLIANCE .........................................39

CERTIFICATE OF SERVICE ...............................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago,*
977 F.2d 1147 (7th Cir. 1992) ..........................................................27

*Arizona v. United States,*
567 U.S. 387 (2012)..........................................................................23

*Board of Trade of Chicago v. Christie Grain & Stock Co.,*
198 U.S. 236 (1905)....................................................................11, 12

*CFTC v. Co Petro Mktg. Grp.,*
680 F.2d 573 (9th Cir. 1982) ...........................................................16

*Chicago Mercantile Exchange v. SEC,*
883 F.2d 537 (7th Cir. 1989) ...........................................................17

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000)..........................................................................23

*Dayton Power & Light Co. v. FERC,*
126 F.4th 1107 (6th Cir. 2025)....................................................22, 23

*Geier v. Am. Honda Motor Co.,*
529 U.S. 861 (2000)..........................................................................27

*Hunter v. FERC,*
711 F.3d 155 (D.C. Cir. 2013)......................................................21, 24

*KalshiEX LLC v. Orgel,*
No. 3:26-CV-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19,
2026) ................................................................................................34

*KalshiEX, LLC v. Flaherty,*
172 F.4th 220 (3d Cir. 2026) (Roth, J., dissenting)..........................25

*Murphy v. NCAA,*
584 U.S. 453 (2018).........................................................................26

1

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ...............................................................15

**STATUTES**

7 U.S.C. § 6a ...............................................................................34

7 U.S.C. § 6d ...............................................................................33

7 U.S.C. § 7(d) .......................................................................34, 35

7 U.S.C. § 7a-1 ...........................................................................32

7 U.S.C. § 7a-2(c)(5)(C) .............................................................19

7 U.S.C. § 7a-2(c)(5)(C)(i) ....................................................25, 28

7 U.S.C. § 16(e)(1) ......................................................................26

7 U.S.C. § 16(e)(2) .................................................................18, 26

7 U.S.C. § 16(h) ..........................................................................18

15 U.S.C. § 78bb(a)(3) .................................................................18

16 U.S.C. § 824(b)(1) .....................................................................9

18 U.S.C. § 1960(a), (b)(1)(A) ....................................................10

31 U.S.C. § 5362(1)(E) ................................................................18

205 Ill. Comp. Stat. 658/5-1 .......................................................10

Commodity Exchange Act § 2(a)(1)(A) ................................*passim*

Tenn. Code Ann. § 29-19-101 ......................................................33

**REGULATIONS**

17 C.F.R. § 38 .......................................................................31, 35

91 Fed. Reg. 35806 ......................................................................29

## INTEREST OF AMICUS CURIAE[1]

On its face, this case concerns sports event contracts. But if a state may prohibit a contract listed on a CFTC-designated market because it references an activity the state regulates in other contexts, the same authority reaches an entire class of event contracts that the CFTC has overseen for years, as well as the integrated infrastructure on which those contracts are traded, cleared, and settled. The answer this case requires will shape the regulation of federally listed derivatives far beyond sports.

The Digital Chamber ("TDC") is the world's largest trade association for the digital asset and blockchain industry, with more than 250 members. Its members include firms that build, operate, and rely on the federally registered market infrastructure—designated contract markets ("DCMs") and derivatives clearing organizations ("DCOs")—through which event contracts and other CFTC-regulated derivatives are

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel certifies that no entity or person, aside from amicus curiae or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief, that undersigned counsel authored the brief in full, and that all parties have consented to the filing of this brief.

3

listed and cleared.  TDC members have ordered their affairs around a settled understanding: that designation by the CFTC confers nationwide authority to list and clear contracts within the agency's exclusive jurisdiction, free of a state-by-state veto.  The State's theory would unsettle that understanding, and TDC has a direct interest in its rejection.

TDC submits this brief to supply context beyond that provided by the parties: the century-long history of state efforts to reach exchange-traded instruments by treating them as the equivalent of activities the states regulate, the principles that have resolved those efforts against the states, and the operational realities of modern market infrastructure that make a patchwork of state regulation unworkable.  TDC respectfully urges the Court to affirm.

## INTRODUCTION

Not long ago, the owner of a Miami condominium bracing for hurricane season could manage that risk in at least three different ways—by purchasing a windstorm policy from a state-licensed insurer, a Hurricane Index contract on the Chicago Mercantile Exchange under the exclusive jurisdiction of the CFTC, or a catastrophe bond governed by the federal securities laws.

Today, there is another option: contracts listed on CFTC designated contract markets and payable when a particular hurricane reaches shore. This singular risk can be hedged by four instruments from three distinct regulators. That is not a loophole or an accident. The fundamental design of U.S. financial regulation is that the regulator follows the instrument and the venue, not the economic function.

The State contends that the Commodity Exchange Act (the "Act") does not preempt its sports-wagering law—that the Act's occupied field does not reach trading on these markets. Appellant's Br. 43-61. But if the Act's grant of exclusive jurisdiction leaves the states free to regulate contracts traded on a DCM, it leaves every state regulator free to reach any contract that references an activity it oversees.

5

For example, a state insurance commissioner regulates the transfer of risk from severe weather.  Accepting the State's position, that insurance commissioner could reach the CFTC-regulated weather derivatives traded on CME that transfer the same risk.  A public utility commission regulates retail electricity sales, so it could reach electricity futures.  A banking department licenses currency exchanges, so it could reach currency futures.  The State's reading of the Act would hand every state regulator of an activity underlying a derivative concurrent authority over the federal markets on which those instruments trade.

The profound implications of the State's reading demonstrate that it is incorrect.  No insurance commissioner regulates weather futures.  No banking department regulates currency futures.  No utility commission regulates power futures.  A state's authority over an underlying activity has never carried authority over the federally regulated instruments that reference it.  That is because the regulatory line is drawn based on venue and instrument, not underlying function.  States regulate underlying functions and corresponding businesses, such as casinos, insurers, and currency exchanges.  The federal government

6

exclusively regulates the federally designated markets on which standardized instruments referencing those activities trade.

A ruling for Kalshi does not deregulate gambling. Every sportsbook or casino remains fully subject to state law. The CFTC's jurisdiction reaches only transactions conducted on, or subject to the rules of, a federally designated market. A ruling against the State merely identifies which sovereign regulates federally designated markets and leaves the State's authority over every other venue untouched.

By contrast, the State's theory threatens to dismantle a class of federally regulated instruments *and* threatens a federal regulatory framework upon which a wide range of derivatives are traded, cleared, and settled. Amicus submits four reasons why the Act forecloses that result.

## SUMMARY OF ARGUMENT

Each of the four reasons rests on a single principle—that federal financial regulation assigns an instrument to its regulator by its form and its venue, not by the activity it resembles.

First, the regulatory structure that the State attacks is nearly as old as futures trading itself. A century ago, states condemned exchange

contracts settled on the difference in price on things like corn and wheat as wagers, on the very theory the State presses now. When that theory reached the Supreme Court, the Court called it an "extraordinary and unlikely proposition" to treat the dealings of futures markets as "mere wagers." Congress then drew the federal line, placing on-exchange trading under exclusive federal authority. That line has never turned on resemblance because many derivatives resemble something states regulate. The State does not ask this Court to draw a new line. It asks the Court to erase the well-settled one.

Second, the State is wrong about how far the CFTC's domain reaches. The State claims that the swap definition is confined to financial hedging. Whether these contracts are swaps is for the parties—Amicus does not parse the definition, and assumes event contracts are swaps for purposes of this brief. But the State's premise—that the CFTC's reach runs only to hedging instruments—is false.

The CFTC has long overseen contracts that pay on non-financial events. Weather and temperature derivatives are the clearest examples. A hurricane-index contract pays a holder who owns nothing and has lost nothing. And a contract that settles in cash is not a wager. It is the

8

ordinary form of the modern derivative, from the first Eurodollar future in 1981, to the digital-asset futures the CFTC now regulates. The breadth the State calls a novel and unauthorized expansion has been federal ground for a generation.

Third, once these contracts are traded on a designated contract market, the Commodity Exchange Act preempts the State's law, by field and by conflict. The Act grants the CFTC exclusive jurisdiction over the trading executed on those markets. That grant fixes the boundary of the field Congress placed under exclusive federal control, and field and conflict preemption follow.

The statutory grant is exclusive of everyone. It has ousted even a federal energy regulator armed with its own statute and a genuine interest in the price of natural gas. A clause that displaces a coordinate federal agency surely displaces a state one. And the occupied field is trading on designated markets, not gambling. Conflict preemption is just as plain. Whether a gaming-related event contract may be listed is a judgment Congress gave to the CFTC, made through a federal process subject to judicial review.

9

Fourth, the State's theory cannot be confined to sports, and it cannot be reconciled with the markets it would govern. Nothing in the theory is sports-specific—it reaches every event contract on a designated market, and every state regulator behind one. The theory is not only wrong in law. It is impossible in operation. A federal derivatives market is one national market, not fifty. A derivatives contract on a federally regulated exchange cannot be lawful for a trader in one state and a crime for one in another state in the same anonymous book. A clearinghouse cannot cut one State's slice out of a netted, mutualized book.

Affirmance takes nothing from the States. They keep their casinos and their sportsbooks. Preemption here creates no vacuum. It names the regulator Congress chose for transactions on federally regulated exchanges.

## ARGUMENT

## I. THE REGULATOR FOLLOWS THE INSTRUMENT AND THE VENUE, NOT RESEMBLANCE TO A STATE-REGULATED ACTIVITY.

### A. States comprehensively regulate the underlying activities and off-exchange businesses, while the federal government exclusively regulates designated markets.

Selling insurance without a state license has been penalized—often

criminally—since long before the enactment of the Commodity Exchange Act. Yet for decades, anyone—licensed or not, able to obtain insurance or not—could transfer the very same risk on a federally designated market using a weather or temperature derivative, outside the reach of state insurance law. *See* CME Group, *Weather Options Overview* (Nov. 15, 2016), CME Group, https://www.cmegroup.com/education/articles-and-reports/weather-options-overview.

Insurance is not unique in that respect. The same is true of electricity, which cannot be sold at retail without a state certificate, even though futures contracts referencing the same underlying commodity are traded every day on CFTC-designated contract markets. *See, e.g.*, 16 U.S.C. § 824(b)(1) (expressly reserving the regulation of retail electricity sales to the states by limiting federal jurisdiction to the transmission and sale of electric energy at wholesale).

Currency exchanges and money transmission are also regulated by states. No one may exchange money for a fee or operate a money transmitting business without a state license, although the currency-based derivatives traded on the Chicago Mercantile Exchange are some

of the most liquid markets in the world. *See, e.g.*, 205 Ill. Comp. Stat. 658/5-1; 18 U.S.C. § 1960(a), (b)(1)(A).

In all these cases, what separates the state-licensed activity from the federally regulated instrument is not the nature of the risk, which is identical, but the venue on which it changes hands. The field that the federal government occupies is the designated market on which standardized instruments trade—not insurance, not electricity, not currency exchanges, and not the underlying event. The states regulate the activity and the businesses that conduct it off the exchange. The federal government regulates the exchange. The courts and Congress have drawn that line clearly throughout history. Now, the State asks this Court to blur (or erase) that line.

### B. The line was resolved against the States in the bucket shop fight.

The argument that gaming should be the lone exception to this line is particularly implausible given its history. The rule stems, in part, from a century old gaming fight brought about by the original state anti-gambling laws.

By the turn of the 20th century, states across the country enacted "bucket-shop" laws that condemned contracts settled on the difference in

a price as wagers. Eventually, these laws were turned against the organized exchanges on a theory similar to the one the State presses today. In *Board of Trade of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236 (1905), the Board sued to stop bucket shops from misappropriating the price quotations its trading generated. The bucket shops responded by arguing that the Board's own contracts were illegal gambling under the Illinois bucket-shop statute, so the quotations were not protectable. *Id.* at 246.

Writing for the Court, Justice Holmes called it "an extraordinary and unlikely proposition that the dealings which give its character to the great market for future sales in this country are to be regarded as mere wagers," and described such speculation as "the self-adjustment of society to the probable," valuable for "avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Id.* at 247. *Christie* indicates the Supreme Court's reluctance to brand organized exchange trading as gambling, and its recognition of speculation's public value, years before Congress brought derivatives trading under federal authority.

13

Building on the distinction Justice Holmes made in *Christie*, Congress placed trading on federally designated markets under exclusive federal authority while leaving the off-exchange business to the states. The State forgets (or ignores) this history and now risks repeating it.

## C.   The regulator follows form and venue, not economic resemblance.

Consider again the Miami condominium owner who had four options to manage the same risk. What separates those options is not the risk—which is identical—but the structure of each instrument, and the structure is what assigns the regulator. The windstorm policy answers to the state insurance commissioner, the catastrophe bond to the SEC, and the hurricane-index future and event contract both to the CFTC. The two derivatives share a regulator not because they pay out when the same hurricane hits, but because they share an exchange-traded form.

There are four different instruments with three regulators, each managing one risk. Again, that is not an accident but a product of the intentional design of U.S. financial regulation.

The windstorm policy is a contract of indemnity, payable only to someone with an insurable interest in the property and only for a proven

14

loss.  Recovery is capped at the actual loss—you cannot insure a $400,000 condo for $1 million and collect the difference—precisely so the policy gives its holder no reason to cause or facilitate the loss.  The insurer answers to the state insurance commissioner, whose central concern is whether the insurer will be able to pay claims when the storm comes.

The Chicago Mercantile Exchange hurricane index contract was the mirror image of the windstorm policy.  It required no insurable interest and indemnified nothing, paying on a measured index whether or not the holder lost anything.  Chicago Mercantile Exchange, *CME Hurricane Index Seasonal Binary Contract,* CME Rulebook, Chapter 427B, https://www.cmegroup.com/rulebook/CME/IV/400/427B/427B.pdf.    The price of the hurricane index contract was determined by market forces on a DCM rather than written by a single insurer, so it answered exclusively to the CFTC, whose concern is not solvency but market integrity, policed through surveillance and position limits.

The catastrophe bond inverts the structure of the transaction once more.  In a catastrophe bond, the investor *sells* protection, forfeiting principal if the hurricane makes landfall in exchange for an above-market coupon if it does not.  *See* U.S. Gen. Accounting Office, GAO-02-

941, Catastrophe Insurance Risks: The Role of Risk-Linked Securities and Factors Affecting Their Use (2002).  Because it is sold as a security, it answers to the federal securities laws, whose concern is not the insurer's reserves or the exchange's surveillance but the investor relationship.

One hurricane with three different instruments and three different regulators.  The same hurricanes are faced by the owner who insures his condo, the trader who purchases the index contract, and the investor who buys the bond.  But they are regulated in three different ways by three different entities.  The risk does not change across the instruments, nor does the economic function performed by each instrument.  What changes is the structure of the instrument and the market in which it trades, and that—not the risk or its resemblance to some other instrument—is what assigns the regulator.

This principle extends across the U.S. financial regulatory landscape.  The same dollar of savings can be a bank deposit under the bank regulators or a money-market fund under the SEC.  The same corporate borrowing is a bank loan or an economically identical bond.  The regulator depends on which instrument the parties choose.

16

Resemblance cannot be what places an instrument inside or outside the CFTC's domain for a structural reason. A derivative is defined by reference to something else, so it always resembles whatever it references. A weather derivative resembles property insurance. A total return swap resembles owning the stock. Index futures resemble owning the index.

In the field of derivatives, resemblance is not the exception—it is the universal condition. The State treats these contracts as "instruments of sports gambling, not financial derivatives," Appellant's Br. 24, but almost every derivative resembles some activity a state regulates, and that resemblance has never removed it from the federal domain. If it did, Congress's determination to accord the CFTC exclusive jurisdiction of swaps and futures traded on DCMs would be defeated.

The State may respond that financial regulation does look past form to economic substance, and it can cite a line of cases in support of that proposition. For example, in defining what is a "security," the Supreme Court has long held that "form was disregarded for substance and emphasis was placed upon economic reality." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946). Commodities law has a similar line of cases in

17

which courts examine a transaction's substance to determine if it is a regulated futures contract. *See, e.g., CFTC v. Co Petro Mktg. Grp.*, 680 F.2d 573, 581 (9th Cir. 1982).

But those cases answer a different question. Economic substance governs *classification*—in other words, whether an instrument is a "security" or a "swap." Whether these contracts are "swaps" is for the parties. Amicus does not parse that definition here, taking the contract's status as the district court found it. One feature of the State's reading still warrants a response, because it underlies both the swap argument and the clear-statement canons—the assumption that the CFTC's authority runs only to instruments used for financial hedging.

Accordingly, we address the issue of *allocation*—once an instrument is a swap traded on a DCM, and thus within the CFTC's exclusive jurisdiction, may a different sovereign reach it by recharacterizing it based on what it economically resembles? On that question, the line of cases discussed above is silent, and for good reason. All of them used substance to bring an instrument *within* a federal regulatory regime. None of them used substance to let one regulator

18

override another's classification, nor did they ever let a state pierce a federally classified instrument's character and venue.

When the allocation question has been litigated, courts affirmed the exclusive jurisdiction of the CFTC to regulate instruments on designated contract markets, even where an instrument arguably falls within two regulators' domains at once. In *Chicago Mercantile Exchange v. SEC*, 883 F.2d 537 (7th Cir. 1989), the instruments—called "index participations"—were engineered to deliver stock index exposure and thus bore attributes of both securities and futures. *Id.* at 539–540. The court found the instrument to be "no less a future than it is a security, and no more"—yet held that "[i]f an instrument is both a security and a futures contract, the CFTC is the sole regulator[.]" *Id.* at 539, 546.

If economic resemblance could not move an exchange-traded future into the SEC's domain even when the instrument itself is a security, it cannot pull an exchange-traded event contract into a state gaming regulator's domain merely because it resembles a wager. Indeed, the SEC was a federal agency with its own federal statute, not a state regulator with no federal statute at all.

19

Even in the methodology the State asks this Court to adopt, the existence of a comprehensive regime—here, the CFTC's exclusive authority over exchange-traded derivatives—weighs against a second regulator reaching the instrument.  When state insurance regulators argued that credit default swaps were "really" financial-guaranty insurance, based on their identical economic effect, Congress answered categorically in Dodd-Frank—a swap "shall not be considered to be insurance" and "may not be regulated as an insurance contract under the law of any State."  7 U.S.C. § 16(h).

Likewise, when the argument was that exchange-traded options were "really" wagers, Congress drew the same line in the securities and commodities laws and then reinforced that line again in the Unlawful Internet Gambling Enforcement Act, 15 U.S.C. § 78bb(a)(3); 7 U.S.C. § 16(e)(2); 31 U.S.C. § 5362(1)(E).  And when Congress addressed event contracts that might involve gaming, it neither excluded them nor preserved state authority over them.  Instead, it bestowed discretionary review power in the CFTC, clearly acknowledging its intent that the CFTC's exclusive jurisdiction over all exchange-traded futures and swaps

20

extended to exchange-traded derivatives of the nature of "event contracts." 7 U.S.C. § 7a-2(c)(5)(C).

### D.    The CFTC's domain has never been limited to financial hedging, and event contracts are not new.

The State's argument rests on a premise that the CFTC's domain runs only to instruments used for financial hedging. Appellant's Br. 20. The hurricane index contract refutes that premise. It pays a speculator who owns nothing and has hedged nothing, on a measured index, for reasons having nothing to do with hedging a financial exposure.

For decades, the CFTC has overseen contracts that pay on occurrences outside the financial markets. S*ee supra* Part I.A. A contract keyed to a non-financial event is a long-settled feature of the markets that the CFTC regulates. The breadth the State treats as a recent and unauthorized expansion has been part of the CFTC's domain for a generation.

The old objection, that a cash-settled contract is a "mere wager," did not survive. The modern cash-settled contract dates to 1981, when the Chicago Mercantile Exchange introduced Eurodollar futures—the first cash-settled futures contract, settled against an interest-rate number with nothing delivered. CME Group, *CME Celebrates 25th Anniversary*

21

*of Benchmark CME Eurodollar Futures Contract*, CME Group (Dec. 5, 2006), https://www.cmegroup.com/media-room/press-releases/2006/12/05/cme_celebrates_25thanniversaryofbenchmarkcmee urodollarfuturescon.html.  Cash settlement is now the rule and not the exception: stock-index futures, volatility futures, and digital-asset futures all pay the difference on a number rather than deliver anything. The settlement structure the State calls gambling is the ordinary structure of the instruments traditionally regulated by the CFTC.

## II. THE CEA FIELD- AND CONFLICT-PREEMPTS STATE REGULATION OF TRADING ON DESIGNATED CONTRACT MARKETS.

### A. The grant of exclusive jurisdiction defines the federal field.

In 1974, Congress created the CFTC and granted "exclusive jurisdiction" to it precisely to end the jurisdictional debate that came before it and install a single expert regulator.  Section 2(a)(1)(A) of the Commodity Exchange Act grants the CFTC "exclusive jurisdiction" over transactions involving swaps and futures "traded or executed on" a designated contract market.  7 U.S.C. § 2(a)(1)(A).  That grant defines the federal field.  That field is fixed by venue and instrument—the

trading "executed on" a designated contract market—not by the underlying subject of the contract.

This hard statutory line held even when challenged by another *federal* agency. The Federal Energy Regulatory Commission sought to sanction a trader for manipulating natural gas futures on the New York Mercantile Exchange, which is a DCM. Although FERC has its own federal anti-manipulation statute and a clear interest in regulating natural gas prices, the D.C. Circuit held that because the conduct occurred on a CFTC-regulated exchange, § 2(a)(1)(A) gave the CFTC exclusive jurisdiction and FERC had none. *Hunter v. FERC*, 711 F.3d 155, 157-58 (D.C. Cir. 2013).

The State reads § 2(a)(1)(A) narrowly, contending that the clause does no more than "clarify that the CFTC, and not the SEC, enforces" the Act. Appellant's Br. at 21. *Hunter* forecloses that reading. The agency ousted there was neither the CFTC nor the SEC, but FERC—a third federal regulator wielding its own statute. Had the clause merely sorted enforcement between the CFTC and the SEC, it could not have stripped FERC of authority it otherwise possessed. The clause makes the CFTC's authority over transactions on a designated contract market exclusive of

23

all others.   A clause that excludes a coordinate federal regulator necessarily excludes a state one.

The State's lead authority points the other way.  It relies on *Dayton Power & Light Co. v. FERC*, 126 F.4th 1107 (6th Cir. 2025), in which this Court held that the Federal Power Act did not preempt an Ohio law requiring certain utilities to join a regional transmission organization. But *Dayton Power* turned on a feature of the Federal Power Act that the Commodity Exchange Act does not share.  This Court found no occupied field precisely because "the FPA's text does not grant FERC *exclusive* jurisdiction over interstate transmission facilities" and instead "recognizes states' role in transmission regulation." *Id.* at 1129. (emphasis in original).  The provisions on which the utilities relied, the Court explained, "teem with references to state involvement."  In them, "Congress, in a single sentence, both granted and limited FERC's jurisdiction." *Id.*

Section 2(a)(1)(A) is the opposite kind of statute.  It does not divide authority over trading on a designated contract market and write the States into the text.  Instead, it grants the CFTC exclusive jurisdiction over that trading and preserves state authority only beyond the exchange

door.  *Dayton Power* thus supplies the very distinction that decides this case.  Where Congress grants one regulator exclusive jurisdiction over a field, the field is occupied and field preemption follows.  Where Congress instead splits authority and writes a continuing role for the States into the statute, it does not.

The State's first move is to deny that Section 2(a)(1)(A) is an express-preemption provision, but neither the district court nor Amicus relies on express preemption.  "[T]he existence of conflict cognizable under the Supremacy Clause does not depend on express congressional recognition that federal and state law may conflict."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 388 (2000).  Rather, Congress's express grant of "exclusive jurisdiction" establishes total federal authority over the swaps and derivatives market, triggering the dual doctrines of implied preemption that do the displacing.  Where Congress has occupied a field, state regulation within it falls by field preemption. *Arizona v. United States*, 567 U.S. 387, 399 (2012).  Where state law obstructs the federal scheme, it falls by conflict preemption.  *Id.*

If the term "jurisdiction" carries "many, too many, meanings," here the meaning is regulatory.  Appellant's Br. 45.  Section 2(a)(1)(A) confers

25

exclusive authority to regulate the transactions executed on a designated contract market.  A presumption that two sovereigns may share the power to adjudicate does not decide whether Congress placed the regulation of a market under one agency alone.  And insofar as Appellant reads the clause to do no more than sort enforcement between the CFTC and the SEC, *Hunter* is again the answer: the clause displaced a federal regulator that was neither.

### B.    The occupied field is DCM trading, not gambling.

The State urges this Court to apply a "'strong presumption' against preemption," dubbing the trading occurring on a designated contract market "*intrastate* sports wagering" and invoking a tradition of state control.  Appellant's Br. at 44, 51 (emphasis in original).  But fields are defined by what Congress regulated, and in the CEA it regulated trading *markets*, not the underlying activities corresponding to contracts traded on those designated contract markets.

The fact that the underlying activities are themselves traditional subjects of state regulation has never changed the relevant field.  Farming, energy, and currency exchanges are each regulated by states,

but the CEA's field has always been the exchange, not the corn field, oil rig, or teller's window. This issue is no different.

The presumption relied upon by the State is therefore not triggered. The State reaches that presumption only by naming the field for its underlying subject instead of for the activity the statute regulates. That is the same error, at the level of the whole statute, that the bucket shops made transaction by transaction.

The State, echoing Judge Roth's dissent in the Third Circuit's *Flaherty* decision, argues that the trading here occupies only a narrow subfield—gaming on designated contract markets—that Congress declined to occupy even as it occupied futures trading at large, and it reads the Act's gaming-specific provisions as proof Congress meant to leave that subfield to the States. *See KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 236–37 (3d Cir. 2026) (Roth, J., dissenting).

The State's inference runs backward. The Special Rule provides that the CFTC "may determine" whether an event contract involving gaming is contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i). A statute directing a federal agency to decide whether gaming contracts may be listed on a designated market occupies that subfield; it does not

27

reserve it to the states. Congress placed the gaming determination inside the field and assigned it to the Commission—the surest sign the subfield is federal.

The State also argues that the Act's savings provisions leave the field too porous to be occupied. Appellant's Br. at 46–47, and 49–51. The Act does preserve state authority—gaming, bucket-shop, and antifraud laws applied to transactions not conducted on a registered entity. 7 U.S.C. § 16(e)(1)-(2). But each preserved power operates outside of CFTC-designated markets. The savings provisions keep the states in command of casinos, sportsbooks, and bookmakers and stop at the exchange door. The State relies heavily on *Murphy v. NCAA*, 584 U.S. 453 (2018), which is an anti-commandeering decision that struck down a federal law that dictated to state legislatures that they could not authorize sports gambling. Yet nothing in *Murphy* insulated gambling from federal laws of general applicability. In fact, the Supreme Court held the federal law in question was "not a preemption provision" because it did not involve "regulation of private actors." *Id.* at 479–481.

The Commodity Exchange Act meets that requirement. It is everything that the law in *Murphy* was not—a comprehensive statute

28

that regulates private actors such as exchanges, intermediaries, and traders—and confers rights and duties on them.

### C. State enforcement conflicts with the federal scheme, and policing compliance is for the CFTC.

In *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, the Seventh Circuit held that the Commodity Exchange Act preempted the application of state law to the conduct of business on a designated contract market. 977 F.2d 1147, 1156–57 (7th Cir. 1992). Whatever debate there can be at the outer edges of § 2(a)(1)(A) does not exist where "application of state law would directly affect trading on or the operation of a futures market," as is the case here. *Id.* at 1156. A state law forbidding a designated contract market from listing a contract the CFTC permits does not run parallel to the federal scheme—it conflicts with it, recreating the patchwork that exclusive federal jurisdiction was enacted to end.

A federally regulated event contract listed on a DCM cannot be criminalized under state law merely because a state regulator reaches a different policy judgment regarding the same conduct. That is obstacle preemption in its purest form. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000) (finding obstacle preemption where state law

29

presented an "obstacle to the accomplishment and execution of" the full purposes and objectives of Congress).

The State cannot have it both ways. Rule 40.11 governs event contracts listed on designated contract markets. To invoke Rule 40.11 is to concede that these contracts are event contracts within the CFTC's domain—the premise the State denies when it argues they are not swaps. And if they fall outside that domain, Rule 40.11 provides no prohibition for the State.

Congress vested the CFTC with the authority to resolve questions related to gaming-related event contracts through a unified federal regulatory process. Under the Special Rule, the CFTC "*may determine*" that event contracts involving enumerated categories such as, "activity that is unlawful under any Federal or State law, terrorism, assassination, war, or gaming" are contrary to the public interest. § 7a-2(c)(5)(C)(i) (emphasis added).

Notably, Congress did not define what "contrary to the public interest" means or prescribe a self-executing ban. Instead, the Special Rule acts as a channeling provision, establishing a CFTC-administered public-interest review mechanism under which enumerated activities

30

inform—rather than categorically prohibit—whether a contract may be listed for trading.

The Commission has proposed to refine the standards governing the Rule 40.11 public-interest review. 91 Fed. Reg. 35806 (June 12, 2026). That the contours of the prohibition are being set by the agency Congress charged with the question, through a federal rulemaking, underscores that whether a given contract falls within Rule 40.11 is a federal determination—not one a state may make for itself by recharacterizing the contract as gambling.

Reading the enumerated activities as categorically prohibited would effectively nullify the statute's public-interest inquiry and deprive the CFTC of its review authority. Moreover, the inclusion of state-law illegality as an enumerated category of event contract that the CFTC may determine is contrary to the public interest is evidence that Congress intended for state law to inform the federal determination of what is permitted, not replace the CFTC's independent judgment.

The State's "works in tandem" argument assumes that the dispositive question is whether sports event contracts constitute gambling. It is not. The relevant inquiry is whether event contracts

31

listed on a DCM fall within the CFTC's exclusive jurisdiction. The flaw in the State's position is that it conflates the subject matter of a contract with the contract itself. Although sports wagering is traditionally regulated by the states, federally listed sports event contracts are instruments traded on a CFTC-regulated exchange—the fact that the transaction involves a sporting event does not change the fact that it is a federally regulated financial instrument.

## III. THE STATE'S THEORY CANNOT BE CABINED TO SPORTS, AND THREATENS THE FEDERAL REGULATORY FRAMEWORK UPON WHICH A WIDE RANGE OF DERIVATIVES ARE CLEARED AND SETTLED.

### A. Nothing in the State's theory is sports-specific.

The contracts in this case reference sporting events, but nothing in the State's theory turns on that. The State's position rests on two premises: that these contracts are not "swaps," because a sporting event carries no economic consequence of the kind the State reads into the statutory definition, and that the Act's grant of exclusive jurisdiction leaves a presumption of concurrent state authority over contracts traded on a designated contract market. Appellant's Br. 20, 28–29, 44–51.

Neither of these premises is confined to sports. If a contract falls outside the swap definition because the event it references has no

32

economic significance beyond itself, the same must be said of many contracts keyed to a non-financial occurrence, such as a weather event, which the CFTC has listed and overseen for years.

The second premise reaches just as far. If the Act's grant of exclusive jurisdiction left a State free to regulate a contract traded on a designated contract market whenever it references an activity the State oversees, then every state that regulates an underlying activity could reach the federal contracts that reference it—sweeping in, as shown above, the CFTC-regulated weather, electricity, and currency derivatives that transfer the same risks. The authority the State claims for its gaming regulator it claims, by the same logic, for every state regulator of every underlying activity.

## B. A patchwork of state-by-state regulations is incompatible with unified clearing, segregation, and surveillance.

The federal derivatives market is not fifty markets that share a rulebook—it is one national market. A contract listed on a designated contract market subject to approved rules clears through a single clearinghouse, is margined against a single pool of segregated customer funds, and settles under one set of federal rules. *See generally*, 17 C.F.R.

33

§ 38. A state prohibition is mechanically incompatible with the federal market, which surfaces at every stage of a trade.

Transactions on a federally regulated DCM are conducted pursuant to the rules, and transactions are executed based on market criteria—not based on the state in which a participant lives. A listed contract trades in one anonymous order book, at one national price, among participants whose location the book does not see. It cannot be lawful for some of them and criminal for others. To implement such a system, the exchange would have to screen orders by location—abandoning the anonymous, continuous market the system requires—or match trades it cannot lawfully match.

The trade then clears through a DCO, which becomes the buyer to every seller and the seller to every buyer and holds one matched book, mutualizing default risk across every clearing member. *See* 7 U.S.C. § 7a-1. If a state voids the positions its residents hold, the clearinghouse is left holding the opposite side with no enforceable counterparty, and the cost of closing that exposure falls on default resources shared by members in every State. A clearinghouse cannot cut one state's slice out of a netted, mutualized book.

34

Additionally, the clearinghouse does not margin contract-by-contract but rather nets risk across each participant's entire positions, a computation that assumes every position is enforceable—and a valid position cannot be netted against one a state has voided. Customer margin, in turn, sits in a single omnibus pool under the federal segregation regime. *See* 7 U.S.C. § 6d. A patchwork regulatory system would force firms to carve up by state and by each contract's local status, customer by customer.

The collision is sharpest at settlement. Cleared positions are marked to market and settled in cash daily, so money moves between counterparties across the market long before any contract expires. When they expire, the transaction is final and guaranteed by the clearinghouse. The State's law declares wagers void and unenforceable and would void existing positions. Tenn. Code Ann. § 29-19-101. Applied to a listed contract, it would unwind a completed, federally guaranteed transaction and require clawing back settlements already paid throughout the system. A position cannot be simultaneously final under federal law and void under state law.

35

The same fracture runs through oversight, because the CFTC enforces position limits and polices manipulation against aggregated positions—a patchwork of voided and excluded positions would fragment. 7 U.S.C. § 6a.  The State's law dismantles the machinery the system runs on—federally regulated market, one clearinghouse, one pool of segregated margin, final settlement, one national view of the market.

### C. Preemption does not deregulate, but merely selects the regulator.

The State urges, and the district court acknowledged, that preemption raises consumer-protection concerns.  *See KalshiEX LLC v. Orgel*, No. 3:26-CV-00034, 2026 WL 474869 at *11, n. 20 (M.D. Tenn. Feb. 19, 2026).  The concern is understandable, but it rests on a false premise. A ruling that the CEA preempts the State's gaming law as to event contracts traded on CFTC-registered exchanges does not deregulate these markets—it identifies the CFTC as their exclusive regulator.

Congress established a strong and robust federal framework of 23 core principles, with which every DCM must comply.  7 U.S.C. § 7(d).  In establishing these core principles Congress did not say "in consultation with the states" because this framework must be set at the federal level to work.

36

The core principles and required DCM rules are comprehensive and address key functions that operate at the federal market level—execution, clearing and settlement, customer-fund protection, position limits, market surveillance and enforcement, emergency authority, governance, and system safeguards. *Id.*; 17 C.F.R. § 38.

## CONCLUSION

The line separating the federally regulated exchange from the activity its contracts reference is older than the CFTC, and it is drawn by instrument and venue, not by resemblance. Affirming the district court's decision does not deregulate gambling, because the states retain their full authority over casinos or sportsbooks. The Commodity Exchange Act solely preempts state regulation of trading on markets the CFTC regulates, by field and by conflict. Accordingly, the judgment of the district court should be affirmed.

37

Respectfully submitted,

*/s/ Renato Mariotti*

Renato Mariotti
*Counsel of Record*
Holly H. Campbell
Amiri Lampley
Margaret DePoy
PAUL HASTINGS LLP
71 S. Wacker Drive, 45th Floor
Chicago, IL 60606
(312) 499-6005
renatomariotti@paulhastings.com

Michael Spafford
PAUL HASTINGS LLP
2025 M Street NW
Washington, D.C. 20036

June 24, 2026

*Counsel for Amicus Curiae*
*The Digital Chamber*

38

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 6,465 words, excluding parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Century Schoolbook font.

/s/  *Renato Mariotti*

June 24, 2026

39

## CERTIFICATE OF SERVICE

I hereby certify that, on June 24, 2026, I caused a true and correct copy of the foregoing brief to be filed with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/  *Renato Mariotti*